IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 07-cv-00630-DME-MEH

NETQUOTE INC, a Colorado corporation,

    Plaintiff,

v.

BRANDON BYRD, an internet user making use of the IP Addresses 64.136.27.226 and 64.136.26.227, and

MOSTCHOICE.COM, INC., a Georgia corporation

    Defendants.

**THIRD AMENDED COMPLAINT**

Plaintiff NetQuote Inc ("NetQuote"), through its counsel with Faegre & Benson LLP, for its Third Amended Complaint in this civil action, the first amendment however since removal of this matter to federal court, states as follows:

**Introduction**

1.    This case seeks monetary and injunctive relief for the deceptive conduct and unfair competition by the defendants in interfering with NetQuote's business through submissions of false customer information to NetQuote's websites and through false advertising and promotion aimed at harming NetQuote's reputation and appropriating NetQuote's relationships with its base of insurance brokers and agents. Through their false submissions, which impersonated the actual names and addresses of living persons, as well as through false advertising and promotion about NetQuote, the defendants have caused substantial harm to

NetQuote's relations with its own customers and to NetQuote's good will and business reputation in the industry of lead generation for insurance brokers.

### Jurisdiction and Venue

2. This diversity action was removed to this Court by notice of Defendant Brandon Byrd under 28 U.S.C. § 1441(a). This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 with respect to the federal claim, and 28 U.S.C. §§ 1332(a)(1) and 1367(a) with respect to the state-law claims.

3. This Court may exercise *in personam* jurisdiction over the non-resident defendants under Colo. Rev. Stat. § 13-1-124 and the Due Process Clause of the Fourteenth Amendment of the United States Constitution because the defendants have transacted business within the State of Colorado and because they have knowingly aimed their tortious conduct directly at NetQuote, which resides in Colorado, and the harm from the defendants' conduct has been directly felt within Colorado.

4. On information and belief, NetQuote alleges that the defendants transacted business within the State of Colorado by deliberately accessing NetQuote's websites at www.netquote.com and www.localinsurance.com, deliberately and persistently over the course of at least four weeks in the fall of 2006 requesting NetQuote's insurance quotation services through NetQuote's websites. On information and belief, NetQuote alleges that the defendants conducted their commercial transactions with NetQuote with knowledge that NetQuote is based in and operates in Colorado and with knowledge that NetQuote prominently publishes its location on its website at its "Contact Us" page at www.netquote.com/about/contact-us.aspx. On information and belief, NetQuote also alleges that MostChoice has engaged in extensive

commerce in Colorado through its own lead-generation business, dealing with both purchasers of sales leads in Colorado and with end-user consumers in Colorado who provide information to MostChoice that MostChoice then sold to its clients as sales leads.

5. On information and belief, NetQuote alleges that the defendants aimed their tortious conduct intentionally at NetQuote, and that the defendants had actual or constructive knowledge that NetQuote is based in and operates within the State of Colorado, and with knowledge and a specific intent that their tortious acts would harm NetQuote wherever NetQuote might be located, including in Colorado.

6. Venue is proper in this Court under 28 U.S.C. §§ 1391(a)(2) because the corporate defendant resides within Colorado by operation of 28 U.S.C. § 1391(c), and because a substantial part of the events giving rise to the claims herein occurred within Colorado.

### Parties

7. Plaintiff NetQuote Inc is a corporation duly organized under the laws of the State of Colorado, with its principal place of business in Denver, Colorado.

8. Defendant Brandon Byrd ("Byrd") is an internet user currently residing in Sandy Springs, Georgia, who from at least October 9, 2006 through November 5, 2006, and perhaps longer, accessed the internet through the internet service provider Juno Online Services, Inc., with whom he used the Internet Protocol addresses 64.136.27.226 and 64.136.26.227, and through which he used the email address minch1@netzero.net in order to submit false and harmful information to NetQuote through NetQuote's online business at www.netquote.com. On information and belief, NetQuote alleges that Byrd's conduct in this matter was at the behest and supervision, and as an agent of, Defendant MostChoice.com, Inc.

