**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 07-cv-00630-DME-MEH

NETQUOTE, INC., a Colorado corporation,

　　Plaintiff,

v.

BRANDON BYRD, an internet user making use of the IP Addresses 64.136.27.226 and 64.136.26.227, and

MOSTCHOICE.COM, INC., a Georgia corporation,

　　Defendants.

## NETQUOTE'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS

　　Plaintiff NetQuote, Inc. ("NetQuote"), through undersigned counsel, responds to Defendants' Motion To Dismiss ("Motion" or "Mot.") as follows:

### INTRODUCTION

　　Defendant Brandon Byrd, working for Defendant Mostchoice.com, Inc. ("MostChoice"), submitted hundreds of false insurance application forms to Plaintiff NetQuote's website, which caused serious harm to NetQuote. Defendants do not dispute that they engaged in this wrongful conduct. Rather, they try to excuse it on various legal theories. But the law does not tolerate the deceitful business practices in which they have engaged.

　　In their motion to dismiss, Byrd argues that, notwithstanding that he intentionally targeted a Denver, Colorado-based company for his cyber-attack, this Court lacks jurisdiction over him. His argument has no support in the law. Courts long ago abandoned the notion that a

defendant must travel into a state to be subject to jurisdiction there. *See, e.g.*, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) ("it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines"). That Byrd committed his intentional torts by use of a computer does not shield him from the jurisdiction of this Court. His argument that he did not know where the computer servers were that he was attacking likewise does not save his claim. That argument has been rejected time and again by courts around the country.

Defendants argue further that one of NetQuote's five causes of action, pleading fraud, does not state a claim. To make this argument, Defendants simply ignore the allegations in the Complaint. On a motion to dismiss for failure to state a claim, those allegations must be accepted as true. Doing so, there is no question that NetQuote's allegations state a claim for fraud.

## BACKGROUND

Plaintiff NetQuote is in the business of marketing and selling insurance-customer leads to insurance agents, brokers, and others. From its Denver, Colorado offices, NetQuote operates a website through which prospective purchasers of insurance submit requests for insurance quotations. *See* Third Amended Complaint ("Compl.") ¶ 13. NetQuote runs the prospective customers' information through a series of proprietary filters and matches the prospective customers with insurance agents who have agreed to purchase leads from NetQuote. *Id.* ¶ 17. NetQuote then sells the leads to the selected insurance agents. *Id.* ¶ 14

There is no mystery as to where NetQuote is located. NetQuote prominently publishes its location on its "contact us" webpage, www.netquote.com/about/contact-us.aspx, which is

accessible from the www.netquote.com home page.  Compl. ¶ 4; Ex. 1 ("contact us" webpage).  The webpage includes a photograph of NetQuote's office building and states:  "NetQuote is located in the heart of beautiful downtown Denver, Colorado.  If you have any questions regarding NetQuote services please contact us using the information below."  *See* Ex. 1.  It then lists NetQuote's address as "1860 Blake Street, Suite 900, Denver, CO 80202."  *Id.*

Defendant MostChoice is an Atlanta, Georgia-based direct competitor of NetQuote's in the internet-based insurance lead generation business.  Compl. ¶ 18.  Defendant Brandon Byrd, a Sandy Springs, Georgia fitness instructor at a gym owned by one of the founders of MostChoice, found himself with no steady employment in October 2006.  *Id.* ¶ 23.  MostChoice hired Byrd during the week of October 7, 2006 and began paying him "commissions" of $300 per week.  *Id.* ¶¶ 24-25.  To earn these commissions, Byrd, at MostChoice's direction, began to conduct an online sabotage campaign against NetQuote's website to undermine NetQuote's relationships with the sales agents and brokers who purchase NetQuote's leads.  *Id.* ¶ 27.  Byrd submitted at least 394 false leads in a computer attack that stretched over more than four weeks.  *Id.* ¶ 33.  His attack was designed to cause the maximum disruption to NetQuote's business.  *Id.* ¶¶ 35-37.  NetQuote, in reliance on the veracity of the insurance lead information Byrd supplied, sold the sham insurance quotation requests to its customer agents, who then called persons they believed were prospective customers only to find individuals with no interest in purchasing insurance who were greatly upset by the intrusion into their privacy.  *Id.* ¶¶ 40-42.

