IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 07-cv-00630-DME-MEH

**NETQUOTE INC**, a Colorado corporation,

    Plaintiff,

v.

**BRANDON BYRD**, an internet user making use of the IP Addresses 64.136.27.226 and 64.136.26.227, and

**MOSTCHOICE.COM, Inc.**, a Georgia corporation

    Defendants.

## REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS

    Comes now, Defendant Mostchoice.com, Inc. and files this its Reply Brief in Support of its Motion to Dismiss and shows this Court the following:

I.  Unfair Competition

    Netquote cites *Colorado Nat'l Co. v. Colorado Nat'l Bank*, 95 Colo. 386, 391 (Colo. 1934) ("the bank case") and *American Television & Communications Corp. v. Manning*, 651 P.2d 440 (Colo. Ct. App. 1982) in support of its claim that unfair competition should be applied because they say so. However, neither of these cases supports the position asserted by Netquote. First, in the Bank case, decided in 1934, the court decided that a claim for unfair competition would lie against a non-competitor using a previously established corporate name. When discussing the scope of unfair competition as it existed at in 1934, it was found "In the past courts in other jurisdictions have frequently refused to enjoin use of similar corporate names

because there was no market competition.  The tendency of the courts has been to widen the scope of protection in unfair competition, and hold that it is not confined to actual market competition." *Colorado Nat'l Co.* at 390. (internal citations omitted).  The issue was still a matter of deception or confusion of the public.

*Manning* was decided by the Colorado Court of Appeals.  Mostchoice has cited *Swart v. Mid-Continent Refrigerator Co.,* 145 Colo. 600 (Colo. 1961), for the proposition that the keystone to unfair competition is deception or confusion.  *Swart* was a Colorado Supreme Court decision and is not controlled by *Manning*. *Manning* has never been cited by the Colorado Supreme Court as authority for the expanded scope of the common law of unfair competition.

In discussing *Manning*, one court found similar to the case at bar that "Plaintiff argues that Manning opens the door for unfair competition claims whenever a defendant capitalizes on the efforts, skill, and labor of another. Indeed, Manning has spawned several cases in which courts have broadly defined unfair competition *in dicta*.  *Powell Prods. v. Marks*, 948 F. Supp. 1469, 1475 (D. Colo. 1996) (emphasis added).

Under Colorado law, the legal test for unfair competition is . . ."whether the public is likely to be deceived" or confused regarding a celebrity's endorsement  of a particular company or product. *Coherent, Inc. v. Coherent Tech., Inc.*, 736 F. Supp. 1055, 1068 (D. Colo. 1990); *Amazon, Inc. v. Cannondale Corp*., 2006 U.S. Dist. LEXIS 13406, 35-36 (D. Colo. 2006) *Adolph Coors Co. v. A. Genderson & Sons, Inc.*, 486 F. Supp. 131 (D. Colo. 1980)

II.  False Advertising

Neqtuote cites **Full Draw Prods. v. Easton Sports**, 85 F. Supp. 2d 1001, 1006 (D. Colo. 2000) in support of the proposition that "a statement concerning the superiority or quality of a

product goes beyond mere puffing it is purports to have some objective or factual basis, or if the defendant's product is claimed to be superior for specific objective reasons." (See Netquote Response Page 5-6).  However, this is not the law, notwithstanding the supporting statement for this proposition asserted by Neqtuote is in a section of the opinion dealing with the Colorado Consumer Protection Act, and not unfair competition.

In this same section in ***Easton Sports***, it is stated that

It is true that at common law, [a] competitor is conditionally privileged to make an unduly favorable comparison of the quality of his own land, chattels or other things, with the quality of the competing land, chattels or other things of a rival competitor, although he does not believe that his own things are superior to those of the rival competitor." Restatement (Second) of Torts § 649 (1977). However, the conditional privilege does not extend to false assertions of fact. See id. The Restatement explains:So long as nothing more is done than to exaggerate dishonestly the merits of the publisher's goods as compared with those of his competitor the publisher is not liable. *If, however, he goes further and makes a direct attack upon the quality of his competitor's things by stating specific unfavorable facts even though he does so to supply a reason for his claim that his own things are superior, he cannot successfully claim a privilege . . . .*Id. § 649 cmt. c. Certainly Full Draw was free to shout from the rafters that the BTS was superior to AMO's Archery Trade Show. What Full Draw *could not do, however, was support such an assertion with false statements of fact* such as the allegedly false numerical comparisons of the intentions of archery dealers to attend the respective trade shows. (emphasis added)

Netquote cannot point to a single specific false statement of fact on the relevant web page.  It contains statements about Mostchoice only, and makes no comparisons to Netquote other claiming that its leads are better in the page title.  Nequote's claims rest on the argument that affirmative factual statements about Mostchoice "imply" false factual statements about Netquote.

