IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 07-cv-00630-DME-MEH

NETQUOTE, INC., a Colorado corporation,

    Plaintiff,

v.

BRANDON BYRD, an internet user making use of the IP Addresses 64.136.27.226 and 64.136.26.227, and

MOSTCHOICE.COM, INC., a Georgia corporation,

    Defendants.

## ORDER ON PARTIAL MOTION TO DISMISS

Pending before the Court is a motion filed on June 15, 2007, by Defendant MostChoice.Com, Inc., to dismiss certain of NetQuote's claims in this case pursuant to Fed. R. Civ. P. 12(b)(6). (Dkt. # 32.) The motion requests that this Court dismiss for failure to state a claim upon which relief can be granted NetQuote's state law claims of fraud, unfair competition, and deceptive trade practices under the Colorado Consumer Protection Act, and its federal claim of false advertising under the Lanham Act. NetQuote responded to Defendants' motion on July 16, 2007 (Dkt. # 51), and MostChoice replied on July 27, 2007 (Dkt. # 57). Therefore, the motion is ripe for determination.

This Court GRANTS the motion as to NetQuote's claims of common law unfair competition and deceptive trade practices under the Colorado Consumer Protection Act. The Motion to Dismiss the claim of false advertising under the Lanham Act is DENIED.

1

To the extent the motion also seeks dismissal of the fraud claim or asserts that the court lacks personal jurisdiction over MostChoice, the motion is DENIED.

I. BACKGROUND

Plaintiff NetQuote, Inc., is a Colorado-based company that operates a web site that allows individuals to seek insurance referrals and quotes from multiple insurance companies. NetQuote sells information collected from such individuals to its clients – insurance brokers and agents. NetQuote has brought suit against Defendants MostChoice, a Georgia-based competitor that also collects and sells insurance referrals through a web site, and Brandon Byrd, an individual of Georgia who was employed by MostChoice at the time of the events in question.

NetQuote alleges that MostChoice hired Byrd for the purpose of pretending to be individuals interested in insurance quotes and submitting hundreds of false inquiries to NetQuote's web site, knowing that NetQuote's clients would receive fictitious information that could not lead to an insurance purchase. NetQuote alleges that its clients complained about the inaccurate information and some terminated their business with NetQuote. NetQuote also claims that, as a result of the false submissions, MostChoice promoted itself to potential clients as having superior accuracy and reliability in insurance referrals compared to NetQuote. Accordingly, NetQuote's amended complaint asserts state-law claims of fraud, tortious interference with business relations, common law unfair competition, false advertising under the federal Lanham Act, and deceptive trade practices under the Colorado Consumer Protection Act (CCPA). (Dkt. # 13.)

Both Defendants have admitted that Byrd was employed by MostChoice and that he submitted "at least 394 fictitious submissions as alleged." (Dkt. # 33, 34.) They deny that Byrd used the identities of real people in doing so. MostChoice also has admitted to promoting its insurance leads as "better than NetQuote," but has denied asserting in such promotions that NetQuote's leads contain bad or false information.

We continue to have jurisdiction over this matter on the basis of complete diversity, 28 U.S.C. § 1332, because the Plaintiff is a citizen of Colorado and both Defendants are citizens of Georgia, and the amount in controversy is greater than $75,000.

## II.  POSTURE OF THE PENDING MOTION

MostChoice's pending motion invokes Fed. R. Civ. P. 12(b)(6).[1] MostChoice makes a single reference to personal jurisdiction in the introductory sentence of its pending motion. "Federal Rule of Civil Procedure 12 provides that objections to personal jurisdiction or service of process must be raised in a party's first responsive pleading or by motion before the responsive pleading." United States v. 51 Pieces of Real Prop., 17 F.3d 1306, 1314 (10th Cir. 1994). MostChoice, in its reply memorandum, concedes that its first response to NetQuote's amended complaint was the motion to dismiss that it and Defendant Byrd filed May 4, 2007. (Dkt. # 57.) MostChoice did not raise a jurisdictional objection in that motion. Therefore, MostChoice has waived that defense.

---

[1] To the extent that the motion could be construed as one under Fed. R. Civ. P. 12(c), the court's rulings would be the same.

