## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 07-cv-00630-DME-MEH

NETQUOTE, INC., a Colorado corporation,

     Plaintiff,

v.

BRANDON BYRD, an internet user making use of the IP Addresses 64.136.27.226 and 64.136.26.227, and

MOSTCHOICE.COM, INC., a Georgia corporation,

     Defendants.

## NETQUOTE'S MOTION TO REOPEN DEPOSITIONS AT FEDERAL COURTHOUSE

Plaintiff NetQuote, Inc. ("NetQuote"), through undersigned counsel, moves this Court to permit NetQuote to reopen the deposition of Michael Andrew and the Rule 30(b)(6) deposition of MostChoice.com, Inc. ("MostChoice") at the federal courthouse in Denver. In support of its motion, it states as follows:

### INTRODUCTION

MostChoice's refusal to participate in discovery in a meaningful way now necessitates that two depositions be reopened – the deposition of MostChoice employee Michael Andrew and the Rule 30(b)(6) deposition of MostChoice. NetQuote has been hampered throughout this litigation by MostChoice's dilatory and incomplete document productions, its production of documents in databases that cannot easily be presented to a jury, and its inadequate responses to interrogatories. On August 7, 2007, NetQuote first brought this issue to the Court's attention in a

telephonic hearing with respect to one of MostChoice's interrogatory responses.  *See* Dkt. # 65.

At that time, the Court suggested that NetQuote could test the adequacy of MostChoice's

responses at a Rule 30(b)(6) deposition of MostChoice.

NetQuote did so.  At the deposition, MostChoice's founder, Michael Levy, claimed that

he had conducted an exhaustive search for documents.  But subsequent depositions and

document productions have revealed that his statements were false and that material documents

were omitted from MostChoice's document production prior to the deposition of MostChoice

witnesses.  Those documents require the reopening of the Andrew deposition and the Rule

30(b)(6) deposition to question the witnesses on late-produced documents that contradict their

sworn testimony.

Moreover, Defendants now refuse to stipulate to the authenticity of documents that ***they***

***themselves produced***.  NetQuote needs to reopen the Rule 30(b)(6) deposition of MostChoice to

get an explanation as to what the documents are that Defendants have produced and to

authenticate those documents.

## ARGUMENT

**I.      THIS COURT IS AUTHORIZED TO MAKE SUCH ORDERS AS ARE NECESSARY TO ENSURE THAT DISCOVERY IS COMPLETED IN THIS MATTER IN AN ORDERLY AND EFFICIENT MANNER.**

This Court is authorized to issue such orders as are necessary to control and supervise

discovery in this action.  *See, e.g.*, *Qwest Communc'ns Int'l, Inc. v. Worldquest Networks, Inc.*,

213 F.R.D. 418, 419 (D. Colo. 2003) (holding that court has "broad discretion" to supervise

discovery).  With respect to the conduct of depositions, that authority permits the Court to order

that a deposition be reopened when appropriate.  *See, e.g.*, *Alioto v. Hoiles*, 2007 WL 3090660,

at *7 (D. Colo. Oct. 19, 2007) (allowing deposition to be reopened and providing that, if it is

disrupted again, it "will continue in open court"); *Timmerman v. U.S. Bancorp*, 2005 WL

1950209, at *4 (D. Colo. Aug. 12, 2005).  This Court may order depositions to be taken at the

courthouse when necessary when "deposition abuse is anticipated."  D.C.COLO.LCivR 30.3(C);

*accord Moreland v. State Farm Mut. Auto. Ins. Co.*, 2007 WL 1033453, at *4-5 (D. Colo. Apr. 3,

2007).

**II.    NETQUOTE NEEDS TO RESUME THE DEPOSITION OF MICHAEL ANDREW.**

Michael Andrew is the MostChoice employee who was tasked with assisting Defendant

Byrd in submitting the false insurance quotation requests to NetQuote's websites.  Specifically,

Andrew supplied Byrd with lists of zip codes and telephone area codes and prefixes to target.  At

his deposition, Andrew denied all knowledge as to the use to which his labors were to be put.

However, a document withheld by MostChoice until two business days *after* the deposition

directly refutes that denial of responsibility.

