Netquote Inc. v. Byrd

Doc. 100 Att. 1

# EXHIBIT A

Dockets.Justia.com

Deposition of Michael Andrews

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 07-cv-00630-DME-MEH

NETQUOTE, INC., a Colorado
corporation,

     Plaintiff,

vs.

BRANDON BYRD, an internet user
making use of the IP Addresses
64.136.27.226 and 64.136.26.227,
and MOSTCHOICE.COM, INC., a
Georgia corporation,

     Defendants.

_____/

VIDEO DEPOSITION OF MICHAEL ANDREW

October 12, 2007
12:41 p.m. - 3:17 p.m.

7000 Peachtree-Dunwoody Road
Building 15, Suite 100
Atlanta, Georgia  30328

Reported by:
Paula Parris, CCR-CVR
State of Georgia
Esquire Deposition Services
Atlanta Office  Job #425102
Phone - 800.787.5302
       404.872.7890



Esquire Deposition Services 1180 W. Peachtree St.  Suite 650  Atlanta, Georgia 30309    tel: 404-872-7890

029d87ce-1d46-42e1-80bf-61e064bc90fa

1   A.   Yeah.  Just draw a radius in between this
2   range I believe.
3   Q.   So you went through the list of largest to
4   smallest metropolitan areas, and then you would pick the
5   center of that area, and Mr. Levy would provide you with
6   information of the radius around those areas within which
7   to --
8   A.   I think he said --
9   Q.   -- generate the list?
10  A.   Just draw a radius around here just to get
11  a sample of ZIP codes from each area.
12  Q.   When did you first learn what the purposes
13  of your list was?
14  A.   After the lawsuit became what the project
15  was.  Before that, Mike -- It was just some project he
16  was doing.
17  Q.   Did you continue to send the lists after
18  you learned what the purpose of your lists was?
19  A.   No.  But it was already -- I didn't send
20  them for a long time.  It wasn't like the process was
21  still going on.
22  Q.   The lawsuit was filed prior to these
23  e-mails from you.  So what I'm trying to get a sense of
24  is when is it that you found out -- Hang on a second.
25  A.   Okay.

1  Q.     When is it that you found out what the
2  purpose of your sending these lists was?
3  A.     Whenever Mike told us about the lawsuit.  I
4  mean, I had no idea.  I don't know when the lawsuit was
5  filed.  It was just when he came in and said this is
6  what's going on in I think his deposition -- whenever he
7  discussed the matter, but I don't remember exactly when
8  he discussed it, but it seemed a significant period of
9  time after.  I wasn't doing any of this process at that
10 point in time.
11 Q.     Okay.  And --
12 A.     And it had already been over for a while
13 whenever he brought that up -- what the project was.
14 Q.     Are you aware that MostChoice has been
15 sending false insurance quotation requests to companies
16 other than NetQuote?
17 A.     I think it may have been brought up.
18 That's the lawsuit.  But I wasn't aware --
19 Q.     No, this wasn't in the lawsuit.
20 A.     -- of any of this.
21 Q.     It's not in the lawsuit, but are you aware
22 that MostChoice has been sending false insurance -- Hold
23 on a second.
24        MR. WILLIAMS:  You're not claiming
25 attorney's eyes only for the name of the other

1    Q.    This article you read in Wired Magazine
2 related to something different?
3    A.    It related to affiliate marketing and the
4 problems with affiliates in the --
5    Q.    That's something different, right?
6    A.    -- online lead generation industry.
7    Q.    Yeah. So that's not what we're talking
8 about here, right?
9    A.    I believe I may have also read stuff in
10 regards to the online loan place -- I forget the name of
11 it, but one of the major online loan places -- you know,
12 people submitting data and -- I mean --
13   Q.    Where did you read that?
14   A.    I'm sure it was some kind of marketing
15 magazine, maybe Revenue. I mean --
16   Q.    Do you know specifically which one?
17   A.    I read so much it's really hard to say.
18 It's just --
19   Q.    Do you know specifically which one?
20   A.    I cannot specifically say.
21   Q.    Okay. Were you ever asked to preserve and
22 not destroy documents relating to this lawsuit?
23   A.    Nothing that I know of.
24   Q.    What did you do to prepare for this
25 deposition?

