# EXHIBIT C

Deposition of Michael Levy

Page 1



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Civil Action No. 07-cv-00630-DME-MEH

NETQUOTE, INC, a Colorado corporation,

      Plaintiff,

vs.

BRANDON BYRD, an internet user making
use of the IP Addresses 64.136.27.226 and
64.136.26.227, and MOSTCHOICE.COM, INC.,
a Georgia corporation,

      Defendants.                      /

\*\*THIS TRANSCRIPT IS CONFIDENTIAL AND PORTIONS OF\*\*
THE TRANSCRIPT ARE DESIGNATED ATTORNEY EYES ONLY

VIDEOTAPED 30(b)(6) DEPOSITION OF

MICHAEL LEVY

September 5, 2007

Volume I

Building 15, Suite 100
7000 Peachtree-Dunwoody Road
Atlanta, Georgia

Reported By:
F. Renee Finkley, RPR, CRR,
Georgia CCR-B-2289
Esquire Deposition Services
Atlanta Office Job No. 424829B
Phone - 404-872-7890

1  "information" implies that they would actually do
2  something with it. Until they actually do something
3  with it, it's nothing but bits and bytes going over
4  a -- going over a data line. So I don't object to
5  the false. I object to the information.
6      Q.   What would you call the false information
7  that he submitted? Data?
8      A.   He submitted data.
9      Q.   So did you hire Mr. Byrd to submit false
10 data into NetQuote's web sites?
11     A.   Yes.
12     Q.   When did you engage Mr. Byrd to do this?
13     A.   It would have been -- you know, we talked
14 about it, I think, late September. And I think he
15 got started around in October.
16     Q.   Did he ever perform such services for
17 MostChoice as an independent contractor prior to
18 early October?
19     A.   I just remember at first we were going to
20 pay him as an independent contractor. And then we
21 switched it over to an employee. And I can't
22 remember how long he was -- it probably was only a
23 matter of weeks or something like that. I don't
24 remember -- I can go check and see what account he
25 was under in the accounting system, and exactly when

1 it started and when it switched over to the payroll
2 account. And I can tell you exactly.
3     Q.    You should do that.
4     A.    Okay.
5     Q.    Is it your testimony that Mr. Byrd was not
6 submitting these false insurance quotation requests
7 prior to the October 2006 time frame?
8     A.    He was not working for us or me -- or he
9 was not on this project, as I like to refer to it,
10 before then, as far as I can recall today.
11     Q.    Do you have any knowledge of whether or
12 not he was submitting the false insurance quotation
13 requests prior to the October 2006 time frame?
14     A.    I don't think -- I can't remember whether
15 he started late September or early October.
16     Q.    One of those two?
17     A.    It's somewhere in that time frame, but he
18 was never doing it before we put together the
19 project, or I should say I put together the project.
20     Q.    You taught Mr. Byrd how to execute his
21 steps under the project, right?
22     A.    I showed him how.
23     Q.    In your home?
24     A.    Yes.
25     Q.    One evening?

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Civil Action No. 07-cv-00630-DME-MEH

NETQUOTE INC, a Colorado corporation,

    Plaintiff,

vs.

BRANDON BYRD, an internet user making
use of the IP Addresses 64.136.27.226 and
64.136.26.227, and MOSTCHOICE.COM, INC.,
a Georgia corporation,

    Defendants.                    /

**THIS TRANSCRIPT IS CONFIDENTIAL AND PORTIONS OF**
THE TRANSCRIPT ARE DESIGNATED ATTORNEY EYES ONLY

CONTINUED VIDEOTAPED 30(b)(6) DEPOSITION OF

MICHAEL LEVY

September 6, 2007

Volume II

COPY

Building 15, Suite 100
7000 Peachtree-Dunwoody Road
Atlanta, Georgia

Reported By:
F. Renee Finkley, RPR, CRR,
Georgia CCR-B-2289
Esquire Deposition Services
Atlanta Office Job No. 424831B
Phone - 404-872-7890

1  previous exhibit. The document that you described
2  that's the lawsuit by Geico versus MostChoice is
3  actually marked Exhibit Number 28. This lawsuit also
4  objects to MostChoice's use of the term Geico on its
5  web site, correct?
6      A.   Yes.
7      Q.   And it also objects to MostChoice's paid
8  searches to steer traffic to MostChoice if Geico is
9  typed into Yahoo or Google, correct?
10     A.   Yes.
11     Q.   And it alleges that MostChoice has used
12 incorrect spellings of Geico, so that if someone
13 types in an incorrect spelling of Geico, MostChoice
14 will pop up, correct?
15     A.   I'm going to trust you on it. I believe
16 yes.
17     Q.   That is something that MostChoice, in
18 fact, does, correct?
19          MR. ISENBERG: I'm going to object to the
20     question. I mean, if you're asking him about
21     allegations in the complaint, there's been an
22     answer filed. There are legal implications and
23     I think that's problematic.
24     Q.   (By Mr. Williams) Go ahead and answer,
25 please.

