IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 07-cv-00630-DME-MEH

**NETQUOTE INC, a Colorado corporation,**

    Plaintiff,

v.

**BRANDON BYRD, an internet user making use of the IP Addresses 64.136.27.226 and 64.136.26.227, and**

**MOSTCHOICE.COM, Inc., a Georgia corporation**

    Defendants.

_____

**DEFENDANT MOSTCHOICE.COM'S RESPONSE TO
PLAINTIFF'S MOTION TO REOPEN DEPOSITIONS**
_____

    COMES NOW, Defendant Mostchoice.com, Inc. and herein files this its Response to Plaintiff's Motion to Reopen the Depositions of Michael Levy and Michael Andrew and show this Court the following:

**Introduction**

    The general assertions made by the plaintiff in its introduction are just factually and legally wrong, and the suggestion that Mostchoice has not provided sufficient documents is most certainly the pot calling the kettle black.

    FRCP §34(b) clearly requires that *unless the parties otherwise agree, or the court otherwise orders* electronic documents will be either be produced how they are kept or in their native format. The rule further requires that documents need only be produced in a single format.

Yet, despite these being the rules, Neqtuote complains that Mostchoice produced the database it created and maintained specifically for the Brandon Byrd project as both it was kept in the ordinary course of business and in its native format.[1]

Netquote also complains that Mostchoice has refused to authenticate documents it produced. This is either a blatant misrepresentation to the Court, or more likely a demonstration that Netquote's counsel is simply not familiar with the differences in the documents that were sent to Netquote and the documents that were asked to be authenticated.

Mostchoice produced a copy of files that were downloaded from the internet. These are web pages saved by Brandon Byrd as he would generate a lead through the Netquote, or Localinsurance web site. These files contain images and links that are embedded in the downloaded files themselves. They were organized within folders assigned to the areas that related to where the submissions were made. In addition, Mostchoice produced the database that contained the agents identified by Byrd's submissions.

Finally, if this Court finds that post deposition production of previously requested documents is grounds for reopening a deposition, then Mostchoice will certainly join the chorus because documents were produced post deposition by the plaintiff as well.

I.  Court Authority

Mostchoice does not dispute that the Court has authority and discretion to reopen the depositions. However, repeated or second depositions are rare and disfavored. See ***Cuthbertson v. Excel Indus.***, 179 F.R.D. 599, 605 (D. Kan. 1998); ***Dixon v. Certainteed Corp.***, 164 F.R.D.

---

[1] Ironically, as demonstrated herein, Mostchoice has had to beg for documents to be produced in native, or other electronic format.

685, 690 (D. Kan. 1996)citing **Starcom, Inc. v. US Telecom, Inc.**, No. 87-2540-O, unpublished op. at 1 (D. Kan. June 20, 1990).

II. Deposition of Michael Andrew

Plaintiff's representation of Michael Andrew's involvement in Byrd's submissions is highly exaggerated. Andrew knew nothing of what Byrd was doing (See Deposition of Michael Andrew Page 77 Lines 12-16). His involvement was limited to identifying street names that corresponded with a telephone prefix (See Deposition of Michael Andrew Page 60 Lines 17-23).

Before discussing the post deposition production of e-mails (of which Netquote twists for the purpose of making a mountain out of a mole hill) Netquote produced an e-mail on November 28th that it not only failed to produce in response to its initial discovery, but confirmed didn't exist, and then it miraculously appeared after a "redoubling of its efforts" (See E-mails from Netquote counsel attached hereto as Exhibit "A"). How is it then that when Mostchoice located documents after further searching that this is sinister, but when Netquote does it, it's a mere oversight?

Netquote seeks to re-depose Andrew over two issues, one of which should be resolved in this filing. Netquote claims a need to depose Andrew over the e-mails that were produced after his deposition for the purpose of authentication. Mostchoice stipulates to the authenticity of EVERY document it produced, so long as they are not altered.[2] These particular e-mails were sent to Mostchoice's counsel and then sent to Netquote's counsel by e-mail. There is no dispute as to the authenticity of those e-mails.

