Exhibit "C"

Dockets.Justia.com

**WHITE PAPER:** Don't leave your e-discovery response planning to chance.

*A Comprehensive Approach to Discovery Response Planning*

Download your complimentary copy from Fios, Inc. today!
www.fiosinc.com

**LAW PRACTICE MANAGEMENT SECTION**

# LAW TECHNOLOGY TODAY

HomeAboutSubscribeAdvertiseArchivesLPM Web SiteEditorial BoardFeedback  Search LTT [SEARCH]

**In this issue** of *Law Technology Today* :: July 2007

### Columns

**Fire Wire**
John Tredennick

**Tech Events**
George Socha

**[NEW] The Digital Edge: Lawyers and Technology**
Sharon D. Nelson & Jim Calloway

### Editors

Craig Ball
Joseph Kashi
Dennis Kennedy
Browning Marean
Tom Mighell
Tom O'Connor
Dan Pinnington
George Socha
John Tredennick
Kurt Harzke
Sheri Jacobs

Related Publication

### Fire Wire

## The New Federal Rules on E-Discovery: The First 180 Days

Edited By John Tredennick

Now that we have some perspective on the Federal Rules of Civil Procedure, what impact has it had in the last six months? In this roundtable, experts in electronic discovery discuss their experiences with the new rules and what they anticipate for the future.

It has been a half year since Congress allowed the proposed amendments to the Federal Rules of Civil Procedure take effect. In the months leading to December 1, 2006, we were flooded with announcements about the dire effects the new rules governing the treatment of electronic evidence would have and enough CLE programs to max anyone out for the next decade at least. Every magazine with any kind of legal bent had stories on the scope of the new rules and a number of books hit the stands.

Six months have passed and it is worth taking a look back to see what impact, if any, the new rules have had. To be sure, this may be a bit premature. It will take years before we know the full impact of the rule changes. But, with all the "sturm and drang" associated with electronic discovery today, it is worth an early report on what changes corporations and their counsel are seeing already. We will come back to this topic in another 6 months or so and check again on how things are going.

We have assembled a blue chip panel of practitioners and consultants, most of whom have decades of discovery experience and years



Learn how to...



3M RFID  The search is over.

### Upcoming Technology Events
By George Socha

**SUBMIT EVENT**

**Conference**
5th Australian Digital Forensics Conference
Edith Cowan University, School of Computer and Information Science
Dec 03, 2007 6:00 AM to Dec 03, 2007 6:00 AM

**Audio Conference**

VOL 1 NO 5

New Podcast Series:
The Digital Edge
Lawyers and Technology

working with electronic files. We have asked them to talk about what they are seeing on the front lines and where they think this is all heading.

## Our Panel

**Craig Ball (CB)** is a board certified trial lawyer turned electronic evidence expert who serves as a court-appointed special master in Federal and state courts and as a consultant in computer forensics and e-discovery, notably in the Enron/Andersen, Tyco, BP Texas City explosion and Katrina Canal Breaches consolidated litigation cases. Craig holds multiple certifications in computer forensics and specializes in cases involving alleged theft of digital data. A frequent lecturer on forensic technology, Craig's award winning monthly e-discovery column, "Ball in Your Court," appears in American Lawyer Media publications. His many other publications on electronic discovery can be found at his website.

**Joe Kashi (JK)** is a trial lawyer in Soldotna, Alaska who has been requesting and working with electronic discovery since 1994 and who has written extensively on this subject for the Law Practice Management Section and other entities over the past decade. A member of the Alaska Court System's Civil Rules subcommittee now revising the Alaska Rules of Civil Procedure to incorporate ESI, he recently made a two hour presentation to the 2007 Alaska Judicial Conference about discovering, authenticating and using ESI in civil litigation. He fervently hopes that the Conference's guest of honor, Chief Justice Roberts, did not attend that particular session.

**Dennis Kennedy (DK)** is a technology lawyer, legal technology consultant, and well-known blogger based in St. Louis, Missouri. An award-winning author and frequent speaker, Dennis has written extensively on the technology of electronic discovery and co-authors the "Thinking E-Discovery" column at DiscoveryResources.org. His website and blog are well-regarded resources on legal technology and electronic discovery topics. He is a member of the Council of the ABA's Law Practice Management Section and the Webzine Board.

