**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 07-cv-00630-DME-MEH

NETQUOTE, INC., a Colorado corporation,

      Plaintiff,

v.

BRANDON BYRD, an internet user making use of the IP Addresses 64.136.27.226 and
64.136.26.227, and

MOSTCHOICE.COM, INC., a Georgia corporation,

      Defendants.

---

**NETQUOTE'S RESPONSE TO**
**DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY**

---

Plaintiff NetQuote, Inc. ("NetQuote"), through counsel, respectfully submits its response
to the Motion to Exclude Expert Testimony (the "*Daubert* Motion") filed by Defendants
MostChoice.com, Inc. and Brandon Byrd (collectively, "MostChoice" unless otherwise noted).

**I.      INTRODUCTION**

MostChoice's *Daubert* Motion contains a series of arguments regarding the weight that
the finder of fact should accord the testimony of Stephen A. Duree ("Duree") dressed up as
*Daubert* challenges to the reliability of his methodology. As discussed below, Duree's expert
opinions meet the requirements for admissibility set forth in the Rules of Evidence and related
case law. Duree, relying on his considerable education and professional experience, applied a
clearly articulated and reliable methodology based on information that an expert in his field
would reasonably rely upon to arrive at his opinions. While MostChoice may disagree with his

conclusions or contend he should have gone about reaching them in a different way, those issues are properly raised at trial. Accordingly, the *Daubert* Motion should be denied.

## II.  BACKGROUND

NetQuote and MostChoice are direct business competitors in the on-line insurance lead generation industry. Both NetQuote and MostChoice receive requests for insurance quotes from consumers, which they sell to their respective insurance-agent customers. Defendants candidly admit that MostChoice hired Byrd to submit false requests for insurances quotes to NetQuote in order to obtain the names of NetQuote's insurance agent customers by territory. (Mem. of Law in Supp. of Defs.' Mot. for Summ. J. at 2 [Docket # 154].) MostChoice submitted at least 3,521 such malicious applications to NetQuote starting in the fall of 2006 and extending through at least July 2007. MostChoice's chief defense is to contend that this conduct did not cause NetQuote any harm. (*See id.*)

NetQuote retained Duree[1] to evaluate and quantify certain of NetQuote's damages. On October 1, 2007, Duree issued the Report on NetQuote's Damages Resulting from Byrd/MostChoice Submission of Malicious Applications to NetQuote and the Related Effects on NetQuote and its Business.[2] (*See* Duree Report, Exhibit A-22 to Defendants' Motion to Exclude Expert Testimony by Defendants MostChoice.com, Inc., Brandon Byrd [filed under seal at Docket No. 151] [hereinafter "Ex. A-22"][3].)  In the Report, Duree opines that:

---

[1] Defendants do not challenge Duree's qualifications as an expert, which are detailed in the Duree Report. (*See* Ex. A-22, Duree Report SD0079-80.)  Duree is a Certified Public Accountant with qualifications and experience in conducting business valuations. (*Id.*)

[2] Subsequently, on October 8, 2007, Duree issued errata to his earlier report, in which he corrected a small number of immaterial typographical errors in the original report.

[3] MostChoice appropriately filed Duree's Report and certain documents on which he relied under seal, as they contain information properly designated highly confidential under the Protective Order. Because this Response does not reproduce information designated highly confidential, but merely refers to the documents, NetQuote has not filed it under seal.

- NetQuote lost 157 local insurance agent accounts as a result of MostChoice's malicious applications;

- Its damages for two lost national accounts total approximately $1.1 million;

- NetQuote's damages for lost local accounts total $1.1-1.5 million;

- NetQuote suffered $128,000 in damages related to responding to MostChoice's attack;

- MostChoice made at least $51,000 in sales to NetQuote customers affected by malicious applications.

(*Id.* SD0017, 19.)

## III.  ARGUMENT

### A.  LEGAL STANDARD FOR ANALYSIS OF EXPERT TESTIMONY.

This Court's review of the *Daubert* Motion is governed by Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny.  Rule 702 states the following requirements for the admission of expert testimony:  (1) the proffered expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue"—often referred to as the "relevance" or "fit" requirement; (2) the witness must be "qualified as an expert by knowledge, skill, experience, training or education,"—commonly called the "qualifications" requirement; and (3) the proffered testimony must be reliable—the reliability requirement.  Fed. R. Evid. 702.  *See also Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir. 2004).  In *Daubert*, the Supreme Court held that a court faced with a proffer of scientific expert testimony is obliged to determine whether the testimony is both relevant and reliable.  *Daubert*, 509 U.S. at 589, 594-95.  The Supreme Court subsequently made clear that this "gatekeeping" requirement and the relevance and reliability standards of Rule 702 likewise apply to proffers of non-scientific expert testimony.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

