## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 07-cv-00630-DME-MEH**

**NETQUOTE INC, a Colorado corporation,**

    **Plaintiff,**

**v.**

**BRANDON BYRD, an internet user making use of the IP Addresses 64.136.27.226 and 64.136.26.227, and**

**MOSTCHOICE.COM, Inc., a Georgia corporation**

    **Defendants.**

_____

### MOSTCHOICE.COM, INC.'S RESPONSE TO
### PLAINTIFF NETQUOTE'S MOTION FOR SUMMARY JUDGMENT

_____

COMES NOW, Mostchoice.com, Inc. and herein files this its Response to Plaintiff's

Motion for Summary Judgment and shows this Court the following:

I.  Click Fraud as a Cause of Action

Netquote argues that its admitted "clicking" on Mostchoice's paid advertisements does

not constitute fraud. In support of its motion, Netquote identified two cases that are inapposite.

These cases are *Payday Advance Plus, Inc. v. Findwhat.com, Inc.*, 478 F. Supp. 2d 496

(D.N.Y. 2007) and *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229 (D. Pa. 2007). Neither

plaintiff actually pleaded a claim for fraud. In *Findwhat*, no claim for fraud was pleaded, but a

civil conspiracy claim was dismissed without prejudice to allow the plaintiff to re-plead a claim

for fraudulent concealment. In *Feldman*, the case was, similar to the claims against Findwhat, an

Dockets.Justia.com

action against an advertiser with whom the plaintiff had a contract.  Feldman didn't allege that

Google was involved in the click fraud at all.

Netquote concedes that "any . . .conduct that amounts to an assertion not in accordance

with the truth" may constitute a misrepresentation which supports a claim for fraud (Mot. at 6).

In this case, there is no dispute that Netquote employees have clicked through Mostchoice's paid

advertisements for a purpose other than a legitimate inquiry or interest in Mostchoice services.

In **In re Miva, Inc., Sec. Litig.**, 511 F. Supp. 2d 1242, 1249 (D. Fla. 2007) it was said that

the conduct that is "commonly referred to as 'click-fraud,' meant that advertisers were not

forwarded legitimate leads of consumers interested in acquiring their products.

Netquote takes inconsistent positions with respect to its claims of misrepresentation and

those made by Mostchoice.  Netquote asserts that when its employees click on a paid

advertisement to get to the Mostchoice site[1] they are merely making a legitimate inquiry for some

"permissible" purpose.  One thing is clear though.  Netquote's employees had no interest in using

Mostchoice products or services.

Yet, Netquote's claims against Mostchoice are virtually identical.  Mostchoice submitted

fictitious applications for the legitimate business purpose of identifying Netquote's customer

base[2] with no intention of using Netquote's products or services.  If Netquote's activity was

permissible because it served a legitimate business purpose, then Mostchoice's activity was

similarly permissible.  Netquote is no more entitled to assume that everyone that comes to its

---

[1]Since Netquote is clearly aware of Mostchoice, Netquote's employees could have simply
gone directly to the Mostchoice website located at www.mostchoice.com.

[2]Deposition of Michael Levy Page 263 Lines 11-15

website is there because they are truly interested in buying insurance than Mostchoice is entitled

to assume that those visitors to its site that have been referred through a paid search engine listing

were interested in seeing Mostchoice's services.

Further, Netquote attempts to impermissibly limits the scope of an allegation in a

counterclaim by asserting that the *user seeks only* to be taken to a page on the website (Mot. at

7).  The allegation is not so limiting.

Netquote continues to misconstrue Mostchoice allegations by claiming that "to the extent

that Mostchoice's contention is that for a click through a paid search engine link to be legitimate,

the user must then complete a Mostchoice insurance application. . ." (Mot. at 7-8).  Mostchoice

makes no such contention.[3]  In fact, Martin Fleischmann was asked about this at his deposition,

and he specifically testified that it was not Mostchoice's contention that every visitor is expected

to complete an application.[4]

Netquote claims that Mostchoice cannot demonstrate justifiable reliance.  However, that

is generally a question for the jury, unless the ability to ascertain the relevant facts were equally

available to all parties. See ***Ades v. Werther***, 256 Ga. App. 8, 11-12 (2002); 567 S.E.2d 340.

