**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. 07-cv-00630-DME-MEH**

**NETQUOTE INC, a Colorado corporation,**

    **Plaintiff,**

**v.**

**BRANDON BYRD, an internet user making use of the IP Addresses 64.136.27.226 and 64.136.26.227, and**

**MOSTCHOICE.COM, Inc., a Georgia corporation**

---

**MOTION FOR LEAVE TO TAKE PRESERVATION DEPOSITIONS**

---

    COMES NOW, Mostchoice.com, Inc. ("Mostchoice") and files this its Motion for Leave to Take Preservation Depositions[1] and shows this Court the following:

**Introduction**

    As the Court is no doubt well aware by now, this is case between competitors in the on-line insurance lead generation business. During the course of employment by Mostchoice, Brandon Byrd submitted various fictitious applications through the Neqtuote system for the purpose of identifying the Neqtuote customer base. Netquote claims that Byrd submitted 3,521 such applications and initially alleged a loss of 2 national customers and 157 local customers.

    In this motion, Mostchoice asserts that it is entitled to take depositions two categories of

---

[1] This motion is being filed subsequent to the discussion of this issue in open court and pursuant to Dkt.# 200, and counsel presumes as such that the requirements of LR 7.1 are not applicable.

Dockets.Justia.com

witnesses for preservation of testimony at trial. This includes the 155 local accounts and 8 other witnesses who reside outside the subpoena power of the Court.

## Argument and Citation to Authority

Among the central issues in this case is why the 157 customers left Netquote. Netquote contends it lost these customers as a result of Byrd's submissions, but Colorado law requires evidence that would support a finding that Byrd's submissions were at least a substantial factor in causing an injury. ***See Lyons v. Nasby***, 770 P.2d 1250, 1256 (Colo. 1989).

Neqtuote is relying entirely on its expert, Stephen Duree, to prove causation as it relates to the local customers.[2] While Mostchoice has challenged Duree's methodology as it relates to causation (and he has since changed that methodology) what Netquote hopes to be able to accomplish at trial is to have Duree testify (i.e. speculate) about what the local customers motivations were when they decided to cease doing business with Netquote. In essence, Netquote wants Duree to testify as to what these agents were thinking when they terminated.[3]

Whether or not Duree is allowed to testify as Netquote hopes, one thing is clear. The best and highest evidence of why each agent terminated would be each agent's testimony. Mostchoice sought leave to depose the local accounts during discovery to secure this very testimony. [See *Dkt. # 93*; *Dkt. #104* ][4] In seeking these depositions, Mostchoice recognized that they should be fairly straightforward and only sought a total of 150 hours of deposition time

---

[2]See Shine Depo. Page 104 Lines 9-23

[3]As has since been discovered, many were actually terminated by Netquote for non-payment or collection issues.

[4]In an effort to be reasonable, Mostchoice only sought 150 hours of deposition

rather than full depositions of each proposed witness. Unfortunately, that motion was denied.

Subsequently, (and after the close of discovery) Netquote provided its expert with communications and customer service notes relating to the 157 local accounts. Duree used these documents to come up with a different methodology for causation, in which he now categorized the 157 local accounts into three categories denominated as (1) MC Substantial (2) MC Substantial and (3) MC Not Substantial.

Duree includes as a MC Substantial agent, one who purchased 58 leads from Netquote and received 3 allegedly from Brandon Byrd, that expressed that he was terminating because he was leaving the insurance industry. Duree cannot be allowed to offer such far fetched testimony to the jury without Mostchoice having an opportunity to present the testimony of that customer.

Mostchoice proffers that this example is representative of the communications and documents that reveal that all but a handful[5] terminated (or were terminated by Netquote) for reasons other than receiving leads from Byrd.

I. Purpose of Preservation Depositions

It is not disputed that, with respect to a witness that lives more than one hundred miles away from the courthouse can't be compelled to appear at trial, and "absent a voluntary appearance by the witness, the "sole means of presenting such a witness' testimony . . . is through use of a preservation deposition." ***Odell v. Burlington N. R.R. Co.***, 151 F.R.D. 661, 663 (D. Colo. 1993); ***Watson v. Norton***, 10 Fed. Appx. 669, 676 (10th Cir. 2001).

