## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.  07-cv-00630-DME-MEH

NETQUOTE, INC., a Colorado corporation,

     Plaintiff,

v.

BRANDON BYRD, an internet user making use of the IP Addresses 64.136.27.226 and 64.136.26.227, and

MOSTCHOICE.COM, INC., a Georgia corporation,

     Defendants.

---

## REVISED FINAL PRETRIAL ORDER

---

## 1.  DATE AND APPEARANCES

The Final Pretrial Conference was held on March 21, 2008 at 2:30 p.m. before Magistrate Judge Michael E. Hegarty.  Heather Carson Perkins, Faegre & Benson LLP, 3200 Wells Fargo Center, 1700 Lincoln Street, Denver, Colorado 80203, Telephone:  (303) 607-3500,  and Daniel D. Williams, Faegre & Benson LLP, 1900 Fifteenth Street, Boulder, Colorado 80302, Telephone: (303) 447-7700, appeared on behalf of Plaintiff.  Ryan L. Isenberg, Isenberg & Hewitt, P.C., 7000 Peachtree Dunwoody Road, Bldg 15, Suite 100, Atlanta, Georgia  30328, Telephone: (770) 351-4400, appeared on behalf of Defendants.

## 2.  JURISDICTION

This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 with respect to the Lanham Act claim and pursuant to 28 U.S.C. § 1332 with respect to the state-law claims and counterclaim.  Jurisdiction is not contested.

## 3.  CLAIMS AND DEFENSES

### Plaintiff's Statement

Plaintiff NetQuote, Inc. ("NetQuote") brings claims for common-law fraud, intentional interference with contract, and false advertising under the Lanham Act.  Defendant Mostchoice has brought a counterclaim for fraud.  The facts, legal theories, and relief sought on NetQuote's claims, and the facts, legal theories, and defenses to the counterclaim are as follows:

NetQuote is a Colorado-based company that sells insurance referrals to insurance brokers and agents.  NetQuote operates websites found on the internet at www.netquote.com and www.localinsurance.com.  Consumers may submit information through these websites containing the consumers' insurance needs, which NetQuote sells to its customers—insurance agents and brokers—who then contact the consumer with an insurance quote.  Defendant Mostchoice.com, Inc. ("Mostchoice") is one of NetQuote's competitors in the online insurance referral industry.

In September or October 2006, Mostchoice hired Defendant Brandon Byrd to submit false online requests for insurance quotes through NetQuote's website.  Working twenty hours per week, Byrd submitted at least 3,521 false leads to NetQuote's website.  Mostchoice concentrated the effects of its cyber-attack to inflict the maximum harm on NetQuote's business.  Each day, the attack would be targeted to specific insurance products for specific metropolitan areas, which had the effect of causing agents who served a certain metropolitan area and bought particular types of

leads to receive large quantities of false submissions on any given day.  Because NetQuote sells

each application it receives to multiple insurance agents, the damage from these bogus

applications is magnified.  NetQuote has determined that Mostchoice's conduct caused it to

distribute the 3,521 bogus applications 12,123 times to 1,063 local accounts and 5 national

accounts.

All the while that Mostchoice and Byrd were submitting the bogus applications,

Mostchoice maintained on its website pages titled "Better Than NetQuote Leads" and "Better

Than NetQuote.com Leads" that claimed falsely that Mostchoice's leads were of higher quality

than NetQuote's.  Mostchoice's web pages with these claims failed to inform potential customers

that Mostchoice was engaged in a campaign to sabotage the quality of NetQuote's leads by

sending thousands of junk applications into NetQuote's system.  The Mostchoice web pages also

contain the false statement that Mostchoice does not buy leads from other lead aggregators to re-

sell to Mostchoice customers when Mostchoice has in fact done so and currently is looking for

opportunities to continue doing so.

When Byrd completed each of his false applications, he received a web page from

NetQuote providing him with the name of the insurance agent or agents receiving the false lead,

which Byrd in turn inserted into a database of NetQuote's insurance agent customers.  Since at

least the spring of 2007, Mostchoice has been marketing to the NetQuote agents whose identities

it discovered through its bogus submissions.  It has been successful in securing business from a

portion of these customers.

Once it became aware of the attack, NetQuote developed systems to stop the bogus

submissions.  Each time NetQuote developed systems to stop the bogus submissions, Mostchoice

would change strategies to evade the blocks NetQuote had put in place. While Mostchoice claimed that it stopped its bogus submissions in July 2007, documents produced in discovery prove that the submissions continued into September and November 2007. Mostchoice has continued its bogus submissions notwithstanding NetQuote's initiation of this lawsuit and its formal demand that Mostchoice cease and desist from doing so. As recently as October 2007, Mostchoice has refused to cease and desist from marketing to NetQuote's agents whose identities it discovered through its bogus submissions.

1. <u>Fraud</u> – Through the conduct described above, Mostchoice defrauded NetQuote by barraging it with false claims pretending to be individuals requesting insurance quotations. NetQuote's customer list of insurance agents is a closely guarded secret. Through the fraud, Mostchoice was able to learn those names through surreptitious means. In addition, through the fraud, Mostchoice caused NetQuote customers to receive bogus leads from NetQuote, which greatly upset NetQuote's customers, harming NetQuote's business reputation as an industry leader with high quality leads and causing some of NetQuote's customers to terminate.

NetQuote currently estimates that it will seek the following in compensatory damages for its fraud claim:

- $973,786 for the loss of the HSBC account

- $148,582 for the loss of the SBLI account

- $1 million to $1.5 million for loss of 157 local accounts

- $51,000 in disgorgement damages for Mostchoice's billings to customers of NetQuote who received Mostchoice's bogus leads

- $128,000 in personnel costs related to responding to Mostchoice's attack

- prejudgment interest at the statutory rate

Defendants' conduct described above was fraudulent, malicious, wanton, and done in bad faith. Moreover, Defendants refused to cease and desist after this litigation commenced and after NetQuote formally demanded that it do so. Finally, Defendants aggravated the harm caused by their conduct by increasing their marketing to NetQuote's agents in retaliation for NetQuote filing this lawsuit. Accordingly, NetQuote seeks exemplary damages in the maximum amount permitted by statute in addition to an award of compensatory damages.

Finally, NetQuote seeks an injunction ordering Defendants to: (1) stop submitting applications on NetQuote's website; (2) stop all marketing to NetQuote customers whose identities were provided to Mostchoice in response to Mostchoice's false applications on NetQuote's websites ("the affected customers"); (3) terminate any contracts with the affected customers that Mostchoice entered into after it began submitting its false leads in September 2006; and (4) remove from its databases the names of the affected customers.

2. <u>Intentional Interference with Contract</u> – Through the conduct described above, Mostchoice also intentionally interfered with NetQuote's relationships with 157 local accounts and two national accounts in an attempt to steal these customers away from NetQuote and gain their business for Mostchoice. NetQuote had oral or written contracts with each of these accounts. Mostchoice knew or should have known that NetQuote has contracts with its customers, including these 159 accounts. Mostchoice's conduct was wrongful in that it involved fraud. Its conduct also was wrongful because each bogus application contained false information, and thus the conduct involved knowing misrepresentations. Mostchoice's conduct caused these accounts to stop doing business with NetQuote. The damages NetQuote claims are as follows:

NetQuote currently estimates that it will seek the following in compensatory damages for its intentional interference claim:

- $973,786 for loss of the HSBC account

- $148,582 for loss of the SBLI account

- $1 million to $1.5 million for loss of 157 local accounts

- $51,000 in disgorgement damages for Mostchoice's billings to customers of NetQuote who received Mostchoice's bogus leads

- $128,000 in personnel costs related to responding to Mostchoice's attack

- prejudgment interest at the statutory rate

Defendants' conduct described above was fraudulent, malicious, wanton, and done in bad faith. Moreover, Defendants refused to cease and desist after this litigation commenced and after NetQuote formally demanded that it do so. Finally, Defendants aggravated the harm caused by their conduct by increasing their marketing to NetQuote's agents in retaliation for NetQuote filing this lawsuit. Accordingly, NetQuote seeks exemplary damages in an amount to be determined by the jury in addition to an award of compensatory damages.

Finally, NetQuote seeks an injunction ordering Defendants to: (1) stop submitting applications on NetQuote's website; (2) stop all marketing to NetQuote customers whose identities were provided to Mostchoice in response to Mostchoice's false applications on NetQuote's websites ("the affected customers"); (3) terminate any contracts with the affected customers that Mostchoice entered into after it began submitting its false leads in September 2006; and (4) remove from its databases the names of the affected customers.

3.      <u>False Advertising Under the Lanham Act</u> – NetQuote's Lanham Act claim is premised on Mostchoice's false and deceptive advertisements on its website titled "Better Than NetQuote Leads," "Better Than NetQuote.com Leads," and the like.  The advertisements contain "metatags" such that, when a prospective customer enters various search terms into Google, Yahoo!, or other search engines, the result that appears, in large print and underlined, is "Better Than NetQuote Leads" or a variant of that claim.  The prospective customer is then provided with a computer link directing the user to Mostchoice's false and deceptive advertisement comparing Mostchoice's services to NetQuote's.

