IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 07-cv-00630-DME-MEH

NETQUOTE, INC., a Colorado corporation,

      Plaintiff,

v.

BRANDON BYRD, an internet user making use of the IP Addresses 64.136.27.226 and
      64.136.26.227, and
MOSTCHOICE.COM, INC., a Georgia corporation,

      Defendants.

---

## RECOMMENDATION ON MOTION TO EXCLUDE EXPERT TESTIMONY

---

**Michael E. Hegarty, United States Magistrate Judge**.

      Pending before the Court is Defendants' Motion to Exclude Expert Testimony [filed December 14, 2007; docket #151].  Pursuant to 28 U.S.C. § 636(b)(1)(A) and D.C. Colo. LCivR 72.1C, the Motion has been referred to this Court for recommendation.  The Court held an evidentiary hearing on this matter on April 14, 2008.  For the reasons stated below, this Court recommends that the District Court **deny** the Motion to Exclude.[1]

---

[1]Be advised that all parties shall have ten (10) days after service hereof to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned.  Fed. R. Civ. P. 72.  The party filing objections must specifically identify those findings or recommendations to which the objections are being made.  The District Court need not consider frivolous, conclusive or general objections.  A party's failure to file such written objections to proposed findings and recommendations contained in this report may bar the party from a *de novo* determination by the District Judge of the proposed findings and recommendations.  *United States v. Raddatz*, 447 U.S. 667, 676-83 (1980); 28 U.S.C. § 636(b)(1).  Additionally, the failure to file written objections to the proposed findings and recommendations within ten (10) days after being served with a copy may bar the aggrieved party from appealing the factual findings of the Magistrate Judge that are accepted or adopted by the District Court.  *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Moore v. United States*, 950 F.2d

**BACKGROUND**

The District Court in this case has previously set forth the background of this matter as follows.  Plaintiff NetQuote, Inc., is a Colorado-based company that sells insurance referrals.  NetQuote operates a website that offers individuals a way to submit information about themselves and their insurance needs, and NetQuote sells that information to its clients – insurance brokers and agents – who then contact the individuals with an insurance quote.  NetQuote has brought suit against Defendants MostChoice, a Georgia-based competitor that also collects and sells insurance referrals through a website, and Brandon Byrd, a resident of Georgia who was employed by MostChoice at the time of the events in question.  NetQuote alleges that MostChoice hired Byrd for the purpose of pretending to be individuals interested in insurance quotes and submitting hundreds of false inquiries to NetQuote's website, knowing that NetQuote's clients would receive bad information that could not lead to an insurance purchase.  NetQuote alleges that its clients complained about the inaccurate information and some terminated their business with NetQuote.  NetQuote also claims that, as a result of the false submissions, MostChoice promoted itself to potential clients as having superior accuracy and reliability in insurance referrals compared to NetQuote.

NetQuote's amended complaint asserts the following claims: fraud (against all Defendants); tortious interference with business relations (against all Defendants); common law unfair competition (against MostChoice); false advertising under the Lanham Act (against MostChoice); and deceptive trade practices under the Colorado Consumer Protection Act (against MostChoice). Doc. # 13.

---

656, 659 (10th Cir. 1991); *Niehaus v. Kansas Bar Ass'n*, 793 F.2d 1159, 1164 (10th Cir. 1986).

## A.     Expert Report

Based upon the assumption that MostChoice's employee, Defendant Byrd, submitted false insurance leads to NetQuote for the period October 2006 through July 2007, Stephen Duree, an expert retained to evaluate and quantify NetQuote's damages, opined that:

(1)     NetQuote lost 157 local insurance agent accounts as a result of MostChoice's false applications;

(2)     Netquote's damages for two lost *national* accounts total approximately $1.1 million;

(3)     NetQuote's damages for the lost *local* accounts total $1.1-1.5 million;

(4)     NetQuote suffered $128,000 in damages related to responding to MostChoice's attack; and

(5)     MostChoice made at least $51,000 in sales to NetQuote customers affected by false applications.

