## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 07-cv-00630-DME-MEH**

**NETQUOTE INC, a Colorado corporation,**

      **Plaintiff,**

**v.**

**BRANDON BYRD, an internet user making use of the IP Addresses 64.136.27.226 and 64.136.26.227, and**

**MOSTCHOICE.COM, Inc., a Georgia corporation**

      **Defendants.**

---

## OBJECTION TO MAGISTRATE'S ORDER
## DENYING MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESS

---

COMES NOW, Mostchoice.com, Inc. and herein files this Objection to Magistrate Hegarty's Order [Dkt. #224] Denying the Plaintiff's Motion to Exclude the Expert Testimony of Stephen Duree and shows this Court the following:

### Introduction

In light of the pending summary judgment motions still pending in this case, and the Court's prior ruling on other motions, the Court has and appears to be aware of the background giving rise to the claims at issue between the parties, and as little repetition of previously stated facts will be included herein. However, since the filing of the original Motion to Exclude the Plaintiff's Expert was filed in December, 2007, some additional facts and arguments have been set forth before the Court which require discussion.

Dockets.Justia.com

The essential basis of the Defendant's Motion is that Plaintiff's Expert was not qualified to offer an opinion as to causation relating to the Plaintiff's claims that it lost customers as a result of the alleged tortious conduct, and that his methodology for calculating damages was contrary to the facts.

On December 17, 2007, Defendant Mostchoice filed a Motion to Exclude the Plaintiff's Expert Witness. Simultaneously therewith, Mostchoice filed a Motion for Summary Judgment in this matter relying in part on the Motion to Exclude, and otherwise utilizing a master set of exhibits for both motions.

On or about December 13, 2007, and in January, 2008, Plaintiff produced an additional 4,500+ pages from Netquote's customer service records, which are referred to as the "Goldmine" records. These customer service records had not been included in or reviewed by the plaintiff's expert at the time his expert report was disclosed. The expert, who had not asked for the customer service records, reviewed them and then issued a supplemental report in February, 2008. This supplemental report replaced his previous methodology as to causation.

### Objections

Defendant makes the following objections, discussed further below:

(1)    Defendant Objects to the Magistrate's Finding That Plaintiff's Expert Can Testify as to Causation.

(2)    Defendant Objects to the Magistrate's Finding That the Plaintiff's Expert Can Testify to Damages Using a Calculation Methodology That Is Not Based on Facts.

(3)    Defendant Objects That on the Basis of the Evidence Presented That the Magistrate Failed to Preclude the Expert from Testifying as to the Loss of Customers to Which the

Expert Were Not Sufficiently Caused by the Alleged Tortious Conduct to Be Considered by the Jury.

(4)     Defendant Objects to the Evidentiary Finding that the Quist Report is a Business Record.

## Argument and Citation to Authority

I.  Identification of Lost Accounts / Causation

Duree's initial report was based on a visual inspection that compared the receipt of a supposedly *significant* number of leads compared to revenue and the timing of the terminated relationship (See A-22 / SD 15).[1]  Regular people (as opposed to a highly paid expert witnesses) would call this the "eyeballing it method.[2]"  And, had it been a matter of picking out a customer that bought 10 leads and got 5 from Byrd, that would certainly be a much closer issue.  But, some of the claims are simply ridiculous, including one agent received who received seven (7) leads from Byrd, who had purchased 1,438 over the 14 month period pre-dating his departure, was initially claimed under the eyeballing method to have left as a result of Byrd's leads.  There was simply no evidence or experience that would support the proposition that an agent who is receiving over 99% good quality leads would leave.  Of course, it turned out that this particular agent left Netquote because he decided to retire, which was reflected in the supplemental report (See Sealed Tr. Page 8-10; Ex. A-22 /SD 23).

Because Duree knew full well that he had no idea how accurate his made up method was,

---

[1]Of the 157 accounts identified, 33 actually only received 2 leads from Byrd, another 24 received 3 leads from Byrd. and 22 received 4.  (Ex. A-22 / Table 3.1 SD24).  Duree's supplemental report actually refers to the term "magnitude" when describing agents who received as few as 2 leads.

[2]It is this same "method" that was rejected in ***Kumho Tire Co. v. Carmichael***, 526 U.S. 137, 151 (U.S. 1999).

he allowed that 25%-50% would have terminated for reasons other than the alleged tortious conduct.[3]  Netquote claims this is a reduction in the "quantification," but in reality, this is nothing more than an allowance that 25% - 50% of the customers Netquote claims left after receiving Byrd's leads, are likely to have left for other reasons.  In preparing his supplemental report relying on the customer service records, Duree discards the 25% - 50% allowance in favor of just figuring out which customers appear to have left for other reasons.[4]

Duree acknowledges he has no experience in the on-line lead generation business, and indeed no experience in the insurance industry, other than providing his services as a CPA or a business valuation professional.  He further acknowledged that review and use of the customer service records was nothing more than his opinion as to the credibility of the statements made BY THE INSURANCE AGENTS.