3

9.      Defendant MostChoice.com, Inc. ("MostChoice") is a corporation duly organized under the laws of the State of Georgia, with its principal place of business in Atlanta, Georgia. MostChoice is a direct competitor of NetQuote.

**Factual Background**

**A.      NetQuote's business activities**

10.     Among NetQuote's various business activities, it maintains websites at the URL domain names www.netquote.com and www.localinsurance.com. True and correct copies of excerpts of these websites is attached here, and incorporated, as **Exhibits A** and **B**.

11.     NetQuote has been in business since 1989. It has operated the www.netquote.com website since 1995. NetQuote acquired the www.localinsurance.com website in October 2006, and has operated it as NetQuote's own business ever since.

12.     Both the www.netquote.com and the www.localinsurance.com websites are operated and managed by NetQuote from its headquarters in Denver, Colorado.

13.     Through NetQuote's websites, consumers interested in obtaining quotations on various forms of insurance, such as auto, life, home, renter, health, and business insurance, may submit information to NetQuote, and NetQuote will then locate insurance agents or brokers who will supply the customer with a rate and policy quotation on the kind of insurance requested.

14.     NetQuote does not charge consumers for its services. Rather, NetQuote receives revenues from insurance agents and brokers who participate in NetQuote's services.

15.     It is commonly known in the insurance-lead industry, and it is true for NetQuote's business, that the most valuable sales leads for insurance agents and brokers are leads for potential life insurance customers. As a result, insurance agents and brokers pay a substantial

4

premium for sales leads on customers who are interested in life insurance, in comparison to sales leads for other kinds of insurance customers.

16. NetQuote's business depends on the reliability and accuracy of the information it provides to its base of insurance agents and brokers who contract with NetQuote for sales leads. Thus, any submission of false information through NetQuote's website can seriously damage both NetQuote's relations with its brokers and agents and its business reputation in general.

17. As a result, and at significant expense to NetQuote, NetQuote has developed proprietary filtering and monitoring systems that ensure the accuracy and quality of the information NetQuote collects through its websites, and thus the information that it passes along to its brokers and agents. These systems review each and every submission made to NetQuote through its websites. These systems can be evaded only through intentional effort by a person with direct knowledge of the lead-generation industry and the criteria used by the industry to filter false submissions.

### B. MostChoice's scheme to harm NetQuote

18. MostChoice is a direct competitor of NetQuote in the field of internet-based insurance lead generation.

19. On information and belief, NetQuote alleges that MostChoice's business, at least with respect to insurance-lead generation, is substantially focused on the sale of sales leads for life insurance and health insurance.

20. MostChoice promotes itself as the fastest growing technology firm in Georgia.

21. MostChoice also promotes itself by publishing advertising that claims MostChoice's leads are "better" or "higher quality" than NetQuote's leads. On information and

5

belief, NetQuote alleges the insurance industry understands MostChoice's advertising claims to mean, among other things, that NetQuote's leads contain bad or false information whereas MostChoice's leads do not. A copy of one of MostChoice's internet-based advertisements is attached here, and incorporated, as **Exhibit C**.

22. On information and belief, NetQuote alleges that MostChoice's sales personnel have promoted MostChoice in presentations to customers and potential customers with claims that NetQuote's leads contain false or dummy information, and that MostChoice's leads are of better quality than NetQuote's leads because MostChoice allegedly ensures that its leads do not include such false information.

23. On information and belief, NetQuote alleges that prior to October 7, 2006, Defendant Byrd had no steady employment other than as a once-a-week fitness/yoga instructor at a gym owned by one of the principals/founders of MostChoice.

24. On information and belief, NetQuote alleges that during the week of October 7, 2006, MostChoice hired Byrd.

25. On information and belief, NetQuote alleges that MostChoice placed Byrd on its payroll, paying Byrd $300 per week in what it treated as "commissions."

26. On information and belief, NetQuote alleges that MostChoice's purpose in hiring and paying Byrd was for Byrd to sabotage NetQuote's online business.

27. On information and belief, NetQuote alleges that MostChoice and Byrd jointly agreed to conduct an online sabotage campaign against NetQuote's websites whereby MostChoice's false and disparaging advertising and promotion against NetQuote, in which

MostChoice had claimed that NetQuote's leads were of a poor quality because they contained false information, would be transformed into a reality.