After sabotaging one of its principal competitors, MostChoice engaged in an audacious advertising campaign in which it bragged about the superiority of its insurance leads.  Insurance agents and brokers are critically attuned to the "quality" of the insurance leads they purchase

from on-line lead generation services, *i.e.*, the likelihood that a purchased lead will produce a signed insurance contract.  MostChoice, after undermining the quality of NetQuote's leads, prominently displayed at the top of its own website the statement "**Better Than Netquote.com Leads**"  Compl. Ex. C (emphasis in original).

Defendants' conduct caused immediate and severe harm to NetQuote.  Brokers and other clients who had received false information submitted by Byrd terminated their business dealings with NetQuote.  *Id.* ¶ 44.  NetQuote incurred substantial costs it otherwise would not have to identify the source of the attack and to develop and implement internal protocols to identify Byrd's false information so that the company could stop forwarding Byrd's false information to its customers.  *Id.* ¶ 50.  In addition to these direct and substantial costs, the Defendants' conduct has caused substantial harm to NetQuote's business reputation and good will in the industry, casting a cloud over the reliability of NetQuote's services.  *Id.* ¶ 53.

## ARGUMENT

In their Motion, Defendants argue that this Court lacks personal jurisdiction over Byrd and that NetQuote's fraud count fails to state a claim.  Defendants do not contend that the court lacks jurisdiction over co-defendant MostChoice, nor do they argue that each of NetQuote's remaining four counts fails to state a claim.  Defendants' partial motion to dismiss should be rejected for the reasons set forth below.

### I.     THIS COURT HAS PERSONAL JURISDICTION OVER BYRD BECAUSE BYRD COMMITTED INTENTIONAL TORTS IN COLORADO.

Byrd's primary argument against jurisdiction is that, because he never bothered to click his mouse to determine the location of the company he was attacking with his barrage of false quotation requests, he can escape this Court's jurisdiction.  But the issue is not whether Byrd

**actually knew** where he was misbehaving.  It is that he knew he was sending his false insurance quotation requests to NetQuote, and accordingly it was foreseeable that, if he was caught, he could be called to account for his wrongs in NetQuote's home state.  Courts repeatedly have rejected the "no actual knowledge" defense to jurisdiction, holding that, if a defendant commits a tort in the forum, the defendant is subject to jurisdiction there.

>    A.    **Standard of Review.**

When reviewing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(2) for want of personal jurisdiction, the allegations of the complaint must be taken as true if they are not specifically controverted by the defendant's affidavits.  *Federal Deposit Ins. Co. v. First Interstate Bank of Denver, N.A.*, 937 F. Supp. 1461, 1466 (D. Colo. 1996).  While the plaintiff bears the burden to prove jurisdiction, prior to trial, a plaintiff need only make a *prima facie* showing of jurisdiction based on the uncontroverted allegations in the complaint, affidavits, and other written materials.  *Id.*; *accord Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995) (in the preliminary stages of litigation, the "plaintiff's burden is light"); *Broadview Fin., Inc. v. Entech Mgmt. Servs. Corp.*, 859 F. Supp. 444, 448 (D. Colo. 1994).

Defendant Byrd has submitted an affidavit accompanying his Motion, but the affidavit disputes nearly none of the key allegations in the Complaint.  *See* Mot. Ex. A.  With respect to the conduct that subjects Byrd to jurisdiction in Colorado – his repeatedly barraging NetQuote's Colorado-based servers with false information – Byrd says only this:  "All of the submissions alleged by Netquote in its complaint were generated in [Byrd's hometown of] Sandy Springs, Georgia.  I did not know Netquote was located in Colorado."  *Id.* ¶ 4.  As is explained below, Byrd's protestation is legally irrelevant.  The **uncontroverted** facts in the Complaint, combined

with Byrd's tacit acknowledgement in his affidavit (quoted above) that he "generated" the false information submitted to NetQuote's servers, leave no dispute that Byrd is subject to the jurisdiction of this Court.