Netquote cites ***Cottrell, Ltd. v. Biotrol Int'l, Inc.***, 191 F.3d 1248, 1252 (10th Cir. 1999) for the proposition that "Section 43(a) of the Lanham Act encompasses more than literal

falsehoods," because otherwise, "clever use of innuendo, indirect intimations, and ambiguous suggestions could shield the advertisement from scrutiny precisely when protection against such sophisticated deception is most needed." This is a correct statement of an application of Section 43(a) and comes from *American Home Prods. Corp. v. Johnson & Johnson*, 577 F.2d 160, 165 (2d Cir. 1978).

However, there is no innuendo, intimation, or ambiguous suggestions made in the Mostchoice web page. It simply states that its leads are better. It does not state that its leads are better because of anything in particular that relates to Netquote, and makes no false statements of fact. It requires a stretch of the imagination coupled with a severe inferiority complex for Netquote to read any implication out the web page, and applying the facts alleged turns the law on its head because it is the equivalent of ruling that there is no longer any non-actionable advertisement because EVERY advertisement of any product could be alleged to contain a subtle implied falsity as demonstrated below.

For example, the following is from Netquote's website.[1]

---

[1] http://insurance-lead.netquote.com/

> **Superior Insurance Leads**
>
> NetQuote® provides insurance leads for insurance agents for Auto, Home, Health, Life, Renters, and Business. NetQuote virtually eliminates the need for traditional marketing expenditures, cold calls, list buys and x-dating by providing quality insurance leads in the agent's target market.
>
> Our affiliate programs and marketing efforts drive an ever increasing number of consumers seeking insurance quotes to our online application — over 200,000 consumers complete the request for a quote application monthly.
>
> NetQuote has provided over 21 million insurance leads to agents. We are the oldest and largest unbiased online insurance lead program.
>
> Buy insurance leads based on a region, the entire state or as targeted as a specific zip code. Our unique processes and filters increase the quality of the leads — providing you access to consumers that are ready to buy.

Under the theory asserted by Netquote, Mostchoice can state a claim for relief for false advertising[2] alleging that the above falsely implies that:

(a)    Mostchoice doesn't provide quality insurance leads

(b)    Mostchoice doesn't allow its customers to purchase leads based on a region, state, or targeted zip code.

(c)    Mostchoice doesn't have filtering process for its leads.

A side by side comparison of the page that Netquote complains about with the above web page reveals that the claims asserted cannot reasonably be implied as false against competitors.

---

[2]"There need not be a direct comparison to a competitor for a statement to be actionable under the Lanham Act." ***Southland Sod Farms v. Stover Seed Co.***, 108 F.3d 1134, 1145 (9th Cir. 1997)

## Netquote complains about Mostchoice

**All Leads Are:**

- **From a solid company.** Ranked #80 in the Inc 500. In business since 1999. Not a "fly by night" company like most lead companies.
- **Super-Fresh.** Sent to you within 3 minutes of generation.
- **Customer Requested.** All leads have asked for a quote.
- **Database verified phone numbers.**
- **No setup fees or long-term contracts.**
- **Deposit Return Guarantee.** You are guaranteed to get good leads for your money.
- **No-Call List Compliant.** Guaranteed.
- **Recommended:** By the Wall Street Journal, Inc. Magazine, and other publications for agent friendly consumers and agents who want spam-free leads.

## From Netquote's website

**Superior Insurance Leads**

NetQuote® provides insurance leads for insurance agents for Auto, Home, Health, Life, Renters, and Business. NetQuote virtually eliminates the need for traditional marketing expenditures, cold calls, list buys and x-dating by providing quality insurance leads in the agent's target market.

Our affiliate programs and marketing efforts drive an ever increasing number of consumers seeking insurance quotes to our online application – over 200,000 consumers complete the request for a quote application monthly.