3

Furthermore, although a conclusory statement that a court lacks personal jurisdiction may be sufficient to raise a defense in an answer, it is not enough to support an argument for purposes of a motion seeking dismissal on those grounds. See D.C.Colo.L.Civ.R. 7.1(C) (requiring that "a motion involving a contested issue of law shall . . . be supported by a recitation of legal authority incorporated into the motion"). A passing reference to a lack of personal jurisdiction does not satisfy this requirement.

In a similar vein, this court has already denied MostChoice's previous motion to dismiss NetQuote's claim of fraud. The court will not entertain another attempt at dismissal of the fraud claim on the same grounds raised in the prior motion, i.e., of failure to state a claim upon which relief can be granted.

Finally, the court notes that the parties have submitted additional materials to support their memoranda on the pending motion that were not originally attached as exhibits to pleadings in this case.

> If, on a motion . . . to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Fed. R. Ci. P. 12(b). The court here has resolved the pending motion to dismiss without consideration of or reliance on the additional materials submitted by the parties. Therefore, it is not necessary to convert the motion to one for summary judgment.

### III. MOTION TO DISMISS

MostChoice seeks dismissal of three of NetQuote's claims: common law unfair competition, false advertising under the federal Lanham Act, and deceptive trade

4

practice under the CCPA.

This court must accept "the well-pleaded allegations of the complaint as true and construe them in the light most favorable to the plaintiff."  Ramirez v. Dep't of Corr., 222 F.3d 1238, 1240-41 (10th Cir. 2000).  We also "'look for plausibility in th[e] complaint.'" Alvarado v. KOB-TV. L.L.C., ___ F.3d ___, 2007 WL 2019752, at *3 (10th Cir. July 13, 2007) (quoting the standard for Rule 12(b)(6) dismissals in Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1970 (2007)).

**A.  Common Law Unfair Competition Claim**

Colorado courts recognize the common law tort of unfair competition, with somewhat varying definitions.  NetQuote argues that the tort of unfair competition holds defendants liable for conduct that causes damage to "business reputation and good will."  (Dkt. #51 at 6.)  However, NetQuote provides no authority that supports this assertion.  Instead, under any of the formulations of this tort under Colorado law identified by the parties and this court, a claim of unfair competition requires that the public was deceived or confused at to whether NetQuote or MostChoice was the source of the internet insurance services.  NetQuote's allegations do not lend themselves to such a conclusion.

The Colorado Supreme Court, in adjudicating a claim of unfair competition with respect to a trade name, has held that the tort contains two elements: "[t]he name must have acquired a secondary meaning or significance that identifies the plaintiff; [and] the defendant must have unfairly used the name or a simulation of it against the plaintiff." Swart v. Mid-Continent Refrigerator Co., 360 P.2d 440, 442 (Colo. 1961) (quotation

omitted). However, the court did not purport to limit unfair competition to disputes over trade names. Instead, it stated that "[u]nfair competition is a question of fact and no inflexible rule can be stated as to what conduct will constitute unfair competition. <u>The universal test is whether the public is likely to be deceived</u>." <u>Id.</u> (emphasis added; quotation omitted).

In another case, the Colorado Court of Appeals held that a claim of unfair competition could be sustained when a defendant sells products and services for which the plaintiff had exclusive rights to offer to the public. <u>Am. Television & Commc'ns Corp. v. Manning</u>, 651 P.2d 440, 443, 445 (Colo. Ct. App. 1982). The court concluded that the plaintiff, which had the right to display a certain brand of cable programming, had a reasonable probability of success on its claim of unfair competition against a defendant, who was selling and installing "pirate" equipment that allowed viewers to watch that same brand of programming. <u>Id.</u> The court held that in Colorado said the tort of unfair competition was not limited to cases "in which one competitor engaged in 'palming off,' <u>i.e.</u>, misrepresenting work of another as his own," but instead includes "unfair misappropriation and the exploitation of a competitor's business values." 651 P.2d at 445.