MostChoice's document production prior to the Andrew deposition was surprising for its

absence of documents describing how MostChoice executed its scheme of sending fraudulent

insurance quotation requests to NetQuote.  In light of that apparent gap in the document

production, at the deposition NetQuote's counsel questioned Andrew about his document

retention practices.   Andrew admitted that he had never been asked to retain documents relating

to this litigation.  (Andrew Dep. Tr. 105:21-23, attached as Ex. A.)  He conceded, however, that

he "probably" had retained the written instructions he had received from Levy concerning how to

gather the zip codes and telephone numbers for Defendant Byrd to use in making his false

submissions.  (*Id.* at 113:15-25.)  When counsel for NetQuote asked that the instructions be

produced, MostChoice's counsel stated that it would be "unreasonable" for the documents to be produced the same day and that they would be produced by the end of the next business day.  (*Id.* at 114:10-25.)

Two business days later, on October 16, 2007, MostChoice finally produced the first of these e-mail instructions.  MostChoice provided no explanation for its failure to produce the document earlier – either prior to the Rule 30(b)(6) deposition or prior to Andrew's deposition. The late-produced e-mail reveals, among other things, that MostChoice knew its conduct was wrongful.  (September 6, 2006 e-mail, attached as Ex. B.)  In the e-mail, Levy upbraids Andrew for taking so long in compiling the lists for the false submissions.  He explains to Andrew the purpose of the project as follows:  "It is a denial of service attack."  (*Id.*)  Making clear to Andrew that the project was clandestine, Levy instructed Andrew to "[r]andomly pick streets so that it does not look contrived and make sure the streets are short names that are easy to enter." (*Id.*)

On November 12, 2007, without explanation, MostChoice produced an additional 29 e-mails between Levy, Andrew, and Byrd used to execute the scheme to send false insurance quotation requests to NetQuote.  The e-mails attached spreadsheets of information for Byrd to input into his false submissions.

These e-mail raises serious questions about the veracity of Andrew's deposition testimony.  At his deposition, Andrew claimed that he lacked all knowledge as to the nature of the fraudulent scheme he was assisting.  When asked what he understood the purpose of the assignment Levy had given him to be, Andrew claimed to have no knowledge whatsoever as to the use to which the lists of information he was assembling would be put.  (Ex. A at  77:12-16;

78:1-13.) But in light of Levy's September 6, 2006 e-mail at the commencement of the project, it is now clear that Andrew did indeed understand that the purpose of the list was to assist in the submission of information to a competitor in as quick a manner as possible to facilitate a "denial of service attack" that would not look "contrived." (Ex. B.) Other of the e-mails finally produced on November 12, 2007 similarly reveal that Andrew was actively offering suggestions for how to target the attack, which demonstrates a level of complicity that he denied at his deposition.

NetQuote now needs to reopen the Andrew deposition for two reasons. First, it needs to authenticate the late produced e-mails between Andrew and Levy. Second, NetQuote needs to question Andrew about the apparent discrepancy between his account of his knowledge of the fraudulent scheme at his deposition and his level of knowledge as documented in the e-mails. Andrew cannot be compelled to appear at trial because he is outside of the subpoena power of the Court – thus it is only through deposition that he can be cross-examined about how his denials of knowledge at his deposition square with the late-produced documents.

## III. NETQUOTE NEEDS TO RESUME THE RULE 30(b)(6) DEPOSITION OF MOSTCHOICE.

NetQuote needs to reopen the Rule 30(b)(6) deposition of MostChoice for three purposes. First, the e-mails MostChoice finally produced should have been produced much sooner, and NetQuote needs to determine why they were not and whether other documents continue to be withheld by MostChoice. Second, these late-produced e-mails directly contradict MostChoice's testimony at the Rule 30(b)(6) deposition concerning when this fraudulent scheme commenced. NetQuote needs to determine when the false submissions started so that it can supplement its damages demand to include damage inflicted prior to the date previously admitted to by

MostChoice.  Finally, NetQuote needs to reopen the deposition to have MostChoice explain what the documents are that it previously produced without Document Control Numbers that it now denies are authentic, and where the authentic copies of the documents are in its document production.