1   Q.   What did he say about that specifically?  I
2 don't understand what you mean.
3   A.   Well, basically that in our lead system,
4 you know, leads come in.  We look at the lead.  That
5 people have to pull reports or something.  It's just --
6 The system is not efficient from my understanding.
7   Q.   That's what Mr. Levy told you?
8   A.   Yes.
9   Q.   That NetQuote had an inefficient system?
10  A.   I don't know if he said -- He didn't say
11 inefficient.
12  Q.   Obviously in your words --
13  A.   I'm translating it to inefficient
14 basically.
15  Q.   Well, what did he say?
16  A.   Something akin to that.  I mean, he doesn't
17 like the way they do it, doesn't think it was the right
18 way.
19  Q.   Well, what did he say?
20  A.   That they've grown to 90 employees and that
21 -- or somewhere around there, much bigger than us but
22 they're probably not managing it well since the new
23 owners have come into play.
24  Q.   You spoke with Mr. Levy this morning about
25 your deposition, correct?

Esquire Deposition Services 1180 W. Peachtree St.  Suite 650   Atlanta, Georgia 30309        tel: 404-872-7890

029d87ce-1d46-42e1-80bf-61e064bc90fa

1    A.    Yes.

2    Q.    And you spoke with Mr. Levy yesterday about the depositions yesterday, right?

4    A.    I don't believe I spoke to him yesterday.

5    Q.    I'm sorry. You spoke with him this morning about the depositions yesterday, correct?

7    A.    He said just today -- prepared just us, you know. Just what the deposition process is and answer the questions asked.

10    Q.    Was Mr. Sullivan there when you spoke with Mr. Levy this morning?

12    A.    Excuse me? Can you --

13    Q.    Was Mr. Sullivan there -- Erick Sullivan there when you spoke --

15    A.    No.

16    Q.    Was Caroline Sellers there when you spoke with Mr. Levy this morning?

18    A.    Yes.

19    Q.    And what did Mr. Levy say exactly?

20    A.    Just what you said earlier about keep your answers short and answer the question asked.

22    Q.    Counsel wasn't there during these discussions?

24    A.    No.

25    Q.    What else did he say?

1    A.    Something about they don't -- Their system
2 isn't set up right, you know.
3    Q.    Yeah. But specifically you testified
4 something about monitoring leads coming into their
5 system. What did he tell you about that?
6    A.    Something about they have to use a
7 database, you know, to answer queries. It's not
8 efficient.
9    Q.    And did he tell you what witness testified
10 concerning how --
11    A.    No.
12    Q.    -- leads can be recovered from their
13 system?
14    A.    He didn't say.
15    Q.    You testified earlier I believe that Mr.
16 Levy had sent you an e-mail with instructions for how to
17 put your spreadsheets of ZIP codes and other information
18 together. Do you remember that testimony?
19    A.    It's possible it was an e-mail. I don't
20 remember if he told me or if it was an e-mail.
21    Q.    Have you ever looked for that e-mail?
22    A.    No.
23    Q.    Have you kept that e-mail?
24    A.    Yeah. I don't -- You don't delete stuff.
25 It's just probably somewhere in my inbox.

1  Q. Okay. And I'll ask now that you find that
2  e-mail and send it to your counsel today or tomorrow.
3        MR. WILLIAMS: And we'll ask counsel to
4  turn it over to us as soon as Mr. Andrew turns it
5  over to you.
6        MR. ISENBERG: What is it?
7        MR. WILLIAMS: This is the e-mail he
8  received with his instructions. Strike that.
9  BY MR. WILLIAMS:
10 Q. I'll ask you for all e-mails you received
11 from Mr. Levy with instructions as to how to compile the
12 spreadsheets that you're providing to Mr. Byrd or how or
13 where to transmit them.
14 A. Okay.
15       MR. ISENBERG: You can send them to me. I
16 don't know about today or tomorrow. He doesn't
17 work tomorrow and we got out of here at 6 o'clock
18 today it might be a little unreasonable, but --
19       MR. WILLIAMS: That -- No. You know what,
20 that's fair. I forgot it's Friday. I would ask
21 that you do that by the end of the day on Monday.
22 Is that doable?
23       THE DEPONENT: I'll look and see again.
24       MR. WILLIAMS: Is that acceptable, counsel?
25       MR. ISENBERG: Yeah.