1  MR. ISENBERG: No, I'm going to instruct
2  him that, you know, that the answer speaks for
3  itself.
4  THE WITNESS: Read the document.
5  MR. ISENBERG: You want to ask him a
6  question that the answer to the question, you
7  know, is a factual matter, has an impact on an
8  answer that's been filed in the case. I mean,
9  that's -- I think that's problematic. I think
10 it's, you know, patently inappropriate.
11 THE WITNESS: Unethical.
12 MR. ISENBERG: Well, I don't think it's
13 unethical. But I think the answer speaks for
14 itself. I mean, I think you're trying to ask
15 him a question, and you know, you've got an
16 answer that's been filed in a lawsuit that
17 includes, you know, both legal and factual
18 consideration of allegations. And so you're
19 asking him to, you know, commit to providing, I
20 think, a partial response that could later be,
21 you know, potentially used against him in that
22 litigation.
23 MR. WILLIAMS: What part of rule 30
24 authorizes your objection?
25 MR. ISENBERG: Well, the part that says

1  that I guess we can stop the deposition, and I
2  can move for a protective order.
3          MR. WILLIAMS: That is your obligation.
4  That's right. Do you want to do that now?
5          MR. ISENBERG: No, I'll --
6          MR. WILLIAMS: He has to answer the --
7  those are your options. He can answer the
8  question, or you can stop and move for
9  protective order. So which is it?
10         MR. ISENBERG: You know, what do you want
11 to do?
12         THE WITNESS: Move for a protective order.
13 The judge isn't going to hear for this --
14         MR. ISENBERG: I'm sorry, but you know --
15         MR. WILLIAMS: Okay. Let's get the judge
16 on the phone.
17         THE WITNESS: Are we on or off?
18         MR. WILLIAMS: We're going to stay on the
19 record.
20         (Discussion off the record with the
21 judge.)
22         Q.    (By Mr. Williams) A few minutes ago, we
23 were talking about the complaint that Geico filed
24 against MostChoice, correct?
25         A.    Correct.

1     A.    I've instructed each and every one of
2 them.
3     Q.    What have you done to confirm that each
4 and every one of them has followed that practice?
5     A.    I occasionally check their desks.
6     Q.    What have you done to search for paper
7 documents that refer to NetQuote in each and every
8 one of the 25 employees' control?
9     A.    I've gone to every desk, every cube,
10 opened every drawer, looked in every possible place
11 that they would put paper.
12     Q.    Your testimony is that you've reviewed
13 every piece of paper at MostChoice personally to
14 determine whether any of them contained references to
15 NetQuote?
16     A.    Yes.
17     Q.    How long did that take you?
18     A.    About a weekend.
19     Q.    How many hours?
20     A.    Several.
21     Q.    Well, about how many?
22     A.    As I was going -- I would say nine.
23     Q.    Nine hours?
24     A.    Nine hours.
25     Q.    Did you find any paper documents in those

1  A. There are -- well, yeah, there's --
2  there's several databases that make up the entire
3  application that runs our office.
4  Q. There's a sales database?
5  A. Sales database, there's a customer's
6  database, and there's many, many sub-databases that
7  compose those two main databases.
8  Q. What did you do to search all of those
9  databases?
10 A. I searched all of the records that would
11 be the type of records that would -- like the
12 activity records that could contain references to
13 NetQuote.
14 Q. Now, you produced some today or yesterday
15 that you hadn't produced previously, right?
16 A. Correct.
17 Q. And why hadn't you discovered those during
18 your previous search?
19 A. Actually, I had.
20 Q. But you withheld them?
21 A. Yeah, we hadn't given them over for one
22 reason or another. So we brought them today.
23 Q. Do computer users at MostChoice have a
24 limit on the number of e-mails they can keep in their
25 e-mail account?

1    A.    No.
2    Q.    They can keep an unlimited number of
3 e-mails?
4    A.    They can.  We use a POP3 server, so it
5 downloads to their individual computers.
6    Q.    So their e-mails are all resident on their
7 individual computers; is that right?
8    A.    Yes.
9    Q.    Do you use an Outlook system?
10   A.    Yes.
11   Q.    Whose computers did you search for
12 responsive documents?
13   A.    I searched every computer in the office.
14   Q.    You've just discovered a file of Martin
15 Fleischmann e-mails that you didn't search, right?
16   A.    He had disconnected it from the main PST
17 file -- he had two PST files operating in Outlook.  I
18 did not notice the second PST file, so I searched his
19 first PST file, and then searched his second one.
20 Nobody else was using two PST files.
21   Q.    How do you know that?
22   A.    It was a special circumstance that caused
23 him to use two PST files.  Nobody else did.
24   Q.    Have you asked the other employees whether
25 any of them is using two PST files?

1  searches.
2  Q.  Why don't we do it this way.  Listen to my
3  question, and answer the question I ask you.
4  A.  Okay.
5  Q.  You ran the search terms Striegel and
6  Coccari on your own computer and on Mr. Fleischmann's
7  computer; is that correct?
8  A.  Correct.
9  Q.  Did you run them on anyone else's
10 computer?
11 A.  No.
12 Q.  Did you run any other search terms on your
13 computer?
14 A.  I ran a myriad of terms on my computer and
15 on Marty's computer.  Capozzi was one of them, you
16 know, Keith, Chris.  Pulled up a lot of stuff that
17 wasn't related.  I'm trying to remember.  There were
18 a lot of ways that I ran it.  The majority of the
19 stuff simply comes back under NetQuote or NQ.
20 Q.  What other search terms do you recall
21 running on your computer or Mr. Fleischmann's
22 computer?
23 A.  Stripes, Spectrum.
24 Q.  Any others?
25 A.  There were some terms related to our