Netquote then claims to need to re-depose Andrew because he can't be called to trial and

---

[2]As the saved web pages were when distilled by the plaintiff from HTML to PDF.

perceive they have additional materials that are suitable for further cross-examination. Specifically, Netquote claims that

> "in light of Levy's September 6, 2006, e-mail at the commencement of the project, it is now clear that Andrew did indeed understand that the purpose of the list was to assist in the submission of information to a competitor in as quick a manner as possible to facilitate a "denial of service attack" that would not look "contrived." (Plaintiff's Motion at 5)

Netquote acknowledges that Andrew already testified that he didn't know the reason he was asked to provide the street names and prefixes (Plaintiff's Motion at 4). The e-mail at issue makes no reference to Netquote, Brandon Byrd or what would be done with the information, and was sent to Andrew, as opposed from him.

Netquote rather humourously hangs its hat on the use of the phrase "denial of service attack," that is contained in the e-mail. First of all, Mostchoice has already proffered that this was a communication from Mr. Levy to Mr. Andrew, both technically familiar people, not to provide more information than was necessary.[3] Second, and perhaps most important, and the part that makes this humorous is what constitutes a denial of service attack

> In a denial-of-service (DoS) attack, an attacker attempts to prevent legitimate users from accessing information or services. By targeting your computer and its network connection, or the computers and network of the sites you are trying to use, an attacker may be able to prevent you from accessing email, web sites, online accounts (banking, etc.), or other services that rely on the affected computer.
>
> The most common and obvious type of DoS attack occurs when an attacker "floods" a network with information. When you type a URL for a particular web site into your browser, you are sending a request to that site's computer server to view the page. The server can only process a certain number of

---

[3] It cannot be surprising that technical people would use technical terms outside of their normal parlance.

requests at once, so if an attacker overloads the server with requests, it can't process your request. This is a "denial of service" because you can't access that site.

See US Department of Homeland Security National Security Cyber Alert System Tip ST04-015[4]

Brandon Byrd, who is described in the plaintiff's complaint as a part-time fitness instructor, had no computer related experience, and was using dial up internet access to submit a fictitious lead between every 5-8 minutes, or about seven (7) an hour (See Deposition of Brandon Byrd Page 13- Lines 9-20; Page 91 Lines 13-14; Page 101- Page 102 Line 10). Considering the number of applications Netquote receives, it is clear that not only was a denial of service attack ever intended, it wasn't technologically possible under the circumstances. All of this is to demonstrate that Levy was, as proffered, telling Andrew not to give too much information, and was not informing Andrew that this was the purpose of this project. If Netquote wants to make such an ridiculous argument at trial, then they are free to do so, but to require Mostchoice to fly Mr. Andrew to Denver for a deposition over one e-mail is an undue burden.

III. 30(b)(6) Deposition

Yet again, in response to the allegations of late produced documents, Mostchoice points out that it has received contracts and e-mails that could have and should have been produced before depositions of Netquote's employees, but failed to do so.[5]

**A. Need to Inquire About Searching for Documents**

Even in a case involving exclusively hard copy documents, there is no obligation on the part of a responding party to examine every scrap of paper in its

---

[4] http://www.us-cert.gov/cas/tips/ST04-015.html

[5] Depositions of Netquote's employees were taken the week of September 24. Netquote produced additional documents on 10/5, 10/29, and 11/28.