**Browning Marean (BM)** is a litigation partner in DLA Piper's San Diego Downtown office. He specializes in the areas of complex business litigation, technology matters, professional responsibility, and knowledge management. Browning is a nationally known teacher and lecturer on computer technology and its application to efficient practice and matter management, risk and decision analysis, legal ethics issues, e-discovery and knowledge management. Browning is a member of DLA Piper's Technology Committee, and is an emeritus member of the California State Bar Law Practice Management Committee. He is a member of the San Diego County Bar Association Ethics Committee and the Sedona Conference.

**Sharon Nelson (SN)** is the President of Sensei Enterprises, Inc., a computer forensics and legal technology corporation based in Fairfax, VA. She is a co-author of The Electronic Evidence and Discovery Handbook: Forms, Checklists and Guidelines (2006, ABA) and Information Security for Lawyers and Law Firms (2006, ABA). She is the co-author of the monthly column "Hot Buttons" in Law Practice magazine and writes and speaks on the subject of electronic evidence throughout the country. Ms. Nelson has been interviewed on e-



Order Online

---

Document Retention Dos & Don'ts for Law Firms
National Constitution Conference Centers
Dec 04, 2007 12:00 PM to Dec 04, 2007 1:00 PM

**Conference**

**11th Annual Electronic Discovery and Records Retention Conference - San Francisco**
West Legalworks
Dec 13, 2007 9:00 AM to Dec 14, 2007 1:00 PM

**Conference**

**Electronic Discovery and Records Management: New Litigation Challenges**
Federal Judicial Center
Jan 17, 2008 7:30 AM to Jan 17, 2008 4:45 PM

Full Calendar

---

James I. Keane Memorial Award for Excellence in eLawyering



Submit Your Nomination by December 31, 2007

Learn More

evidence topics by ABC, NBC, CBS, CNN, NPR and Oprah's "O" Magazine (only the latter gained her any credibility with her three daughters). Her next book, with co-authors John Simek and Bruce Olson, will be Electronic Evidence Best Practices, to be published in the spring of 2008 by the American Bar Association.

**John Tredennick (JT)** is the editor of Law Technology Today and a former Chair of the Law Practice Management Section. After a quarter century as a trial lawyer and litigation partner at Holland & Hart, he founded and is CEO of Catalyst Repository Systems, a leading provider of web-based repositories for document review and electronic discovery. He is the author of 4 books and countless articles on legal technology issues.

## Questions
### 1. Well, its been 6 months since the new rules took effect. Has anyone seen any difference?

**Dennis Kennedy:** My mailbox and email inbox continue to fill up with a stream of announcements for seminars about the impact of the new rules. While there are certainly a lot of educational opportunities and articles out there, I don't hear many lawyers saying that they are actually involved in e-discovery on a daily basis. My sense is that there is a slow growth across the board, with a few pockets, primarily in complex litigation and in certain geographic areas, where EDD is becoming more common than before the rule changes, but they are probably some of the areas that were already seeing EDD before the rule changes. I'd say that some of the decisions of courts in the last month or so might give more urgency to the process. Craig, what are you seeing out in the trenches?

**Craig Ball:** I'd guess that I'm seeing 150% more e-discovery and computer forensics consulting work in 2007 than 2006. Yet, based on the sprinkling of hands that go up at lawyer gatherings, I'm flabbergasted by how few lawyers overall are pursuing electronic evidence. Requesting parties share a vague conviction they're not getting all they're entitled to, but they're flummoxed in terms of how to get it. Often they do nothing, fearing it will be expensive or (far scarier) they might reveal themselves to be computer illiterate. Producing parties are unhappy, too, but they don't appreciate how fortunate they are that so few lawyers are with the e-discovery program. The encouraging news is that the courts are more open to e-discovery, to the point where I've heard judges remark that they're looking forward to hearing cases involving technology and electronic evidence.