Because MostChoice challenges neither the relevance/fit of Duree's testimony nor his qualifications as an expert, the reliability of his methodology is the only matter at issue in the *Daubert* Motion. Testimony is reliable if (i) the testimony is based upon sufficient facts or data, (ii) the testimony is the product of reliable principles and methods, and (iii) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702. That there is a reliability requirement is not to say that the offering party must prove "that the expert is indisputably correct" for the expert's testimony to be admissible. *Bitler*, 400 F.3d at 1233 (quoting *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999)); *In re Williams Sec. Litig.*, 496 F. Supp. 2d. 1195, 1233 (N.D. Okla. 2007) (reliability evaluation should not be permitted to evolve into analysis of persuasiveness). Rather, the party need only prove that "the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based upon facts which sufficiently satisfy Rule 702's reliability requirements." *Id.*

In cases where the proposed expert testimony is based on technical or other specialized knowledge, as opposed to scientific knowledge, the relevant inquiry into the expert's reliability predictably shifts from objective indicia of scientific reliability to the experience of the witness. *See Kumho Tire*, 526 U.S. at 151 (holding experience would be principal indicator of reliability of testimony by perfume tester who claims to be able to test 140 odors at a sniff); *Turck v. Baker Petrolite Corp.*, 10 Fed. Appx. 756, 766 (10th Cir. 2001) (holding an accountant may be qualified to give expert testimony on the value of lost future wages based principally on education and experience). The purpose of the *Daubert/Kumho* gatekeeping function is not to measure every expert by an inflexible set of criteria, but to undertake whatever inquiry is necessary to 'make certain that an expert whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that

characterizes the practice of an expert in the relevant field." *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1243 (quoting *Kumho Tire*, 526 U.S. at 152). If the test of reliability is met and the expert's testimony is otherwise admissible, "it is up to the jury to decide whether the expert used the best or most reliable methodology, what weight to accord to his testimony and which of competing experts' opinions should be credited." *Cook v. Rockwell Int'l Corp.*, 2006 WL 3533049, at *4 (D. Colo. Dec. 7, 2006).

As the Advisory Committee to the 2000 amendments to Rule 702 noted with apparent approval, "[a] review of the case-law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's notes to 2000 amendment.

## B. DUREE'S METHODOLOGY.

Duree's analysis of NetQuote's damages had two phases: (i) in the first phase, Duree identified lost accounts for consideration in the damages calculation (the "identification phase"); and (2) in the second phase, Duree quantified damages resulting to NetQuote as a result of these lost customers (the "quantification phase").

### 1. Identification Phase.

To identify the customer accounts lost as a result of MostChoice's conduct, Duree analyzed data regarding the 3,521 malicious applications. (Ex. A-22, Duree Report SD0005.) NetQuote generated 12,123 leads from MostChoice's 3,521 false applications. (*Id.*) These malicious leads were, in turn, sent to 1,068 NetQuote local and national agents (collectively, the "affected accounts"). (*Id.*) Duree determined that five of the affected accounts were national accounts and the remaining 1,063 were individual, local agent accounts. (*Id.*) With respect to

the five affected national accounts, Duree excluded three from his damages analysis based on information from NetQuote.  (*Id.* SD0015.)

For the 1,063 affected local accounts, Duree performed two additional steps to identify accounts lost as a result of the false applications.  First, Duree identified the affected local accounts that remained active NetQuote customers as of the date of his analysis and excluded those accounts from further analysis.  (*Id.* SD0014.)  After the exclusion of the continuing accounts, 271 inactive accounts, 147 terminated accounts and 41 accounts with no revenue in July 2007 ("zero revenue accounts") remained.[4]  (*Id.*)

Next, Duree analyzed account data to determine whether an inference could be drawn from that data that MostChoice's malicious leads caused the customer to cease doing business with NetQuote.  Duree considered a number of factors, including the duration that the agent had been a NetQuote customer, the timing of the receipt of malicious applications relative to the termination or inactivity of the account, and the number of malicious leads received by type of insurance product.  (*Id.* SD0015.)  Applying his professional judgment, Duree concluded that an affected account should be classified as a "lost account" where the number of malicious leads was particularly significant in relation to the account's typical monthly revenue, and the timing of the malicious leads was relatively close to the month in which the account's status adversely changed.  (*Id.* SD0015.)  Duree identified 157 local accounts lost as a result of MostChoice's attack.  (*Id.* SD0016, 28-72.)