Unlike the submissions made by Byrd, which Netquote could have easily intercepted before

---

[3]Netquote alleges in its brief that there is some sort of "admission" by Mostchoice that its actual conversion rate is lower than alleged in its Counterclaim and relies upon the testimony of Martin Fleischmann for his estimate of 5 to 25 percent as a variation from the counterclaim's allegation of 15 - 30 percent.  Fleischmann first testified to a range of 5 OR 10 percent to 25 percent or maybe, in some cases, some sources may be even better than that.  (Deposition of Martin Fleischmann Page 110 Page 21 - Page 111 Line 1).  Neqtuote's counsel then took the answer and repeated the broad range and cites that as support for this non-existent contradiction. Certainly 10 to 25 percent is close to the 15-30 percent, and there is no dispute that all of the technical analysis falls under the aegis of Michael Levy.

[4]Deposition of Martin Fleischmann Page 104 Lines 21-24

distributing, Mostchoice had no way of intercepting the "clicks" before its account was charged because, as described, Netquote's employee would simply click on the link and be taken to the Mostchoice website.

Netquote argues that there is no evidence that it engaged in click fraud because Mostchoice only identified a total of 52 clicks over a period of 3 years. However, Mostchoice has performed an analysis of its internal click data and has identified over 8,000 clicks thousands of clicks that are believed to have come from Netquote through an America Online (AOL) proxy (See Exhibit A). As part of this analysis Mostchoice documented the methodology used to determine that Netquote was using AOL proxy IP addresses (See Exhibit A - Page 4). As a consequence, Mostchoice has sought and received leave to subpoena AOL for additional data for analysis (See Dkt. #124; 168). That subpoena has been served and received[5] and Mostchoice has filed an affidavit under FRCP 56(f) for the purpose of being able to include the results of that subpoena as evidence in support of its claims to the extent it reveals what Mostchoice contends.

II. Other Causes of Action

Netquote asserts that no other causes of action have been pleaded in Mostchoice's counterclaim, other than a common law fraud claim. However, "a plaintiff is not required to cite legal authority in its complaint; it is only required to allege facts which would entitle it to relief under any legal theory. *Pacificare v. Martin*, 34 F.3d 834, 838 (9th Cir. 1994) (emphasis added).

Rather, FRCP § 8 requires a plaintiff to "set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514 (1st Cir. 1988); *United States ex rel.*

---

[5]See Exhibit B

*Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 240 (1st Cir. 2004).

Mostchoice has set forth sufficient allegations not only to state claims under a theory of

fraud, but also under a theory of intentional tort under Restatement § 870.

> "intentional" or "prima facie" tort as described in . . .Section 870 of the
> Restatement (Second) of Torts, which provides that "one who intentionally causes
> injury to another is subject to liability to the other for that injury, if his conduct is
> generally culpable and not justifiable under the circumstances." Restatement
> (Second) of Torts § 870. Section 870 also states that such liability "may be
> imposed although the actor's conduct does not come within a traditional category
> of tort liability." *Id.* Thus, a claim for intentional tort, if recognized, would likely
> be appropriate where there is no other category of tort liability within which a
> plaintiff's claim would fit. *Marshall v. Fenstermacher*, 388 F. Supp. 2d 536, 558
> (D. Pa. 2005).

Neither Colorado, nor Georgia has expressly adopted Section § 870 of the Restatement (Second),

but Colorado has adopted eleven (11) other sections of the Restatement according to a search of

cases decided by the District of Colorado.[6]  Georgia Courts rarely expressly adopt restatement

sections, but have relied on as authority, or adopted at least nineteen (19).[7]

Mostchoice has pleaded facts which support a claim for intentional court.

## Conclusion

Based upon the foregoing, Mostchoice respectfully requests that Netquote's Motion for

Summary Judgment be denied.


[Signature on next page]

---

[6]They are, in no particular order: 427, 552, 402A, 400, 324A, 46, 908, 766B-768, and
595.

[7]They are, in particular order: 908, 530, 409, 8, 324, 490, 402, 766, 466, 311, 895, 580,
768, 533, 623, 623, 565, 552, and 473.

Dated this 7th day of January, 2008.

  s/ Ryan Isenberg
Ryan L. Isenberg, Esq.
Isenberg & Hewitt, P.C.
7000 Peachtree Dunwoody Road
Building 15, Suite 100
Atlanta, Georgia 30328
Telephone: 770-351-4400
Facsimile: 770-828-0100 (Fax)
Email: ryan@isenberg-hewitt.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of January, 2008, I served the foregoing Response to Plaintiff Neqtuote's Motion for Summary Judgment by electronic delivery, as an attachment to an email, to the following counsel of record:

David W. Stark
Heather Carson Perkins
Daniel D. Williams
Theresa T. Tate
FAEGRE & BENSON LLP
3200 Wells Fargo Center
1700 Lincoln Street
Denver, Colorado 80203
dwilliams@faegre.com

  s/ Ryan Isenberg