---

[5]Though this not to be construed as an admission of any sort, having reviewed the documents at issue, it appears that an argument could be made that 5-7 accounts terminated as a result of receiving bogus leads, though these may have been bogus leads from Netquote's own sources that are believed to generate substantial numbers of leads that are no more legitimate than Byrd's.

Further, Courts in this District have ruled that there is a distinction between discovery depositions and preservation depositions. See *Prince Lionheart, Inc. v. Halo Innovations, Inc.*, 2007 U.S. Dist. LEXIS 77157 (D. Colo. 2007); *Estenfelder v. Gates Corp.*, 199 F.R.D. 351, 355 (D. Colo. 2001); *Vaughn v. Stevenson*, 2007 U.S. Dist. LEXIS 8864 (D. Colo. 2007); *Watson*, supra; *Odell*, supra.

In *Prince Lionheart, Inc*., the Court applied the four factor test from test from *Estenfelder*, which were identified as

> (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in court, and (4) bad faith or willfulness in failing to comply with the court's order." (citations omitted)

It was further determined that these factors weighed in favor of allowing the preservation deposition sought "considering the Tenth's Circuit's admonition that, "[t]he decision to exclude evidence [because of untimeliness] is a drastic sanction." (citing to *Summers v. Missouri Pacific Railroad System*, 132 F.3d 599, 604 (10th Cir. 1997)).

## II. FRCP cannot Govern Number of Witnesses to Be Offered at Trial

Before the conclusion of discovery, the defendants previously sought permissions to take additional depositions. The plaintiff argued that the scheduling order only allowed for ten depositions, which is contemplated by FRCP § 30(a)(2)(A)(I). The Court denied leave to take additional depositions.

If not permitted to take additional depositions, the effect is that the Federal Rules of Civil Procedure will have preemptively served as the basis for excluding otherwise relevant and

admissible evidence on the grounds that the non-party witnesses do not happen to be located within 100 miles of the courthouse. The rules would further be used to arbitrarily limit the number of witnesses the defendants can call by virtue of nothing more than the arbitrary requirement that a party must get permission before taking more than ten depositions. Witnesses cannot be excluded merely based on the number. ***See MCI Communications Corp. v. American Tel. & Tel. Co.***, 708 F.2d 1081, 1171 (7th Cir. 1983) citing ***Padovani v. Bruchhausen***, 293 F.2d 546, 549-50 (2d Cir. 1961).

In this case, Netquote's organizational structure required the depositions of its employees to ascertain the basis for its claims. The defendants cannot be put into a position of having to choose between finding out what the opposing party's claims and evidence are OR obtain depositions of witnesses. It is unthinkable that Netquote could be allowed to have its expert witness testify as to what 157 people were thinking and disallow Mostchoice the opportunity to rebut that testimony by offering the truth.

III.  Unavailability and Voluntariness

FRCP § 32 provides that a deposition may be used where the witness is more than 100 miles away from the courthouse. "The mere absence of the deponent from the 100 mile area is sufficient, and the party attempting to submit the deposition into evidence need not proffer an excuse for the failure of the deponent to appear in court." ***Houser v. Snap-on Tools Corp.***, 202 F. Supp. 181, 189 (D. Md. 1962). Clearly, the defendants would be able to use any deposition obtained from these local accounts. If the local accounts were located in the Court's jurisdiction (i.e. within 100 miles of the courthouse) it wouldn't be necessary to take them, and the only determination that the Court could make as to whether the witnesses could testify would be a

determination the Federal Rules of Evidence.  It is only because the witnesses are not located in the district that Netquote is permitted to attempt to limit the defendants' proposed witnesses in this manner.   It is certainly perplexing that there is a rule that allows for use of a deposition because the party can't make the witness come to court and yet the court will not allow the party to obtain the deposition testimony in the first place.