The advertisements contain statements that are both literally false and false by implication. The advertisements are literally false in that they claim that Mostchoice does not purchase leads from other lead aggregators when Mostchoice has in fact done so in the past and it continues to seek out opportunities to do so in the future.  They are false by implication in that they imply that Mostchoice's leads are of higher quality than NetQuote's without disclosing that Mostchoice has sabotaged the quality of NetQuote's leads.  Because Mostchoice's conduct in creating the advertisements and in sabotaging NetQuote's leads was willful and intentional malicious conduct involving a direct comparison between Mostchoice's services and NetQuote's, and because Mostchoice's advertisements contain at least one literally false statement, there is a presumption that the advertisements have caused consumer confusion that has harmed NetQuote.  Mostchoice has no evidence to rebut that presumption.

NetQuote seeks an injunction requiring Mostchoice to remove its advertisements comparing its services to NetQuote's and to remove from its website all occurrences of the false statement that "[w]ith links posted on search engines like Google and Yahoo, Mostchoice.com

prides itself on the fact that its only leads are from people who visit its site." NetQuote further seeks an accounting of all sales to all customers that have visited the Mostchoice "Better Than NetQuote Leads," "Better Than NetQuote.com Leads," and similar web pages and disgorgement of all sales to such customers after the date that they visited those web pages.

     4.    <u>Defense to Mostchoice Counterclaim</u> – Mostchoice has brought a counterclaim against NetQuote for fraud premised on about four dozen clicks on Mostchoice's paid on-line advertisements over the course of two years. The conduct alleged is not fraud. NetQuote's clicks on those paid advertisements were for the legitimate purpose of determining the content linked to the advertisements. They did not involve any misrepresentation of any kind. To the extent that the click is considered a statement, it is a statement that the computer user wishes to be directed to Mostchoice's website advertisements, which accurately describes why NetQuote employees clicked on Mostchoice's advertisements. Moreover, based on Mostchoice's own knowledge about the small percentage of persons that fill out a Mostchoice application after clicking on a Mostchoice on-line advertisement, Mostchoice did not justifiably rely on the fact of a click on its website as a representation that one of its applications would be completed.

     Mostchoice contends that thousands of clicks on its website through an America Online proxy server were made by a NetQuote employee. NetQuote denies that these clicks came from a NetQuote employee, and there is absolutely no evidence to support Mostchoice's contention to the contrary. Mostchoice relies on speculation and opinions to support its allegation, but it lacks any expert opinion testimony or actual factual evidence to support its claim that clicks through AOL servers were made by NetQuote.

NetQuote asserts as an affirmative defense that Mostchoice failed to mitigate any damages. Mostchoice actively pursued various search engine companies for refunds for alleged click fraud perpetrated by others and dedicated several employees to tracking and stopping click fraud. To the extent that it failed to pursue reimbursement from the search engines – which are the parties that actually charged Mostchoice for the allegedly inappropriate clicks – it has failed to mitigate its damages on this claim.

### Defendants' Statement

The parties are competitors in the Internet insurance lead generation industry. There are two fundamental differences between the two companies, being that (1) Netquote uses a system of affiliates to generate leads and (2) Netquote offers incentives to individuals to complete its insurance applications, who are interested in redeeming rewards and not really interested in buying insurance. These two differences result in Netquote offering a lower quality lead.

In addition, when a consumer would complete an application on the Netquote system, Netquote identified the agents who would be receiving the application, whereas Mostchoice does not.

In an effort to identify Netquote's agent base, Mostchoice Chairman Michael Levy hired a friend named Brandon Byrd to work from home on a part-time basis. Byrd used his dial-up account and submitted fictitious applications through the Netquote system for the purpose of identifying Netquote agents. Byrd was specifically instructed to only submit one application per zip code per type of insurance to ensure that Netquote's agents would not be inundated with his applications. Byrd submitted leads through Netquote's system initially, and later changed to what was believed to be an affiliate named localinsurance.com because that site was faster. Byrd made

submissions over the course of approximately nine (9) months from October 2006 – July, 2007. Mostchoice denies that any further submissions were made subsequently, other than by Michael Levy, who made a small number of submissions using his own information for the purpose of preparing for his deposition in this case in September, 2007, and later an additional small number related to Mostchoice's forthcoming motion for summary judgment. Further, Netquote has admitted to instructing its employees to make applications to through the Mostchoice site and its claims in this case are contradictory to its own business practices.

Byrd created a database of the agents that were identified by Neqtuote in response to his submissions. In March or April of 2007 Mostchoice added the e-mail addresses to its program that sends out e-mail advertisements about Mostchoice. Later in the Spring or Early Summer, Mostchoice authorized certain members of its sales staff to contact the agents, who did not know the source of information, which yielded very little in sales.

Mostchoice denies any attempt to sabotage, attack or otherwise harm Netquote, and denies that Byrd' submissions could have, or did cause any actual harm to Netquote. Mostchoice further denies Netquote's claims that Byrd's tactics changed as Netquote found ways to block his submissions. Mostchoice contends that Netquote had the ability to block Byrd's submissions within days, which is what Netquote officers believed had been done.

Fraud

Mostchoice contends that Netquote cannot satisfy its burden in proving any of the elements of common law fraud. Netquote's contention that the submissions of fictitious information constitute a misrepresentation is not supported by any Colorado legal authority. Further, Netquote has insufficient evidence to demonstrate that any misrepresentation was made

for the purpose of inducing an act that supports an action for fraud. Additionally, Netquote cannot prove justifiable reliance or any relationship between its claim of damages and the alleged misrepresentation.

Tortious Interference

Mostchoice asserts that because it is undisputed that the parties are competitors that Netquote must prove that its conduct was "wrongful" in the context of its claim for interference, which is the functional equivalent of proving fraud, and Netquote's tort claims can only yield a single recovery. Further, there is a lack of evidence of intent to interfere with Netquote contracts or business relations, and it is not sufficient to identify such an ancillary consequence, if it could be proven that this were the case. Finally, as addressed below, there are no damages that have been proximately caused by the Byrd submissions.

Damages

Netquote's claims for damages fail because there is no evidence that any of Byrd's submissions caused it to lose any customers. In addition, Netquote's damages calculation assuming causation is not supported by any legal authority, is not consistent with any recognized theory for damage calculation, and application of its method is incorrect.

Mostchoice is not aware of any legal authority that would allow for disgorgement as a remedy to a tort claim. Should one be identified, and should Netquote prove that Mostchoice is liable for some conduct that is compensable, Mostchoice contends that Netquote's damages would be the net profits associated with sales that are in addition any sales that it is likely to have made anyway.

Finally, Netquote profited by the leads it generated from Byrd's applications and has failed

to take into account in its claims or damage calculation that it did not issue credits equal to the amounts it charged its customers for the Byrd leads.

False Advertising

Netquote's claims that Mostchoice has engaged in false advertising by claiming on a web page that its leads are "better" are nothing more than puffery. Netquote offers no evidence that the claims that form the basis of any alleged misrepresentation involve and inherent or material quality of a lead. In fact, Netquote offers nothing more than a quote from a magazine article, which Mostchoice believes to have been accurate at the time the quote was published. Further, any leads purchased from other lead generators are sold primarily to a few select customers, who do not represent the type of agent that would be reading the pages. The agents at issue are not likely to receive purchased leads.

Mostchoice stands by its claims that it leads are better, though the particular web pages Netquote complains of were published as a result of a dispute between the respective founders of Netquote and Mostchoice. In addition, Netquote has no evidence that anyone other than its own employees or attorneys ever visited this page and the page is not linked to any advertising that would drive agents or consumers to the page.

To the extent Netquote claims that Mostchoice statements are implicitly false, Netquote has no evidence to support such a contention, and makes no claim for actual damages. It limits the remedies sought to an injunction more broad than it would be entitled to if it proved its case, and seeks disgorgement. With respect to disgorgement, Mostchoice has never sold a single lead to an agent that has visited the pages at issue, and there is nothing to disgorge. With respect to the injunctive relief sought, the Court should limit any injunction to the scope necessary. This any

remote should merely preclude statements found to be objectively false, rather than broadly prohibiting any comparative advertising.

Scope of Injunction

Netquote's claim for an injunction as a remedy to a tort claim lacks authority and is contradictory to its claim for damages. Either Netquote has an adequate remedy at law in the for of money damages, or it cannot calculate its damages, in which case it may be entitled to equitable relief, but Colorado law does not recognize both as a remedy.

A list of licensed insurance agents is kept by each state insurance commissioner, and is available to the public at large. In addition, many of the agents identified by Byrd's submissions were already known to Mostchoice or were large national insurance carriers known to the general public.

Counterclaim

Mostchoice has alleged that Netquote employees have engaged in click fraud. Mostchoice has identified 8,469 "clicks" believe to have originated from Netquote employees. This is the result of an analysis in which known submissions from Netquote identify a particular "user-agent." Netquote's employees implicitly represented that it had a legitimate interest in getting to the Mostchoice website via a link that was displayed resulting from an internet search. The displayed link is for sponsored advertising and there is a cost associated every time a user clicks on a link to be directed to a Mostchoice page. Mostchoice claims that Netquote employees clicked on such sponsored links resulting in damage to calculable damage to Mostchoice in the amount of $54,563.43. In addition, Mostchoice seeks punitive damages as allowed by law.