In coming to these conclusions, Duree first identified accounts allegedly lost as a result of MostChoice's conduct by eliminating those accounts that were affected by the false leads but had not been terminated ("identification phase").  Then, with the remaining accounts, Duree considered a number of factors (including the duration that the agent had been a NetQuote customer, the timing of the receipt of false applications relative to the termination or inactivity of the account, and the number of false leads received by type of insurance product) by which to draw an inference that MostChoice's conduct caused the accounts to terminate.  Using this method, Duree identified 157 local (as opposed to national) accounts allegedly lost as a result of the false leads.

Second, Duree quantified the losses from these 157 accounts by relying on a valuation of NetQuote's business, which was performed by Quist Valuation, Inc. ("Quist") in 2005 ("quantification phase").  The Quist Report was prepared in connection with NetQuote's acquisition by its current owner for purposes of allocating the price the owner paid to acquire NetQuote to the assets it acquired, in order to record the allocated values on financial statements. Price Waterhouse Coopers (PWC) then audited NetQuote's 2005 financial statements, and in so doing, evaluated the Quist Report and found its conclusions reasonable.

To quantify damages, Duree first assumed that NetQuote's customer relationships would decay over a seven-year period, based on a similar assumption used in the Quist Report to determine the book value of NetQuote's customer relationships.  Duree also testified that he independently determined that the seven-year decay period was appropriate for NetQuote's local accounts, based upon his experience in conducting valuations of companies similar to NetQuote.

Second, Duree evaluated and then employed the revenue projections related to NetQuote's existing customers, as set forth in the Quist Report.  These projections of NetQuote's expected revenue from existing customers over the seven-year decay period were found to be reasonable by PWC in its audit of NetQuote's 2005 financial statements. Duree then applied the seven-year decay period and a twenty-five percent business risk discount rate (also applied by Quist and found to be reasonable by PWC) to arrive at a present value of the revenue stream of NetQuote's existing customer relationships before related costs.  Duree compared that present value figure for the existing customer relationships of $123,557,589 with the annualized 2005 revenues for the existing customers, and determined that the relationship of the present value of the customer revenues to the annualized base-year revenues for the same customers was a 3.2

4

value multiple.  In other words, for purposes of valuation, the value of a customer equates to 3.2 times the annual revenue generated from that customer.

Duree then determined the value of each lost account by calculating each account's average monthly revenue, annualizing that revenue, and multiplying the annualized revenue by 3.2.  Based on this analysis, Duree determined that the fair value of the lost national accounts was $1,122,368 and the fair value of the lost local accounts was $2,021,193.  After giving consideration to other possible causes of customer losses, Duree concluded that a range of 50-75% of the damages resulting from lost local accounts were caused by MostChoice's false applications.  Duree testified that he based this range on his professional judgment and experience, as well as on his analysis of the customer data during the identification phase of the analysis.

**B.**     **Motion to Exclude**

MostChoice claims that Duree's methodology is neither reliable nor relevant for several reasons: (1) Duree improperly speculates about the causation of damages by using visual inspection of the accounts, rather than direct communications with account customers, to identify accounts lost as a result of Byrd's false leads; (2) Duree is not qualified in the industry of insurance sales leads necessary to perform a visual inspection of the accounts; (3) the Quist Report is inadmissible hearsay, and thus, may not be used as a basis upon which to rely for valuation; (4) the Quist Report expressly provides that it may not be used for any purpose other than that specified in the report; and (5) reliance on the Quist Report is improper in certain respects, including the seven-year decay period for customer accounts.

In response to each of MostChoice's reasons, NetQuote states:

(1)     Duree considered objective customer data, including the customer's status, the duration of the relationship, the total number of false leads received by type of insurance lead, and revenue by type of insurance lead.  NetQuote claims that, while Duree applied his professional judgment to the objective data in determining which accounts were sufficiently affected by MostChoice's false leads to include in his analysis at the quantification phase, that does not render his entire methodology speculative.  At the hearing, Duree also explained his decision not to interview NetQuote account holders, as MostChoice contends he should have done, on the basis that conducting interviews with customers "so far after the fact" would be too speculative for his analysis, based on his experience in having engaged in that precise exercise in other contexts.