Duree cannot be allowed to testify about matters that the jury can determine on its own. (See FRE § 702 in order to be admissible the testimony must be able to "assist the trier of fact to understand the evidence.").  Further, Duree in relying upon the statements of the agents from the customer service records is essentially testifying as to what they would testify if called, and then making his own judgment as to the credibility where convenient.  For instance, one agent represented to Netquote that he was quitting the business, but Duree chose not to believe him. Instead, Duree concludes on his own that because the agent still had appointments that he had

---

[3]The Magistrate found that "certainly, an expert who claims to be either 50% right or 50% wrong raises significant uncertainty as to the credibility of his analysis." [Dkt. #224 Page 19]

[4]Duree claims that he did not abandon his initial methodology, but there is no other explanation that would allow an agent, such as the one that was discovered to have retired, to go from being causally related to not at all.

concocted the story as an easier way to tell Netquote he wanted to stop buying leads[5] (Sealed Tr.

Pages 7-8). Further, Duree acknowledges that a jury would be able to determine the credibility

of these agents. "Credibility of a witness is generally not an appropriate subject for expert

testimony because, in part, it encroaches upon the jury's vital and exclusive function to make

credibility determinations . . . ." *United States v. Adams*, 271 F.3d 1236, 1245 (10th Cir. 2001);

*Gilson v. Sirmons*, 520 F.3d 1196 (10th Cir. Okla. 2008) (internal quotations omitted).

In performing his subsequent analysis with the customer service records, Duree looked to

see what factors may or may not have led to the departure from Netquote. Netquote is clearly

attempting to prove causation circumstantially by having Duree engage in the functional

equivalent of a differential diagnosis. That analysis, in order survive a challenge under *Daubert*

requires that the treating physician rule out possible causes. See Generally *Tingey v. Radionics*,

193 Fed. Appx. 747, 765 (10th Cir. 2006). Among the comments to Rule § 702 is the following:

"before a conclusion on causation can be reliably drawn, the expert must make some reasonable

attempt to eliminate some of the most obvious causes."

In this case, a review of the customer service records demonstrates that the 157 agents

identified in the initial report did not leave because of the receipt of particular leads identified as

having come from Byrd, and failed to ascertain what percentage of the leads the agents received

were "bogus" through incentives or other causes having nothing to do with the alleged

applications submitted by Byrd. While this is true with respect to each of the 111 customers

Netquote now claims left because of Netquote, it is perhaps even more true where Duree himself

---

[5]This particular agent was deposed for preservation of evidence on May 8, 2008 and substantially testified that in fact he was now an equities trader and went back to work for a prior employer in that capacity because of a lucrative job offer.

found reason to doubt what part Mostchoice played in the departure of the 54 customers identified as "MC Substantial and Other."

In other words, Duree failed to rule out the possibilities that he acknowledged were problematic in his initial opinion that could have caused the 25% - 50% allowance.

The bottom line here is that Duree is not qualified to opine as to why Neqtuote's local agent customers actually stopped buying leads, especially in light of the customer service records.

II.  Damages Methodology

Duree testified that his method for quantifying damages included an assumption that Neqtuote retained its customers for an average of seven (7) years, which is identified as the decay rate.  However, this assumption was based on yet another assumption contained in the 2006 Quist Report, and was not only "not based on historical facts," it was actually <u>contrary</u> to the data provided by Netquote.[6]  In fact, Netquote's management specifically informed Duree that a national account would be expected to stay on the service for 3-3.5 years, which was far better than a local account (Tr. Page 94 Lines 14-25).  Duree even admits that the Quist Report was not based on information from Netquote, or even about Neqtuote, but rather was made up of assumptions and Quist's experience as a business valuation firm.  Had Quist had the same data from management that was provided to Netquote, it is logically likely that it would not have used a seven (7) decay rate, or if it did that would clearly demonstrate that the decay rate is nothing more than an accounting fiction that has no relevance to any damage calculation.

---

[6]In category of customers that Duree identifies as not being substantially related to the allegedly tortious conduct, the average length that the agents purchased leads from Neqtuote was just over six (6) months.

Duree contends that experts in his field commonly rely upon a report such as the 2006 Quist Report and in his experience a 5-10 year range is commonly used to value customer relationships. This testimony was nothing more than a conclusory statement in an attempt to have his testimony deemed admissible under FRE § 703. However, the commentary from FRE § 703 includes offers example as to when it is appropriate to allow an expert to base his testimony on the kinds of reports generally used by experts in that field]. The Advisory Committee's example "is that of a physician who forms a diagnosis based on (1) information from numerous sources, including statements by patients and relatives, and (2) reports and opinions from nurses, technicians, and other doctors." The commentary also cites *United States v. Posey*, 647 F.2d 1048 (10th Cir. 1981) for the proposition that (in a drug prosecution, it was permissible for one chemist to rely upon tests run by another in testifying that the tested substance was cocaine: "It is quite reasonable for a chemist to review another chemist's analysis when forming an opinion as to the veracity of the latter's test results.").