28.     On information and belief, NetQuote alleges that in all material respects, MostChoice knew of, guided, directed and benefited from the conduct by Byrd that is alleged here, and that Byrd acted as MostChoice's agent or employee, all with MostChoice's consent.

29.     On information and belief, NetQuote alleges that MostChoice and Byrd jointly agreed that Byrd would conduct his sabotage against NetQuote through the use of his home computer.

30.     On information and belief, NetQuote alleges that in the conduct of his sabotage against NetQuote, Byrd used an internet service account provided by Juno Online Services, Inc. ("Juno"), and that Byrd fraudulently activated that account with the name and address of his former girlfriend, Melissa Buchschacher, a woman with whom Byrd was then engaged in a bitter custody and child support legal battle.

31.     On information and belief, NetQuote alleges that Ms. Buchschacher had no knowledge of Byrd's use of her name and account information, or of the plan to sabotage NetQuote's business.

        **C.     Defendants' false submissions to NetQuote's websites**

32.     Beginning at least as early as October 9, 2006, Byrd began submitting information through NetQuote's websites that falsely indicated that certain persons identified in Byrd's submissions were interested in receiving price quotes from NetQuote's insurance brokers and agents.

33. Byrd transmitted at least 394 false submissions requesting life insurance quotations to NetQuote's website at www.netquote.com during the time period between October 9, 2006 and November 5, 2006. Byrd spent an average of three to five minutes on NetQuote's website for each one of his submissions for life insurance quotations. On various occasions, Byrd spent several hours each day making submissions for life insurance quotations using the personal information of third parties from all across the United States. An index of these false submissions is attached here, and incorporated, as **Exhibit D**.

34. Byrd also has admitted to transmitting an untold number of additional false submissions to NetQuote's additional website at www.localinsurance.com during roughly the same period, if not longer. NetQuote has not been able to collect the requisite information to prepare an index of these submissions, but NetQuote anticipates that discovery directed to the hard-drive of Byrd's computer, as well as discovery from other sources, will reveal the particulars of Byrd's false submissions to the NetQuote website at www.localinsurance.com.

35. Byrd grouped his submissions to NetQuote's websites each day by the geographic locale of the personal information he was submitting and by the type of insurance quotations he was seeking. Thus, for example, during a two-hour period on October 16, 2006, all of Byrd's submissions to the www.netquote.com website contained information on purported customers in the Miami-Palm Beach-Fort Lauderdale area, all seeking life insurance quotations.

36. As a result, on any given day during the defendants' attacks on NetQuote's websites, a substantial percentage of the false leads transmitted to NetQuote by Byrd, and then on to NetQuote's agents and brokers by NetQuote, were populated with the false information submitted by Byrd.

37. This method to the defendants' sabotage ensured maximum impact against NetQuote because it focused the defendants' false submissions on discrete subsets of NetQuote's brokers and agents in discrete locales, thus magnifying the impact of the false information.

38. In addition, on information and belief, NetQuote alleges that this method to the defendants' sabotage also ensured maximum advantage to MostChoice from these false submissions because MostChoice's business is focused substantially on the sale of life insurance leads, and by concentrating their false submissions to NetQuote on the life insurance sector, the defendants were able to enhance MostChoice's position vis-à-vis NetQuote.

39. Unbeknownst to NetQuote, the information in these false submissions was either fictitious or related to real persons who had no interest in receiving any kind of insurance quote information from NetQuote or NetQuote's brokers.

40. As a result of NetQuote's lack of knowledge that the customer information submitted by Byrd was false and deceptive, and in reliance on the accuracy and veracity of Byrd's submissions to NetQuote, NetQuote passed along these requests to various of NetQuote's brokers and agents in the applicable geographic markets.

41. NetQuote's brokers and agents then attempted to contact the persons identified in the false submissions by the defendants.

42. NetQuote's brokers and agents quickly ascertained that the persons identified in the defendants' submissions had not requested any price quote information and were greatly upset by the intrusion into their privacy from the contacts of NetQuote's brokers.