**B.     Because Byrd Committed Intentional Torts in Colorado, He Is Subject To This Court's Jurisdiction.**

The exercise of personal jurisdiction over a non-resident defendant must comply with the forum state's long-arm statute as well as constitutional due process. *Doe v. Nat'l Med. Servs.*, 974 F.2d 143, 145 (10th Cir. 1992). Both are satisfied in this case.

**1.     Byrd's Conduct Falls Within Colorado's Long-Arm Statute.**

Colorado's long-arm statute subjects a defendant to personal jurisdiction if the cause of action arises from, *inter alia*, "[t]he transaction of any business within this state" or "[t]he commission of a tortious act within this state." C.R.S. § 13-1-124(1)(a) and (b). The long-arm statute applies both when the "tortious conduct occurs in Colorado" and "when tortious conduct initiated in another state causes injury in Colorado." *Wenz*, 55 F.3d at 1507. The Complaint alleges that Byrd transacted business in Colorado and committed a tortious act within this state when he submitted false information to NetQuote through NetQuote's Colorado-based computer servers and thereby caused harm to NetQuote in Colorado. *See* Compl. ¶¶ 4, 5, 44, 50. Thus, the allegations satisfy the requirements of CRS § 13-1-124(1).

Byrd argues briefly that "plaintiff has failed to allege any specific harm," which is necessary "in order to satisfy the minimum contact analysis under Colorado law." Mot. 7. He concedes, however, that "the Colorado long arm statute allows jurisdiction to the full extent of the [U.S.] Constitution" and he argues only that the exercise of jurisdiction over him would "offend[] due process." Mot. 3 (citing *Benton v. Cameco Corp.*, 375 F.3d 1070, 1075 (10th Cir.

2004)). His concession is well founded. *See, e.g.*, *Waterval v. District Court of El Paso County*, 620 P.2d 5, 8 (Colo. 1980) ("In enacting the long-arm statute, the Colorado legislature intended to extend the jurisdiction of Colorado courts to the fullest extent permitted by the due process clause of the United States Constitution."). Moreover, contrary to Byrd's claim, the Complaint does plead direct damages. Byrd's conduct forced NetQuote to incur significant costs to stop Byrd's ongoing cyber-attack. *See* Compl. ¶ 50. Moreover, various customers "terminated their business dealings with NetQuote" as a direct result of Byrd's conduct. Compl. ¶ 44. Byrd simply ignores these allegations.

  **2.**  **Exercising Jurisdiction over Byrd Comports with Due Process.**

A "court may exercise personal jurisdiction over a nonresident defendant only so long as there exist 'minimum contacts' between the defendant and the forum State." *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291 (1980). The "minimum contacts" standard may be met by establishing "specific jurisdiction" over the defendant based on the defendant's activities giving rise to the cause of action or "general jurisdiction" based on the defendant's ongoing activities in the forum unrelated to the subject matter of the dispute. *See, e.g.*, *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1090-91 (10th Cir. 1998) This Court has specific personal jurisdiction over Byrd.

A nonresident defendant has "'fair warning'" sufficient to confer specific personal jurisdiction "if the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 (1985) (internal citations omitted). A specific-jurisdiction analysis involves a two-step inquiry. First the court must consider whether

"the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen,* 444 U.S. at 297. Second, it must consider "whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King*, 471 U.S. at 476.