NetQuote has provided over 21 million insurance leads to agents. We are the oldest and largest unbiased online insurance lead program.

Buy insurance leads based on a region, the entire state or as targeted as a specific zip code. Our unique processes and filters increase the quality of the leads – providing you access to consumers that are ready to buy.

**How do I receive my leads?**
Leads are provided electronically to agents moments after the consumer completes the application.

III.  Colorado Consumer Protection Act

Netquote makes yet another quantum leap in claiming that Mostchoice's conduct has harmed the insurance buying public.  Netquote doesn't sell insurance to the public, and the allegations in its complaint are not that the public was harmed.  Rather, Netquote complains that it was harmed by Mostchoice's conduct.  Netquote sells leads to insurance agents and brokers, who are clearly not the general consuming public.  "The CCPA was enacted to provide "prompt, economical, and readily available remedies against *consumer* fraud." ***Western Food Plan v. Dist. Court***, 198 Colo. 251, 256, 598 P.2d 1038, 1041 (1979) as quoted in ***Crowe v. Tull***, 126 P.3d 196, 202 (Colo. 2006) (emphasis added).  Mostchoice hasn't been alleged to have engaged in any conduct that would constitute consumer fraud, or made any misrepresentation that any consumer has ever heard.

The fact is the CCPA was "intended to reach practices of the type which affect consumers generally and is not available as an additional remedy to redress a purely private wrong.  ***Rhino Linings United States v. Rocky Mt. Rhino Lining***, 62 P.3d 142, 150 (Colo. 2003) citing ***Newman-Green, Inc. v. Alfonzo-Larrain***, 590 F. Supp. 1083, 1086 (N.D. Ill. 1977). Reminiscent of the Ginsu knife, no matter how Neqtuote tries to slice or dice the CCPA, by no stretch of the imagination does the alleged conduct affect consumers generally, and no such allegations have been raised in Neqtuote's complaint.

IV.  Legal Standard / Procedural Background

As a result of a communication error, the previously filed motion to dismiss (Dkt. #16)

was prepared by the undersigned as a motion only on behalf of Brandon Byrd. It was forwarded to Rachael Eichenbaum, then local counsel assisting in the representation of Mostchoice. Byrd had previously filed a motion to dismiss based on personal jurisdiction and failure to state a claim (Dkt. #8). Subsequently, Netquote's complaint was amended and an order was entered requiring Byrd to resubmit his motion (Dkt. # 14). When preparing #8, when Byrd was the only defendant, the motion to dismiss was prepared by the undersigned and Ms. Eichenbaum reviewed it for filing and indicated that she wanted to make some minor changes, that were largely stylistic. Those changes were in reviewed and were indeed minor.

Subsequently, when #16 was prepared, it was only intended to be on behalf of Brandon Byrd, and not on behalf Mostchoice. When, Ms. Eichenbaum said she wanted to make some minor changes, based on the previous review of minor changes, there was no need to review them. However, she assumed the motion should have been as to both Mostchoice and Byrd, and included that in her changes.

None of the above has any legal significance, or otherwise affects the procedural posture of the case, which is correctly asserted by Netquote.[3] However, counsel for Mostchoice was not trying to get a second bite at the apple, and didn't realize that the motion had been modified to include both defendants until the Court entered its order.

---

[3]As a consequence, unless the Court wants declarations under penalty of perjury, this is merely information for the Court presented to avoid any frustration that may arise from what may appear to be a chance at a second bite.

[Signature on next page]

Dated this 27th day of July, 2007.

        s/ Ryan Isenberg
Ryan L. Isenberg, Esq.
Isenberg & Hewitt, P.C.
7000 Peachtree Dunwoody Road
Building 15, Suite 100
Atlanta, Georgia 30328
Telephone: 770-351-4400
Facsimile: 770-828-0100 (Fax)
Email: ryan@isenberg-hewitt.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 27th day of July, 2007, I served the foregoing Reply Brief in Support of Mostchoice's Motion to Dismiss by electronic delivery, as an attachment to an email, to the following counsel of record:

David W. Stark
Daniel D. Williams
FAEGRE & BENSON LLP
3200 Wells Fargo Center
1700 Lincoln Street
Denver, Colorado 80203
cbeall@faegre.com

        s/ Ryan Isenberg