Although the tort of unfair competition under Colorado law has been "broadened" beyond situations involving the defendant "palming off" its product as that of the plaintiff, <u>Powell Prods., Inc. v. Marks</u>, 948 F. Supp. 1469, 1475 (D. Colo. 1996), the tort is not without boundaries. "Generally, the common-law tort of unfair competition has been limited to protection against copying of nonfunctional aspects of consumer products which have acquired secondary meaning such that they operate as a designation of

6

source." Univ. of Colo. Found., Inc. v. Am. Cyanamid, 880 F. Supp. 1387, 1403 (D. Colo. 1995) (quoting Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 158 (1989)), vacated in part on other grounds, 193 F.3d 1366 (Fed. Cir. 1999). With respect to the question of what constitutes "misappropriation . . . of . . . business values," Am. Television & Commc'ns Corp., 651 P.2d at 445, this court has held that it "envisions a wrongful appropriation by one competitor of the skill or labor of another." Univ. of Colo. Found., 880 F. Supp. at 1404. But the court has reiterated that "the most important consideration remained whether defendant's conduct will confuse or deceive the public." Powell Prods., 948 F. Supp. at 1475 (quotation omitted).

In Powell Products, the court rejected an unfair competition claim by a plaintiff who alleged that the defendant used knowledge gained from his position as plaintiff's former employee to build and sell the same type of machine plaintiff had designed. The court observed that the defendant had not misrepresented whose product the equipment was, "[n]or is there any indication that the public would be deceived by defendant's actions here." Id. at 1476. The court said it could "[]not conclude, . . . that the Colorado courts intended to expand unfair competition to cover every instance in which an individual capitalizes upon the skill and efforts of another." Id. Similarly, this court rejected a claim for unfair competition under Colorado law when a plaintiff was unable to produce any evidence that the defendant's actions were "likely to cause confusion as to the source of the invention" in dispute. Univ. of Colo. Found., 880 F. Supp. at 1403 (quotation omitted). In contrast, the court found liability for unfair competition when "customers [we]re likely to be confused" by a defendant's unauthorized marketing and distribution of Coors beer, and Coors could be injured

7

because customers "will hold Coors responsible for any loss of high quality resulting from defendant's acts." Adolph Coors Co. v. A. Genderson & Sons, Inc., 486 F. Supp. 131, 136 (D. Colo. 1980).

Thus, state and federal courts applying Colorado law have consistently held that the tort of unfair competition requires, first, that the defendant has copied the plaintiff's products or services or misappropriated plaintiff's name or operations in some regard, and second, that this conduct is likely to deceive or confuse the public because of the difficulties in distinguishing between the plaintiff's and defendant's products and services.

Assuming NetQuote's allegations are true, NetQuote has established that Defendant MostChoice deceived certain insurance companies that are NetQuote clients. However, to establish a claim of unfair competition, NetQuote must go further: it must allege facts that could support a conclusion that "the public is likely to be deceived," Swart, 360 P.2d at 442 (quotation omitted), by the "copying" or "misappropriation" of "nonfunctional aspects of [a plaintiff's products or services] which have acquired secondary meaning such that they operate as a designation of source." Univ. of Colo. Found., 880 F. Supp. at 1403. Yet, according to NetQuote, the members of the public affected by MostChoice's actions were not seeking insurance quotes at all, and thus were not deceived or confused by either NetQuote's or MostChoice's marketing or services. NetQuote at most alleges that MostChoice's conduct deceived NetQuote's insurance company clients as to the validity of the insurance leads that NetQuote sold. But NetQuote has not alleged that MostChoice's alleged actions deceived or confused insurance companies as to whether MostChoice or NetQuote was

8

operating a given web service. NetQuote's insurance companies were not deceived into believing that a service operated by MostChoice was in fact a service offered by NetQuote. Instead, the deception was of a very different nature from the deception of passing off or appropriation. It was simply the deception as to the bonafides of those who purported to use the NetQuote system. NetQuote's allegations do not support a conclusion that MostChoice appropriated NetQuote's services, technology or trade name in offering MostChoice.Com services to its own clients and the public.