A.      **NetQuote Needs To Question MostChoice About Its Search for and Production of Responsive Documents.**

At the Rule 30(b)(6) deposition of MostChoice, MostChoice Chairman Levy claimed that he personally conducted a thorough and exhaustive search for paper and electronic documents. With respect to paper documents, he claimed that he had "gone to every desk, every cube, opened every drawer, looked in every possible place that they would put paper."  (Rule 30(b)(6) Dep. Tr. 390:6-11, attached as Ex. C.)  He stated that he also had personally searched for and located his employees' electronic documents.  (Ex. C at 394:8-13; Ex. C at 395:11-13 ("I searched every computer in the office.").)  He further testified that he did an exhaustive search of his own computer.  (Ex. C at 400:12-19 ("I ran a myriad of terms on my computer and [on CEO Martin Fleischman's] computer.").)[1]

It is now clear that Levy did not, in fact, locate all responsive documents in his employees' files.  As noted above, a crucial document concerning Levy's instructions for how to execute his scheme to send the false insurance quotation requests to NetQuote was omitted.  (*See* Ex. B.)  This e-mail seems to be a response to earlier e-mails concerning the scheme that still have not been produced.  Moreover, as noted above, on November 12, 2007, MostChoice finally

---

[1]    Curiously, Levy testified that MostChoice waited to produce various of the responsive documents it located until just before the Rule 30(b)(6) deposition even though they had been located much earlier.  When asked why he had withheld them, he said only:  "Yeah, we hadn't given them over for one reason or another.  So we brought them today."  (Ex. C at 394:14-22.)

has produced an additional 29 e-mails between Levy, Andrew, and Byrd as well as two other

responsive documents that it had been withholding without explanation for months.  Included

among the documents produced on November 12, 2007 is an excerpt from an entry from a

MostChoice database memorializing a MostChoice sales agent's telephone call with a potential

customer in which NetQuote was discussed by name.  Had MostChoice produced these materials

in a timely fashion, NetQuote could have asked questions about them at the original Rule

30(b)(6) deposition and at the depositions of other MostChoice witnesses.  NetQuote is entitled

to explore why documents witnesses testified about subsequent to the Rule 30(b)(6) deposition

were not produced previously and to have MostChoice authenticate and explain these

documents.

**B.     NetQuote Needs To Question MostChoice About When The Fraudulent Conduct Began.**

The late-produced e-mails between Andrew and Levy also are critical to this case because

they directly contradict MostChoice's sworn testimony as to when it began its campaign of

sending false insurance quotation requests to NetQuote.  At the Rule 30(b)(6) deposition, Levy

testified that MostChoice was not submitting the false insurance quotation requests to NetQuote

until "late September or early October."  (Ex. C at 66:5-15); (Ex. C at 65:12-15 ("he got started

around in October").)  Levy's September 6, 2006 e-mail to Andrew, however, precedes that

timeframe be several weeks.  (*See* Ex. B.)  In the e-mail, Levy expresses great urgency for the

need for Andrew to complete his list so that "the project," as Levy refers to it, can commence at

once.  The subsequent e-mails produced on November 12, 2007 confirm that "the project" did

indeed commence in the first two weeks of September 2006.

MostChoice has refused to produce documents relating to damages pre-dating October 1, 2006 on the theory that "the project" did not start before then. NetQuote needs to understand if this "project" did indeed commence prior to October 1, 2006. If, as it appears, the fraudulent submissions to NetQuote's websites began in early September 2006, NetQuote has a right to discover who was involved in it, which NetQuote customers were identified as a result of the fraudulent submissions, and whether MostChoice was able to poach NetQuote's customers in September 2006 as a result of its deceptive conduct.

**C.  NetQuote Needs To Question MostChoice To Authenticate Documents Defendants Produced with no Document Control Numbers.**

MostChoice's evasive discovery tactics have not been limited to incomplete disclosures. Rather than producing its documents with Document Control Numbers and in a manner that would permit easy document authentication, MostChoice has produced critical documents in this case only as embedded linked files, in databases that it made available over the internet for a limited period of time, and by requiring NetQuote to search hundreds of individual e-mail accounts established by Defendants. To avoid unnecessary discovery disputes, NetQuote, at its own expense, accepted the document production in this manner but then, after printing the documents and assigning Document Control Numbers to them, sent a request for admission asking that Defendants admit to the authenticity of various of these MostChoice documents. (Request for Admission No. 1 and corresponding Response, attached as Ex. D.) Defendants, after seeking a weeklong extension claiming the need for additional time to review the documents, (*see* Dkt. # 96), flatly denied the request for admission, which covered over 4800 pages of Defendants' document production. (Ex. D.) This denial cannot be squared with Defendants' repeated insistence that it has, in fact, produced the database of responses it received

8

from NetQuote as a consequence of Byrd's ficticious submissions to NetQuote's websites. (*See, e.g.*, Byrd Request for Production No. 1 and corresponding Response, attached as Ex. E.)