> potentially voluminous files in order to comply with its discovery obligations. Rather, it must conduct a diligent search, which involves developing a reasonably comprehensive search strategy. Such a strategy might, for example, include identifying key employees and reviewing any of their files that are likely to be relevant to the claims in the litigation. See, e.g., General Electric Corp. v. Lear Corp., 215 F.R.D. 637, 640 (D. Kan. 2003); McPeek v. Ashcroft, 202 F.R.D. 31, 32-33 (D.D.C. 2001) ("In a traditional 'paper' case, the producing party searches where she thinks appropriate for the documents requested under Fed. R. Civ. P. 34. She is aided by the fact that files are traditionally organized by subject or chronology ('chron' files), such as all the files of a particular person, independent of subject."). Defined search strategies are even more appropriate in cases involving electronic data, where the number of documents may be exponentially greater. See, e.g., In re Ford Motor Co., 345 F.3d 1315, 1316-17 (11th Cir. 2003); Wood v. Sempra Energy Trading Corp., 2005 U.S. Dist. LEXIS 33637, No. 3:03-CV-986, 2005 WL 3465845, at *4-6 (D. Conn. Dec. 9, 2005); United States ex rel Tyson v. Amerigroup Ill., Inc., 2005 U.S. Dist. LEXIS 24929, No. 02 C 6074, 2005 WL 3111972, at *2-3 (N.D. Ill. Oct. 21, 2005); McPeek, 202 F.R.D. at 35. See also The Sedona Principles: Best Practices Recommendations & Principles for Addressing Electronic Document Production, Principle 11 (2003) ("A responding party may properly access and identify potentially responsive electronic data and documents by using reasonable selection criteria, such as search terms or samples.").

***Treppel v. Biovail Corp.***, 233 F.R.D. 363, 374 (D.N.Y. 2006)

In the case at bar, as pointed out by the plaintiff, Levy testified that he searched for paper documents, and employed various search terms to search for relevant documents (Plaintiff's Motion at 6). Netquote contends that because Mostchoice located documents after it first searched for them that it needs to further inquire about the process for document searching.[6]

---

[6]Shouldn't this be a two way street, or do we assume that Netquote's subsequent discovery of documents was merely inadvertent, while Mostchoice's subsequent discovery was a plot to obfuscate the discovery process?

### B. When the submissions started?

Netquote claims the need to re-depose Levy, who was already deposed for seven hours,[7] to further inquire about when the false submissions began based on two e-mails that they contend support the theoretical possibility that it began in early September, rather than late September.

A review of the evidence adduced to date reveals that Netquote does not need further deposition testimony on this issue. As pointed out by Netquote, Levy testified that Byrd began the project in late September or early October. Byrd testified that he began working in early October, and Netquote was able to ascertain the IP addresses where Byrd's leads had originated, could tell the good from the bad, and can run this analysis on its own database.[8]

Finally, rather than create an issue of when the submissions began, the e-mail the plaintiff relies upon is consistent with the project beginning in early October as it was necessary to gather the street address and telephone prefix information before Byrd could start making submissions.

### C. Need to Authenticate Documents

Netquote complains because Mostchoice produced documents in compliance with F.R.C.P. §34(b) by producing electronic documents in both the native format, and the format in which the data was maintained. Specifically, Mostchoice sent two forms of electronic data that Netquote addresses in its motion.[9] One contained documents that were saved web pages that Byrd saved from Internet Explorer, and the other was a database of the results of Byrd's

---

[7] 10 ½ hours including breaks.

[8] See Deposition of Brandon Byrd Page 14 Lines 13-16; Deposition of John Marosi Page 35 Lines 13-16; 42 Line 1 - Page 43 Line 16

[9] Netquote appears to incorrectly refer to both kinds of data as a database, which is certain to confuse the Court.

submissions. When a web page is saved, the page is saved separately from the images, and other content that is linked within the document.

*What we see...* (saved page)                          *Files that are linked* (images, etc.)

 

For each city or geographical area, Byrd saved the web pages for each submission made and created a file structure based on geography. Those files were made available for Netquote to copy exactly how they were created. Netquote cannot complain when the documents cannot be authenticated after it distilled the documents and changed the format, author, file creation date, etc.[10] (See Exhibit "B" attached hereto demonstrating an example of the document properties with an unknown author "DallasPro8" and a July 31, 2007 creation date.) Netquote's claims

---

[10]Other than taking the agent data from the saved page and inserting it in the database, no one looked at these pages, which were created by Netquote (which is why it is strange that they claim to need Mostchoice to authenticate these documents). , and no one has specific knowledge as to what they are. The way that documents that are created electronically that no one can identify the page content. However, the saved pages do contain information that Netquote would be able to match to its database.

regarding document control numbers are inconsistent with receiving documents produced in native format.[11]

Mostchoice electronically analyzed the files to determine whether or not the documents could be authenticated when compared to the native files and determined that this could not be done.