**Sharon Nelson:** Agreed, Craig - there has been a notable jump in attorneys plunging (sometimes headlong and haplessly) into electronic discovery. Though some of the big firms are pretty savvy about ED, it's still amazing how many good-sized and well reputed law firms show up shaking their heads in misery and asking for someone to hold their hand throughout the entire ED process. Without question, we're seeing more electronic evidence in state courts. This was a no brainer - computers, in many cases, are simply where the evidence is. It's tough on the little guys though - electronic discovery is hard on the corporate pocketbook. A lot of attorneys need threshold counsel as to whether they should even start down the road to ED. If the case is worth no more than $25,000 at the end of the day, you're not going to spend a lot of money on electronic discovery. Some of our country lawyer friends are counting their blessings that they live in

jurisdictions where the cases are about whose dog bit whom, and whether Bubba's Hardware got a permit to put up their tacky neon sign.

Technophobia is still rife in the legal profession.

**Joe Kashi:** I have seen only a gradually dawning awareness rather than a sudden enlightenment. A few lawyers, and most judges, are aware that ESI is going to have a major impact on civil litigation but they're still feeling their way. We need to remember that most members of the Bar and Bench are not technically trained and hence do not yet have a solid understanding about how ESI is stored and used. This will resolve over time and pretrial ESI issues will probably proceed more facilely over the next few years as judges and lawyers become more comfortable with routine technical aspects. In the short term, courts and counsel will require assistance from neutral experts acting as discovery masters. However, over the long term, I would expect that most such matters will become straightforward and encapsulated in standard pretrial orders, form discovery requests, etc. After all, very few lawyers and judges are psychologists or medical doctors and yet courts are comfortable dealing with child custody and personal injury/medical issues.

**Browning Marean:** I see increasing levels of fear, uncertainty, doubt and confusion. Right sizing the e-discovery to the matter at hand is a difficult task. The costs associated with e-discovery are staggering. Clients are not happy.

**Craig Ball:** Clients are sometimes happy?!?

**2. The new rules speak of native productions. That used to be the exception rather than the rule. What about now?**

**Craig Ball:** One of the many smart things the new rules do is acknowledge that there is rarely a one-size-fits-all form of production for the variety of electronic information seen in discovery. Sadly, most lawyers still equate e-discovery with TIFF production, and just a savvy handful appreciate the need to obtain a load file containing searchable text and relevant metadata with those TIFFs. TIFF and load files work well enough for information like an e-mail message or plain-vanilla word processed stuff capable of delivering its full informational payload on paper. But one-dimensional paperphilic formats are rapidly going the way of the floppy disk and American Idol. I'm seeing a fast-growing awakening among lawyers that some data is impossible to divine unless it's furnished in a native or near-native form. This is notably true of spreadsheets and databases, and it's increasingly common to see embedded sound, video, animation and other rich content that simply can't reveal itself as a TIFF. There's also push back against the absurdity and gargantuan cost of converting everything to a TIFF format. Native production is the inevitable destination, but with so much money still being made from TIFF conversion and TIFF review, it's not going away quickly or quietly. Instead, look for a hybridized (some might say bastardized) mix of TIFF and native.

**Joe Kashi:** I am a big fan of native document production within practical limits. The new federal rules allow the requesting party to specify the format in which discovery and disclosure responses will be produced, with the default format being native document format production. Using native format makes a lot of sense when documents are in a standard format such as Email, Adobe PDF, JPEG

photos, MS Word or WordPerfect, HTML, MS Excel, MS Access, etc. A standard native file format, in conjunction with inherent metadata, allows the data to be analyzed much more effectively and completely, particularly when changes can be tracked with metadata. Native format is particularly useful with spreadsheet and database files because you can examine data, formulas and relationships that are either not shown in a printed report or that would be simply too hard to re-key. There are a few practical alternatives to native format, including translating raw data into PDF, ASCII text and comma delimited databases. These may make sense when the ESI is stored in an obscure or customized program. Requesting document production in PDF format would make senses when a requesting party is on a very tight litigation budget.