---

[4] NetQuote classifies accounts as "terminated" either in response to a customer's specific request, or after the account has been in a suspended status for 60 days.  An account is "suspended" where the customer stops taking leads for more than 30 days without a waiver from customer service, or fails to make required payments.  An account is reclassified as "inactive" after being "terminated" for two months.  (Ex. A-22, Duree Report SD0014.)

## 2. Quantification Phase.

Duree then proceeded to quantify damages for the 157 lost local accounts and two lost national accounts. To perform the quantification of damages resulting from the lost accounts, Duree used certain data contained in the "Allocation of the Purchase Price of NetQuote, Inc." prepared by Quist Valuation (the "Quist Report"). Because the Quist Report is the focus of a substantial portion of MostChoice's challenge to Duree's methodology, it merits discussion at some length.

### a. The Quist Report.

The Quist Report was prepared by Quist Valuation ("Quist") in connection with NetQuote's acquisition by its current owner and corporate parent, non-party NetQuote Holdings, Inc. ("NQH"). (Ex. A-23 to *Daubert* Mot., Quist Report.) Quist is a nationally recognized and highly reputable business valuation firm. (Decl. of Stephen A. Duree ("Duree Decl.") ¶ 15, attached hereto as Exhibit 1.) Quist performed the analysis in order to allocate the price NQH paid to acquire NetQuote to the assets it acquired, for purposes of recording the allocated values on NetQuote's financial statements. (Ex. 1, ¶¶ 3-6; *see also* Summary of Financial Accounting Standards Board ("FASB") Statement No. 141, attached as to Duree Decl. as Exhibit A.) This evaluation is required by Generally Accepted Accounting Principles ("GAAP"). (*Id.*) In other words, the Quist Report was prepared as part of NetQuote's ordinary operations and financial reporting obligations. (*Id.* ¶ 6.)

Quist's conclusions on the appropriate allocation of the purchase price were, in turn, recorded on NetQuote's 2005 year end balance sheet as the value of the assets acquired as of their acquisition in August 2005. (*Id.* ¶ 7.) PriceWaterhouseCoopers ("PWC"), a highly reputable national accounting firm, audited NetQuote's 2005 financial statements in accordance

with Generally Accepted Auditing Standards ("GAAS"). As part of the audit, PWC evaluated

the analysis and conclusions of the Quist Report. (*Id.* ¶¶ 8-9.) PWC concluded that the

allocation contained in the Quist Report was reasonable and that NetQuote's 2005 financial

statements, into which the conclusions of the Quist Report were integrated, fairly stated

NetQuote's assets and liabilities and results of operations in accordance with GAAP. (*Id.* ¶ 8.)

Duree also independently concluded, based on his education and experience, that Quist's

analysis was reasonable and contained reliable data and analysis on which he could properly rely

in his methodology. (*Id.* ¶¶ 10-16.)

### b. The Quantification Methodology.

To quantify damages, Duree first assumed that NetQuote's customer relationships would

decay over a seven-year period, based on a similar assumption used in the Quist Report to

determine the book value of NetQuote's customer relationships. (Duree Tr. at 30:3-16, excerpts

attached to *Daubert* Mot.) Duree independently determined that the seven-year decay period

was appropriate for NetQuote's local accounts, based upon his experience in conducting

valuations of companies similar to NetQuote. (Ex. 1, Duree Decl. ¶ 16.)

Second, Duree evaluated and then employed the revenue projections related to

NetQuote's existing customers set forth in the Quist Report at Exhibit 14. (Ex. A-22, Duree

Report at SD0019.) These projections of NetQuote expected revenue from existing customers

over the seven year decay period were found to be reasonable by PWC in its audit of NetQuote's

2005 financial statements. (Ex. 1, Duree Decl. ¶ 15.) Duree then applied the seven-year decay

period and a conservative twenty five percent business risk discount rate (also applied by Quist

and found to be reasonable by PWC) to arrive at a present value of the revenue stream of

NetQuote's existing customer relationships before related costs. (Ex. A-22, Duree Report at

SD0019.)  Duree compared that present value figure for the existing customer relationships of $123,557,589 with the annualized 2005 revenues for the existing customers, and determined that the relationship of the present value of the customer revenues to the annualized base-year revenues for the same customers was a 3.2 value multiple.  (*Id*.)  In other words, for purposes of valuation, the value of a customer equates to 3.2 times the annual revenue generated from that customer.  (*See id.*)