It has been suggested that there must be some attempt made to determine whether the proposed non-party witnesses are willing to attend.  While there may be some requirement yo demonstrate that a witness is unavailable in order to have evidence admitted under FRE § 804, there is no such requirement in taking depositions for preservation of evidence.  Otherwise a party would be left to rely upon a non-party witnesses representation made several months or more in advance of trial, which of course that non-party would be subject to changing its mind.

IV. Proposed Deponents

The defendants propose to take depositions for preservation of evidence of two categories of people, being local accounts and other former customers who were not identified by Netquote as having received leads from Byrd, but whose identities and testimonial substance were known to Mostchoice.

A.  *Local Customers*

Netquote initially claimed that it lost 157 local accounts as a result of Byrd's submissions.  In "supplementing" his report, Netquote's expert has removed 14 and categorized 32 as not substantially caused by Byrd's submissions.  To the extent that Netquote no longer seeks to recover as to these agents then that would leave 111, two of whom are believed to be subject to the jurisdiction of this Court.  Mostchoice included the identity of all 155 of these local

customers that live outside the courthouse area in its portion of the pre-trial order which was submitted on February 12th.

Of note is that the testimony of these witnesses is not cumulative under FRE § 403 because Netquote has alleged that each terminated as a result of Byrd's submissions, and Netquote seeks to recover damages as to each.[6]

Finally, the defendants are well aware of the substantial cost and time it will take to obtain the depositions sought herein. However, this is the natural result of Netquote making a "federal case" out of a matter that should have been filed in small claims court.

*B. Former Netquote Customers*

In addition to the local accounts, Mostchoice identified eight (8) non-party witnesses who (1) did not receive leads from Byrd (2) are former Netquote customers and (3) are familiar with the quality of Netquote's leads (See Exhibit "A" attached hereto). The defendants concede that these witnesses would be substantially cumulative of each other and seeks to only depose three for use at trial.

V. Application

Counsel for the defendants were only provided with the addresses and phone numbers of the proposed local accounts on December 13, 2007. This information is contained in a document stamped as NQ2516-NQ2519. The defendants did not have the ability to obtain depositions of any of these non-parties previously, and has obviously not engaged in any sort of strategic

---

[6]Previously, Netquote's expert testified that his opinion was in the aggregate and that he was not identifying any particular customer, but claimed that he recognized that between 25%-50% may have terminated for other reasons. In light of a recent supplementation, it is not clear exactly whether this opinion remains.

decision as contemplated in certain of the cases cited herein.

If the factors set forth above are properly weighed, then the Court can really on reach one result, which is to allow the depositions of the local accounts, and some testimony of the former customers who did not receive Byrd's submissions.

**Conclusion**

The result of not allowing the depositions requested in this motion would be nothing less than an arbitrary determination that allows Netquote to call the witnesses it wants to call while depriving the defendants of the opportunity to present the witnesses that would have the most to offer as it relates to the primary issue in this case, which is why Netquote lost the customers it claims to have lost. Consequently, this Court should allow the defendants to take the depositions of all of the local accounts that Netquote claims to have lost. Further, this Court should allow the defendants to obtain testimony from the agents it identified in discovery has having knowledge as former Netquote customers who did not receive leads from Byrd.

WHEREFORE, Defendants respectfully request that the Court grant this motion, and for such other relief deemed necessary and just by this Court.

[Signature on next page]

This 25th day of February, 2008.

    s/ Ryan Isenberg
Ryan L. Isenberg, Esq.
Isenberg & Hewitt, P.C.
7000 Peachtree Dunwoody Road
Building 15, Suite 100
Atlanta, Georgia 30328
Telephone: 770-351-4400
Facsimile: 770-828-0100 (Fax)
Email: ryan@isenberg-hewitt.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of February, 2008, I served the foregoing Motion for Leave to take Preservation Depositions by electronic delivery, as an attachment to an email, to the following counsel of record:

David W. Stark
Heather Carson Perkins
Daniel D. Williams
Theresa T. Tate
FAEGRE & BENSON LLP
3200 Wells Fargo Center
1700 Lincoln Street
Denver, Colorado 80203
dwilliams@faegre.com

    s/ Ryan Isenberg