## 4. STIPULATIONS

1.     This Court has jurisdiction over the subject-matter of this action.

2.     This Court has jurisdiction over the parties.

3.     NetQuote is a Denver, Colorado-based company that sells insurance referrals to insurance agents and brokers.

4.     NetQuote maintains a website called www.netquote.com where potential insurance consumers can complete applications requesting information from insurance agents and brokers.

5.     NetQuote maintains another website called www.localinsurance.com where potential insurance consumers can complete applications requesting information from insurance agents and brokers.

6.     NetQuote received 3,627,909 applications between October 1, 2006 and July 31, 2007.

7.     From July 14, 2006 - June 14, 2007 Nequote offered 25 free leads to new agents who were then obligated to use Netquote's lead service for 90 days.

8.     On June 15, 2007 the number of free leads was reduced from 25 to 15.

9.     An inactive account is one that has been terminated for 60 days.

10.    Mostchoice is an Atlanta, Georgia-based company in the same business as NetQuote and is a business competitor of NetQuote's in the on-line insurance lead generation industry.

11.    In 2006, Mostchoice hired Defendant Brandon Byrd of Sandy Springs, Georgia.

12.    As part of his job duties as an employee of Mostchoice, Byrd filled out applications on NetQuote's websites requesting insurance information.

13.     Byrd used fictitious names, addresses, and other information in the submissions. Byrd knew that the information he was including in his submissions was fictitious.

14.     Mostchoice knew that the information Byrd was providing in the applications on NetQuote's websites was fictitious.

15.     Byrd attempted to group his submissions to NetQuote's websites each day by the geographic locale of the personal information he was submitting and by the type of insurance quotations he was seeking.  Thus, for example, during a two-hour period on October 16, 2006, all of Byrd's submissions to the www.netquote.com website contained information on purported customers in the Miami-Palm Beach-Fort Lauderdale area, all seeking life insurance quotations.

16.     Byrd and Mostchoice intended for Byrd to receive responses from NetQuote to the fictitious submissions identifying NetQuote's insurance agent and broker customers.

17.     NetQuote sold some or all of the applications Byrd submitted to insurance agents.

18.     Byrd used a series of hundreds of individual e-mail accounts that he had created on Yahoo! for his submissions to NetQuote.

19.     Byrd received responses from NetQuote sent to the e-mail accounts Byrd had created detailing specific insurance agents that would be in contact in response to Byrd's fictitious submissions.

20.     Various insurance agents attempted to contact Byrd via the e-mail addresses he provided in the fictitious submissions.

21.     The documents numbered B0002 - B0640 are e-mails Byrd received both from NetQuote and from insurance agents and brokers in response to Byrd's fictitious submissions.

22.     The insurance agent information he received from NetQuote in response to the fictitious submissions was incorporated into a database which was transmitted to Michael Levy at Mostchoice.

23.     The documents numbered MCSS Page 00001-04927 are copies of the NetQuote web pages listing matching insurance agents that Byrd received in response to his fictitious submissions.

24.     Mostchoice added the names of the insurance agents Byrd compiled from his fictitious submissions to its marketing database, unless the agent was already present.

25.     Mostchoice sent e-mail solicitations to various insurance agents for whom e-mail addresses were provided in response to Byrd's fictitious submissions.

26.     In the late spring or early summer, Mostchoice allowed its sales agents to contact the insurance agents by telephone whose names Byrd had compiled to solicit the insurance agents to become Mostchoice customers.

27.     Mostchoice continued to complete applications on NetQuote's www.localinsurance.com website after NetQuote filed this lawsuit and after it demanded that Mostchoice cease and desist from doing so.

28.     Mostchoice solicited business from some of the insurance agents whose names Byrd compiled from his fictitious submissions after NetQuote filed this lawsuit and after NetQuote demanded that Mostchoice cease and desist from doing so.

29.     Mostchoice continues to send e-mail solicitations to the e-mail addresses it obtained as a result of Byrd's submissions.

30.     NetQuote had contracts with each of the 157 local accounts set forth in the document numbered SD0020-22.

31.     HSBC received a total of 4826 leads from NetQuote.

32.     SBLI received 1863 leads from NetQuote.

33.     As of August 16, 2005, NetQuote had 81 customers who had active accounts for 7 continuous years.

34.     Mostchoice maintains pages on its website with the statements "'Better Than Netquote Leads" and "Better Than Netquote.com Leads." (referred to as Mostchoice's "'Better Than NetQuote Leads' pages").

35.     Mostchoice has maintained one or all of the "Better Than NetQuote Leads" pages on its website notwithstanding NetQuote's request that Mostchoice remove the pages.

36.     Mostchoice maintains multiple pages on its website that quote from an Inc. magazine article published in August, 2006 in which CEO Martin Fleischmann is quoted as stating "Mostchoice.com prides itself on the fact that its only leads are from people who visit its site," meaning that Mostchoice did not purchase leads from other lead aggregators for re-sale by Mostchoice.

37.     Between one and two years ago, for a short period of time Mostchoice purchased leads from LeadCo and re-sold the leads to various Mostchoice insurance agent customers.

38.     Between one and two years ago, for a short period of time Mostchoice purchased leads from Norvax and re-sold the leads to various Mostchoice insurance agent customers.

39.     Over the last year, Mostchoice has considered purchasing leads from other companies for resale to Mostchoice's insurance agent customers.

40.     Under the doctrine of respondeat superior, Mostchoice is responsible for Byrd's conduct relating to the facts alleged in this action.

## 5.  PENDING MOTIONS

a.      Defendants' Motion for Summary Judgment, filed on December 14, 2007. Plaintiff's Response was filed on January 3, 2008 and Defendants Reply was filed on January 18, 2008.

b.      Defendants' Motion to Exclude Expert Testimony, filed on December 14, 2007. Plaintiff's Response was filed on January 3, 2008, Defendants Reply was filed on January 18, 2008, Defendants' Supplemental Submission of Defendants' Expert Report was submitted for filing on January 23, 2008 and approved for filing on February 4, 2008, and Plaintiff's Surreply concerning the Defendants' Expert Report was filed on February 22, 2008.

c.      Plaintiff's Motion for Summary Judgment on Defendant's Counterclaim, filed on December 18, 2007.  Defendant's Response was filed on January 7, 2008 and Plaintiff's Reply was filed on January 18, 2008.

## 6.  WITNESSES

a.      See Plaintiff's List of Nonexpert and Expert witnesses attached as Exhibit A.

b.      See Defendants' List of Nonexpert and Expert Witnesses attached as Exhibit B.

## 7.  EXHIBITS

a.      See Joint Exhibit List attached hereto as Exhibit C.

b.      Copies of listed exhibits must be provided to opposing counsel and any *pro se* party no later than five days after the final pretrial conference.  The objections contemplated by

Fed. R. Civ. P. 26(a)(3) shall be filed with the clerk and served by hand delivery or facsimile no later than 11 days after the exhibits are provided.

c.      The parties stipulate and agree to exchange copies of summary and demonstrative exhibits 30 days before trial. Summary and demonstrative exhibits need not be listed separately on the Exhibit List set forth as Exhibit C to this Order.

## 8. DISCOVERY

Discovery is complete.

## 9. SPECIAL ISSUES

a.      <u>Plaintiff's position:</u>      Plaintiff does not intend to take any preservation depositions. Although Defendants have provided Plaintiff with a list of possible deponents and proposed dates that have been cleared with counsels' schedule, Defendants have not gotten proposed dates much less confirmed dates with the potential deponents as required by this Court. In the March 6, 2008 Order on Defendant Mostchoice.com's Motion for Leave to Take Preservation Depositions, (Dkt. #210 ), the Court ordered that it would:

> require a deposition schedule to be in place (names and dates) by the time of the Final Pretrial Conference on March 21, 2008, and the Court will request to see the schedule at that time. Any depositions not scheduled at that time may be excluded without further argument.

Accordingly, Defendants should not be permitted to conduct preservation depositions.

b.      <u>Defendant's position:</u> Defendants propose the following preservation depositions:

| Name | Location | Proposed Dates |
|---|---|---|
| Donald Marquez | Henderson, NV | 5/14/08 |
| Will Smoltino | Brooklyn, NY | 5/08/08 |
| Chris Duncan | Indian Wells, CA | 5/15/08 |

| Kevin Nemec | San Antonio, TX | 5/02/08 |
|---|---|---|
| Bob Vineyard | Atlanta, GA | 04/23/08 |
| Jeff Beck or Mark Gatch (Representative of Investors Financial Group) | Sarasota, FL | 04/24/08 |
| Matt Goldberg (Representative of Ascencea) | Clark, NJ | 05/07/08 |

## 10. SETTLEMENT

a. Counsel for the parties and any *pro se* party met in person on August 10, 2007 to discuss in good faith the settlement of the case.

b. The participants in the settlement conference included counsel, party representatives, and any *pro se* party.

c. The parties were promptly informed of all offers of settlement.

d. Counsel for the parties and any *pro se* party do not intend to hold future settlement conferences.

e. It appears from the discussion by all counsel and any *pro se* party that there is little possibility of settlement.

f. No future settlement conferences are planned.

g. Counsel for the parties and any *pro se* party considered ADR in accordance with D.C.COLO.LCivR.16.6.