(2)     While not directly responding to the qualifications issue, NetQuote argues that contrary to MostChoice's assertion, Duree did not apply the 50-75% range in the identification phase to reach the conclusion that NetQuote's overall customer attrition is 50-75% attributable to MostChoice's false applications.  Rather, the 50-75% range was applied in the quantification phase for the purpose of accounting for the possibility that certain of the lost accounts (all of which received multiple false leads) may have been lost for a combination of reasons (of which MostChoice's false applications may have been only one), or for reasons other than MostChoice's conduct. Second, NetQuote contends that the 50-75% range does not equate to "error rate" as that term was used in *Daubert*, and that for non-scientific evidence such as Duree's analysis, "'*Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it.'" *See Hangarter v.*

6

*Provident Life & Accident Inc. Co*, 373 F.3d 998, 1017 (9th Cir. 2004) (internal citations omitted).

(3)     NetQuote argues that Rule 803(6) of the Federal Rules of Evidence provides an exception to the hearsay rule for business records if they are "kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum [record]." Fed. R. Evid. 803(6).  NetQuote contends that the Quist Report, which was incorporated into NetQuote's financial reporting and audited by Price Waterhouse Coopers, is thus admissible under Rule 803(6), and that because the Quist Report is admissible, Duree's reliance upon it is permitted.

(4)     NetQuote claims that Fed. R. Evid. 703 explicitly permits an expert to rely upon any matter that an expert in the field would reasonably rely upon to form the offered opinion, and permits experts to base their opinions on "all manner of underlying data that might otherwise not be admissible in evidence, including interviews, reports prepared by third parties, clinical and other studies, and technical publications." *In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D at 654 (citing 4 Weinstein's Federal Evidence § 703.04[3]).  Nequote asserts that Rule 703 merely requires that the facts or data on which Duree based his opinions be of a type reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject.

Moreover, NetQuote argues that Duree concluded that the data and analysis contained in the Quist Report was reliable based upon his education and nearly 40 years of experience as a CPA, including his experience with preparing, evaluating and reviewing analyses such as that contained in the Quist Report.  NetQuote claims that Duree's reliance on the Quist Report in his damages quantification is reasonable because: (1) the Quist Report was prepared prior to the start

of MostChoice's attack on NetQuote and for reasons wholly unrelated to this litigation, (2) Price Waterhouse Coopers (PWC) had conducted audit procedures on the Quist Report, (3) reliance on such analysis is permitted by relevant accounting industry professional standards, (4) Duree has regularly relied upon the types of information contained in the Quist Report, both in his work as a consultant and in his work as a CPA, (5) Duree interviewed Quist personnel and satisfied himself that they had appropriately conducted the procedures required by FASB No. 141, and (6) Duree confirmed that PWC reviewed, evaluated, and relied upon the Quist Report in the audit of NetQuote's 2005 financial statements.

(5)    NetQuote claims that Duree specifically considered whether the Quist Report was a sufficiently reliable source of information for use in his analysis and concluded that it was based upon his extensive experience.  In addition, with respect to the seven-year decay period, NetQuote contends that Duree independently concluded that the decay period was consistent with decay rates used for analysis of similar assets in his experience.  NetQuote argues that the seven-year decay factor is an accounting assumption, analogous to the assignment of a useful life for a tangible asset over which period of time the tangible asset will be depreciated.  Duree testified that, in his experience in conducting valuations of businesses similar to NetQuote, he has found that decay periods ranging from 5 to 10 years are appropriate for customer relationships similar to NetQuote's relationships with its local agents, depending on a variety of factors.

In reply, MostChoice counters that Duree is not qualified to testify as to whether the false leads caused damage to NetQuote, because Duree is not an expert and has no experience in the field of insurance lead generation or sales.  MostChoice argues that an expert who is relying

solely on experience must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. *See Highland Capital Mgmt, L.P. v. Schneider* 379 F. Supp.2d 461 (S.D.N.Y. 2005). Moreover, MostChoice claims that the record is devoid of any evidence that another expert could reach the same conclusion as to causation of lost customers based on a visual inspection that fails to include any review of NetQuote's communications with customers or any direct communications with customers himself.  MostChoice criticizes Duree for using no random sampling techniques to test his methodology.