The nature of this rule is to allow a doctor to use an X-Ray report done by a radiologist to testify that a bone is broken, or similarly observed, and predominantly objective data. In the case at bar, the seven (7) year attrition rate is an assumption in the Quist Report that was not based on historical or observed data. Nor was it one of many documents or factors considered. Rather, it was the only factor considered in creating the damages formula. Expanding on the example in the commentary, if the x-ray report indicated that the patient had a broken leg, and the doctor actually looked at the x-ray and it was of the patient's arm, then it wouldn't matter whether or not the doctor is typically allowed to look use the report, it is demonstrably and patently false. Such is the case at bar where the 7 year decay rate is factually false.

III.  Magistrate Should Have Excluded Portions of Duree's Testimony

Even assuming the Magistrate's analysis was correct, certain of Duree's opinions should not be presented at trial.  As noted in the Defendants' Motion For Summary Judgment, the Plaintiff must prove that Mostchoice's allegedly tortious conduct was a substantial factor in causing the customer to stop purchasing leads from Netquote.  Duree has now excluded 14 customers from his original 157, leaving 143 customers.  However, 32 of these customers, Duree identifies as "MC Not Substantial," meaning that even Duree is not willing to testify that these agents left because of the allegedly tortious conduct.[7] (Daubert Tr. Page 96 Lines 10-17). Netquote cannot recover for these 32 customers, and Duree should not be allowed to present any testimony relating to these customers at trial.  Consequently, the Magistrate's order is clearly erroneous in that assuming all else being admissible, Duree should be precluded from testifying as to the agents for which there is no evidence that would allow a jury to determine a substantial factor of the termination was Byrd's submissions.

IV.  2006 Quist Report as a Business Record

Mostchoice objects to the finding that the Quist Report is admissible under the business records exception to the hearsay rule.  No Motion in Limine was filed or referred to the Magistrate that would allow for a binding determination that the Quist Report is admissible under FRE § 803(6).

The Magistrate cited Footnote 3 in *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1258 (9th Cir. Or. 1984) in support of the proposition that the Quist Report was a business record.  However, Paddack cannot be fairly read so broadly.  The footnote at issue stated that

---

[7] *e.g.* the agent who was found to have retired.

financial statement audits were generally admissible as business records. The Quist Report is not a financial statement audit. It is a specific device that exists for the purpose of allocating the purchase price of Neqtuote into various assets and what is left over is Goodwill. The report opinions of other experts, market data and industry information that is not merely the product of other records kept by Neqtuote. The admission of the report is subject to the other rules of evidence as asserted in Reply Brief filed by Mostchoice in which Mostchoice argues that

> unless Rule 803(6) is deemed to override the opinion rules, it should not be construed to allow the introduction of expert opinions without opportunity to ascertain the qualifications of the maker, the extent of his study or for other reasons to cross-examine him. Otherwise, the report of every appraiser would be admissible upon the mere showing that the preparer was in the business of making such appraisals, without more. ***Forward Communications Corp. v. United States***, 221 Ct. Cl. 582, 627-628 (Ct. Cl. 1979).

### Conclusion

The Magistrate seemingly recognizes the problems inherent in Duree's opinions by agreeing that there are "serious issues regarding Duree's methodology." However, the application of ***Daubert***, and its progeny, is clearly erroneous for the following reasons: (1) The causation methodology is beyond the scope of Duree's knowledge (i.e. he is not a perfume tester smelling perfumes, or a tire expert inspecting tires. Rather, he is an accountant speculating about why 157 particular insurance agents were no longer customers of Netquote.) and (2) Duree's damages calculation is contrary to any facts available to him.

This 9th day of May, 2008.

 **s/ Ryan Isenberg**

Ryan L. Isenberg, Esq.
Isenberg & Hewitt, P.C.
7000 Peachtree Dunwoody Road
Building 15, Suite 100
Atlanta, Georgia 30328
Telephone: 770-351-4400
Facsimile: 770-828-0100 (Fax)
Email: ryan@isenberg-hewitt.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of May, 2008, I served the foregoing Motion to Exclude Expert Witness by electronic delivery, as an attachment to an email, to the following counsel of record:

David W. Stark
Heather Carson Perkins
Daniel D. Williams
Theresa T. Tate
FAEGRE & BENSON LLP
3200 Wells Fargo Center
1700 Lincoln Street
Denver, Colorado 80203
dwilliams@faegre.com

 **s/ Ryan Isenberg**