43. NetQuote's brokers and other clients have in turn vehemently complained to NetQuote for providing them with false customer information that risked their own business reputations and good will in their own communities.

44. As a result of these false submissions, certain of NetQuote's brokers and other clients who had received false information submitted by Byrd terminated their business dealings with NetQuote.

### D. NetQuote's efforts to halt the sabotage

45. NetQuote learned of the false submissions through complaints from its brokers. As a result of these complaints, NetQuote identified the false customer submissions as emanating from two IP addresses: 64.136.27.226 and 64.136.26.227. NetQuote then identified those IP addresses as being used to access the internet through the auspices of Juno's internet service.

46. In an effort to identify the person making false submissions to NetQuote's websites, NetQuote filed suit in Colorado state court against pseudonymously identified "John Doe" defendants, and requested a commission for an out-of-state subpoena to Juno for the identity of the person using Juno's services to submit the false information to NetQuote.

47. Upon the approval of that request, and pursuant to a subpoena issued by the state courts of New Jersey, Juno supplied its customer information related to the IP addresses identified by NetQuote. A copy of Juno's initial subpoena response, dated December 27, 2006, is attached here, and incorporated, as **Exhibit E**. Juno provided further information concerning its customer on January 30, 2007, and that further information is attached here, and incorporated, as **Exhibit F**.

48. As indicated by Juno's subpoena responses, Byrd fraudulently reactivated the Juno account of Ms. Buchschacher on April 2, 2006, after Ms. Buchschacher had terminated the account on March 30, 2006.

49. To date, Byrd, at MostChoice's direction, has submitted at least 392 false quote requests with false customer information, and has admitted to submitting even more than that number.

50. After expending substantial effort and cost in locating certain identifying features of Byrd's false submissions, NetQuote built internal protocols and filters that captured Byrd's false submissions before they could be transmitted to NetQuote's brokers. Soon after NetQuote began to successfully capture Byrd's false submissions, Byrd halted his submissions.

51. NetQuote remains at the mercy of Byrd and MostChoice to the extent they alter the identifying features of their false submissions, such that NetQuote is unable to identify the false submissions prior to transmitting them to NetQuote's brokers.

52. The continuing threat of imminent resumption of the defendants' sabotage of NetQuote's business has forced NetQuote to build additional security protocols that it otherwise would not have been forced to construct.

53. In addition to the intentional interference and loss of certain of NetQuote's business relationships with certain of its brokers and other clients, the defendants' false submissions also have caused substantial harm to NetQuote business reputation and good will in the industry, casting a cloud over the reliability of NetQuote's services.

## FIRST CLAIM FOR RELIEF
### Fraud
### (All Defendants)

54. NetQuote incorporates the allegations of previous paragraphs of this Third Amended Complaint as though fully set forth here.

55. On information and belief, NetQuote alleges that at all material times and for all material purposes, Byrd's acts or omissions were committed as an agent or employee of MostChoice and were within the scope of his agency or employment with MostChoice.

56. Beginning sometime in October 2006, Byrd submitted false and misleading information to NetQuote through NetQuote's websites at www.netquote.com and www.localinsurance.com concerning persons, both real and fictitious, who purportedly wished to receive price quotations from insurance agents or brokers under contract with NetQuote, with respect to various forms of insurance, but who in reality did not wish to receive any such contact from NetQuote or NetQuote's brokers. An index of certain of the false submissions that are currently known to NetQuote is shown in attached Exhibit C, and is incorporated here.

57. The false and misleading information submitted by the defendants was material to NetQuote and NetQuote's insurance brokers and agents, and NetQuote and its clients relied on this information to their detriment.

58. NetQuote's reliance on the false and misleading submissions by the defendants was reasonable and justified.

59. The defendants knew the information that Byrd was submitting to NetQuote was false and misleading.

60.     NetQuote has been harmed by the defendants' false and misleading submissions in an amount to be determined at trial.

61.     In addition, because the defendants acted with malice, ill will, and a knowing intent to harm NetQuote, NetQuote is entitled to an award of exemplary damages in an amount to be determined at trial.