### a. When Byrd Undertook To Defraud NetQuote, It Was Foreseeable That He Would Be Sued in Colorado.

Byrd emphasizes that he did not travel into Colorado to commit his tortious conduct, but "[j]urisdiction . . . may not be avoided merely because the defendant did not **physically** enter the forum State." *Burger King*, 471 U.S. at 476 (emphasis in original). Byrd entered Colorado through his computer by accessing NetQuote's Denver-based internet website. He purposefully and intentionally used his computer to access the Colorado website and then repeatedly submitted false information to NetQuote through the Colorado website. *See* Compl. ¶¶ 12, 32, 33. Having done so, it was readily foreseeable that Byrd would be sued in Colorado, and he should have reasonably anticipated being haled into court here.

Whether by physical force, by paper mail, or by electronic means, a non-resident who intentionally takes wrongful action in the forum state should reasonably expect to be subject to that state's jurisdiction. For example, in *Burt v. Board of Regents*, 757 F.2d 242, 244-45 (10th Cir. 1985) *vacated on other grounds*, 475 U.S. 1063 (1986), the Tenth Circuit concluded that a defendant's mailing of libelous letters subjected the defendant to personal jurisdiction in the forum to which the letters were mailed. The Fifth Circuit has explained the rule with respect to tortious communications as follows:

> **When the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment.** The defendant is purposefully availing himself of 'the privilege of causing a

> consequence' in [the forum]. It is of no use to say that the plaintiff 'fortuitously' resided in [the forum]. If this argument were valid in the tort context, the defendant could mail a bomb to a person in [the forum] but claim [the forum] had no jurisdiction because it was fortuitous that the victim's zip code was in [the forum]. It may have been fortuitous, but the tortious nature of the directed activity constitutes purposeful availment.

*Wein Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 213 (5th Cir. 1999) (internal citations omitted; emphasis supplied); *accord In re Sterling Foster & Co. Sec. Litig.*, 222 F. Supp. 2d 289, 301-02 (E.D.N.Y. 2002); *Internet Doorway, Inc. v. Parks*, 138 F. Supp. 2d 773, 779 (S.D. Miss. 2001) (intentionally sending one tortious e-mail sufficient for jurisdiction to attach in forum where e-mail was received). The Tenth Circuit has recognized that communication in the information age does not change the analysis. Surveying the law of multiple jurisdictions, it explained that "use of a computer or network service located in a particular state [can create] sufficient contacts to establish personal jurisdiction." *Intercon, Inc. v. Bell Atl. Internet Solutions, Inc.*, 205 F.3d 1244, 1248 (10th Cir. 2000).

Byrd's sole argument that he should not have anticipated being haled into court in Colorado is that he never bothered to learn the location of the victim of his electronic attack. *See* Mot. 5 (asserting, without case support, that "purposeful availment, at the very least, requires knowledge by defendant that his activities involved the forum state"). The issue is not whether the defendant **foresaw** that he would be haled into court in the forum state – it is whether "the actions had **foreseeable** effects in the forum." *Wein Air*, 195 F.3d at 212 (emphasis added). Byrd's actions indisputably did. There is no question that Byrd specifically targeted NetQuote for his attack, nor does he claim that he could not have found out NetQuote's location by reading the plain text on NetQuote's website that NetQuote is based in Colorado. Whether he bothered to check or not, he certainly **could have** foreseen where his actions would cause harm.

Similar claims of ignorance by defendant internet attackers have been rejected. In the leading case on the subject, the U.S. District Court for the Eastern District of Virginia concluded as follows:

> **Defendants cannot bombard with impunity a Virginia Internet Service Provider ("ISP"), consuming server capacity and deluging the ISP's customers with spam, and then avoid jurisdiction by asserting ignorance of where the [e-mail spam] was going** or the harm such spam would cause the ISP's servers and its customers. Defendants knew or should have known that their [e-mail spam] was harming Verizon and that Verizon would bring suit against them where Defendants' spam caused Verizon the greatest injury. When a business directs [spam] advertising of its products to a Virginia ISP and causes a tort within Virginia, the business tortfeasor is purposefully availing itself of the laws of Virginia and thereby subjects itself to long-arm jurisdiction in Virginia within the contours of the Constitution.