NetQuote cites two Colorado cases to support its argument that the tort of unfair competition covers a broader range of conduct that damages a business's reputation and goodwill. But neither case is so sweeping. The Colorado Supreme Court in 1934 held the law of unfair competition would "intervene to protect the good-will and business reputation" of a plaintiff, but specified that the law applied "[w]here one passes off his goods [or] his services . . . as [that] of another." Colo. Nat'l Co. v. Colo. Nat'l Bank, 36 P.2d 454, 456 (Colo. 1934). Similarly, although American Television provides potentially broad language to impose liability for "misappropriation . . . of . . . business values," it was in the context of a defendant company selling "pirate" equipment for which the plaintiff had exclusive rights. Am. Television & Commc'ns Corp., 651 P.2d at 445. That case did not purport to provide for liability for any and all conduct damaging to a business's reputation, nor did it address the core element repeatedly stated in Colorado unfair competition cases: "The universal test is whether the public is likely to be deceived." Swart, 360 P.2d at 442 (quotation omitted); see also Powell Prods., 948 F. Supp. at 1475; Adolph Coors Co., 486 F. Supp. at 136.

9

Indeed, other jurisdictions similarly view the tort of unfair competition in terms of being a common law solution to various trade secret, trade name or copyright infringements.[2]  The Restatement of Unfair Competition describes how liability may attach for false or misleading representations in marketing, passing off one company's products or services as another's, misappropriation of trade secrets, trademark infringement, and other related conduct.  See, e.g., Restatement (Third) of Unfair Competition §§ 2-6, 38-45.  But it is not apparent that the Restatement would impose liability relating to deceptive conduct at the origination of the raw material used in a plaintiff's products or services absent any allegations that the defendant tried to market a plaintiff's business or product as its own or that of a third party.  Id. at §§ 4-5.  Likewise, other jurisdictions do not broadly construe the tort to cover any sort of competitive conduct that seems "unfair."  See, e.g., QSP, Inc. v. Aetna Cas. & Sur. Co., 773 A.2d 906, 924 (Conn. 2001)  (the "'tort' of unfair competition . . . should not 'be equated with the far more amorphous term "commercial unfairness"'" (quoting Ruder & Finn Inc. v. Seaboard Sur. Co., 422 N.E.2d 518, 522 (N.Y. 1981)).

In summary, the tort of unfair competition in Colorado has not been expanded to provide a cause of action for any alleged improper conduct by a competitor that deceives a plaintiff or its clients.  Instead, it reaches only conduct that involves either using or copying a plaintiff's products or services and deceiving or confusing the public

---

[2] Some jurisdictions have held that the tort of interference with business and contractual relations includes claims of unfair competition.  See, e.g., City Ambulance of Ala., Inc. v. Haynes Ambulance of Ala., Inc., 431 So. 2d 537, 539 (Ala. 1983); Keaton & Keaton v. Keaton, 842 N.E.2d 816, 820 (Ind. 2006).  NetQuote has brought a claim of tortious interference in its complaint against MostChoice and Byrd, and neither Defendant has sought to dismiss that claim.  Therefore, this opinion does not address whether NetQuote's allegations support such a claim.

10

as to the source of the business in question. NetQuote has not shown that its allegations can meet the required elements of a claim of unfair competition in Colorado, and therefore this claim must be DISMISSED.

**B. Lanham Act/ False Advertising Claim**

The Lanham Act provides for a private right of action to impose liability on anyone who "misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B).

> NetQuote alleges that
>
> MostChoice . . . promotes itself by publishing advertising that claims MostChoice's leads are "better" or "higher quality" than NetQuote's leads. . . . NetQuote alleges the insurance industry understands MostChoice's advertising claims to mean, among other things, that NetQuote's leads contain bad or false information whereas MostChoice's leads do not. . . .
>
> . . . MostChoice's sales personnel have promoted MostChoice in presentations to customers and potential customers with claims that NetQuote's leads contain false or dummy information, and that MostChoice's leads are of better quality than NetQuote's leads because MostChoice allegedly ensures that its leads do not include such false information.

(Third Am. Compl. at 5-6, ¶¶ 21-22.) NetQuote attached to its complaint an advertisement from MostChoice's web site, with the bold-print headline "Better Than NetQuote.com Leads," and a claim that "All leads are . . . customer requested. All leads have asked for a quote." (Compl. Exh. C.)