To permit NetQuote to authenticate the documents Defendants have produced only as embedded files buried in massive electronic databases or in multiple e-mail accounts, NetQuote seeks to reopen the Rule 30(b)(6) deposition of MostChoice to question MostChoice about these documents with the benefit of the documents reduced to paper copies that could be shown to the jury. So that the deposition can proceed in a coherent manner, NetQuote requests that MostChoice be required to bring to the deposition paper copies of the documents contained in the databases, and that each of the pages be marked with a separate Document Control Number that includes a prefix making clear the source of the document. The documents for which such authentication is required are:

1)      the contents of the two databases described in the e-mail from counsel for MostChoice, Ryan Isenberg, Esq., dated May 21, 2007 (attached as Ex. F), titled "lead.buyers.fp7" and "http://www.mostchoice-updates.com/localnq.rar";

2)      the updated database described in the e-mail from Mr. Isenberg dated July 17, 2007 (attached as Ex. G), titled "http://www.mostchoice-updates.com/localnq.rar";

3)      any other web pages that Byrd or any other MostChoice employee saved to collect the information gained in response to MostChoice's submissions to the www.NetQuote.com and www.LocalInsurance.com websites;

4)      any other databases or lists of agent names and other information collected through Byrd's submissions to the www.NetQuote.com and www.LocalInsurance.com websites; and

5)　　　all e-mail responses Byrd received from NetQuote, Local Insurance, or any insurance agent attempting to follow up with Byrd concerning the false insurance quotation requests that he submitted.

MostChoice claims that it has already produced such documents, but it now appears that MostChoice plans on making authentication of these documents as difficult as possible at trial by denying the authenticity of the documents when they are reduced to a printed form that could be submitted to a jury. MostChoice should not be permitted to hide behind techniques such as producing only a link to a database as a means to prevent or delay admission of these critical documents at trial.

## IV. NETQUOTE SEEKS TO HAVE THESE REOPENED DEPOSITIONS TAKE PLACE AT THE FEDERAL COURTHOUSE IN DENVER.

NetQuote seeks to hold these reopened depositions at the federal courthouse in Denver for two reasons. First, Levy, MostChoice's Rule 30(b)(6) witness and its corporate representative at most of the depositions taken to date, has engaged in a pattern of disruptive conduct that did not end with the Court's most recent instruction to counsel. Second, convening the reopened depositions in Denver appropriately removes the burden on NetQuote of having to travel to continue depositions when MostChoice's bad faith conduct necessitated the continuation of the depositions.

### A. Levy Has a Pattern of Disruptive Deposition Conduct.

At the Rule 30(b)(6) deposition of MostChoice, Levy appeared for MostChoice. Levy was extremely reticent to answer questions at the deposition, and at one point flatly refused to do so. As a result of this conduct, NetQuote was required to secure the Court's intervention in the middle of the deposition, after which Levy finally complied and answered the question asked.

(Ex. C at 189:19-191:25.[2]) NetQuote had to seek this Court's intervention during depositions on a second occasion, on October 11, 2007, after Levy, attending depositions as MostChoice's corporate representative, continued his pattern of disruptive behavior. When he was asked to leave the deposition after continual disruptions by laughing out loud in a dismissive manner, Levy responded by making an obscene gesture with his middle finger toward opposing counsel. (Fleischmann Dep. Tr. 353:25-354:3, attached as Ex. H); (Jones Dep. Tr. 6:4-17, attached as Ex. I (making record of teleconference with the Court just prior to the commencement of the next deposition after the disruption).)