The bottom line is that the saved web pages are Netquote's documents.[12] a database is not easily reduced to paper format. However, even if reduced to paper, a deposition of Mostchoice is not going to result in authentication of the files as produced for two reasons. The documents are not what they purport to be, and no one is familiar with the documents. They were maintained for the sole purpose of extracting the final document that identifies the Netquote agent(s) who received the lead.

With respect to the e-mail accounts, Netquote was provided access to the accounts and the passwords. Byrd testified that he didn't read the e-mails that were sent to him after he submitted the applications, and could therefore not authenticate them. (See Deposition of Brandon Byrd Page 166 Lines 17-20).

Netquote requests that the Court require Mostchoice "bring paper copies of the documents contained in the databases . . ." (See Motion at 9). This request demonstrates that Netquote still doesn't get it. First, the saved web pages are not a database. Second, they have

---

[11] See Exhibit "C" and "D"
http://www.abanet.org/lpm/ltt/articles/vol1/is5/TheNewFederalRulesonE-Discovery.shtml
http://www.metrocorpcounsel.com/current.php?artType=view&EntryNo=7606

[12] The web pages were created by Netquote and contain an Application ID number assigned by Netquote. (See Exhibit "E")

been produced in accordance with the FRCP. Third, Mostchoice will stipulate to the authenticity of the documents it produced in electronic form.[13] Fourth, neither Byrd nor Mostchoice can authenticate documents that no one has seen or paid attention to before, and fifth, all of the saved web pages were all documents created by Netquote in the first place.

Finally, with respect to items 3 and 4 of Netquote's requested remedies on page 9 of its motion, there are no other web pages or databases that were not produced. Most importantly, as Byrd testified to at deposition, he never read the e-mails, couldn't remember half of the e-mail accounts, and Netquote was provided with access to all of them (See Deposition of Brandon Byrd Page 58 Lines 21-25).

IV. Location of Deposition

First, Michael Andrew should not be forced to travel to Denver to give a deposition to answer a short series of questions about an e-mail that was sent to him by Mr. Levy. In the event the Court finds that Andrew should be re-deposed for this purpose, there is no reason it can't be handled over the telephone or by video-conference.

**A. Levy's Disruptive Deposition Conduct**

Netquote's assertions that Levy's conduct was continuously disruptive is overblown and misleading. Claims that Levy refused to answer questions are ridiculous. Levy was questioned about matters that were not relevant to the case, including his individual minority position in an adult entertainment business, other pending lawsuits, and copyright infringement allegations were made about his potential sharing of a video game with Brandon Byrd. The Court was not

---

[13] Its not quite clear what all the fuss is about. Byrd and Mostchoice have admitted that Byrd made false submissions to Netquote.

called because of disruptive behavior in the first instances, rather it was called for the purpose of determining whether or not he would be compelled to testify about matters pending in another case out of concern the information would be shared with that other litigant.

Levy did gesture with his middle finger towards opposing counsel during one deposition. Whether or not that required the Court's attention is a matter of opinion. Just because the plaintiff's counsel can't handle an opposing litigant's behavior doesn't make it disruptive. If laughing or sneezing are too disruptive for a lawyer to take a deposition, then perhaps transactional work is a better course. This is not to say that it is ever appropriate for a party or lawyer to be disruptive, but the realities of litigation are that there are emotions involved, and things get heated during deposition. And, just because an opposing witness doesn't answer the question posed is not disruptive.