**Dennis Kennedy:** I noted earlier this year when the US Justice Department delivered boxes full of printouts of emails to Congress that we had a good idea of where we were in the evolution of EDD. Think about it. You take emails in digital form, print them out, box them up, ship the boxes, unpack the boxes, and then, probably, scan the emails as TIFF images so they can be looked at in an electronic format. While there are nuances in the debate about native file formats, I'll keep using this example to people in hopes that someone can tell me that that is a logical process with a straight face. Or maybe they'd let me see how they explain the costs of that process to their clients. At the time I was reading about the Justice Department printing out the emails, I was working on my taxes and seeing those notices in the instructions about paperwork reduction and the encouragement to e-file my return.

**Sharon Nelson:** Keep talking Dennis - it is indeed our tax dollars that are being thrown down a rathole. Native evidence is simply the best evidence, but as Craig points out, we have a way to go before it becomes accepted. The biggest problem with native format right now is that many ED vendors can't handle native format, except for the most popular applications. That means you end up with a part native and part TIFF production in many cases. Mind you, that will often work, but the endgame is to get to native format. Hey, it's fast, it's cheap - who wouldn't go there? Ah yes, therein lies the rub. So many vendors have invested so heavily in TIFF that moving to native will literally bankrupt them. To my amazement and amusement, one of the "big five" actually published an article in their newsletter - the title, essentially, was "Arguments Against Native Format Production." One of the arguments currently working best is that the Sedona Conference hasn't spoken on this subject since 2004, at which point they gave TIFF their blessing. Their stance was logical at that time, and the judges (who all know Sedona) glommed on to that. The bench is only slowly waking up to native format production - it will help if Sedona speaks again and endorses native format as the preferred form of production wherever possible.

**John Tredennick:** We have seen increasing amounts of native review and productions. As little as a year ago, most of our repositories were predominantly PDF image bases. All of a sudden we saw a flood of native coming in. What is most surprising is their character. These are not just Word, PowerPoint and Excel files. Rather, it seems like people are collection everything they can find. We are talking about executables, flash files, dll files, sql dumps and programming files. This would be like producing your desks and file cabinets in the

helped with a production to the FTC involving 4.6 million records. Millions of the so called "documents" we useless--the spell check dictionary for a Linux application for example. Yet, they come pouring in and people wonder why they don't open and can't be reviewed.

**Browning Marean:** I don't see pure native productions currently. Hybrid productions appear to be more the more popular method. The challenge is knowing enough about your opposition's data to know what to ask for. Hopefully that can be sorted out in the meet and confer process.

## 3. What tips can you offer people contemplating native productions? Avoid them at all costs? How can you keep control of documents when you produce them in native format?

**Craig Ball:** The form and function of the evidence dictates the form of production. The only way to avoid native productions is to be content with less information. Sometimes what's missing doesn't matter, but it's the lawyer's job to recognize when it does. Just as we're obliged to know when a photograph is no substitute for site inspection and when we need a deposition in lieu of a witness statement, lawyers must snap to the differences between TIFF and native production for each kind of electronic evidence they seek and produce.

When you look at it that way, you realize that you can't "avoid" native production anymore than you can avoid inspections and depositions.

Most of the objections levelled against native production are overblown. Even if alteration of evidence weren't aberrational, it's a risk that's been with us always. In fact, it's easier to detect alteration of electronic data than of paper or TIFF images. If your definition of "document control" is Bates numbering, then abandon hope all ye who enter here; but, be consoled that when the pre-trial process distills production to that handful of key documents actually used in deposition and at trial, you'll likely be able to return to numbered pages.

**Sharon Nelson:** Craig is "spot on" as usual. Native format production is clearly the wave of the future and smarter vendors are all heading in that direction. They'll have to give up the mammoth profits from processing TIFF with load files, but I'm sure they'll find other ways to replenish their coffers. Also, just to add one more quick thought about the eternal bleating that native format doesn't allow for Bates stamping, you can always number by file rather than by page. As Craig points out, you can always go back to numbered pages when the documents have been winnowed down, but you may find yourself working with file number instead.