Duree then determined the value of each lost account by calculating each account's average monthly revenue, annualizing that revenue, and multiplying the annualized revenue by 3.2.  (*Id.* SD0020-22.)  Based on this analysis, Duree determined that the fair value of the lost national accounts was $1,122,368 and the fair value of the lost local accounts was $2,021,193. (*Id.* SD0019.)  After giving consideration to other possible causes of customer losses, Duree concluded that a range of 50-75% of the damages resulting from lost local accounts were caused by MostChoice's false applications.  (*Id.* SD0016.)  Duree based this range on his professional judgment based on his experience and his analysis of the customer data in the identification phase of his analysis.  (Duree Tr. at 64:6-15, additional excerpts attached hereto as Exhibit 2.)

## C.     DUREE'S METHODOLOGY IS RELIABLE AND HIS OPINIONS ARE ADMISSIBLE.

Duree employed a reliable methodology drawn from his considerable experience in accounting and business valuation.  He relied upon techniques, data and information that experts in his field would reasonably rely upon.  The reliability of Duree's testimony is derived from his many years of professional experience and continuing education with damages analysis and

business valuation, his review of relevant discovery materials, and the fit between the bases for his opinions and the facts of this case.[5]  Consequently, the *Daubert* Motion should be denied.

## 1. Duree's Identification Methodology is Reliable.

### a. MostChoice's Attack on Duree's Identification Methodology Goes to Weight But Not Admissibility of His Opinions.

MostChoice first contends that Duree's testimony should be excluded because his identification of the affected accounts was subjective.  In reality, Duree considered objective customer data, including the customer's status, the duration of the relationship, the total number of malicious leads received by type of insurance lead, and revenue by type of insurance lead. (Ex. A-22, Duree Report Exs. 3.2 and 3.3, SD0028-72.)  While Duree applied his professional judgment to the objective data in determining which accounts were sufficiently affected by MostChoice's attack to include in his analysis at the quantification phase, that does not render his entire methodology speculative.  *U.S. v. Llera Plaza*, 188 F. Supp. 2d 549, 571 (E.D. Pa. 2002) (noting that experts operate "within a vocational framework that may have numerous objective components, but the expert's ultimate opining is likely to depend in some measure on experiential factors that transcend precise measurement and quantification").

MostChoice next contends that Duree's methodology is flawed because he supposedly considered only the number of leads purchased by the lost accounts, but not other data.  This argument is belied by the Duree Report itself.  As demonstrated by Exhibits 3.2 and 3.3 to his report, Duree explicitly considered in his analysis customer inception and end dates, the total

---

[5] MostChoice insinuates that this court should deem Duree's methodology unreliable because two other courts have previously declined to adopt his opinions.  (*Daubert* Mot. at 7.)  Neither court excluded Duree's testimony as unreliable; indeed both courts admitted his testimony, even if they did not ultimately credit it.  In any event, the question here is whether Duree's methodology in *this* case is sufficiently reliable as to warrant admission.  *See McReynolds v. Sodexho Marriott Servs., Inc.*, 349 F. Supp. 2d 30, 45 (D.D.C. 2004).  ("Looking to past decisions— whether the admitted [the expert's] testimony while nonetheless according it little weight . . . or whether they lauded his work and gave it great weight . . . hardly advances this Court's *Daubert* analysis.").

dollar value of leads purchased, and the number of malicious leads received by type of insurance. (Ex. A-22, Duree Report Exs. 3.2 and 3.3, SD0028-72.) In addition, notwithstanding MostChoice's assertion, Duree considered the credits NetQuote issued to customers and the terms on which the customers purchased from NetQuote in constructing his overall methodology. (Ex. 1, Duree Decl. ¶ 21.) Duree also explained his decision not to interview NetQuote account holders, as MostChoice contends he should have done, on the basis that conducting interviews with customers so far after the fact would be of speculative value in his analysis. (*See* Ex. 2, additional Duree Tr. excerpts at 67:22-68:21.) Finally, Duree applied a significant (25-50%) discount to account for the possibility that customer losses occurred for reasons other than MostChoice's conduct. (Ex. A-22, Duree Report SD0016-17.)