## 11. OFFER OF JUDGMENT

Counsel and any *pro se* party acknowledge familiarity with the provision of Rule 68 (Offer of Judgment) of the Federal Rules of Civil Procedure. Counsel have discussed it with the clients against whom claims are made in this case.

## 12. EFFECT OF FINAL PRETRIAL ORDER

Hereafter, this Final Pretrial Order will control the subsequent course of this action and the trial, and may not be amended except by consent of the parties and approval by the court or by order of the court to prevent manifest injustice. The pleadings will be deemed merged herein. This Final Pretrial Order supersedes the Scheduling Order. In the event of ambiguity in any provision of this Final Pretrial Order, reference may be made to the record of the pretrial conference to the extent reported by stenographic notes and to the pleadings.

## 13. TRIAL AND ESTIMATED TRIAL TIME; FURTHER TRIAL PREPARATION PROCEEDINGS

a.  The case will be tried to a jury for purposes of money damages and to the court for purposes of injunctive relief.

b.  <u>Plaintiff's Position</u>:  Plaintiff estimates that ten trial days are required.

   <u>Defendant's Position</u>:  Defendant estimates that fifteen to twenty trial days are required.

c.  The trial will be held in Denver, Colorado.

d.  The parties shall contact Judge Ebel's Chambers to have this matter set for trial and to schedule a Final Trial Preparation Conference.


DATED this 20th day of March, 2008.


BY THE COURT:


_____
United States Magistrate Judge

APPROVED:


s/ Daniel D. Williams                          s/ Ryan L. Isenberg
David W. Stark                                 Ryan L. Isenberg
Heather Carson Perkins                         ISENBERG & HEWITT, P.C.
FAEGRE & BENSON LLP                            7000 Peachtree Dunwoody Road, Bldg 15,
3200 Wells Fargo Center                        Suite 100
1700 Lincoln Street                            Atlanta, Georgia  30328
Denver, Colorado 80203                         Telephone:  (770) 351-4400
Telephone:  (303) 607-3500                     Facsimile:   (678) 990-7737
Facsimile:   (303) 607-3600                    E-mail:  ryan@isenberg-hewitt.com
E-mail:  dstark@faegre.com
            hperkins@faegre.com                **Counsel for Defendants Mostchoice.com,
                                               Inc. and Brandon Byrd**

Daniel D. Williams
Teresa Taylor Tate
FAEGRE & BENSON LLP
1900 Fifteenth Street
Boulder, Colorado 80302
Telephone: (303) 447-7700
Facsimile:  (303) 447-7800
E-mail:  dwilliams@faegre.com
            ttate@faegre.com

**Counsel for Plaintiff NetQuote, Inc.**

# EXHIBIT A

**Plaintiff's Witness List**

**Non-expert Will Call Witnesses**

| | |
|---|---|
| 1. | **Aaron Broome**, Director of Sales & Service at NetQuote, Inc.  Mr. Broome will testify regarding the subjects addressed in the testimony he provided during his deposition and any matter relating to NetQuote's business and operations, including but not limited to, efforts to retain customers victimized by Defendants' bogus leads. |
| 2. | **Paul Ford**, President at NetQuote, Inc.  Mr. Ford will testify regarding the subjects addressed in the testimony he provided during his deposition and any matter relating to NetQuote's business and operations, including but not limited to, discussions concerning stopping the cyber attack. |
| 3. | **John Marosi**, Director of Technical Operations at NetQuote, Inc.  Mr. Marosi will testify regarding the subjects addressed in the testimony he provided during his deposition and any matter relating to NetQuote's business and operations, including but not limited to, efforts to identify and stop the cyber attack as well as NetQuote's sophisticated computer systems. |
| 4. | **Craig Shine**, Vice President and Treasurer at NetQuote, Inc.  Mr. Shine will testify regarding the subjects addressed in the testimony he provided during NetQuote's 30(b)(6) deposition and any matter relating to NetQuote's business and operations, including but not limited to, results of the cyber attack, personnel matters and personnel expenditures in relation to the cyber attack. |
| 5. | **Scott Striegel**, President Emeritus at NetQuote, Inc.  Mr. Striegel will testify regarding the subjects addressed in the testimony he provided during his deposition and any matter relating to NetQuote's business and operations, including but not limited to, its relationship with HSBC. |
| 6. | **Qin Zhou**, Director of Software Development at NetQuote, Inc.  Mr. Zhou will testify regarding the subjects addressed in the testimony he provided during his deposition and any matter relating to NetQuote's business and operations, including but not limited to, efforts to identify and stop the cyber attack as well as NetQuote's sophisticated computer systems. |

**Non-expert May Call Witnesses**

| | |
|---|---|
| 1. | **Marian Aavang**, Executive Assistant & Customer Service Representative at NetQuote, Inc.  Ms. Aavang may testify regarding any matter relating to attempts to access and the contents of e-mail accounts created by Brandon Byrd and data retrieved. |
| 2. | **Mary Bro**, President at CI Direct.  Ms. Bro may testify regarding the subjects addressed in the testimony she provided during her deposition. |
| 3. | **Brandon Byrd**, employee at Mostchoice.com, Inc.  Mr. Byrd may testify regarding the subjects addressed in the testimony he provided during his deposition and any matter relating to the cyber attack. |
| 4. | **Alberto Canas**, Marketing Analyst at NetQuote, Inc.  Mr. Canas may testify regarding the subjects addressed in the testimony he provided during his deposition and any matter relating to NetQuote's business and operations, including but not limited to, NetQuote's on-line advertising and NetQuote's affiliate relationships. |
| 5. | **Jeff Coppock**, Vice President of National Sales at NetQuote, Inc.  Mr. Coppock may testify regarding any matter relating to NetQuote's business and operations, including but not limited to, its relationship with SBLI. |
| 6. | **Cynthia Capozzi**, Former Chief Information Officer for NetQuote, Inc.  Ms. Capozzi may testify regarding the subjects addressed in the testimony she provided during her deposition. |
| 7. | **Gregg Coccari**, Chief Executive Officer at NetQuote, Inc.  Mr. Coccari may testify regarding the subjects addressed in the testimony he provided during his deposition and any matter relating to NetQuote's business and operations. |
| 8. | **James H. Connors, III**, Managing Director at Quist Valuation Company.  Mr. Connors may testify regarding the basis for the analysis in the Allocation of the Purchase Price of NetQuote as of August 16, 2005 prepared by Quist Valuation. |

| | |
|---|---|
| 9. | **Heather Delaney**, Director of National Accounts at NetQuote, Inc. Ms. Delany may testify regarding the subjects addressed in the testimony she provided during her deposition and any matter relating to NetQuote's business and operations, including but not limited to, relationships with national accounts. |
| 10. | **Hussein Enan**, Chief Executive Officer at InsWeb Corporation. Mr. Enan may testify regarding any matter relating to the on-line lead generation industry, including but not limited to, industry norms and competitive practices. |
| 11. | **Martin Fleischmann**, Chief Executive Officer, President and co-founder of Mostchoice.com, Inc. Mr. Fleischmann may testify regarding the subjects addressed in the testimony he provided during his deposition, and any matter relating to Mostchoice's business and operations, the cyber attack, and corporate espionage aimed at NetQuote. |
| 12. | **Amy Jensen**, Project Manager, NetQuote, Inc. Ms. Jensen may testify regarding the subjects addressed in the testimony she provided during her deposition and any matter relating to NetQuote's business and operations, including but not limited to, marketing. |
| 13. | **Michael Levy**, Chairman of Mostchoice.com, Inc. Mr. Levy may testify regarding the subjects addressed in the testimony he provided during Mostchoice.com, Inc.'s 30(b)(6) deposition, and any matter relating to Mostchoice's business and operations, the cyber attack, and corporate espionage aimed at NetQuote. |
| 14. | **Tim McTavish**, Chief Executive Officer at Insureme. Mr. McTavish may testify regarding any matter relating to the on-line lead generation industry, including but not limited to, industry norms and competitive practices. |
| 15. | **Mike Phillips**, Former Programmer/Analyst at TechLaw Solutions. Mr. Phillips may testify regarding any matter relating to data analysis of NetQuote and Mostchoice's customer lists and those results. |
| 16. | **Sanjay Tiwary**, Chief Information Officer at NetQuote, Inc. Mr. Tiwary may testify regarding NetQuote's business and operations, including but not limited to, NetQuote's computer information systems. |
| 17. | **Shirley Villacis**, Manager, Service Organization at NetQuote, Inc. Ms. Villacis may testify regarding any matter relating to NetQuote's business and operations, including but not limited to, relationships with local accounts. |
| 18. | **Danielle Wilkie**, Marketing Director at NetQuote, Inc. Ms. Wilkie may testify regarding the subjects addressed in Ms. Jensen's deposition and any matter relating to NetQuote's business and operations, including but not limited to, marketing. |
| 19. | **Brent R. Snook**, Farmer's Insurance Agent, 9034 E Easter Pl, Centennial, CO 80112 (303) 708-1207. Mr. Snook may testify as to the quality of NetQuote's leads and services. |
| 20. | **John McSweeney**, Farmer's Insurance Agent, 9565 South Kingston Court Suite 100, Englewood, CO 80112-6010, (303) 925-1177. Mr. McSweeney may testify as to the quality of NetQuote's leads and services. |
| 21. | **Matthew Rozelle**, Farmer's Insurance Agent, Clorado. Mr. Rozelle may testify as to the quality of NetQuote's leads and services. |