Further, MostChoice asserts that the Quist Report is not admissible under Fed. R. Evid. 703 or 803(6), and that it cannot be used for any purpose other than that specified in the report itself.  In addition, MostChoice finds fault with Duree's reliance on the seven-year decay period for customer relationships, which is taken from the Quist Report.  MostChoice argues that NetQuote has the means to determine the actual average life for a customer (which MostChoice has calculated to be less than one year) and that, in fact, a NetQuote representative has determined that the life of a national account, which is arguably longer than a local account, is approximately three to three-and-one-half years. *See* Def. Hearing Exh. 1.  Finally, MostChoice contends that Duree's calculation for the value of NetQuote's customer relationships at $123 million is not credible considering that the 2005 Quist Report values customer relationships at roughly $11 million and that, in 2007, Quist valued the entire company at between $7 million and $77 million.  Therefore, MostChoice concludes that there is no sound basis for the methodology created and/or used by Duree in quantifying NetQuote's damages.

## DISCUSSION

Rule 702 of the Federal Rules of Evidence allows the parties to present scientific testimony through a qualified expert where such evidence "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702 (2008). In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589 n. 7 (1993), the Supreme Court defined the role of the trial judge in admitting scientific testimony under Rule 702 as that of a "gatekeeper." The Court listed four non-exclusive factors which it deemed relevant in deciding whether to admit expert scientific testimony: (1) whether the opinion at issue is based on scientific knowledge,[2] is susceptible to testing, and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted by the scientific community. *Id.* at 593-94.

The objective of *Daubert's* gatekeeping requirement is to ensure the reliability and relevancy of expert testimony. "It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd v. Carmichael,* 526 U.S. 137, 152 (1999). As an example of a useful factor in a situation where the witness' expertise is based purely on experience, the Supreme Court

---

[2]The Supreme Court explained that scientific knowledge "implies a grounding in the methods and procedures of science" which must be based on actual knowledge and not "subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 590. In other words, "an inference or assertion must be derived by the scientific method ... [and] must be supported by appropriate validation-ie. 'good grounds,' based on what is known." *Id.*

suggested inquiring "whether [the expert's] preparation is of a kind that others in the field would recognize as acceptable." *Id.* at 151.  Accordingly, a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony, but consideration of other factors is not precluded where appropriate. *Id.*  Expert testimony may be admitted based on the expert's professional knowledge, training, experience, and personal observations, where supported by solid evidence in the scientific community. *See St. Martin v. Mobil Exploration & Producing U.S., Inc.,* 224 F.3d 402, 406-07 (5th Cir. 2000) (holding that an ecologist's first-hand observation of flooded marsh combined with his expertise in marshland ecology were sufficiently reliable bases of his opinion on causation under *Daubert* to admit the testimony).

In determining whether an expert opinion is reliable, the court's focus is on "scientific principles and methodology, not on the conclusions that they generate." *Daubert,* 509 U.S. at 595.  Although it is not always a straightforward exercise to distinguish between method and conclusion, "when the conclusion simply does not follow from the data, a district court is free to determine that an impermissible analytical gap exists between premises and conclusion." *Bitler v. A.O. Smith Corp.*, 391 F.3d 1114, 1121 (10th Cir. 2004) (citing *General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997)). When examining an expert's method, however, the inquiry should not be aimed at "the exhaustive search for cosmic understanding but for the particularized resolution of legal disputes." *Daubert,* 509 U.S. at 597.  Thus, it is the specific relation between an expert's method, the proffered conclusions, and the particular factual circumstances of the dispute that renders testimony both reliable and relevant. *Bitler*, 391 F.3d at 1121.

Relevant evidence "means evidence having any tendency to make the existence of any

fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. The Supreme Court has described the consideration of relevant evidence as one of "fit." *Daubert,* 509 U.S. at 591.  A trial court must look at the logical relationship between the evidence proffered and the material issue that evidence is supposed to support to determine whether it advances the purpose of aiding the trier of fact.

The trial court is not charged with weighing the correctness of an expert's testimony, nor must the court choose between the testimony of competing expert witnesses.  Rather, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596.  The proponent has the burden of establishing admissibility of the expert testimony under Rule 702 by a preponderance of the evidence. *See* Fed. R. Evid. 104(a); Fed. R. Evid. 702 (Advisory Committee Notes for 2002 Amendments); *Bourjaily v. United States,* 483 U.S. 171 (1987).