62.     The harm to NetQuote from the defendants' false and misleading submissions cannot be adequately compensated through monetary relief.

63.     NetQuote is entitled, as a result of the defendants' false and misleading submissions, to injunctive relief prohibiting the defendants from continuing or resuming their fraudulent conduct and for such other equitable relief as the Court deems proper and just.

## SECOND CLAIM FOR RELIEF
### Tortious Interference with Business Relations
### (All Defendants)

64.     NetQuote incorporates the allegations of previous paragraphs of this Third Amended Complaint as though fully set forth here.

65.     On information and belief, NetQuote alleges that at all material times and for all material purposes, Byrd's acts or omissions were committed as an agent or employee of MostChoice and were within the scope of his agency or employment with MostChoice.

66.     NetQuote has contractual or other business relations with insurance brokers, agents and other clients that are highly valuable to NetQuote and that depend, at least in part, on the accuracy and effectiveness of the customer information that NetQuote supplies to its clients.

67. On information and belief, NetQuote alleges that the defendants knew or reasonably should have known of NetQuote's business relationships with its insurance brokers and agents.

68. The defendants' conduct in submitting false requests seeking rate quotes with false or fictitious customer information has interfered with the contractual and other business relations between NetQuote and its customers.

69. The defendants' submissions of false customer information was fraudulent and deceptive and therefore improper.

70. The defendants' interference with NetQuote's contractual and other business relations has harmed NetQuote in an amount to be determined at trial.

71. In addition, because the defendants acted with malice, ill will, and a knowing intent to harm NetQuote, NetQuote is entitled to an award of exemplary damages in an amount to be determined at trial.

72. The harm to NetQuote from the defendants' interference in NetQuote's contractual and other business relations cannot be adequately compensated through monetary relief.

73. NetQuote is entitled, as a result of the defendants' interference in NetQuote's contractual and other business relations, to injunctive relief prohibiting the defendants from continuing their interfering conduct and for such other equitable relief as the Court deems proper and just.

### THIRD CLAIM FOR RELIEF
**Common Law Unfair Competition**
**(Only as to MostChoice)**

74. NetQuote incorporates the allegations of previous paragraphs of this Third Amended Complaint as though fully set forth here.

75. NetQuote and MostChoice are direct competitors in the field of insurance lead generation.

76. MostChoice has unfairly competed with NetQuote through the various unlawful acts described herein.

77. NetQuote has been harmed by MostChoice's unfair competition in an amount to be determined at trial.

78. In addition, because MostChoice's unfair competition was conducted with malice, ill will, and a knowing intent to harm NetQuote, NetQuote is entitled to an award of exemplary damages in an amount to be determined at trial.

79. The harm to NetQuote from MostChoice's unfair competition cannot be adequately compensated through monetary relief.

80. NetQuote is entitled, as a result of MostChoice's unfair competition, to injunctive relief prohibiting MostChoice from continuing its unfair competition and for such other equitable relief as the Court deems proper and just.

### FOURTH CLAIM FOR RELIEF
**False Advertising under the Lanham Act – 15 U.S.C. § 1125(a)(1)(B)**
**(Only as to MostChoice)**

81. NetQuote incorporates the allegations of previous paragraphs of this Third Amended Complaint as though fully set forth here.

82. MostChoice has engaged in commercial advertising and promotion in interstate commerce that misrepresents the nature, characteristics, and qualities of its own services and NetQuote's services.

83. MostChoice's misrepresentations in this commercial advertising and promotion were material to customers and potential customers of NetQuote.

84. MostChoice's false advertising and promotion violated 15 U.S.C. § 1125(a)(1)(B).

85. NetQuote has been harmed by the false advertising and promotion conducted by MostChoice in an amount to be determined at trial.

86. In addition, NetQuote is entitled, pursuant to 15 U.S.C. § 1117(a) all of MostChoice's profits gathered as a result of MostChoice's false advertising and promotion.

87. In light of the willful and bad faith nature of MostChoice's false advertising and promotion, and its intentional effort to harm NetQuote's reputation, NetQuote is entitled to a trebling of its damages.