*Verizon Online Servs. v. Ralsky*, 203 F. Supp. 2d 601, 604 (E.D. Va. 2002) (emphasis supplied); *accord id.* at 619-20. After carefully reviewing the relevant case law, the court cited the following factors to support its conclusion: (1) "the activity was driven by pecuniary gain rather than personal purposes," (2) "[t]he alleged acts were 'knowing and repeated' commercial transmissions," and (3) the alleged acts were tortious conduct. *Id.* at 616-17. All three of those factors likewise support the exercise of jurisdiction here.

Similarly in *TravelJungle v. American Airlines, Inc.*, 212 S.W.3d 841, 844 (Tex. App. 2006), plaintiff American Airlines sued a foreign on-line travel company that had accessed and requested travel information from its Texas-based website in violation of American Airlines' "Use Agreement." The defendant argued that it should not be subject to personal jurisdiction in Texas "because it did not know where AA.com's servers were located." *Id.* at 850. The court rejected that argument, holding that a defendant "should [not] be able to avoid personal jurisdiction by purposefully engaging in activity directed towards a server located in a particular

forum and then claiming ignorance of the location of that forum." *Id.*; *accord id.* at 851 (issue is not "the defendants' actual knowledge of the destination of their e-mail activity, but . . . the deliberate nature of the defendants' activity").

In dismissing a similar argument by a defendant that the court could not exercise jurisdiction over it because it did not know where its tortious e-mails would be opened, another court explained: "[t]his allegation has little more validity than one who contends he is not guilty of homicide when he shoots a rifle into a crowd of people without picking a specific target, and someone dies." *MaryCLE, LLC v. First Choice Internet, Inc.*, 890 A.2d 818, 834 (Md. Spec. App. 2006). Courts have held in other contexts as well that ignorance is no excuse. *See, e.g.*, *Barone v. Rich Bros. Interstate Display Fireworks Co.*, 25 F.3d 610, 613 (8th Cir. 1994) (fireworks manufacturer that benefited from distribution of product subject to jurisdiction notwithstanding lack of "actual knowledge" that fireworks were distributed in forum); *Oswalt v. Scripto, Inc.*, 616 F.2d 191, 200-01 (5th Cir. 1980) (defendant that puts defective product into stream of commerce subject to personal jurisdiction whether it "know[s]" that its product is sold in the forum or merely "'should have known'" that its product would be sold there).

Byrd cites to cases holding that "mere injury" in the forum state is insufficient to confer jurisdiction. Mot. at 4-6 (citing, *e.g.*, *ESAB Group*, *Far West Capital* and *Calder*). That argument is a red herring, because unlike the cases on which Byrd relies, the basis for jurisdiction in this case is not simply that Byrd's tortious conduct has caused NetQuote serious financial harm in Colorado. Rather, it is that Byrd specifically chose to target NetQuote's Colorado-based servers, that he submitted information to those Colorado servers, that the repair work to stop further attacks took place in Colorado, and that, in addition, NetQuote lost business,

which caused it financial harm in Colorado.  By using his computer from Georgia to engage in wrongful conduct in Colorado, Byrd established the minimum contacts such that he should have reasonably foreseen being required to appear before this Court.

### b. Assertion of Jurisdiction Comports with Fair Play and Substantial Justice.

In order to satisfy principles of due process, the exercise of personal jurisdiction over a non-resident defendant must also comport with fair play and substantial justice.  The Supreme Court has explained: "where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."  *Burger King*, 471 U.S. at 477.  Byrd has failed to present any such compelling case.

When considering whether the exercise of jurisdiction comports with fair play and substantial justice, courts in this circuit consider the following factors:

> (1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies.

*OMI Holdings*, 149 F.3d at 1095.  Byrd makes an argument with respect to only one of these factors, and even as to that factor, he concedes that the issue is "not dispositive."  Mot. 7.