MostChoice argues that this court should dismiss NetQuote's false advertising claim because it is based on MostChoice's promotional materials that are "mere puffing" and thus are not actionable. (Dkt. #32 at 4.) NetQuote argues that the statements in

question are not "mere opinion" but instead "false factual statements with specific comparisons" between MostChoice's and NetQuote's services. (Dkt. # 51 at 7.)

Although a simple statement that one's products are better than a competitor's likely is "mere puffing," this court concludes that NetQuote correctly characterizes the bulk of MostChoice's alleged statements as "factual."

A plaintiff asserting a claim for false advertising under the Lanham Act must establish four elements:

> (1) that the defendant made material false or misleading representations of fact in connection with the commercial advertising or promotion of its product;
> (2) in commerce;
> (3) that are either likely to cause confusion or mistake as to (a) the origin, association or approval of the product with or by another, or (b) the characteristics of the goods or services; and
> (4) injure the plaintiff.

World Wide Ass'n of Specialty Programs v. Pure, Inc., 450 F.3d 1132, 1140 (10th Cir. 2006) (quotation omitted).[3] It is the first element at issue here.

NetQuote argues that "[t]he claims and misrepresentations made by MostChoice deceive existing and potential consumers by contending that NetQuote sells an inferior product based in large part on bad leads." (Dkt. #51 at 7.)

The Tenth Circuit has held that implied falsities also fall within the Lanham Act, holding that "'Section 43(a) of the Lanham Act encompasses more than literal falsehoods,' because otherwise, 'clever use of innuendo, indirect intimations, and ambiguous suggestions could shield the advertisement from scrutiny precisely when

---

[3] Because the Lanham Act provides a cause of action when a defendant misrepresents "another person's goods, services, or commercial activities," 15 U.S.C. § 1125(a)(1)(B), the first element is not limited to the defendant's own products.

protection against such sophisticated deception is most needed.'" Cottrell, Ltd. v. Biotrol Int'l, Inc., 191 F.3d 1248, 1252 (10th Cir. 1999) (quoting Am. Home Prods. Corp. v. Johnson & Johnson, 577 F.2d 160, 165 (2d Cir. 1978)).  Here, the complaint could fairly be construed to allege that MostChoice's advertising about the poor quality of NetQuote's leads implied that NetQuote's leads generally were of poor quality.  Nothing in MostChoice's advertisements would have notified those that read the advertisements that the reason NetQuote's leads were of poor quality was because of the false leads submitted by MostChoice and Byrd.

Thus, NetQuote's complaint adequately alleges a claim of false advertising under the Lanham Act and the defendant's Motion to Dismiss that claim is DENIED.

### C. Colorado Consumer Protection Act (CCPA) Claim

NetQuote seeks relief under the CCPA, Colo. Rev. Stat. § 6-1-113(1), alleging that MostChoice has engaged in deceptive trade practices.  MostChoice argues that this claim should be dismissed because NetQuote has not and cannot allege that MostChoice's conduct has had a significant impact on the public as actual or potential consumers of MostChoice's services.  This court agrees.

The CCPA provides a private right of action for plaintiffs who are injured by a defendant's "deceptive trade practice":

> (1) The provisions of this article shall be available in a civil action for any claim against any person who has engaged in or caused another to engage in any deceptive trade practice listed in this article. An action under this section shall be available to any person who:
>
> > (a) Is an actual or potential consumer of the defendant's goods, services, or property and is injured as a result of such deceptive trade practice, or is a residential subscriber, as defined in section

13

> 6-1-903(9), who receives unlawful telephone solicitation, as defined in section 6-1-903(10); or
>
> (b) Is any successor in interest to an actual consumer who purchased the defendant's goods, services, or property; or
>
> (c) In the course of the person's business or occupation, is injured as a result of such deceptive trade practice.

Colo. Rev. Stat. § 6-1-113.

The Colorado Supreme Court has interpreted the CCPA's provisions for a private right of action as requiring a potential plaintiff to establish five elements:

> (1) that the defendant engaged in an unfair or deceptive trade practice;[4]
> (2) that the challenged practice occurred in the course of defendant's business, vocation, or occupation;
> (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property;
> (4) that the plaintiff suffered injury in fact to a legally protected interest; and
> (5) that the challenged practice caused the plaintiff's injury.

Hall v. Walter, 969 P.2d 224, 235 (Colo. 1998) (footnote added).