Amazingly, Levy's disrespectful conduct continued the next day, even *after* the Court instructed counsel to have this conduct stopped. While Levy did not attend the next day's depositions personally, that morning at MostChoice's offices, he specifically told two of the witnesses to be deposed that day, Erik Sullivan and Caroline Sellers, that he had "flipped the person off" that was asking questions at the deposition. (Sullivan Dep. Tr. 67:14- 69:13, attached as Ex. J.) That statement sent an unambiguous message to Levy's subordinates that the deposition process was not one worthy of respect and that the depositions did not deserve the solemnity accorded to court proceedings. Yet another witness testified that, the morning of his deposition, Levy undertook, without counsel present, to "prepare" him and other witnesses scheduled to testify that day for their depositions, including by telling them to "keep [their] answers short." (Ex. A at 110:24-111:21.) Not surprisingly, two of the witnesses who appeared for deposition that day were extremely hostile and gave evasive answers to questions.

---

[2]   While the court reporter did not transcribe the teleconference with the Court, the teleconference is recorded on the videotape of the deposition. If it would assist the Court, undersigned counsel can lodge a copy of the recording of the teleconference with the Clerk.

Convening the reopened depositions at the federal courthouse in Denver is necessary to demonstrate to the participants that a deposition is a court proceeding and that rude, disrespectful, and evasive conduct will not be tolerated. Conducting the depositions at the courthouse also simplifies the process in the event that further Court supervision is required.

**B.  NetQuote Should Not Be Forced To Incur the Costs of Out-of-State Travel for These Depositions.**

MostChoice's cat-and-mouse discovery games are wholly inappropriate and only serve to increase legal fees at the expense of fair and efficient resolution of this dispute. As is explained above, the reason these depositions need to be reopened is that MostChoice has failed to provide complete responses to requests for production of documents and it has produced its documents in a manner designed to avoid their authentication. Requiring MostChoice to incur the travel costs for these depositions is a fair allocation of the litigation burden caused by Defendants' discovery tactics, and well within this Court's authority pursuant to D.Colo.LCivR 30.3.

## CONCLUSION

For the foregoing reasons, NetQuote requests that the deposition of Michael Andrew and the Rule 30(b)(6) deposition of MostChoice be reopened, that they take place at the federal courthouse in Denver, and that MostChoice be required to bring to the deposition properly numbered, paper copies of the documents described above that it previously produced so that they can be authenticated on the record.

Dated:  November 12, 2007                    Respectfully submitted,


                                             */s Daniel D. Williams*_____
                                             Daniel D. Williams
                                             Teresa Taylor Tate
                                             FAEGRE & BENSON LLP
                                             1900 Fifteenth Street
                                             Boulder, Colorado 80302
                                             Tel: (303) 447-7700 / Fax: (303) 447-7800
                                             E-mail:    dwilliams@faegre.com
                                                        ttate@faegre.com

                                             David W. Stark
                                             Heather Carson Perkins
                                             FAEGRE & BENSON LLP
                                             3200 Wells Fargo Center
                                             1700 Lincoln Street
                                             Denver, Colorado 80203
                                             Tel:  (303) 607-3500 / Fax:  (303) 607-3600
                                             E-mail:    dstark@faegre.com
                                                        hperkins@faegre.com

                                             **Attorneys for Plaintiff NetQuote Inc.**

## CERTIFICATE OF SERVICE

I certify that on this 12th day of November, 2007, I electronically filed the accompanying **NETQUOTE'S MOTION TO REOPEN DEPOSITIONS AT FEDERAL COURTHOUSE** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following counsel of record:

Ryan L. Isenberg, Esq.
ISENBERG & HEWITT, P.C.
7000 Peachtree Dunwoody Road, Bldg 15, Suite 100
Atlanta, GA 30328
ryan@isenberg-hewitt.com


        __/s Daniel D. Williams_____




## CERTIFICATE OF CONFERENCE

Undersigned counsel conferred with counsel for MostChoice concerning the request that MostChoice bring its Rule 30(b)(6) witness and Mr. Andrew to Denver to continue their depositions. Counsel for MostChoice informed undersigned counsel that MostChoice would not bring the witnesses to Denver for continued depositions. Counsel for MostChoice stated further that the Rule 30(b)(6) deposition could continue in Denver with Mr. Levy as MostChoice's designee only at some undetermined time in the future when Mr. Levy would be in Denver for another reason, but to date he has provided no such dates when Mr. Levy will be in Denver on other business.


        __/s Daniel D. Williams_____