Further, claims that Levy was disruptive the following day are without merit. Levy did not appear at the next day's depositions, and Mostchoice was represented by its CEO, Martin Fleischmann. Netquote contends that Levy's relaying what happened the previous day sent a message that the deposition process was not worthy of respect. However, there is nothing in the record that would support such an assertion. If hostility and evasiveness are proxies by which disruption is measured, then perhaps it would be helpful for the Court to examine the number of times Netquote's witnesses feigned lack of knowledge, lack of understanding, or were coached into not providing responsive testimony.[14]

---

[14]Such an exercise would serve no useful purpose, but Mostchoice is concerned that because the matter is being pressed by

**B. Who should bear the cost of the deposition?**

If the Court grants the plaintiff's motion, there is no reason why they cannot be done over the telephone, or video-conference. The depositions would be limited to the matters identified in the motion, and would therefore, or should therefore be very short.

<u>V. Alternative Dates</u>

Plaintiff proposes that the Court should grant its motion and require Levy and Andrew to appear for deposition before December 31, 2007. Mostchoice implores the Court to not require travel before the end of the year. It is already December 3rd. The undersigned announced at the scheduling conference in June, plans for a vacation from December 16-19. As a consequence, though dispositive motions are technically due on the 18th they are effectively due Friday, December 14th. Subsequent travel just before and after Christmas or before New Years is difficult and expensive. Further, in an unrelated case, Mostchoice and its counsel expect to have to scheduled depositions either on Friday, December 21 or December 28 as discovery expires on the latter.[15]

Currently, the final pre-trial conference is scheduled for February 8, 2007. Because Mostchoice and Levy will be present at that time anyway, should the Court conclude Plaintiff should get a second bite at the proverbial apple, Mostchoice contends that it should be then, and not in a special trip.[16]

---

[15] GEICO v. Mostchoice US Dist. Court (Southern District of Maryland)

[16] Mostchoice has moved for a continuation from the February 8 date. However, should the Court grant Mostchoice's motion and reschedule the final pre-trial conference, then that date or before would be acceptable and preferred.

**Conclusion**

It is apparent from the plaintiff's own motion that it has already extensively examined Mostchoice on its document searching and production, and when Byrd began submitting leads. There is no good reason to compel additional deposition testimony on these issues. As for the issue of the authentication of documents, which isn't a red herring, and not a real issue, if what the plaintiff seeks to is to have Mostchoice print out the 3,001 saved web pages and bates stamp them for production, then while that is a waste of time and resources, and would be contrary to F.R.C.P. §1, it would be more economical than requiring Mr. Levy to fly out to Denver to testify that he has no idea what the documents are that are being shown to him.

The Court made it perfectly clear when called about Mr. Levy's finger incident that future disruptions in deposition would have a consequence. Subsequently, he didn't show up for the next day's depositions, or the depositions taken of the plaintiff's expert, or the two witness depositions taken by Netquote. There is no reason to believe that Levy would cause a problem in any subsequent deposition of himself, and no reason that even if the Court grants additional depositions to the plaintiff that such short depositions cannot be handled adequately by telephone or video-conference.

Dated this 3rd day of December, 2007.

                                                    **s/ Ryan Isenberg**
Ryan L. Isenberg, Esq.
Isenberg & Hewitt, P.C.
7000 Peachtree Dunwoody Road
Building 15, Suite 100
Atlanta, Georgia 30328
Telephone: 770-351-4400
Facsimile: 770-828-0100 (Fax)
Email: ryan@isenberg-hewitt.com

**CERTIFICATE OF SERVICE**

      I hereby certify that on this 3rd day of December, 2007, I served the foregoing Response to Plaintiff's Motion to Re-Open Depositions by electronic delivery, as an attachment to an email, to the following counsel of record:

David W. Stark
Heather Carson Perkins
Daniel D. Williams
Theresa T. Tate
FAEGRE & BENSON LLP
3200 Wells Fargo Center
1700 Lincoln Street
Denver, Colorado 80203
dwilliams@faegre.com

                                                    **s/ Ryan Isenberg**