**Joe Kashi:** I agree with Craig's points but would offer a few additional thoughts. You'll always want to maintain an authenticated original of the native format discovery as received and work with a copy. I would suggest adding a digital authentication signature when the original is received. Native format discovery is, I believe, in most cases, a superior form of discovery because it should be metadata rich and in a more easily reviewed format that can be re-analyzed from different perspectives. Remember, a report that is provided in PDF format is just one look at one set of relationships. Other analytic approaches may be much more enlightening but require native format computer files that can be sorted or re-sorted as needed. I recall that in the Duke lacrosse accusations the prosecutor's failure to

disclose evidence only became apparent when one defense counsel reviewed all 1,844 pages of raw lab DNA data from a defense approach rather than accepting the data in the manner set out in the prosecution's summary.

**John Tredennick:** Get hold of the process right from the start. Decide what files are appropriate for production and cut those that are not out of the mix. Speak with opposing counsel and seek agreement on file types that are worth review. Clicking through 10,000 cookie files might be a useful exercise in some circumstances but most times your review team is wasting its time.

**Dennis Kennedy:** Excellent points. It's all about understanding what's there, what you need, and how information is carried within documents today. The more you understand, the better you can do. As Craig notes, if you don't use native file formats, you get less information. However, that might be OK for many reasons – cost, efficiency, et al. If you are prepared when you "meet and confer," you can tailor your production to what makes sense. It might make sense to do a "blended" production, using TIFFs, PDFs and native file formats. If you know what you need and understanding what native file format is, you can work out optimal ways to handle the data you have. It all boils down to whether the information is "relevant," and I think it will be harder to argue that the metadata and other information in ESI is categorically not relevant. Let me echo Sharon's comments on Bates stamping. In the future, we will often be looking at databases rather than "documents" and lawyers might find that the concept of Bates stamping breaks down when you consider database records that don't have page numbers or have other characteristics of word processing or other document files.

**4. What are the state courts doing about electronic discovery? Are you seeing any differences with arbitration or in any other form?**

**Craig Ball:** Overall, the state courts are on track to promptly adopt versions of the federal e-discovery rules. The principal differences will be in where each jurisdiction draws the line on accessibility (couched as some variant or burden, cost or both) and in who shoulders the expense of e-discovery deemed extraordinary. I expect a greater consistency of enforcement and interpretation from the federal system because they have a better track record for judicial training on EDD issues and because the new Federal rules garnered a lot of attention. But state judges aren't shying away from holding litigants' feet to the fire in terms of producing relevant electronic evidence, and that's going to become even more common in the coming year.

**Sharon Nelson:** Virginia has several groups studying this issue and they will ultimately make recommendations to adopt some variant of the federal rules. Most state judges are beginning to educate themselves about the new federal rules simply because they make sense and because these rules are helping them to impose some order on disorder. As one state judge told me in highly technical language, "I was doing this stuff already - I just didn't call it by these names." The new federal rules have been a great lamp post for the state judges and they are quickly citing to them in cases, so they have in large part been adopted informally before the formal process has even commenced.

**Joe Kashi:** Alaska is changing its Alaska Rules of Civil Procedure to conform to the wording of the federal rules. We may deal with some

potenially divergent interpretations, such as the Rule 37 safe harbor issues, by using a standard pretrial order regarding ESI.

**Browning Marean:** Spoliation and Sanctions are alive and well as robust concepts in state court. Be afraid: be very afraid whether in state or federal court.

## 5. What do you see in your crystal ball for the next 6-12 months? Will electronic discovery shift into high gear or stay the same as now?

**Dennis Kennedy:** As with most technology-related developments, we overestimate the short-term impact and underestimate the long-term impact. The tectonic shift in the way that litigation is practiced and, more importantly, how disputes are resolved, has already started, but its true impact is several years away. Developments in database technology, records management, archiving and storage, and other factors will ultimately play a greater role in the development of electronic discovery than the current rule changes will. The law always struggles to keep current with technology. You can never go wrong by predicting that lawyers will be slow to adopt new technologies, so I believe that electronic discovery will stay a fairly sleepy area in the next 6 - 12 months, but we've already seen, and will continue to see, courts sounding the wake-up alarm. Lawyers, in general, are still hitting the snooze button, but while many sleep late, the real story will be in the gap that those who have already moved into the world of electronic discovery have created and will widen in the next 6 - 12 months. That "EDD gap" will become a growing story in the 21st century practice of law.