At bottom, MostChoice's contentions, while off the mark, would only potentially be relevant to the weight the jury should assign to Duree's opinions, and not to their admissibility. *See Bitler*, 400 F.3d at 1237-38; *see also Asad v. Continental Airlines, Inc.*, 314 F. Supp. 2d 726, 740 (N.D. Ohio 2004) ("the fact that several possible causes might remain 'uneliminated' goes to the accuracy of the conclusion and not the soundness of the methodology"); *Parish Oil Co., Inc. v. Dillon Cos., Inc.*, 2006 WL 2632566 at *7 (D. Colo. Sept. 13, 2006) ("[a]ssuming *arguendo* that [the expert's] opinion fails to account for other factors that may have had an impact…does not render his underlying methodology unsound").

    **b.** **Duree Appropriately Included the Eight Zero Revenue Accounts with His Identification Methodology.**

MostChoice next contends that Duree should have excluded the 41 zero revenue customers from his analysis altogether. (*Daubert* Mot. at 9.) As Duree explains in his report, the classification of an account as "inactive" or "terminated" is a clerical construct applied within

NetQuote's system—the fact that these customers weren't officially designated "inactive" or "terminated" as of July 2007 does not change the fact that they had ceased purchasing from NetQuote by July 2007. (Ex. A-22, Duree Report SD0014 n.15.)[6] While MostChoice is free to argue at trial that Duree should have excluded the zero revenue accounts, his inclusion of those accounts does not render his methodology unreliable. *Asad*, 314 F. Supp. 2d at 726; *see also Cook*, 2006 WL 3533049 at *35.

MostChoice further contends that, with respect to the zero revenue accounts, Duree's methodology is particularly deficient because he did not consider what MostChoice contends is evidence that NetQuote's lead quality was poor as evidenced by the credits issued in the months leading up to July 2007. (*Daubert* Mot. at 9.) As noted above, Duree did consider credits in constructing his overall methodology. (Ex. 1, Duree Decl. ¶ 21.) MostChoice moreover ignores the fact that the parties offer different reasons for the amount of credits issued by NetQuote. (*See* NetQuote's Response to MostChoice's Motion for Summary Judgment at 15-16.) Duree is permitted to assume that NetQuote's version of why those credits were issued is the correct one. *See Walker v. Gordon*, 46 Fed. Appx. 691, 696 (3d Cir. 2002) ("An expert is . . . permitted to base his opinion on a particular version of disputed facts . . .").

### c.  *Daubert's* "Error Rate" Factor is Inapplicable.

Finally, MostChoice contends that Duree's identification methodology has a "high error rate" because Duree supposedly opined that 50 to 75% of NetQuote's overall customer attrition were due to MostChoice's false submissions while supposedly conceding it could be none. (*Daubert* Mot. at 3.) There are two defects with MostChoice's argument.

---

[6] Duree analyzed available NetQuote data through July 2007. NetQuote intends to supplement Duree's report to reflect analysis of subsequent data if appropriate.

First, MostChoice completely misstates Duree's opinion. Duree did not apply the 50-75% range in the identification phase to reach the conclusion that NetQuote's overall customer attrition is 50-75% attributable to MostChoice's malicious applications. Rather, the 50-75% range was applied in the quantification phase for the purpose of accounting for the possibility that certain of the lost accounts (all of which received multiple false leads) may have been lost for a combination of reasons (of which MostChoice's malicious applications may have been only one), or for reasons other than MostChoice's conduct. (Ex. A-22, Duree Report SD0016; Duree Tr. at 47:1-4.) In other words, the range applies only to the narrower subset of NetQuote customers who were actually materially affected by MostChoice's malicious applications.

Second, the 50 to 75% range does not equate to "error rate" as that term was used in *Daubert*. The Supreme Court has emphasized that "[t]he inquiry envisioned by Rule 702 is . . . a flexible one," *Daubert*, 509 U.S. at 594, and must be "tied to the facts of a particular case," *Kumho Tire*, 526 U.S. at 150 (quotation marks omitted). For non-scientific evidence, such as Duree's analysis, "'Daubert factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it.'" *Hangarter v. Provident Life & Accident Inc. Co*, 373 F.3d 998, 1017 (9th Cir. 2004) (quoting *Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1059 (9th Cir. 2002)); *see also In re Williams Sec. Litig.*, 496 F. Supp. 2d at 1234 (noting *Daubert* factors are to be used "only to the extent that they are logically applicable"). Thus, MostChoice's argument fails.

## 2. Duree Employed a Reliable Quantification Methodology.

### a. Duree's Use of the Quist Report Was Reasonable.

With respect to the quantification phase, MostChoice primarily takes issue with Duree's use of portions of the Quist Report in conducting his quantification of NetQuote's damages. Duree's consideration of the Quist Report is expressly permitted by the Rules of Evidence and the case law for at least two reasons.