## Deposition Testimony

| | |
|---|---|
| 1. | **Michael Andrew**, employee at Mostchoice.com, Inc. Mr. Andrew may testify regarding the subjects addressed in the testimony he provided during his deposition. |
| 2. | **Mary Bro**, President at CI Direct. Ms. Bro may testify regarding the subjects addressed in the testimony she provided during her deposition. |
| 3. | **Brandon Byrd**, employee at Mostchoice.com, Inc. Mr. Byrd may testify regarding the subjects addressed in the testimony he provided during his deposition any matter relating to the cyber attack. |

| | |
|---|---|
| 4. | **Cynthia Capozzi**, Former Chief Information Officer for NetQuote, Inc. Ms. Capozzi may testify regarding the subjects addressed in the testimony she provided during her deposition. |
| 5. | **John Doria**, Former Director of Strategic Planning at SBLI. Mr. Doria may testify regarding the subjects addressed in the testimony he provided during his deposition. |
| 6. | **Martin Fleischmann**, Chief Executive Officer, President, and co-founder of Mostchoice.com, Inc. Mr. Fleischmann may testify regarding the subjects addressed in the testimony he provided during his deposition, and any matter relating to Mostchoice's business and operations, the cyber attack, and corporate espionage aimed at NetQuote. |
| 7. | **Paul Goott**, Director for Business Development and Marketing at HSBC. Mr. Goott may testify regarding the subjects addressed in the testimony he provided during his deposition. |
| 8. | **Angilla Jones**, employee at Mostchoice.com, Inc. Ms. Jones may testify regarding the subjects addressed in the testimony she provided during her deposition. |
| 9. | **Mostchoice.com, Inc.** Mostchoice's corporate representative may testify regarding the subjects addressed in the testimony provided during the 30(b)(6) deposition. |
| 10. | **Caroline Sellers**, Operations Manager at Mostchoice.com, Inc. Ms. Sellers may testify regarding the subjects addressed in the testimony she provided during her deposition. |
| 11. | **Erick Sullivan**, Salesman at Mostchoice.com, Inc. Mr. Sullivan may testify regarding the subjects addressed in the testimony he provided during his deposition. |

## Expert Testimony that Will be Presented

| | |
|---|---|
| 1. | **Stephen A. Duree**, CPA/ABV, CFE, MBA and Principal at Duree Barton, LLC. Mr. Duree will testify regarding any matter in his report and the subjects addressed in the testimony he provided during his deposition. |

## Expert Deposition Testimony

| | |
|---|---|
| 1. | **Mark Zyla**, Managing Director at Acuitas, Inc. Mr. Zyla may testify regarding the subjects addressed in the testimony he provided during his deposition. |

# EXHIBIT B

**DEFENDANTS' WITNESS LIST**

**Will Call Witness:**

1.  Michael Levy         Mostchoice chairman familiar with technology issues, Byrd project, click fraud and insurance and on-line lead generation industry

**May Call Witnesses:**

1.  Greg Coccari      Netquote CEO - familiar with Netquote liability/damages claims
2.  Craig Shine      Netquote CFO - familiar with Netquote liability/damages claims
3.  Paul Ford      Netquote President - familiar with Netquote liability/damages claims
4.  Heather Delaney      Netquote national accounts manager familiar with issues relating to national accounts
5.  Danielle Wilkie      E-mail Marketing Manager for Netquote
6.  Shirley Villacis      Netquote local accounts customer service manager
7.  Aaron Broome      Netquote Director of Local Sales & Service familiar with receipt of Byrd leads
8.  Cynthia Capozzi      Netquote former CIO - familiar with how Netquote handled lead blocking
9.  Amy Jensen      Netquote Technology Project Manager familiar with HSBC interface and submissions to Mostchoice
10. Quinn Zhou      Netquote Director of Technology Development familiar with Netquote lead database and filtering systems
11. John Marosi      Netquote Director of Technology Operations familiar with Netquote lead filtering systems
12. Albert Cansas      Netquote Affiliate Manager familiar with issues relating to affiliates
13. John Kidd      Local agent claimed by Netquote to have terminated because of Byrd's leads/familiar with why he left Netquote
14. Kevin Brumfiel      Local agent claimed by Netquote to have terminated because of Byrd's leads/familiar with why he left Netquote
15. Jason Dummer      Local agent claimed by Netquote to have terminated because of Byrd's leads/familiar with why he left Netquote
16. Martin Fleischmann      Mostchoice CEO familiar with Mostchoice operations, click fraud, and lead industry
17. Mark Zyla      Rebuttal Expert Witness familiar with the methods and calculations used by Netquote's expert (May testify by deposition)
18. Any Witness      necessary for impeachment
19. Any Witness      necessary for rebuttal
20. Any Witness      necessary for authentication of documents

1

21. Any Witness            Listed by Netquote

**Witnesses who may testify by deposition:**

1. Paul Goot            HSBC Representative – Relationship and Termination with Netquote
2. John Doria           Former SBLI employee – Relationship and Termination with Netquote
3. Mary Bro             Responsible for running HSBC Call Center
4. Jeff Beck or         Representative of Ascencea, LLC - former Netquote customer familiar
   Mark Gatch           with Netquote lead quality
5. Matt Goldberg        Representative of Investors Financial Group -former Netquote customer
                        familiar with Netquote lead quality
6. Donald Marquez       Local agent claimed by Netquote to have terminated because of Byrd's
                        leads/familiar with why he left Netquote
7. Will Smoltino        Local agent claimed by Netquote to have terminated because of Byrd's
                        leads/familiar with why he left Netquote
8. Chris Duncan         Local agent claimed by Netquote to have terminated because of Byrd's
                        leads/familiar with why he left Netquote
9. Kevin Nemec          Local agent claimed by Netquote to have terminated because of Byrd's
                        leads/familiar withwhy he left Netquote
10. Bob Vineyard        Former Netquote customer familiar with Netquote lead quality
11. Jeff Beck or        Former Netquote customer familiar with Netquote lead quality
    Mark Gatch
12. Scott Streigl       Netquote President Emeritus familiar with CI Direct and HSBC
13. Stephen Duree       Netquote's expert witness as to causation re: local accounts and damages
14. Caroline Sellers    Mostchoice operations manager familiar with Mostchoice operations
15. Erick Sullivan      Mostchoice salesman familiar with selling on-line insurance leads

# EXHIBIT C

## Joint Trial Exhibit List

| Exhibit No. | Brief Description | Confidentiality Status | Stipulated |
|---|---|---|---|
| 1 | 2006 Revenue by Month for Agents Impacted by Fraudulent MostChoice Leads (NQ 002416 – 32) (SD 00191 – 201) | AEO | Yes |
| 2 | 01/06 – 09/07 MostChoice Monthly Income Summary for Jan. '06 through Sept. '07 | | No |
| 3 | 01/06 – 09/07 MostChoice, Inc. Payroll Transactions by Payee Jan. 2006 - Sept. 2007 for Byrd | | Yes |
| 4 | 02/06/06 NetQuote Agent Agreement with Dennis Shefski (NQ 002500 – 01) | AEO | Yes |
| 5 | 03/14/06 E-mail from Sellers to Fleischmann & Rizk re: Google Alert – "Netquote" | | Yes |
| 6 | 03/21/06 E-mail from Fleishmann to Levy, Andrew, Sellers & Rizk re: Paying too much for auto insurance? | | Yes |
| 7 | 03/31/06 E-mail from Fleischmann to Levy re: NetQuote visit on 4/12 | | Yes |
| 8 | 04/11/06 Draft - of Allocation of the Purchase Price of NetQuote Inc. as of August 16, 2005 Prepared by Quist Valuation (SD 003721 – 77) | AEO | Yes |
| 9 | 04/14/06 E-mail string between Fleischmann, Andrew & Selcow re: Ad-Tech + HW Data | | Yes |
| 10 | 04/24/06 E-mail from Malone to Andrew & Fleischmann re: Google Alert – NetQuote | | Yes |
| 11 | 05/22/06 E-mail string between Chapple, Levy & Fleischmann re: Per my phone call | | Yes |
| 12 | 05/22/06 E-mail string between Joker.com Registration Robot and Levy re: Tracking ID [#12519704] (create domain betterthannetquote…) | | Yes |
| 13 | 05/22/06 E-mail from Joker.com Registration Robot to Levy re: Order Receipt for Domain with Tracking-ID#12519704 | | Yes |
| 14 | 06/23/06 E-mail string between Fleischmann & Levy re: Big partnership tech things | | Yes |
| 15 | 07/07/06 E-mail string between Fleischmann, Alfarero, Hansson, Amezcua, Malone & Knowles re: A few new faces | | Yes |
| 16 | 09/06/06 2:47 PM E-mail string between Levy and Andrew re: How's CA coming? | | Yes |
| 17 | 09/06/06 3:04 PM E-mail from Andrew to Levy re: California spreadsheet (with attachment) | | Yes |
| 18 | 09/06/06 5:09 PM E-mail from Andrew to Levy re: Updated California (with attachment) | | Yes |
| 19 | 09/06/06 6:23 PM E-mail string between Levy and Andrew re: Updated California (with attachment) | | Yes |
| 20 | 09/07/06 E-mail from Andrew to Levy re: California Sheet (with spreadsheet attached) | | Yes |
| 21 | 09/07/06 E-mail string between Levy & Andrew re: California Sheet | | Yes |
| 22 | 09/08/06 E-mail from Andrew to Levy re: Florida Zips/Addresses (with attachment) | | Yes |
| 23 | 09/08/06 E-mail from Andrew to Levy re: texas zip code/area code (with attachment) | | Yes |
| 24 | 09/11/06 E-mail from Andrew to Levy re: New York/New Jersey | | Yes |