With the foregoing legal principles in mind, I consider the evidence presented to determine whether the proffered expert testimony is admissible to prove the Plaintiff's damages.

## A.      Duree's Qualifications to Perform the Analysis

Recognizing that expertise may be acquired through a broad range of experience, skills or training, Rule 702 does not impose an "overly rigorous" requirement of expertise.  *See First Data Corp. v. Konya*, 2007 WL 2116378, *9 (D. Colo. July 20, 2007) (citing *United States v. Velasquez,* 64 F.3d 844, 849 (3d Cir. 1995)).  "The trial court should not exclude expert testimony simply because the court feels that the proffered witness is not the most qualified or

does not have the specialization considered most appropriate by the court." *Id.* (citing *Holbrook v. Lykes Brothers Steamship Co., Inc.*, 80 F.3d 777, 782 (3d Cir.1996)).  The Tenth Circuit has acknowledged that "[a]s long as an expert stays 'within the reasonable confines of his subject area,' our case law establishes 'a lack of specialization does not affect the admissibility of [the expert] opinion, but only its weight." *Ralston v. Smith & Nephew Richards, Inc.,* 275 F.3d 965, 969 (10th Cir. 2001) (quoting *Wheeler v. John Deere Co.,* 935 F.2d 1090, 1100 (10th Cir.1991)).

Stephen Duree testified that he has been licensed as a Certified Public Account for nearly 39 years, ten of which he has worked in auditing, 25-30 years in business valuation, and 25-30 years in damages analysis.  He is certified in business valuation and has conducted approximately 6-10 business valuations in his career.  He was primarily responsible for issuing a report, much like the Quist Report at issue in this case, for a cellular telephone company.   He has been a principal of the Duree Barton firm since 1985, and has been qualified as an expert by various courts in the areas of business valuation, forensic investigation and economic/damages analysis.

MostChoice contends that, although Duree may be an expert in business valuations and economic analysis, he is not an expert in insurance lead generation or sales and thus, not qualified to testify as to the causation of customer accounts lost as a result of the false leads submitted in 2006 and 2007.  However, Duree's lack of professional experience in the insurance leads industry is not dispositive as to the issue of his qualifications and will not warrant his disqualification as an expert in this case. Firsthand knowledge is not requisite to the admissibility of an expert opinion. *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235 (10th Cir. 2000) (citing *Daubert,* 509 U.S. at 592  ("[A]n expert is permitted wide latitude to offer opinions, including

those that are not based on firsthand knowledge or observation.")).  As long as the expert stays

"within the reasonable confines of his subject area," Tenth Circuit case law establishes that "a

lack of specialization does not affect the admissibility of [the expert] opinion, but only its

weight." *Wheeler v. John Deere Co.,* 935 F.2d 1090, 1100 (10th Cir. 1991) (mechanical engineer

with expertise in the design of farm equipment permitted to testify on consumer expectations

despite lack of experience in consumer sampling).  Thus, MostChoice may properly address any

shortcomings that its perceives in Duree's academic or professional background during cross-

examination.  *See Daubert,* 509 U.S. at 596 ("vigorous cross-examination, presentation of

contrary evidence, and careful instruction on the burden of proof are the traditional and

appropriate means of attacking shaky but admissible evidence").  This Court recommends

finding that Duree has the necessary knowledge, training and experience to qualify as an expert

witness under Rule 702.

**B.     The Reliability and Relevance of Duree's Analysis**

A trial court has considerable discretion in determining whether particular expert

testimony is reliable.  *Kumho Tire,* 526 U.S. at 152.  "No single factor should be dispositive in

weighing the reliability of an expert's opinions." *First Data Corp.*, 2007 WL 2116378 at *11

(citing *Ruiz-Troche v. Pepsi Cola of Puerto Rico,* 161 F.3d 77, 85 (1st Cir. 1998)).  Ultimately,

the court's inquiry must focus on three areas: (1) whether the expert's testimony is based on

sufficient facts or data; (2) whether the expert used reliable principles and methodologies; and

(3) whether the expert applied these principles and methods reliably to the facts of the case.  Fed.