88. NetQuote is also entitled to injunctive relief prohibiting MostChoice from engaging in any further false advertising or promotion against NetQuote.

**FIFTH CLAIM FOR RELIEF**
**Deceptive Trade Practices under Colorado Consumer Protection Act**
**– Colo. Rev. Stat. § 6-1-113(1)**
**(Only as to MostChoice)**

89. NetQuote incorporates the allegations of previous paragraphs of this Third Amended Complaint as though fully set forth here.

90. MostChoice has engaged in deceptive trade practices, including without limitation, knowingly making false representations as to characteristics and benefits of the

services of NetQuote and disparaging the services of NetQuote with false and misleading representations of fact, in violation of Colo. Rev. Stat. § 6-1-105(1)(e) and (h).

91.     NetQuote has been injured as a result of MostChoice's deceptive trade practices.

92.     MostChoice's deceptive trade practices have had a substantial effect on the consuming public.

93.     MostChoice committed its deceptive trade practices with conduct that was fraudulent, willful, knowing, and intentional, thereby constituting bad faith within the scope of Colo. Rev. Stat. § 6-1-113(2.3).

94.     NetQuote has been harmed by MostChocie's deceptive trade practices in an amount to be determined at trial.

95.     NetQuote is entitled to a trebling of its damages based on MostChoice's bad faith conduct.

96.     NetQuote is also entitled to injunctive relief prohibiting MostChoice from engaging in any further deceptive trade practices against NetQuote.

### **Prayer for Relief**

WHEREFORE, Plaintiff NetQuote Inc prays for a judgment against Defendants Brandon Byrd and MostChoice.com, Inc. as follows:

A.      Preliminary and permanent injunctive relief barring the defendants or their agents, employees, affiliates, representatives, successors or subsidiaries from continuing to knowingly submit false rate quote requests to NetQuote, and from continuing to publish or disseminate false

advertising or promotion concerning NetQuote, and from continuing to engage in deceptive trade practices against NetQuote.

      B.      Damages for the harm caused by the defendants' conduct.

      C.      Exemplary damages arising from the defendant's common law torts, in an amount sufficient to dissuade the defendants or any other similarly situated person from engaging in similar tortious conduct.

      D.      An accounting of MostChoice's profits derived from its false advertising and promotion.

      E.      A trebling of the award of MostChoice's profits, based on 15 U.S.C. § 1117(a).

      F.      A trebling of the award of NetQuote's damages based on MostChoice's deceptive trade practices, based on Colo. Rev. Stat. 6-1-113(2)(a)(III).

      G.      An award of NetQuote's costs and reasonable attorney's fees in bringing this action.

      H.      An award of prejudgment interest.

      I.      Any other relief the Court deems proper and just.

## **Jury Demand**

Plaintiff NetQuote Inc hereby requests a trial by jury on all issues so triable.

Respectfully submitted this  16th  day of April, 2007.

                    By s/ Christopher P. Beall
                    Christopher P. Beall
                    FAEGRE & BENSON LLP
                    3200 Wells Fargo Center, 1700 Lincoln Street
                    Denver, Colorado  80203
                    Tel:  (303) 607-3500 / Fax:  (303) 607-3600
                    E-mail:  cbeall@faegre.com

                    Attorneys for Plaintiff
                    **NetQuote Inc**

## CERTIFICATE OF SERVICE

I hereby certify that on this  16th   day of April, 2007, I electronically filed the foregoing **THIRD AMENDED COMPLAINT** with the Clerk of the Court using the ECF/CM electronic filing system, which will send an electronic copy of this filing to the following counsel of record:

Teresa L. Ashmore, Esq.
Rachel L. Eichenbaum, Esq.
HOLME ROBERTS & OWENS LLP
1700 Lincoln Street, Suite 4100
Denver, Colorado 80203
Tracy.Ashmore@hro.com
Rachel.Eichenbaum@hro.com


Ryan L. Isenberg, Esq.
ISENBERG & HEWITT, P.C.
7000 Peachtree Dunwoody Road, Bldg 15, Suite 100
Atlanta, Georgia  30328
ryan@isenberg-hewitt.com

fb.us.1947138.02