Byrd argues that the first factor, "the burden on defendant," weighs against the exercise of jurisdiction in this case.  But he neglects to mention that he is being represented by the same counsel representing co-defendant MostChoice, an industry competitor of NetQuote's.  He does not disclose what indemnification arrangements he has reached with MostChoice.  It is reasonable to assume that Byrd, an employee of MostChoice (Compl. ¶¶ 24-26), does not face

personal costs with respect to this litigation. Additionally, the fact that Byrd undertook his internet attack for profit supports the exercise of personal jurisdiction. *See Burger King*, 471 U.S. at 474 (where individuals derive benefit from their interstate activities, "it may well be unfair to allow them to escape [the] consequences that arise proximately from such activities").

Moreover, all of the other factors courts are to consider clearly weigh in support of the exercise of jurisdiction here. A forum state has "a 'manifest interest' in providing a forum in which its residents can seek redress for intentional injuries caused by out-of-state actors." *Intercon, Inc. v. Bell Atlantic Internet Solutions, Inc.*, 205 F.3d 1244, 1249 (10th Cir. 2000). In another internet attack case, *Verizon Online*, the court explained, "[a] state has an especial interest in exercising judicial jurisdiction over those who commit torts within its territory." 203 F. Supp. 2d at 617. As for the remaining three factors, NetQuote is located in Denver and has an interest in receiving convenient relief here; many of the witnesses in this case are based in Denver at NetQuote's headquarters; and Georgia does not have a competing compelling interest in preventing this case from being litigated in Colorado. Byrd makes no argument at all with respect to these remaining factors.[1] On balance, when considering the five factors, requiring Byrd to litigate in this Court does not offend notions of fair play and substantial justice.

## II.  THE COMPLAINT STATES A CLAIM FOR FRAUD.

Defendants seek to dismiss NetQuote's fraud count for failure to state a claim. Their Motion ignores the well-pleaded allegations that they defrauded NetQuote when they submitted

---

[1] Byrd does argue that the harm he caused is slight as compared to the size of NetQuote's business overall. *See* Mot. 7-8. He makes no attempt to tie this argument to any of the factors courts consider as part of the due process analysis. Moreover, his argument simply ignores the allegations in the Complaint documenting the substantial harm his conduct caused, and his affidavit does not controvert those allegations. *See* Compl. ¶¶ 35-37, 40-42, 44, 50, 53.

false information to the company and that the company relied on that false information in selling insurance leads to its customers.

Under Colorado law, fraud requires proof that: (1) the defendant made a false representation of a material fact; (2) knowing that representation to be false; (3) the person to whom the representation was made was ignorant of the falsity; (4) the representation was made with the intention that it be acted upon; and (5) the reliance resulted in damages to the plaintiff. *See Coors v. Security Life of Denver Ins. Co.*, 112 P.3d 59, 66 (Colo. 2005). Defendants challenge two elements. First, they contend that NetQuote has failed to plead with particularity that false statements were made. Second, they contend that, as a matter of law, the Complaint fails to plead justifiable reliance. They are wrong on both points.

Defendants assert that NetQuote "has not identified any single fraudulent representation, has not explained the content of any fraudulent representation and has not put defendant on notice of what precisely it claims was fraudulent about the submissions." Mot. 9. That argument ignores what the Complaint says. First, in Paragraph 32, the Complaint alleges:

> Beginning at least as early as October 9, 2006, Byrd began submitting information through NetQuote's websites that falsely indicated that certain persons identified in Byrd's submissions were interested in receiving price quotes from NetQuote's insurance brokers and agents.

NetQuote explained that Byrd spent an average of "three to five minutes" on each false submission and that he "spent several hours each day making submissions for life insurance quotations using the personal information of third parties from all across the United States." Compl. ¶ 33. NetQuote then provided the date, time and content of hundreds of these false submissions in a detailed list it appended as Exhibit D to its Complaint. Byrd's argument that NetQuote "has failed to plead its fraud claim with particularity," Mot. 9, defies common sense.