The cause of action provided at Colo. Rev. Stat. § 6-1-113 does not necessarily limit claims to "the public" or "consumers." See Colo. Rev. Stat. § 6-1-113(1)(c) (giving a person a right of action who, "[i]n the course of the person's business or occupation, is injured as a result of such deceptive trade practice"). Specifically, the plaintiff need not be an actual or potential consumer of the defendant's product or service. Hall, 969 P.2d at 231; Martinez v. Lewis, 969 P.2d 213, 221 (Colo. 1998).

But regardless of whether the plaintiff is a "consumer" of a defendant's products or services, the Colorado Supreme Court has interpreted the CCPA as having a "public

---

[4] MostChoice does not argue in its motion that its admitted conduct is not a "deceptive trade practice" under the CCPA.

14

impact" element because "the CCPA is clearly enacted to control various deceptive trade practices in dealing with the public." Hall, 969 P.2d at 234 (quotation omitted). "Therefore, the challenged practice must significantly impact the public as actual or potential consumers of the defendant's goods, services, or property." Id.

Hall involved allegations that the defendants had misrepresented the property rights associated with real estate they were selling, and the subsequent misuse of the plaintiff's nearby property adversely affected the plaintiff. The Court there held that the public impact element was met because the defendants' "deceptive practices implicated the public as consumers because the misrepresentations were directed to the market generally, taking the form of widespread advertisement and deception of actual and prospective purchasers." Id. at 235.[5]

In Martinez, a companion case to Hall, the Colorado Supreme Court affirmed dismissal of a CCPA claim bought by a medical patient against a physician hired by the patient's insurance company who told the company that the patient was not as injured as she had claimed to be. 969 P.2d 213. The Court first noted that "Dr. Lewis's alleged deceptive practices occurred only in the context of his private agreement to provide services for State Farm. " Id. at 222. The Court then concluded that State Farm, as the "sole consumer" of Dr. Lewis's services, was not the type of "public" envisioned by the CCPA's public impact requirement. "The CCPA provides consumers who are in a

---

[5] In arguing that the public impact requirement is not met in this case, MostChoice points to the fact that NetQuote's alleged damages are "internal costs" only: "All of this suggests that the public has no interest in the outcome of this case." (Dkt. # 32 at 7.) However, Hall's holding that a CCPA plaintiff need not be a consumer – combined with the facts of Hall itself – show that the mere fact that NetQuote's damages are "internal costs" is irrelevant to the public impact inquiry.

15

position of relative bargaining weakness with protection against a range of deceptive trade practices. . . . Unlike the consumers contemplated by the CCPA, State Farm has ample access to information . . .  As a large organization with substantial resources, it is in a position of relative bargaining strength when it solicits the services of experts to assist with insurance coverage decisions." Id. at 222.

In Rhino Linings, the Colorado Supreme Court again rejected the CCPA claim of a plaintiff, who with the assistance of counsel entered into a dealer contract with the defendant to be granted an exclusive territory to sell the defendant's products. Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc., 62 P.3d 142 (Colo. 2003). When the defendant entered into another dealer contract with a third party affecting the plaintiff's territory, the plaintiff brought suit. Id. at 145. The court held that essentially the case involved a "private dispute." "Three affected dealers out of approximately 550 worldwide does not significantly affect the public . . . When a transaction is no more than a private dispute, as is the case here, it may be more difficult to show that the public has an interest in the subject matter." Id. at 150 (quotation omitted). The Court also rested its holding on two other factors: the relative sophistication of the parties and the extent to which any misrepresentation by the defendant reached the public, as opposed to a misrepresentation only to private parties in a transaction. Id. Subsequently, the Court condensed the analysis into:

> at least three factors to consider in determining whether a challenged practice impacts the public under the CCPA:  (1) the number of consumers directly affected by the challenged practice, (2) the relative sophistication and bargaining power of the consumers affected by the challenged practice, and (3) evidence that the challenged practice has previously impacted the other consumers or has the significant potential to do so in the future.

Crowe v. Tull, 126 P.3d 196, 208 (Colo. 2006) (quotation omitted) (holding that

attorneys can be held liable under the CCPA if the public impact and other elements are met).  "The CCPA can not be used to remedy a purely private wrong."  Id.