**Craig Ball:** Dennis nailed it, but 6-12 months is an eye-blink in lawyer time. I see steady, accelerating growth accompanied by an e-discovery creep down into smaller cases. There will be more high profile "wake up call" cases won and lost because of serious e-discovery malfeasance and continued downward pressure on vendor pricing as competition increases. Lawyers will become more adept at negotiating e-discovery, and as the scope and processes of e-discovery efforts standardize somewhat, EDD vendor services will become more commoditized and affordable. Downward price pressures will be amply offset by increases in demand, so it's a rising tide for all ships. The losers are those who don't adapt. The "EDD gap" Dennis mentions applies not only to lawyers behind the curve but as well to companies who fail to implement electronic records management and don't plan for e-discovery as a recurring obligation instead of a reinvention of the wheel in each new case.

**Joe Kashi:** I have to agree with Dennis and Craig but I think that the Bench is going to drive a lot of the change by forcing ESI disclosures. Discovery changes may follow disclosure changes in this case.

**Sharon Nelson:** Just look at the ED vendor market today. One year you see them, fat and happy and pumped up with VC dollars - and next year they're gone. Many have been swallowed up by big companies. Others will fall because of their failure to adapt to changing technology, as Craig points out. Anyone who stays married to TIFF will be extinct. There's a real hunt on in the wild for quality ED companies of all sizes. The market shake-out will continue as far as my crystal ball can see. There is a real focus on finding value for

dollars in electronic discovery. Most clients feel (rightly or wrongly) that many ED vendors have simply charged what the market would bear. Those gold rush days are over and the smart companies will develop sound business practices and a reputation for integrity.

In general, electronic discovery will continue to soar. We've all but stopped creating our records in writing -and we print precious few of them (except for lawyers of course). Practicing law - particularly as a litigator - will never be the same. The Romans had it right: Aut disce aut discede (either learn or leave).

**Craig Ball:** Never the same... and never better. That's the happy news, unheard amidst all the wailing and gnashing of teeth. Miscreants leave countless digital fingerprints. E-mail petrifies res gestae revelations. Our machines bear unblinking witness to the good and evil of our society. Those who quake and quail at e-discovery miss the big picture: A flood of evidence benefits those seeking the truth. Six months of new rules has unleashed only a trickle of a Niagara of information destined to drive the turbines of justice. And on the micro level, if it compels all of us to do a little better job managing our ESI, isn't that the tough love we need?

**John Tredennick:** The amount of content we create is increasing exponentially--a recent study by IDC put the figure at 161 exabytes a year (that's roughly 8 million Libraries of Congress each year). While a lot of that content is video and a fair amount junk, there will still be a lot of data coming online that is subject to discovery. When I started practicing, 30,000 documents was a huge case. Today, 30 million documents is a huge case but not unheard of. Some or reaching 100 million documents and more.

Expect the trend to continue. As the volumes of native files continue to mount, there is little chance of going back to paper discovery. There aren't enough trees in the forest for one thing, let alone enough printers to spit out the paper. And, our clients would go broke trying to manage the process. No, electronic discovery is here to stay and paper discovery is on the way out. That means new techniques will have to be developed to handle the mountain of electronic content and lawyers will have to get comfortable with the fact that they will not be able to review every document. New techniques for finding what's relevent are emerging we will have to give up on the notion that we can simply index and categorize it all. In some ways, the evolution of electronic discovery is like the evolution of the Web itself.

Remember when Yahoo started hiring people to index Web sites and place each in its proper category? People quickly gave up in favor of search--Google search to be specific. Today you know longer care about finding everything on the Web, because that is impossible. It is enough to find some good information that helps you answer your question. There just isn't enough time to worry about the rest. What you missed, doesn't matter so long as you get what you need.

Tune in next January when we ask our panel and perhaps others for their thoughts on these questions after 12 months under the new rules.

Bookmark This:



Subscribe to the *Law Technology Today* RSS Feed

RSS | MY YAHOO! | Add to Google | MY AOL | newsgator | Bloglines

*Law Technology Today* is a periodical of the ABA Law Practice Management Section
© 2007 American Bar Association | ABA Copyright Statement | ABA Privacy Statement

Home | Subscribe | Unsubscribe | Feedback