#### i. *The Quist Report is Admissible as a Business Record.*

First, the Quist Report is admissible in its own right as a NetQuote business record and, thus, Duree properly considered it. Rule 803(6) of the Federal Rules of Evidence provides an exception to the hearsay rule for business records if they are "kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum [record]." Fed. R. Evid. 803(6).[7] "'The rationale behind the business records exception is that such documents have a high degree of reliability because businesses have incentives to keep accurate records.'" *United States v. Gwathney*, 465 F.3d 1133, 1140 (10th Cir. 2006). "Although a financial statement audit is based in part on hearsay, it is generally admissible as a business record of the audited entity under Fed. R. Evid. 803(6)." *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1257 n.3 (9th Cir. 1984); *accord Condus v. Howard Sav. Bank*, 986 F. Supp. 914 (D.N.J. 1997) (independent assessor's report on the quality of the bank's credit administration process and loan loss reserves admissible under Fed. R. Evid. 803(6)). Likewise, the Quist Report, which was incorporated into NetQuote's financial reporting and

---

[7] To satisfy Rule 803(6), 'a document must (1) have been prepared in the normal course of business; (2) have been made at or near the time of the events it records; . . . (3) be based on the personal knowledge of the entrant or of an informant who had a business duty to transmit the information to the entrant; and (4) not have involved sources, methods, or circumstances indicating a lack of trustworthiness." *Gwathney*, 465 F.3d at 1140-41; *see also Simpson v. Univ. of Colo.*, 2007 U.S. Dist. LEXIS 30106 (D. Colo. 2007) (same).

audited by PWC, is admissible. Thus, because the Quist Report is itself admissible, Duree's

reliance upon it is permitted. *See In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 646, 653 (N.D.

Ill. 2006).

> ii. ***Rule 703 Permits an Expert to Rely on Any Material Reasonably Relied Upon by Experts in the Field.***

Second and independently, Rule 703 of the Federal Rules of Evidence explicitly permits

an expert to rely upon any matter that an expert in the field would reasonably rely upon to form

the offered opinion. Indeed, Rule 703 permits experts to base their opinions on "all manner of

underlying data that might otherwise not be admissible in evidence, including interviews, reports

prepared by third parties, clinical and other studies, and technical publications." *In re Sulfuric*

*Acid Antitrust Litig.*, 235 F.R.D at 654 (citing 4 Weinstein's Federal Evidence § 703.04[3]).

Rule 703 merely requires that the facts or data on which Duree based his opinions be of a type

reasonably relied upon by experts in the particular field in forming opinions or inferences on the

subject. Fed. R. Evid. 703; *see also TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732-33

(10th Cir. 1993) (noting expert generally allowed to rely on third-party valuation, but excluding

opinion because expert conceded valuation relied upon was unreliable); *In re Sulphuric Acid*

*Antitrust Litig.*, 235 F.R.D. at 655 (ruling expert testimony that relied on third-party work

admissible); *Ohio Envt'l Dev. Ltd. P'ship. v. Envirotest Sys. Corp.*, 478 F. Supp. 2d 963, 975

(N.D. Ohio 2007) (same).

MostChoice relies on two distinguishable cases for the proposition that Duree may not

use the Quist Report in his analysis. In *Sunlight Saunas, Inc.*, the court excluded an expert's

damage calculation because it was, among other deficiencies, based entirely on unaudited sales

forecasts prepared by the party which the expert undertook no effort to independently analyze.

*Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F. Supp. 2d 1022, 1030 (D. Kan. 2006). The court further noted that the there was no evidence in the record that a reasonable economic expert would have relied upon unsupported client projections without analysis. *Id. Fisherman Surgical Instruments v. Tri-Anim Health Services, Inc.*, is inapposite for similar reasons. *See* 502 F. Supp. 2d 1170, 1188-89 (D. Kan. 2007) (excluding testimony where expert relied upon client forecasts, projections and goals based on limited information and devoid of market analysis).