| Exhibit No. | Brief Description | Confidentiality Status | Stipulated |
|---|---|---|---|
| | Address/AC (with attachment) | | |
| 25 | 09/11/06 E-mail from Andrew to Levy re: Georgia & Colorado Address/Phone (with attachment) | | Yes |
| 26 | 09/12/06 Email from Byrd to Levy re: California leads | | Yes |
| 27 | 09/13/06 Email from Andrew to Levy re: IN MI IA WI MN IL MO Zips etc (with attachment) | | Yes |
| 28 | 09/13/06 E-mail from Andrew to Levy re: More States – KY OH WV VA MD DE (with attachment) | | Yes |
| 29 | 09/14/06 Allocation of the Purchase Price of NetQuote as of August 16, 2005 prepared by Quist Valuation (SD 00450 – 506) | AEO | Yes |
| 30 | 9/20/06 E-mail string between Stanfield & Levy re: Leadco Deal and NetQuote leads | | Yes |
| 31 | 09/25/06 Limited Trial Basis Lead Generation Agreement between SBLI and NetQuote (NQ 002502 – 04) | Conf | Yes |
| 32 | 09/26/06 E-mail from Levy to Andrew re: Zip codes in Cities | | Yes |
| 33 | 09/27/06 E-mail from Andrew to Levy re: Zip codes in Cities (with attachment) | | Yes |
| 34 | 09/29/06 E-mail from Andrew to Levy re: Los Angeles Metro Area Zips/Address (with attachment) | | Yes |
| 35 | 09/29/06 E-mail from Andrew to Levy re: Metro Areas – 003 – Chicago (with attachment) | | Yes |
| 36 | 10/02/06 Business Week: Click Fraud (NQ 000318 A – 4N) | | Yes |
| 37 | 10/02/06 E-mail from Andrew to Levy re: Metro Areas – 004 – Philadelphia (with attachment) | | Yes |
| 38 | 10/03/06 Limited Trial Lead Generation Agreement between NetQuote &  HSBC (NQ 002506 – 07) | Conf | Yes |
| 39 | 10/06/06 E-mail string between Curran, Fleischmann & Tejada re: Credit Request for Lead #6257586 | | Yes |
| 40 | 10/6/06 Employee information form for Byrd | | Yes |
| 41 | 10/09/06 E-mail from Andrew to Levy re: Metro Areas – 005 – Dallas/Ft Worth (with attachment) | | Yes |
| 42 | 10/11/06 E-mail from Andrew to Levy re: metro areas 006 – 010 (with attachment) | | Yes |
| 43 | 10/17/06 E-mail string between Striegel, Goott, Hyder, Rahn, Errante, & Leslie re: NetQuote Overview/bogus (NQ 001556 – 57) | Conf | Yes |
| 44 | 10/17/06 Paystub from MostChoice to Byrd | | Yes |
| 45 | 10/19/06 E-mail string between Capozzi, Wheeler & abuse@support.juno.com re: Malicious submission of fraudulent data to our website (NQ 000104) | | Yes |
| 46 | 10/20/06 E-mail string between Capozzi, Ford, Coccari, Delany, Reikofski, Armbrust & Olsen re: NetQuote Leads (NQ 00011 - 15) | AEO | Yes |
| 47 | 10/20/06 E-mail string between Capozzi, Ford Coccari, Zhou, Marosi, Delany, & Reikofski re: NetQuote Leads (NQ 00095 - 98) | AEO | Yes |
| 48 | 10/20/06 E-mail string from Capozzi to abuse@support.juno.com re: 2nd communication: Malicious submission of fraudulent data to our website (NQ 000099) | | Yes |
| 49 | 10/23/06 E-mail from Byrd to Levy re: database | | Yes |

| Exhibit No. | Brief Description | Confidentiality Status | Stipulated |
|---|---|---|---|
| 50 | 10/25/06 E-mail from Coccari to Ford, Striegel, Delany, Niekerk & Capozzi re: HSBC (NQ 000003) | Conf | Yes |
| 51 | 10/26/06 E-mail string between Capozzi & Striegel re: The Life "Slam:" (NQ 00049 - 50) | AEO | Yes |
| 52 | 10/26/06 E-mail from Striegel to Goott re: Sample consumer email (SD 00510) | AEO | Yes |
| 53 | 10/27/06 E-mail from Andrew to Levy re: another set of zip codes (with attachment) | | Yes |
| 54 | 11/01/06 E-mail string between Marosi, Broome, Coccari, Zhou, Capozzi, Ford, Villacis, Delany re: Bogus Life Apps (NQ 000011 – 18) | AEO | Yes |
| 55 | 11/06/06 E-mail from Andrew to Levy re: Zip Codes 16 to 20 (with attachment) | | Yes |
| 56 | 11/09/06 E-mail string between Striegel, Goott, Leslie, Rahn, & Hyder re: confirming discussion of 11/08 (NQ 001552 – 53) | AEO | Yes |
| 57 | 11/22/06 E-mail from Fleischmann to Andrew, Sellers, Inga, & Levy re: NetQuote Minute Newsletter: November | | Yes |
| 58 | 12/06/06 E-mail string between Fleischmann, Levy & Stiegel re: Idea | | Yes |
| 59 | 12/07/06 E-mail from Andrew to Levy re: Data for Brandon (with attachment) | | Yes |
| 60 | 12/13/06 E-mail string between Fleischmann, Levy, Sellers, Andrew, Curran, & Mast re: Competitive News | | Yes |
| 61 | 12/13/06 E-mail from Andrew to Levy re: More Zips/Etc for Brandon (with attachment) | | Yes |
| 62 | 12/27/06 Letter from Lihn to Dalton re: NetQuote civil subpoena | | No |
| 63 | 12/28/06 E-mail from Byrd to Levy re: Database | | Yes |
| 64 | 2007 Revenue by Month for Agents Impacted by Fraudulent MostChoice Leads (NQ 002450 – 66) (SD 00218 – 32) | AEO | Yes |
| 65 | 01/02/07 E-mail from Levy to Andrew re: Zip Codes for Brandon | | Yes |
| 66 | 01/03/07 E-mail from Byrd to Levy re: zip codes | | Yes |
| 67 | 01/03/07 E-mail from Andrew to Levy re: More Zips for Brandon (with attachment) | | Yes |
| 68 | 01/12/07 E-mail string between Curran, LaScala & Brandl re: MostChoice Insurance Leads | | Yes |
| 69 | 01/12/07 E-mail from Andrew to Levy re: more zips – 045 to 054 (with attachment) | | Yes |
| 70 | 01/16/07 E-mail string between Striegel and Fleischmann re: Idea | | Yes |
| 71 | 01/19/07 E-mail from Byrd to Levy re: zips | | Yes |
| 72 | 01/21/07 E-mail from Levy to Andrew re: Zips for Brandon | | Yes |
| 73 | 01/22/07 E-mail from Andrew to Byrd & Levy re: Zip Codes for Metro Areas 055 to 069 (with attachment) | | Yes |
| 74 | 01/23/07 E-mail from Andrew to Byrd & Levy re: More Zips: 070 – 087 (with attachment) | | Yes |
| 75 | 01/25/07 E-mail from Andrew to Byrd & Levy re: Metro Areas (with attachment) | | Yes |
| 76 | 02/13/07 E-mail from Byrd to Levy re: zip codes | | Yes |
| 77 | 02/15/07 E-mail string between Levy, Byrd & Cook re: More zips | | Yes |