R. Evid. 702 (2008).  If the court concludes that an expert's testimony satisfies these evidentiary

requirements of reliability, "it is up to the jury to decide whether the expert used the best or most

reliable methodology, what weight to accord to his testimony and which of competing experts' opinions should be credited." *Cook v. Rockwell International Corp.,* 2006 WL 3533049, *6 (D. Colo. 2006). Here, MostChoice challenges Duree's methodology and conclusions in both the identification and quantification phases of his analysis.

      1.    <u>Identification Methodology</u>

MostChoice's primary concern regarding Duree's identification of lost local accounts is that he developed a method to identify accounts lost as a result of the false leads based on a visual inspection of the accounts, rather than communicating directly with the account holders to determine the reasons for termination. The Court has significant concern for the same reason.

During the hearing, Duree explained that in his experience with accounts receivable, he has learned that communications with account holders regarding termination of an account well after the fact is typically unreliable. That is, after some time has elapsed, Duree found that account holders tend to give a reason for termination that will quickly end the communication rather than reveal the true motive behind the termination. Also, there was testimony that, even when asked contemporaneously about a departing customer's motive, the customer will often use a false reason to amend an uncomfortable situation. Consequently, Duree determined that a better method was to review records that were contemporaneous with the account terminations, and to consider factors such as the duration that the account holder had been a NetQuote customer, the timing of the receipt of false applications relative to the termination or inactivity of the account, and the number of false leads received by the type of insurance product.

In this case, the false leads were submitted and accounts were terminated from the fall 2006 through the summer 2007. Duree conducted the analysis for his original report in or about

the fall 2007; then, after receiving copies of NetQuote's customer service records in or about January 2008, Duree supplemented his report to reflect contemporaneous information received from certain customers regarding termination. From the customer service records, Duree was able to discern that certain customers most likely terminated as a result of the false leads and that others did not. Therefore, Duree divided the 157 lost local accounts into the following categories:

> "M/C Substantial": in 57 of the affected accounts, the magnitude and timing of the false leads is significant and substantial to the loss of the customer relationships, and the customer service records do not suggest other causes of the loss of the accounts.

> "M/C Substantial and Other": in 54 of the affected accounts, the magnitude and timing of the false leads is significant and substantial to the loss of the customer relationships, but are not the only potential causes of the loss.

> "M/C Not Substantial": in 32 of the affected accounts, the customer service records suggest other overriding reasons for the loss of the accounts.

> "Other non-damage sub-classifications": the customer service and subsequent records reflect that 14 of the 157 accounts should be excluded from the damages calculation.

*See* Duree Barton Supplemental Report, February 18, 2008. This supplemental information reflects a more thorough analysis of the contemporaneous records available for review of customer accounts. *See Bitler*, 391 F.3d at 1122 (fire investigator's personal experience, training, method of observation and deductive reasoning was sufficiently reliable to constitute "scientifically valid" methodology).

Nevertheless, MostChoice contends that certain of the accounts categorized as "M/C Substantial" reflect causes for termination other than the false leads. *See* Def. Exhs. #5 and #6. However, such argument goes to the weight of the evidence rather than to its admissibility, and may be more properly addressed in cross-examination. *See LeMaire by and through LeMaire v.*

*United States*, 926 F.2d 949, 953 (10th Cir. 1987) ("the fact that the expert cannot support his opinion with certainty goes only to its weight, not to its admissibility").  Here, the Court recommends finding that Duree's methodology in identifying lost customer accounts is reliable under Rule 702.

      2.    Quantification Methodology

MostChoice's primary concern with Duree's quantification of damages in this case is his reliance on the seven-year decay period for customer relationships, which Duree apparently derived from the Quist Report.  MostChoice alleges three problems with the Quist Report: (1) it is inadmissible hearsay; (2) it is to be used only for the purpose stated in the report itself; and (3) reliance on the report is improper, since NetQuote has other means for determining the decay period of customer relationships.

With respect to the first issue, the Court recommends finding that the Quist Report is admissible as a business record under Fed. R. Evid. 803(6).  *See Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1257 n. 3 (9th Cir. 1984) ("Although a financial statement audit is based in part on hearsay, it is generally admissible as a business record of the audited entity under Fed. R. Evid. 803(6)").  As to the second issue, Duree testified that he interviewed representatives of Quist and was granted permission to use the report for his analysis.  *See Walker v. Soo Line Railroad Co.,* 208 F.3d 581, 588 (7th Cir. 2000) (acknowledging that "courts frequently have pointed to an expert's reliance on the reports of others as an indication that their testimony is reliable").