Defendants' only other attack on the sufficiency of the pleadings is to claim that NetQuote fails to allege justifiable reliance. Mot. 9-10. To support this argument, Defendants argue that NetQuote merely "passes the information along, without reviewing the information or relying on its content." Mot. 10. Again, this argument ignores the Complaint's allegations.

NetQuote does not merely "pass[] the information along." NetQuote is in the business of **selling** quality leads to insurance agents and brokers. Compl. ¶ 14; *accord* Mot. Ex. B, C.[2] NetQuote's business "depends on the reliability and accuracy of the information it provides to its base of insurance agents." Compl. ¶ 16. To promote reliable information, NetQuote specifically requests that its website users "Be as accurate as possible" and it requires them to acknowledge when submitting information that "I request that insurance companies and NetQuote partners . . . contact me . . . to provide quotes" for insurance. Mot. Ex. C. Nor does NetQuote pass information along "without reviewing the information," as Defendants allege. Mot. 10. NetQuote "review[s] each and every submission made to NetQuote" through its "filtering and monitoring systems." Compl. ¶ 17.

Defendants cite no authority for their claim that, on the facts as pleaded, as a matter of law, NetQuote did not rely, or did not justifiably rely, on Defendants' misrepresentations. NetQuote has pleaded with specificity that it did so and that its reliance was reasonable, particularly in light of the steps it took to assure that it sold only accurate information to its insurance agent and broker customers. Thus, Defendants' argument that the Complaint fails to state a claim for fraud fails.

---

[2]  The Motion contends, and NetQuote does not dispute, that the NetQuote website pages attached to the Motion are properly before the Court because the website is relied on in the Complaint. *See* Mot. at 9-10 n.2.

What the Defendants really want here is an early ruling on the merits as to the reasonableness of NetQuote's reliance on the false information Defendants supplied. But courts routinely hold that, barring unusual circumstances, the question whether reliance was reasonable is one for the jury. *See, e.g.*, *P-W Inv., Inc. v. Westminster*, 655 P.2d 1365, 1372 (Colo. 1982) ("Whether the circumstances in a given case reveal a representation and reasonable reliance so as to give rise to equitable estoppel is a question of fact."); *Shelter Mortgage Corp. v. Castle Mortgage Co.*, 117 Fed. Appx. 6, 10 (10th Cir. 2004) (applying Utah law, explaining "reasonable reliance is usually a question of fact for the jury") *Swartz v. KPMG LLP*, 476 F.3d 756, 762 (9th Cir. 2007) (same; applying Washington law). Defendants present no reason to diverge from that normal practice here.

## CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied.

Dated: May 23, 2007.

                *s/ David W. Stark*
                David W. Stark
                FAEGRE & BENSON LLP
                3200 Wells Fargo Center
                1700 Lincoln Street
                Denver, Colorado 80203
                Tel: (303) 607-3500 / Fax: (303) 607-3600
                E-mail: dstark@faegre.com

                Daniel D. Williams
                FAEGRE & BENSON LLP
                1900 Fifteenth Street
                Boulder, Colorado 80302
                Tel: (303) 447-7700 / Fax: (303) 447-7800
                E-mail: dwilliams@faegre.com

                **Attorneys for Plaintiff NetQuote Inc.**

## CERTIFICATE OF SERVICE

I certify that on this 23rd day of May, 2007, I electronically filed the foregoing **NETQUOTE'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following counsel of record:

Ryan L. Isenberg, Esq.
ISENBERG & HEWITT, P.C.
7000 Peachtree Dunwoody Road, Bldg 15, Suite 100
Atlanta, GA 30328
ryan@isenberg-hewitt.com

Tracy L. Ashmore, Esq.
Rachel L. Eichenbaum, Esq.
HOLME ROBERTS & OWENS LLP
1700 Lincoln Street, Suite 4100
Denver, CO 80203
Tracy.Ashmore@hro.com
Rachel.Eichenbaum@hro.com

*s/Kathryn L. Westcott*