MostChoice's main argument as to why NetQuote's CCPA claim should be dismissed is that NetQuote has not alleged, and cannot under its facts allege, that MostChoice's conduct "significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property."  Hall, 969 P.2d at 235.  MostChoice has two sets of actual or potential consumers: one, the insurance companies who pay MostChoice for insurance leads; and two, the individuals using MostChoice's web site as a vehicle for obtaining insurance quotes from a variety of companies.  NetQuote has not alleged any impact on MostChoice's consumers per se.  However, NetQuote has the same set of potential consumers, and has alleged that MostChoice's conduct has impacted both groups.

With regard to the impact of MostChoice's conduct on insurance companies, NetQuote alleges that its clients "risked their own business reputations and good will in their communities" when they contacted individuals who did not wish to receive insurance quotes.  (Third Am. Compl. at 10, ¶¶ 43-44.)  NetQuote alleges that some of its clients terminated their business with NetQuote after receiving the bad leads.  (Id.)  NetQuote complains of specific harm to its clients arising from specific incidents not alleged to recur.  Furthermore, NetQuote does not suggest that the insurance companies who are potential consumers of insurance-quote web sites lack "relative sophistication and bargaining power."  Crowe, 126 P.3d at 208 (quotation omitted).

The second group of consumers is individuals who potentially may use an insurance-quote web site.  NetQuote has alleged that Byrd made "at least 394 false

17

submissions," including "real persons who had no interest in receiving any kind of insurance quote information from NetQuote or NetQuote's brokers," and alleged that "the persons identified in the defendants' submissions had not requested any price quote information and were greatly upset by the intrusion into their privacy from the contacts of NetQuote's brokers." (Third Am. Compl. at 8-9, ¶¶ 33, 39, 42.)

However, this impact is not of the consumer-related type required by Colorado law for a CCPA claim. The individuals allegedly contacted were not seeking insurance, and there is no suggestion in NetQuote's complaint that MostChoice's actions resulted in misinformation about insurance. The Court in Hall permitted a non-consumer plaintiff to bring a CCPA claim because the defendants' "deceptive practices implicated the public as consumers because the misrepresentations were directed to the market generally." Hall, 969 P.2d at 235. The misrepresentations at issue here – that a specific person was interested in buying insurance, when in fact he or she was not – were given in individual transactions to insurance companies, rather than being "directed to the market generally."

NetQuote does not allege that MostChoice has provided any information to the insurance-buying public, much less that the public has somehow been "deceived" by MostChoice. Instead, NetQuote argues that its CCPA claim meets the "public impact" requirement because "consumers' bargaining power has been damaged by MostChoice's deceptive trade practices," (Dkt. # 51 at 9.) NetQuote contends that because MostChoice caused "some of NetQuote's brokers and agents to stop using NetQuote's services . . . [consumers] were provided with a smaller pool of insurance agents and brokers competing for their business . . . . Thus MostChoice's conduct has

indeed harmed the insurance-buying public." (Id.)  But NetQuote's argument would turn any commercial dispute into a public impact for purposes of the CCPA simply by its effect on the competitiveness of a competitor.  In assessing whether a plaintiff has alleged a public impact, this court is obligated to ascertain "the number of consumers <u>directly</u> affected by the challenged practice."  See Crowe, 126 P.3d at 208 (emphasis added; quotation omitted).  The effects alleged here are indirect at best.

This court concludes that NetQuote's allegations do not meet the public impact element required for a CCPA claim because they do not plausibly suggest that MostChoice's conduct "<u>significantly</u> impacts the public as actual or potential consumers."  Hall, 969 P.2d at 235 (emphasis added).  The CCPA claim is DISMISSED.

## IV.  CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that Defendant MostChoice's "Motion to Dismiss" (Dkt. # 32) filed June 15, 2007, is GRANTED as to Plaintiff NetQuote's claims of common law unfair competition and deceptive trade practices under the CCPA, and is DENIED as to any other basis for dismissal.

DATED at Denver, Colorado, this  <u>15th</u>  day of August, 2007.

BY THE COURT:

*s/ David M. Ebel*

David M. Ebel
United States Circuit Judge