Here, in contrast, notwithstanding the arguments of Defendants' counsel (which are unsupported by any evidence), the Quist Report contains precisely the type of data that a damages expert would normally use in conducting a damages quantification. (*See* Ex. 1, Duree Decl. ¶ 10-15.) *See also Bauman v. Centex Corp.*, 611 F.2d 1115, 1120 (5th Cir. 1980) (admitting accountant's expert opinion based primarily on review of company files and financial statements because the information was "of the type relied upon by certified public accountants in evaluating the operation of corporations"); *Int'l Adhesive Coating Co. v. Bolton Emerson Int'l*, 851 F. 2d 540, 544-45 (1st Cir. 1988) (accountant may provide expert testimony based on company records and interviews with employees); *B.J. Tidwell Indus., Inc. v. Diversified Home Prods.*, 2007 WL 3118300 at *2 (W.D. Tex. Oct. 19, 2007) (holding expert reasonably relied on financial information received from client in evaluating business loss).

Moreover, Duree concluded that the data and analysis contained in the Quist Report was reliable based upon his education and nearly 40 years of experience as a CPA, including his experience with preparing, evaluating and reviewing analyses such as that contained in the Quist Report. Duree's reliance on the Quist Report in his damages quantification was reasonable because:

- the Quist Report was prepared prior to the start of MostChoice's attack on NetQuote and for reasons wholly unrelated to this litigation.[8] (Ex. 1, Duree Decl. ¶ 15.)

- PWC, a highly reputable accounting firm, had conducted audit procedures on the Quist Report. (*Id.*)

- reliance on such analysis is permitted by relevant accounting industry professional standards. (*Id.* ¶¶ 12-15; *see also* Statement of Auditing Standards No. 73 ("SAS No. 73"), attached to Duree Decl. as Exhibit B.)

- Duree has regularly relied upon the types of information contained in the Quist Report, both in his work as a consultant and in his work as a CPA. (Ex. 1, Duree Decl. ¶ 11.)

- Duree interviewed Quist personnel and satisfied himself that they had appropriately conducted the procedures required by FASB No. 141. (*Id.* ¶ 15.)

- Duree confirmed that PWC reviewed, evaluated, and relied upon the Quist Report in the audit of NetQuote's 2005 financial statements. (*Id.*)

*See, e.g., In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. at 654; *Ohio Envt'l Dev. Ltd. P'ship.*, 478 F. Supp. 2d at 974-75 (holding that repair estimates prepared by third party and relied upon by expert were "precisely the source of data 'reasonably relied upon' by experts in the field").

Finally it is worth noting that Duree did not blindly rely upon the Quist Report. Rather, Duree specifically considered whether the Quist Report was a sufficiently reliable source of information for use in his analysis and concluded that it was based upon his extensive experience. (Ex. 1, Duree Decl. ¶¶ 15-16.) In addition, with respect to the seven-year decay period, Duree independently concluded that the decay period was consistent with decay rates used for analysis of similar assets in his experience. (*Id.* ¶ 16.) With respect to the projections of future sales and the business risk discount rate applied by Quist and reviewed and evaluated by

---

[8] Defendants contend that Duree's use of the Quist Report was improper because Duree used it for a purpose other than the valuation purpose for which it was intended. It is true that the Quist Report was not created with an eye towards its use in this litigation—a fact that bolsters its reliability. Fed. R. Evid. Advisory Committee's notes to 2000 amendment.

PWC, in addition to the considerations enumerated above, Duree considered their reasonableness and concluded they were within a range of reasonableness based on his professional experience. (*Id.* ¶ 19.)

Accordingly, Duree's reliance on the Quist Report, the reasonableness of which was confirmed by his own extensive experience, was appropriate and provides no basis for excluding his opinions. *See, e.g., In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. at 654; *Ohio Envt'l Dev. Ltd. P'ship.*, 478 F. Supp. 2d at 974-75; *In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348, 1357 (N.D. Ga. 2000).

        **b.**      **Defendants' Remaining Challenges Do Not Go to the Admissibility of Duree's Opinions.**

        **i.**      **Seven-Year Decay Period.**

MostChoice contends that use of the seven-year decay period for NetQuote's customer relationships was inappropriate because none of the customer relationships lost had a duration of seven or more years. (*Daubert* Mot. at 4.) This argument fails.

First, it is apparent that MostChoice misunderstands the significance of the seven-year decay period. Assuming a seven-year decay period is not the same thing as assuming that each NetQuote customer will cease to be a customer after seven years, or that all customers will persist for seven years, but rather that a seven-year attrition period is reasonable. (Ex. 1, Duree Decl. ¶¶ 16; Ex. 2, additional Duree Tr. excerpts at 31:6-10.) The seven-year decay factor is an accounting assumption, analogous to the assignment of a useful life for a tangible asset, such as a piece of computer equipment, over which period of time the tangible asset will be depreciated. (Ex. 1, Duree Decl. ¶ 17.) In his experience in conducting valuations of businesses similar to NetQuote, Duree has found that decay periods ranging from 5 to 10 years are appropriate for

customer relationships similar to NetQuote's relationships with its local agents, depending on a variety of factors. (*Id.* ¶ 18.) Using his professional experience and judgment, Duree independently determined that Quist appropriately used the seven-year decay period in valuing NetQuote's customer relationships.