| Exhibit No. | Brief Description | Confidentiality Status | Stipulated |
|---|---|---|---|
| 78 | 03/05/07 E-mail from Byrd to Levy re: database | | Yes |
| 79 | 03/05/07 Criminal Warrant for Byrd | | No |
| 80 | 03/11/07 E-mail from Byrd to Levy re: latest database | | Yes |
| 81 | 03/14/07 E-mail from Byrd to Levy re: zips | | Yes |
| 82 | 03/14/07 E-mail from Andrew to Byrd re: zips | | Yes |
| 83 | 03/15/07 E-mail string between Andrew & Byrd re: new zips 211 to 221 | | Yes |
| 84 | 03/15/07 E-mail string between Andrew & Byrd re: New Zips 211 to 221 (with attachment) | | Yes |
| 85 | 03/26/07 E-mail string between Byrd & Andrew: New Zips 211 to 221 | | Yes |
| 86 | 03/27/07 E-mail string between Andrew & Byrd re: New Zips 211 to 221 (with attachment) | | Yes |
| 87 | 03/30/07 Affidavit of Brandon Byrd | | No |
| 88 | 04/02/07 E-mail from Byrd to Levy re: Local/Insureme comparison | | Yes |
| 89 | 04/07/07 E-mail from Coppock to Ford, & Delany re: Same email address, pujea040@yahoo.com, for numerous NET QUOTE leads (NQ 001558 – 61) | AEO | Yes |
| 90 | 04/09/07 E-mail from Byrd to Levy re: database | | Yes |
| 91 | 04/09/07 E-mail from Nelson to Shine re: ACTION REQUIRED: Bad Leads/ Juno Matter (NQ 001696 – 97) | Conf | Yes |
| 92 | 04/09/07 Email from Striegel to Shine re: Bogus leads – HSBC (NQ 001694 – 95) | Conf | Yes |
| 93 | 04/12/07 Better than Netquote.com leads webpage http://www.mostchoice.com/better-than-netquote.com-leads.cfm | | Yes |
| 94 | 04/17/07 E-mail from Delany to Shine re: Fraudulent Life leads – CI Direct (NQ 001720) | Conf | Yes |
| 95 | 04/20/07 NetQuote's First Set of Interrogatories to Byrd | | No |
| 96 | 04/20/07 Plaintiff's First Set of Interrogatories to Defendant Brandon Byrd | | No |
| 97 | 05/04/07 E-mail string between Kalinowski & Smith re: Second Request | | Yes |
| 98 | 05/10/07 E-mail string between Fleischmann, Luskin, Fresen, &Levy re: As I thought | | Yes |
| 99 | 05/13/07 E-mail from Byrd to Levy re: Latest database | | Yes |
| 100 | 05/16/07 E-mail string between Fleischmann & Evans re: MostChoice/Bankrate Follow Up | | No |
| 101 | 05/21/07 Defendant Byrd's Responses to NetQuote's First Set of Interrogatories | | No |
| 102 | 05/21/07 Defendant Brandon Byrd's Responses to Plaintiff's First Request for Production of Documents | | No |
| 103 | 05/29/07 E-mail string between Fleischmann & Evans | | Yes |
| 104 | 06/15/07 Answer of and Counterclaim of Defendant MostChoice.com, Inc. | | No |
| 105 | 06/15/07 Answer of Defendant Brandon Byrd | | No |
| 106 | 06/18/07 E-mail from NetQuote Customer Service to Cince6@yahoo.com re: Your Health Quote Request from NetQuote | | Yes |

| Exhibit No. | Brief Description | Confidentiality Status | Stipulated |
|---|---|---|---|
| 107 | 06/27/07 E-mail from Byrd to Levy re: latest database | | Yes |
| 108 | 07/13/07 Defendant MostChoice's Responses to NetQuote's First set of Interrogatories | | No |
| 109 | 07/13/07 Defendant MostChoice.com, Inc.'s Responses to Plaintiff's First Request for Production of Documents | | No |
| 110 | 07/17/07 E-mail from Isenberg to Williams re: Netquote v. Mostchoice | | Yes |
| 111 | 07/19/07 E-mail from Google Alerts to Malone re: Google Alert – NetQuote | | Yes |
| 112 | 07/23/07 Defendant MostChoice.com Inc.'s Responses to Plaintiff's Second Interrogatories | | No |
| 113 | 07/27/07 Declaration of Michael A. Levy | | No |
| 114 | 08/10/07 E-mail string between Cuvo & Manners re: Affiliate Programs | | Yes |
| 115 | 08/13/07 E-mail string between Fleischmann & Miller Insurance Agency re: Article | | Yes |
| 116 | 08/22/07 Notice of Videotaped Deposition of MostChoice Pursuant to F.R.C.P. 30(b)(6) | | No |
| 117 | 09/03/07 Submissions made by Levy | | Yes |
| 118 | 9/5/07 E-mail from Andrew to Levy re: Netquote Report | | Yes |
| 119 | 09/06/07 MostChoice.com, Inc Employee Contact List | | Yes |
| 120 | 09/03/07 Clicktracks Visual Web Analytics | | No |
| 121 | 09/17/07 Letter from Williams to Isenberg re: NetQuote, Inc. v. Brandon Byrd, et al. | | No |
| 122 | 09/21/07 Defendant MostChoice.com, Inc.'s Responses to Plaintiff's Third Interrogatories | | No |
| 123 | 09/26/07 Defendant MostChoice.com's Second Amended Counterclaim | | No |
| 124 | 09/28/07 Defendant MostChoice.com, Inc.'s Responses to Plaintiff's Third Request for Production of Documents | | No |
| 125 | 10/01/07 Determination of the Fair Value of Customer Relationships and Based on the Fair Value of Customer Relationships as of August 16, 2005 and Summary of NetQuote's Customer Relationship Damages Resulting From Byrd/Mostchoice Malicious Applications (Duree Barton Exh. 1) (SD 0019) | AEO | Yes |
| 126 | 10/01/07 Affected Account Listing – Classified for Loss of Customer Relationship Damages Consideration and Quantification (Duree Barton Exh. 2 from Errata) (SD 003873 – 75) | AEO | Yes |
| 127 | 10/01/07 Customer Relationship Damages Classification Summary – Based on Visual Inspection of Account Activity –  Vis-à-vis MostChoice Malicious Applications(leads) (Duree Barton Exh. 3.1) (SD 0023 – 27) | AEO | Yes |
| 128 | 10/01/07 Terminated and 7/07 Zero Revenue Accounts – Detail of Customer Relationship Damages – Classification Based on Visual Inspection of Account Activity (Duree Barton Exh. 3.2) (SD 0028 – 48) | AEO | Yes |
| 129 | 10/01/07 Inactive Accounts – Detail of Customer Relationship Damages – Classification Based on Visual Inspection of Account Activity (Duree Barton Exh. 3.3) (SD 0049 – 72) | AEO | Yes |

| Exhibit No. | Brief Description | Confidentiality Status | Stipulated |
|---|---|---|---|
| 130 | 10/01/07 Summary of Identifiable Employee Cost Associated with Remediation of Byrd/MostChoice Related Business Disruption and Damages Mitigation (Duree Barton Exh. 4) (SD 0073 – 75) | AEO | Yes |
| 131 | 10/01/07 Summary of MostChoice Revenues as Reported by MostChoice – Where MostChoice Billed for its Services to a NetQuote Affected Account (Duree Barton Exh. 5) (SD 0076) | AEO | No |
| 132 | 10/22/07 Deposition Errata Sheet | | No |
| 133 | 10/29/07 Defendant MostChoice.com's Response to NetQuote's Fourth Request for Production of Documents | | No |
| 134 | 11/07/07 Brandon Byrd's Response to NetQuote's First Request for Admission | | No |
| 135 | 11/15/07 Report_MC_Affected_ Accounts_Statuses_20070920_ match. xls | | Yes |
| 136 | 11/20/07 Affidavit of Martin Fleischmann | | No |
| 137 | 11/20/07 NetQuote Application (Mostchoice Supp. Doc. Prod. 0110 – 12) | | Yes |
| 138 | 12/18/07 Google Search Results- business insurance Atlanta | | No |
| 139 | 01/02/08 Google Search Results- netquote mostchoice better (NQ 005849 – 50) | | No |
| 140 | 01/02/08 Better than Netquote.com leads webpage http://www.mostchoice.com/better-than-netquote.com-leads.cfm (NQ 005851 – 58) | | No |
| 141 | 01/02/08 Better than Netquote Leads webpage http://www.mostchoice.com/better-than-net-quote-leads.cfm (NQ005859 – 67) (MC 004852 – 60) | | No |
| 142 | 01/07/08  Mostchoice Click Fraud Damages without AOL Date | | No |
| 143 | 01/24/08 MostChoice Supplemental Interrogatory Response to Interrogatory No. 10 (b) & (c) Gross Revenues from Common Customers | | No |
| 144 | 02/08/08 10 Tips for Single Mothers Looking for Health Insurance | | No |
| 145 | Better than Netquote leads webpage http://www.mostchoice.com/better-than-netquote-leads.cfm (MC 004861 – 68) | | No |
| 146 | webpage http://www.mostchoice.com/better-than-net-quote-leads.cfm | | No |
| 147 | Lead Buyers Database (lead-buyers fp.7 – 0001 – 19) | | Yes |
| 148 | MostChoice databases 2190.fp7 of agents information gathered from NQ and Local Insurance (database 2190.fp7 – 0001 – 32) | | Yes |
| 149 | Accounts Impacted by MostChoice Fraudulent Leads (NQ 002467 – 95) | AEO | Yes |
| 150 | List from Fone Finder for Area Codes | | Yes |
| 151 | List of e-mail addresses for Local Insurance: Auto compiled by Byrd | | Yes |
| 152 | Printout of InsureMe page | | Yes |
| 153 | Webpage from MostChoice.com titled Better Than NetQuote Leads, The Head of Its Classy Class | | Yes |
| 154 | Responses to MostChoice solicitation | | Yes |