With respect to the third issue, Duree testified that he determined a decay period of seven years not just from the Quist Report, but also from his own experience in valuing businesses and

concluding that customer relationships typically last 5-10 years.  In response, MostChoice contends that the evidence demonstrates NetQuote's customer relationships typically last less than one year, and that NetQuote's own representatives believe their customer relationships last three to three-and-one-half years.  As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony rather than the admissibility, and it is incumbent upon the opposing party to examine the factual basis for the opinion in cross examination.  *Werth v. Makita Elec. Works, Ltd.*, 950 F.2d 643, 654 (10th Cir. 1991) (holding that doubts concerning the sufficiency of the factual basis to support the expert opinion go to its weight and not to its admissibility).  "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded."  *First Data Corp.*, 2007 WL 2116378 at *12. (citing *Bonner v. ISP Techs., Inc.,* 259 F.3d 924, 929-30 (8th Cir. 2001)); *see also LeMaire*, 826 F.2d at 954 ("the fact that an expert cannot support his opinion with certainty goes only to its weight not to its admissibility").  With the benefit of vigorous cross-examination, any perceived weaknesses in Duree's testimony should be addressed by the jury.

MostChoice also contends that Duree's analysis valuing NetQuote's customer relationships at $123 million is improper considering that the Quist Report reflects customer relationships valued at $11 million in 2005, and that in 2007, Quist valued the entire company at between $7 million and $77 million.  Again, the requirement under Rule 702 is to determine reliability, not certainty.  "[E]ven if the judge believes there are better grounds for some alternative conclusion, and that there are some flaws in the scientist's methods, if there are good grounds for the expert's conclusion, it should be admitted."  *Bonner,* 259 F.3d at 929 (quoting *Heller v. Shaw Industries,* 167 F.3d 146, 152-53 (3d Cir. 1999)); *see also Quinton v. Farmland*

*Indus., Inc.*, 928 F.2d 335 337 (10th Cir. 1991) (finding that an expert's opinion need not be generally accepted in the scientific community to be sufficiently reliable and probative to support a jury finding).  Here, the Court recommends finding that Duree's methodology in quantifying Netquote's damages is reliable under Rule 702.

       3.    <u>Methodologies Applied to Facts</u>

Even if an expert's proffered evidence is scientifically valid and follows appropriately reliable methodologies, it might not have sufficient bearing on the issue at hand to warrant a determination that it has relevant "fit."  *Daubert,* 509 U.S. at 591.   Evidence appropriate for one purpose may not be relevant for a different purpose, and it is the trial court's responsibility to make this fitness determination.  Here, while MostChoice may question whether Duree's analysis is complete, it is not proper to conclude that his proposed testimony is based solely on speculation.  At the same time, the Court has some question about Duree's determination to quantify damages using a range of 50-75% to account for "termination reasons other than caused by MostChoice."  Certainly, an expert who claims to be either 50% right or 50% wrong raises significant uncertainty as to the credibility of his analysis.  However, such doubts are properly brought before a jury.  And, as stated above, the existence of contradictory evidence does not itself render Duree's opinions unreliable or irrelevant for purposes of Rule 702.

In this case, Duree's methodologies are sufficiently applied to the facts in this case to render his opinion useful to the jury; therefore, the Court recommends finding that Duree's methodologies are relevant under Rule 702.

<u>**CONCLUSION**</u>

Although MostChoice raises serious issues regarding Duree's methodology and

conclusions, those issues must be resolved by the fact-finder in this case.  Therefore, pursuant to

28 U.S.C. § 636(b)(1)(A) and D.C. Colo. L.Civ.R 72.1(C), I therefore RECOMMEND that

Defendants' Motion to Exclude Expert Testimony [filed December 14, 2007; docket #151] be

**denied**.

   Dated at Denver, Colorado this 28th day of April, 2008.

                              BY THE COURT:

                              s/ Michael E. Hegarty
                              Michael E. Hegarty
                              United States Magistrate Judge