More fundamentally, MostChoice has offered no evidence that a seven-year decay factor was inappropriate so as to render Duree's entire methodology unreliable. The appropriateness of a seven-year decay period as an assumption in his valuation goes to the weight of the testimony, but not its admissibility. *See, e.g., Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) ("contentions that the assumptions are unfounded 'go to the weight, not the admissibility of the testimony'" unless "assumptions are so unrealistic and contradictory as to suggest bad faith' or to be in essence an 'apples and oranges comparison'") (internal citation omitted).

### ii. Price of NetQuote.

Defendants next contend that Duree's use of data in the Quist Report was inappropriate because the Quist Report supposedly does not consider whether NQH overpaid when it acquired NetQuote.[9] (*Daubert* Mot. at 6.) That argument ignores that, as part of conducting the evaluation required by FASB No. 141, Quist implicitly determined that the purchase price paid by NQH to acquire NetQuote was reasonable. (Ex. 1, Duree Decl. ¶ 20; Ex. 2, additional Duree Tr. excerpts at 17:4-18:2.) Since the acquisition, NetQuote has continued to carry the assets acquired at the values assigned by the Quist Report, less applicable depreciation and amortization. (*Id.*) Neither NetQuote nor its auditors have determined that the value of the

---

[9] MostChoice points to the Common Stock Valuation of NetQuote Holdings, Inc. to support its contention that NQH overpaid for NetQuote. That report does not purport to value NetQuote as a whole, or value its customer relationships. (*See* Ex. 1, Duree Decl. ¶ 22.) Rather, that report was required by FASB Statement 123(R), which requires that the cost resulting from share-based compensation (such as employee stock option plans) be valued and recognized as an expense in the financial statements. Thus, it cannot properly be compared to the value of the company as a whole.

acquisition has been impaired—in other words, neither have concluded that NQH overpaid. (*Id.*)

MostChoice's argument on this point misinterprets the significance of the report on which it

relies, and in any event, would at best go to the weight of testimony.[10]

### IV.   CONCLUSION

For the reasons set forth above, the *Daubert* Motion should be denied.

Dated:  January 3, 2008                     Respectfully submitted,

                                            *s/ Heather Carson Perkins*
                                            David W. Stark
                                            Heather Carson Perkins
                                            FAEGRE & BENSON LLP
                                            3200 Wells Fargo Center
                                            1700 Lincoln Street
                                            Denver, Colorado 80203
                                            Tel:  (303) 607-3500 / Fax:  (303) 607-3600
                                            E-mail:        dstark@faegre.com
                                                           hperkins@faegre.com

                                            Daniel D. Williams
                                            Teresa Taylor Tate
                                            FAEGRE & BENSON LLP
                                            1900 Fifteenth Street
                                            Boulder, Colorado 80302
                                            Tel: (303) 447-7700 / Fax: (303) 447-7800
                                            E-mail:        dwilliams@faegre.com
                                                           ttate@faegre.com

                                            **Attorneys for Plaintiff NetQuote, Inc.**

---

[10] Interestingly, Defendants also fault Duree for conducting analysis independent of and different from that conducted by the Quist Report. (*Daubert* Mot. at 7.)  Specifically, Defendants note that Duree calculated the present value of NetQuote's customer relationships at approximately $123 million, whereas Quist valued the relationships at $11 million. (*Id.*)  This is because Duree calculated the net present value of the revenue stream *before* deduction of costs that are not incremental to the value of the customer. (Ex. 1, Duree Decl. ¶ 22.)  This is another example of a methodological decision that MostChoice misunderstands but is free to challenge at trial.

## CERTIFICATE OF SERVICE

I certify that on this 3rd day of January, 2008, I electronically filed the accompanying **NETQUOTE'S RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following counsel of record:

Ryan L. Isenberg, Esq.
ISENBERG & HEWITT, P.C.
7000 Peachtree Dunwoody Road, Bldg 15, Suite 100
Atlanta, GA 30328
ryan@isenberg-hewitt.com


*s/ Veronica Thomas*