| Exhibit No. | Brief Description | Confidentiality Status | Stipulated |
|---|---|---|---|
| 155 | List of IP addresses and ISPs used by NetQuote (NQ 002498 – 99) | | Yes |
| 156 | Statement Summary 091107.xls (SD 003799 – 808) | AEO | No |
| 157 | NetQuote Affiliate Agreement | | Yes |
| 158 | AU Section 336 of the American Institute of Certified Public Accountants' Professional Standards incorporating Statement of Auditing Standards No.73 | | No |
| 159 | *Accounting Standards* as of June 1, 2007, Section B51, Business Combinations (2007/2008 ed.) - Financial Accounting Standards Board Statement No. 141 | | No |
| 160 | Screen shot of List of Insurance Agents Licensed to Conduct Business in the State of Texas | | Yes |
| 161 | NetQuote website | | Yes |
| 162 | MostChoice Home Page | | Yes |
| 163 | Audio recordings of NetQuote contracts with local agents (NQ 002505) | AEO | Yes |
| 164 | Screen shots from applications submitted by Byrd (MCSS 000001 - 4927) | | Yes |
| 165 | Your Matching Agents E-mail Application ID 20310437 (MCSS 04483 – 84) | | No |
| 166 | Your Matching Agents E-mail Application ID 20310629 (MCSS 04471 – 72) | | No |
| 167 | Your Matching Agents E-mail Application ID 20336917 (MCSS 03715 – 16) | | No |
| 168 | Your Matching Agents E-mail Application ID 20404979 (MCSS 03121 – 22) | | No |
| 169 | Your Matching Agents E-mail Application ID 20660735 (MCSS 03919 – 20) | | No |
| 170 | E-mails received in response to applications submitted by Byrd (B0001 – B0640) | | No |
| 171 | Mostchoice Pay Per Click Costs | | No |
| 172 | Table of Credits Issued (Rule 1006 Summary Exhibit) | | No |
| 173 | Chronology | | No |
| 174 | 02/18/08 Affected Account Listing—Classified for Loss of Customer Relationship Damages Consideration and Quantification (Duree Barton Exh. – 2 Revised) (SD 003885 – 86) | AEO | No |
| 175 | 02/18/08 Causation Classification and Quantification of NetQuote's Loss of Local Agent "Customer Relationship Damages" (Duree Barton Exh. – 6) (SD 003887 – 89) | Conf | No |
| 176 | 02/18/08 Review and Causation Classification of the 157 Local Agent Accounts Included in Our Initial Quantification of NetQuote's Customer Relationship Damages (Duree Barton Exh. – 7) (SD 003890 – 94) | Conf | No |
| 177 | 03/18/08 NetQuote Lost Local Agent Accounts – Where MostChoice's Malicious Applications/Leads Were a Substantial Factor to That Loss (SD 004353-54) | | No |
| 178 | Compilation of HSBC / NQ E-mails (SD 507-576, NQ1550-51, NQ1721-25, NQ1730-32) | AEO | No |
| 179 | HSBC Contract (NQ 2506 – 07) | Conf | Yes |

| Exhibit No. | Brief Description | Confidentiality Status | Stipulated |
|---|---|---|---|
| 180 | HSBC Invoice (NQ 1727 – 28) | | Yes |
| 181 | Duree Report (SD 1 - 82) | AEO | Yes |
| 182 | Quist Report 2005      (SD 450 – 506) | AEO | Yes |
| 183 | Quist Report 2007      (SD 82-167) | AEO | Yes |
| 184 | E-mails from Local Accounts (NQ 2520 – 5848; NQ 5883 – 7273) (See Attached Summary) | AEO | No |
| 185 | Duree Excel Spreadsheets (NQ 3877 – 91) | AEO | Yes |
| 186 | Interrog Response to 5-1 | | Yes |
| 187 | Table 3.1 with no. of leads purchased (NQ 5868 - 81 integrated with 3.1) | Conf | Yes |
| 188 | NQ Revenues (NQ 2496) | Conf | Yes |
| 189 | Damages Est. provided to Duree (SD 577 – 92) | AEO | Yes |
| 190 | Value of Customers      (SD 3794 – 95) | AEO | |
| 191 | NQ promotions (SD 3796) | AEO | Yes |
| 192 | Incentivized Offers (MC Supp. 01-204) | | No |
| 193 | NQ lead submissions to MC | | No |
| 194 | Insurance-forums.net complaints | | No |
| 195 | Capozzi E-mail (NQ 43 – 44) | | Yes |
| 196 | SBLI Contract (NQ 002502 – 04) | Conf | Yes |
| 197 | 2006 Credits by Month (NQ 2433- 49) | AEO | Yes |
| 198 | No. of Actual Agents (NQ 2396) | AEO | Yes |
| 199 | No. of Applications 06.07      (NQ 2397 – 98) | AEO | Yes |
| 200 | 2007 Credits    (NQ 2399 – 2415) | AEO | Yes |
| 201 | Agent Leads (MC) | | No |
| 202 | Broome E-mail (NQ 1618 – 23) | | Yes |
| 203 | Customer Service Ticket (NQ 1681) | | No |
| 204 | Capozzi E-mail (NQ1659 – 60) | | Yes |
| 205 | Capozzi E-mail (NQ 101) | AEO | No |
| 206 | Capozzi E-mail (NQ 95 – 98) | AEO | Yes |
| 207 | Broome E-mail (NQ 86) | AEO | No |
| 208 | Marosi E-mail (NQ1565 – 69) | AEO | No |
| 209 | Shoemaker to Nemec (NQ 282) | AEO | No |
| 210 | Customer Revenues 2006 (NQ 2416 – 32) | AEO | Yes |
| 211 | Customer Revenues 2007 (NQ 2450 - 66) | AEO | Yes |
| 212 | Zyla CV | | No |
| 213 | Zyla Report | | No |
| 214 | Salespoint Demo Page (MC Supp. 205) | | No |
| 215 | Click Fraud Methodology | | No |
| 216 | Click Fraud Damages Calculation | | No |
| **DEFENDANTS' SUPPLEMENTAL EXHIBITS** | | | |
| 217 | NQ003570-003593 | AEO | No |
| 218 | NQ003594-003630 | AEO | No |
| 219 | NQ003631-003676 | AEO | No |
| 220 | NQ006032-006089 | AEO | No |
| 221 | NQ003677-003686 | AEO | No |
| 222 | NQ003687-003700 | AEO | No |
| 223 | NQ003701-003728 | AEO | No |
| 224 | NQ003729-003737 | AEO | No |

| Exhibit No. | Brief Description | Confidentiality Status | Stipulated |
|---|---|---|---|
| 225 | NQ003738-003754 | AEO | No |
| 226 | NQ004964-004977 | AEO | No |
| 227 | NQ004978-004994 | AEO | No |
| 228 | NQ003755-003765 | AEO | No |
| 229 | NQ003774-003786 | AEO | No |
| 230 | NQ003766-003773 | AEO | No |
| 231 | NQ004995-005042 | AEO | No |
| 232 | NQ005043-005108 | AEO | No |
| 233 | NQ005109-005118 | AEO | No |
| 234 | NQ003787-003807 | AEO | No |
| 235 | NQ003808-003816 | AEO | No |
| 236 | NQ003819-003820, NQ006995-007003 | AEO | No |
| 237 | NQ003817-003818, NQ003823-003828 | AEO | No |
| 238 | NQ003831-003841 | AEO | No |
| 239 | NQ003829-003830, NQ003842-003851 | AEO | No |
| 240 | NQ003852-003861 | AEO | No |
| 241 | NQ003862-003865 | AEO | No |
| 242 | NQ003887-003897 | AEO | No |
| 243 | NQ003866-003875 | AEO | No |
| 244 | NQ003876-003886 | AEO | No |
| 245 | NQ005119-005141 | AEO | No |
| 246 | NQ003898-003908 | AEO | No |
| 247 | NQ005142-005162 | AEO | No |
| 248 | NQ003909-003917 | AEO | No |
| 249 | NQ005163-005179 | AEO | No |
| 250 | NQ003918-003924 | AEO | No |
| 251 | NQ003956-003992 | AEO | No |
| 252 | NQ003925-003948 | AEO | No |
| 253 | NQ003949-003955 | AEO | No |
| 254 | NQ003993-004009 | AEO | No |
| 255 | NQ004010-004025 | AEO | No |
| 256 | NQ004026-004052 | AEO | No |
| 257 | NQ004053-004064 | AEO | No |
| 258 | NQ004065-004088 | AEO | No |
| 259 | NQ004089-004096 | AEO | No |
| 260 | NQ004097-004112 | AEO | No |
| 261 | NQ005180-005190 | AEO | No |
| 262 | NQ004113-004120 | AEO | No |
| 263 | NQ004121-004126 | AEO | No |
| 264 | NQ004144-004156 | AEO | No |
| 265 | NQ004127-004143 | AEO | No |
| 266 | NQ004157-004166 | AEO | No |
| 267 | NQ004167-004178 | AEO | No |
| 268 | Duree Database with notes (SD 003996 – 4327) | AEO | No |
| 269 | Documents produced in response to Duree subpoena (SD 3900-48) | Various | No |
| 270 | Duree Supplemental Report Excel Spreadsheets (SD SD003898 – 99) | AEO | No |
| 271 | Duree Handwritten notes (SD 003994-95) | AEO | No |

| Exhibit No. | Brief Description | Confidentiality Status | Stipulated |
|---|---|---|---|
| 272 | Glossary of Technical Terms | | No |
| | Any document or thing produced in discovery by parties | | No |
| | Any document or thing necessary for rebuttal or impeachment | | No |
| | Any document or thing marked as a deposition exhibit | | No |
| | Any exhibit listed by any party | | No |
| | Demonstrative Exhibits | | No |
| | Summary Exhibits | | No |