IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 07-cv-00630-DME-MEH

NETQUOTE, INC., a Colorado corporation,

        Plaintiff,

v.

BRANDON BYRD, an internet user making use of the IP Addresses 64.136.27.226 and
64.136.26.227, and

MOSTCHOICE.COM, INC., a Georgia corporation,

        Defendants.

---

## ORDER

---

      Defendants MostChoice and Brandon Byrd have moved for summary judgment

on each of the remaining causes of action asserted by Plaintiff NetQuote. (Doc. No.

149.) NetQuote has responded with its own motion for summary judgment in relation to

MostChoice's counterclaim. (Doc. No. 157.) Having reviewed the pleadings and

evidence offered by each party, this court DENIES in part and GRANTS in part

Defendants' Motion for Summary Judgment and GRANTS NetQuote's motion for

summary judgment in relation to MostChoice's counterclaim.

## I.  BACKGROUND

      Plaintiff NetQuote, Inc., is a Colorado-based company that operates a web site

that allows individuals to seek insurance referrals and quotes from multiple insurance

companies. NetQuote sells information collected from such individuals to its clients –

insurance brokers and agents.  NetQuote has brought suit against Defendants

MostChoice, a Georgia-based competitor that also collects and sells insurance referrals

through a web site, and Brandon Byrd, a Georgia resident who was employed by

MostChoice at the time of the events in question.

NetQuote alleges that MostChoice hired Byrd for the purpose of pretending to be

various individuals interested in insurance quotes and using such identities to submit

hundreds of false inquiries to NetQuote's web site, knowing that NetQuote's clients

would receive these fictitious leads that could not possibly result in insurance sales.

Due to Byrd's conduct, NetQuote alleges that its clients complained about the

inaccurate information they received and some terminated their business with NetQuote

because of it.  NetQuote also claims that as a result of Byrd's false submissions,

MostChoice promoted itself to potential clients as offering superior insurance leads than

NetQuote.  With these allegations in mind, NetQuote's amended complaint asserted

Colorado state-law claims sounding in fraud, tortious interference with business

relations, and common law unfair competition, against both Byrd and MostChoice.

Additionally, NetQuote asserted exclusively against MostChoice a claim of false

advertising arising under the federal Lanham Act, and a claim of deceptive trade

practices arising under the Colorado Consumer Protection Act (CCPA). (Doc. No. 13.)

With respect to NetQuote's claims, Defendants candidly admit that Byrd was

employed by MostChoice and that he submitted "at least 394 fictitious submissions as

alleged."  (Doc. No. 33, 34.)  Defendants deny, however, that Byrd used the identities of

real people in doing so.  Furthermore, MostChoice has admitted to promoting its

insurance leads as "better than NetQuote," but has denied asserting in conjunction with such promotions that NetQuote's leads contain bad or false information.

On May 4, 2007, Defendants moved to dismiss NetQuote's cause of action sounding in fraud and similarly moved to dismiss NetQuote's claims against Byrd for lack of personal jurisdiction. (Doc. No. 16.) This court denied that motion on June 13, 2007. (Doc. No. 31.) Thereafter, on June 15, 2007, MostChoice again moved to dismiss NetQuote's claim sounding in fraud, and also moved to dismiss NetQuote's claims sounding in unfair competition, false advertising, and deceptive trade practices under the CCPA. (Doc. No. 32.) This court granted Defendants' motion to dismiss with respect to NetQuote's claims of unfair competition and deceptive trade practices under the CCPA. (Doc. No. 68.) Defendants' motion to dismiss was denied in all other respects. (Id.)

Subsequently, MostChoice asserted counterclaims against NetQuote. Initially, these counterclaims involved causes of action for "click fraud," defamation, and tortious interference. (Doc. No. 87.) Ultimately, however, NetQuote and MostChoice stipulated to the dismissal of MostChoice's counterclaims sounding in defamation and tortious interference. (Doc. No. 121.) Thus, MostChoice's one remaining counterclaim involves a cause of action for "click fraud," asserted, without dispute, under Georiga law.

On December 14, 2007, Defendants filed a motion for summary judgement with respect to each of NetQuote's remaining causes of action. (Doc. No. 149.) NetQuote responded to this motion on January 3, 2008, (Doc. No. 166) and Defendants replied to this response on January 18, 2008. (Doc. No. 177.)

Similarly, on December 18, 2007, NetQuote filed a motion for summary judgment with respect to MostChoice's one remaining counterclaim. (Doc. No. 157.) MostChoice responded to this motion on January 7, 2008, (Doc. No. 170) and NetQuote replied to this response on January 18, 2008. (Doc. No. 181.) Accordingly, each of these motions is now properly before the court.[1]

## II. STANDARD OF REVIEW

"Summary judgment is appropriate if the pleadings and other documents submitted before the court 'show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Hennigh v. City of Shawnee, 155 F.3d 1249, 1253 (10th Cir. 1998) (quoting Fed. R. Civ. P. 56(c)). When considering a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party. See Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1255 (10th Cir. 1998). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and a 'genuine' issue exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Occusafe, Inc. v. EG&G Rocky Flats, Inc., 54 F.3d 618, 621 (10th Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The moving party has the initial burden to show "that there is an absence of evidence to support the nonmoving party's case." Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir.1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317,

_____

[1] We continue to have jurisdiction over this matter on the basis of complete diversity, 28 U.S.C. § 1332, because the Plaintiff is a citizen of Colorado and both Defendants are citizens of Georgia, and the amount in controversy is greater than $75,000.

325(1986)).  Once the moving party meets this burden, the burden shifts to the

nonmoving party to demonstrate a genuine issue for trial on a material matter.  Id.  In so

doing, the nonmoving party may not rest solely on the allegations in its pleadings, but

must instead, by its "own affidavits, or by the depositions, answers to interrogatories,

and admissions on file, designate specific facts showing that there is a genuine issue for

trial."  Celotex Corp., 477 U.S. at 324 (quotations omitted).

At the summary judgment stage, the judge's function is not to weigh the

evidence and determine the truth of the matter.  Anderson, 477 U.S. at 249.

Nevertheless, "[w]here the record taken as a whole could not lead a rational trier of fact

to find for the nonmoving party," summary judgment in favor of the moving party is

proper.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III.  MOSTCHOICE'S MOTION FOR SUMMARY JUDGMENT

### A.  NetQuote's Fraud Claim

NetQuote seeks to recover from Defendants for Defendants' allegedly fraudulent

conduct.  (Doc. 13 at 12.)  In order to sustain a fraud claim under Colorado law,

NetQuote must demonstrate that Defendants "made a [(1)] false representation of a

material fact, [(2)] knowing that representation to be false; [(3)] that the person to whom

the representation was made was ignorant of the falsity; [(4)] that the representation

was made with the intention that it be acted upon; and, [(5)] that the reliance resulted in

damage to the plaintiff."  Coors v. Security Life of Denver Ins. Co., 112 P.3d 59, 66

(Colo. 2005).[2]  With respect to these requirements, Defendants most basically assert

---

[2]  Coors appears to be the most recent binding precedent setting forth Colorado's
formulation of the elements of civil fraud.  Colorado cases, however, have been

that NetQuote cannot satisfy the elements of reliance and proximate cause.  Each

argument will be considered in turn.

## 1. Reliance

Defendants assert that NetQuote's fraud claim should not survive summary

judgment because there is no evidence that NetQuote relied on the false leads

submitted by Defendants.  In advancing this argument, Defendants contend that

NetQuote receives numerous "bad leads" and issued $150,000 in credits to its

customers for such bad leads prior to Defendants engaging in any of the complained of

conduct.  (Doc. No. 150 at 11.)  Accordingly, Defendants allege that "there is no

evidence that Netquote actually relies upon the content of the lead it receives."  (Id.)

NetQuote counters that Defendants' argument borders on absurd.  According to

NetQuote, its entire business model is reliant upon the accuracy of the leads it receives.

This notion is buttressed by a written declaration of NetQuote's CEO Gregg Coccari.

(See Doc. No. 166, Ex. 7.)  According to Coccari:

---

inconsistent in defining whether the plaintiff needs to allege "reliance."  Despite the fact
that other states and the Restatement of Torts require justifiable reliance, see
Restatement (Second) of Torts § 537, many Colorado cases have not expressly
required such a showing.  See, e.g., Brody v. Bock, 897 P.2d 769, 775-76 (Colo. 1995)
("To establish a prima facie case of fraud, a plaintiff must present evidence that the
defendant made a false representation of a material fact; that the party making the
representation knew it was false; that the party to whom the representation was made
did not know of the falsity; that the representation was made with the intent that it be
acted upon; and that the representation resulted in damages.").
    Ironically, the discussion of the elements of fraud as discussed in Coors cites to
Brody, which, as may be seen above, does not refer to reliance.  Moreover, referring to
"reliance" as the last element in the Coors formulation makes no sense unless the
earlier elements require the plaintiff to demonstrate reliance.  It is possible that Coors'
reference to reliance was inadvertent, but nonetheless, it is a published opinion by the
Colorado Supreme Court that governs the court's disposition of this state law matter.

> When NetQuote sells a lead to one of its insurance agent
> customers, it does so in reliance on the fact that the lead is a
> genuine lead submitted by an individual who actually wants to be
> contacted by one or more insurance agents.... NetQuote's
> business reputation with its insurance agent customers depends on
> the quality of the leads that it sells to them. NetQuote prides itself
> on selling high quality leads and it has become the leader in the on-
> line insurance lead generation industry based on the fact that it
> sells high quality leads with accurate information.

(Id. at 3.) With this declaration in mind, and no evidence offered by Defendants to the contrary, there is a genuine issue of material fact whether NetQuote relied upon the false leads submitted by Defendants. Accordingly, this is not a proper ground for summary judgment.

### 2. Digital Reliance

Next, Defendants contend that NetQuote could not have relied upon Defendants' false submissions because no person at NetQuote actually read the submissions. Instead, the submissions were strictly "received and distributed electronically." (Doc. No. 150 at 12.) As a matter of law, this argument was previously rejected in the court's prior order relating to Defendants' motion to dismiss. (Doc. No. 31 at 11.) Specifically, the court asserted:

> The parties have not referred the Court to any Colorado authority addressing
> whether a computer can "rely" on representations. But Defendants provide no
> authority for the theory that a corporate party can rely on representations only if
> human eyes first review the information. Defendants also make no cogent
> argument as to why a corporation is not entitled to rely on information provided to
> it through the use of computer systems. At least one court in another jurisdiction
> has found that a company's computer system can act as the company's agent in
> relying on information received. See Thrifty-Tel, Inc. v. Bezenek, 54 Cal. Rptr. 2d
> 468, 474 (Cal. Ct. App. 1996).

(Id.)  MostChoice has not offered any argument why these notions should be reconsidered and the court finds no reason to do so.  In that same order, however, the question of whether NetQuote's reliance was justified was left open.

### 3.  Justifiable Reliance

### a. Does Colorado law require justifiable reliance?

From the outset, it is not clear whether Colorado law requires justifiable reliance in order to sustain a cause of action for fraud.  The most recent articulation of the Colorado fraud standard came in Coors, 112 P.3d at 66.  As previously noted, in Coors the Colorado Supreme Court asserted that:

> To establish fraud, the plaintiff must show that the defendant made a false representation of a material fact, knowing that representation to be false; that the person to whom the representation was made was ignorant of the falsity; that the representation was made with the intention that it be acted upon; and, that the reliance resulted in damage to the plaintiff.

Id.  Notably, this standard does not appear to require the existence of justified reliance.

In contrast to Coors is the standard for fraud articulated in M.D.C./Wood, Inc. v. Mortimer, 866 P.2d 1380, 1382 (Colo. 1994):

> To establish fraud, the respondents had to prove that: (1) a fraudulent misrepresentation of material fact was made....; (2) the respondents relied on the misrepresentations; (3) the respondents have the right to rely on, or were justified in relying on, the misrepresentation; and (4) the reliance resulted in damages.

This standard, which does require justifiable reliance, was not expressly disavowed in Coors, or for that matter, was it mentioned.  Adding to the confusion, just last year, in the dicta of a dissenting opinion, the Mortimer standard was apparently offered as the governing standard for fraud actions.  See J.A. Walker Co. v. Cambria Corp., 159 P.3d 126, 132 (Colo. 2007) (Hobbs, J. dissenting) (asserting that "a sufficient allegation of

8

fraudulent inducement would require the subcontractor to advance facts demonstrating each of the following elements: (1) the prime contractor's misrepresentation of a material fact, (2) the subcontractor's reliance on that misrepresentation, (3) the subcontractor's reliance on the misrepresentation was justifiable, and (4) justifiable reliance resulted in damage to the subcontractor" (citing <u>Mortimer</u>, 866 P.2d at 1381)).

Because NetQuote has not asserted that justifiable reliance is <u>not</u> an element of a fraud claim under Colorado law, for purposes of this order, the court will presume that such reliance is required.

### b. Was NetQuote's reliance justified?

Defendants assert that NetQuote's reliance was not justified because NetQuote's computer system did not sufficiently filter out false leads. In making this argument, Defendants cite the deposition testimony of Quin Zhou, NetQuote's Director of Technology Development. According to Zhou, NetQuote's system filters out what the system believes to be false names (such as "Mickey Mouse"), dubious keystroke sequences (such as "a, s, d, f, g"), and fictitious area codes (such as "111"). (Zhou Depo. at 14-16.) Defendants assert that the presence of such a filter could not have resulted in NetQuote's justifiable reliance on the accuracy of the leads it received, because the system "only kicked out obvious errors" and "did not ... ensure accuracy or quality." (Doc. 150 at 13.)

The court is not convinced that this evidence, standing alone, forecloses all questions of fact as to whether NetQuote's reliance was justified. There is no ground on which to conclude that in order for justified reliance to arise, NetQuote was required to have in place a perfect filtering system. The evidence indicates that NetQuote was

aware of potential false leads and took affirmative steps in an effort to limit such leads. Reasonable triers of fact could differ on whether these steps were sufficient to justify NetQuote's reliance on the leads it received. With such difficulties in mind, it is apparent why other courts have asserted that "[n]ormally, whether reliance is justifiable is a question of fact that is unsuited for resolution on summary judgment." Kamboj v. Eli Lilly and Co., 2007 WL 178434, *14 (N.D. Ill. Jan. 18, 2007) (unpublished).

Defendants also ambiguously argue that because NetQuote issues credits to its customers for false leads, "[t]he suggestion ... that the mere receipt and distribution of a bad lead causes harm is without merit." (Doc. No. 150 at 14.) It is not clear how this issue is proximately connected with whether NetQuote's reliance on the leads it receives is justifiable. In any case, the fact that NetQuote gives credit for bad leads neither refutes the justifiable nature of its reliance on the bona fides of the leads it receives nor does it negate NetQuote's charges arising from a systematic effort to submit false inquiries.

Accordingly, Defendants have failed to demonstrate that no material issue of fact exists as to whether NetQuote's reliance was justified.

### 4. Proximate Cause

"An essential element of the plaintiff's cause of action for ... any ... tort is that there be some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has sustained. This connection usually is dealt with by the courts in terms of what is called proximate cause...." Prosser & Keaton On Torts at 263 (1984). NetQuote asserts that Defendants' alleged fraudulent conduct proximately caused NetQuote to incur four distinct forms of damages: (1) the loss of national client

HSBC, (2) the loss of national client SBLI, (3) the loss of numerous "local accounts," and (4) the loss of $128,000 in "employee time to identify and to stop the cyber-attack." (Doc No. 166 at 13.) Defendants counter that NetQuote has failed to offer sufficient evidence to establish a causal connection between Defendants' conduct and NetQuote's damages.

Under Colorado law, "[w]hether proximate cause exists is a question for the jury and only in the clearest of cases, where reasonable minds can draw but one inference from the evidence, does the question become one of law to be determined by the court." Lyons v. Nasby, 770 P.2d 1250, 1256 (Colo. 1989).

> An act is the proximate cause of an injury if the act was a "substantial contributing cause" in bringing about the injury. Rupert v. Clayton Brokerage Co., 737 P.2d 1106, 1112 (Colo. 1987). A "substantial factor" is defined as conduct "'of sufficient significance in producing the harm as to lead reasonable persons to regard it as a cause and to attach responsibility.'" Berg v. United States, 806 F.2d 978, 981 (10th Cir. 1986) (quoting Sharp v. Kaiser Found. Health Plan, 710 P.2d 1153, 1155 (Colo. App. 1985), aff'd, 741 P.2d 714 (Colo. 1987)). If a defendant's conduct is "a substantial contributing cause of the injury, it is irrelevant to the causation analysis whether other factors ... also contributed to the injury." Rupert, 737 P.2d at 1112; see Berg, 806 F.2d at 982 (noting "[t]here can be several proximate causes of the same injury").

F.D.I.C. v. Refco Group, Ltd., 989 F. Supp. 1052, 1068 (D. Colo. 1997). With this standard in mind, the court will consider whether there is at least a triable issue of fact whether causal connections exist between Defendants' alleged fraudulent conduct and each of NetQuote's four distinct claims of damages.

### a. The HSBC Account

Defendants assert that they are entitled to summary judgment on the issue of whether their conduct proximately caused HSBC to terminate its account with

NetQuote.  In making this argument, Defendants rely on the deposition testimony of

Paul Goott, Director of Marketing and Business Development for HSBC.

Goott testified that HSBC terminated NetQuote as a source for life insurance

leads in 2006.  (Doc. No. 166-14 at 16.)  According to Goott, the bogus leads that HSBC

received from NetQuote "in part" caused HSBC to terminate its NetQuote account.  (Id.)

Goott later asserted, however, that there were two "major" reasons HSBC terminated

the relationship: "price and conversion rate."  (Id. at 57.)  As one can imagine, Goott

affirmed that the presence of bogus leads would have harmed the conversion rate.[3]  (Id.

at 62.)

In addition to Goott's testimony, Defendants also rely on an October 17, 2006 e-

mail, which appears to be from HSBC to NetQuote.  (Ex. A-4.)  According to

Defendants, this e-mail demonstrates that the bogus leads had only a slight impact on

HSBC's conversion rate.  Specifically, the e-mail states that HSBC received 476 leads

from NetQuote, 421 of those leads were called, and 95 were discovered to be

unworkable.  (Id.)  As of the date of the e-mail, however, the 325 workable leads that

were called had resulted in no sales.  Thus, Defendants assert, the presence of the

bogus leads had little impact on HSBC's poor conversion rate, and, therefore, no causal

connection exists between HSBC's termination of its account with NetQuote and

Defendants' allegedly fraudulent conduct.

NetQuote attempts to rebut Defendants' argument by pointing to several

additional pieces of evidence.  First, NetQuote cites the deposition testimony of Mary

---

[3]  The term "conversion rate" refers to the percentage of leads that ultimately
result in insurance sales.

Bro.  (Doc. No. 166-15.)  Bro was in charge of the HSBC call center that pursued the leads provided by NetQuote.  According to Bro, when agents attempted to contact the leads, "they found a very high number of wrong numbers."  (Id. at 14.)  Indeed, this began to occur within the "first week" of the operation.  (Id. at 15.)  This was significant, because according to Bro, given the fact that her sales agents were compensated on an hourly as well as a commission basis, the sales agents would be reluctant to pursue leads that were of a dubious nature and would only pursue "those leads last in the day." (Id. at 16.)  Thus, Bro appears to maintain that the presence of the bogus leads spoiled the efficacy of even those NetQuote leads that were legitimate.  Perhaps with this in mind, Bro responded affirmatively when asked whether, but for the bogus leads, the relationship between NetQuote and HSBC would have continued. (Id. at 18.)

In addition to Bro, NetQuote cites the deposition testimony of NetQuote President Emeritus Scott Striegel in arguing that Defendants' conduct proximately caused HSBC to terminate its NetQuote account.  According to Striegel, "the 400 bogus leads [provided by Byrd] had a devastating impact on" the relationship between NetQuote and HSBC.  (Doc. No. 166-16 at 30).  In this regard, Striegel asserted that when he spoke to HSBC about its decision to terminate the NetQuote relationship, HSBC indicated that "the major reason [for the termination] was the bogus leads and not achieving their conversion rate," and that "the bogus leads [were] the primary focus" of the discussion. (Id. at 31.)

Viewed in the light most favorable to NetQuote, the court concludes that this evidence, taken as a whole, creates a genuine issue of material fact whether Defendants' allegedly fraudulent conduct proximately caused HSBC to terminate its

13

relationship with NetQuote.  The testimony of Bro is unequivocal that the poor conversion rate was substantially attributable to the presence of the bogus leads. Similarly, Goott was unequivocal that the poor conversion rate was a major reason behind HSBC's decision to terminate the relationship.  Thus, NetQuote has offered sufficient evidence to survive summary judgment on this claim.

### b.  The SBLI Account

Next, Defendants assert they are entitled to summary judgment on the issue of whether their conduct proximately caused SBLI to terminate its relationship with NetQuote.  In advancing this argument, Defendants rely on the deposition testimony of John Doria, the former Director of Strategic Planning at SBLI and the contact person at the company for the NetQuote relationship.  (Doc. No. 166-17.)

Doria testified that SBLI entered into a six-week trial relationship with NetQuote. (Id. at 11.)  According to Doria, if the project had been successful over those six weeks, SBLI would have continued the relationship.  (Id. at 11, 12.)  The project, however, was not a success.  Instead, Doria testified that a "significant" number of the leads provided by NetQuote proved to be bogus and that he believed the bogus leads were a "main factor" in SBLI's decision to terminate its relationship with NetQuote.  (Id. at 14, 16.)  In this regard, Doria later remarked that SBLI's decision to terminate its relationship with NetQuote was based primarily on a cost-benefit analysis.  (Doc. No. 150-25 at 19.) Doria believed this decision was made by Michael Lane.  (Id.)

Defendants advance two arguments why they should be entitled to summary judgment based on Doria's testimony.  First, Defendants contend that Doria's testimony ought to be excluded under Rule 602 of the Federal Rules of Evidence.  Rule 602

14

"requires that testifying witnesses have personal knowledge of the matter. Under the personal knowledge standard, an affidavit is inadmissible if the witness could not have actually perceived or observed that which he testifies to." Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1200 (10th Cir. 2006) (alterations, quotations omitted). Defendants assert that Rule 602 ought to apply here because Doria only testified that he "believed" the bogus leads were a main factor in SBLI's decision to terminate its relationship with NetQuote. This argument is unavailing.

In Argo, the court excluded testimony because the offeror was not in a position to acquire the knowledge to which he professed. This is inapposite to the case at hand. Doria obviously has a significant knowledge of the SBLI/NetQuote relationship having acted as SBLI's personal liaison between the two parties. "Rule 602 does not require that the witness' knowledge be positive or rise to the level of absolute certainty. Evidence is inadmissible only if in the proper exercise of the trial court's discretion it finds that the witness could not have actually perceived or observed that which he testifies to." United States v. Sinclair, 109 F.3d 1527, 1536 (10th Cir.1997) (quotations omitted). Given Doria's central position in the affairs between SBLI and NetQuote, no such finding may be made in this case.[4]

As an alternative argument, Defendants point to the language in Doria's deposition asserting that SBLI's decision to terminate its relationship with NetQuote came down to a cost-benefit analysis. The fact, however, that Doria previously testified

---

[4] This notion is buttressed by the fact that later in his deposition, Doria unequivocally asserted that he "would say [the bogus leads were] one of the main factors" in SBLI's decision to terminate its relationship with NetQuote. (Doc. No. 166-17 at 16-17.)

the presence of the bogus leads was a "main factor" in SBLI's decision to terminate the NetQuote relationship, at a minimum, creates a genuine issue of material fact on the matter. Furthermore, the bogus leads would no doubt have an impact on SBLI's cost-benefit analysis. Thus, on the basis of Doria's deposition testimony, this claim survives summary judgment.

### c. Local Accounts

Relying on the expert testimony of Stephen Duree, NetQuote asserts that it lost 157 "local accounts" due to Defendants' conduct. Duree's testimony, which is detailed in the Magistrate's report and recommendation on whether it should be excluded (Doc. No. 224), posits that these lost local accounts may be divided into four categories:

1. "MostChoice Substantial": in 57 of the affected accounts, the magnitude and timing of the false leads is significant and substantial to the loss of the customer relationships, and the customer service records do not suggest other causes of the loss of the accounts;

2. "MostChoice Substantial and Other": in 54 of the affected accounts, the magnitude and timing of the false leads is significant and substantial to the loss of the customer relationships, but are not the only potential causes of the loss;

3. "MostChoice Not Substantial": in 32 of the affected accounts, the customer service records suggest other overriding reasons for the loss of the accounts;

4. "Other non-damage sub-classifications": the customer service and subsequent records reflect that 14 of the 157 accounts should be excluded from the damages calculation.

(See Doc. No 224 at 16.) Evidently, this framework was contained in Duree's supplemental expert report, which was prepared after Defendants had already moved for summary judgment, and therefore was not explicitly discussed in the parties' pleadings on this matter.

16

In any case, it appears that based on Doria's framework, and the lack of any other evidence proffered by NetQuote with respect to these local accounts, there is no genuine issue of material fact whether Defendants' conduct substantially caused NetQuote to lose 46 of the 157 local accounts at issue. Indeed, Duree's expert testimony appears explicitly to indicate that MostChoice's conduct was not such a cause. In regard to the remaining 111 local accounts, however, Duree's testimony is sufficient to create a genuine issue of material fact on the issue of proximate cause. Nevertheless, with respect to the 46 local accounts identified in Stephen Duree's expert report as "MostChoice Not Substantial" and "Other non-damage sub-classifications," Defendants' Motion for Summary Judgment is GRANTED.

### d. Lost Time

As an additional form of damages, NetQuote asserts that it is entitled to recover $128,000 in damages "for employee time to identify and stop the cyber-attack." (Doc. No. 166 at 13.) According to the declaration of Craig Shine, Vice President of Finance and Treasurer at NetQuote, he "determined what staff time was expended [by NetQuote] to address MostChoice's fraudulent applications, and how much that staff time cost NetQuote. [His] analysis shows that the staff time cost at least $128,000 in diverted personnel resources." (Doc. No. 166-2 at 2.)

Defendants respond that under Colorado law, there is no authority that permits NetQuote to collect such damages. The most analogous case on the matter appears to be People v. Duvall, 908 P.2d 1178 (Colo. Ct. App. 1995). In Duvall, a defendant who committed criminal theft was ordered "to reimburse the victim company for time spent by its president, security manager, and pharmacist in conducting inventories, installing

17

and using security equipment, and cooperating with investigating and prosecuting authorities." Id. at 1179.  On appeal, the defendant argued that the trial court erred in ordering such restitution because "no funds in addition to the employees' regular salaries were expended by the victim company."  The Colorado Court of Appeals rejected this argument.  According to the court, "the purpose of an award of restitution under [the restitution statute] is to make the victim whole" and therefore such damages were appropriate.  Id.

Similar notions may be applied in the instant context.  "General tort law provides plaintiffs with two types of monetary remedies: compensatory damages and exemplary damages.  Compensatory damages are intended to make the plaintiff whole." Stamp v. Vail Corp., 172 P.3d 437, 448 (Colo. 2007).  Thus, in order to allow NetQuote the opportunity to be made whole, it is apparent that Colorado law would permit the company to recover for the lost employee time wrought by Defendants' allegedly tortious conduct.

As an additional argument, Defendants assert that NetQuote should not be able to recover for its lost employee time because "Netquote admits to having received a benefit from services performed as it was able to upgrade and improve its lead filtering system...."  (Doc. No. 177-5.)  This fact, however, is not dispositive of NetQuote's entire claim for lost time damages.  Rather, any benefits NetQuote received from this time must be subtracted from the damages that it sustained.  If the evidence subsequently demonstrates that NetQuote's benefits equaled or exceeded its damages, no further award of damages will be necessary.

**5. Damages**

In arguing that Defendants' conduct caused it to suffer damages, NetQuote relies on the expert report of Stephen Duree.  Although Defendants argue that Duree's damages calculations are severely flawed[5], the calculations are sufficient to create genuine issues of material fact with respect to each of the forms of damages asserted by NetQuote.  Accordingly, aside from the 46 lost local accounts that Duree himself asserted were not substantially caused by Defendants' conduct, NetQuote has offered sufficient evidence to survive summary judgment with respect to each of these claims.

**B. NetQuote's Tortious Interference Claim**

"Tortious interference with a contract requires that: (1) the plaintiff have a contract with another party; (2) the defendant knew or should have known of such contract's existence; (3) the defendant intentionally induced the other party to the contract not to perform the contract with the plaintiff; and (4) the defendant's actions caused plaintiff to incur damages."  <u>Telluride Real Estate Co. v. Penthouse Affiliates, LLC</u>, 996 P.2d 151, 155 (Colo. Ct. App. 1999).

Defendants assert two grounds on which they believe they are entitled to summary judgment on this claim.[6]  First, Defendants contend that their conduct was

---

[5]  Again, this matter is considered in significant detail in the Magistrate's report and recommendation on whether Duree's testimony is admissible.  (Doc. No. 224.)

[6]  Defendants also appear to assert in this context that NetQuote cannot adequately demonstrate that Defendants' conduct proximately caused any of the damages NetQuote incurred.  Any such contention is addressed in the previous section regarding damages for fraud, as the damages NetQuote seeks to recover for its tortious interference claims appear to be the same as those damages it seeks to recover for its fraud claims.

protected under the "competitor's privilege."  Second, Defendants argue that there is no

evidence that they <u>intended</u> to "induce or cause any customer to discontinue a

relationship with Netquote."  (Doc. No. 150 at 16.)  Each of these assertions will be

considered in turn.

## 1. Competitor's Privilege

Under Colorado law, the defense of competitor's privilege provides that

One who intentionally causes a third person not to enter into a prospective
contractual relation with another who is his competitor or not to continue
an existing contract terminable at will does not interfere improperly with
the other's relation if
(a) the relation concerns a matter involved in the competition between the actor
and the other and
(b) <u>the actor does not employ wrongful means</u> and
(c) his action does not create or continue an unlawful restraint of trade and
(d) his purpose is at least in part to advance his interest in competing with
the other.

<u>Hutton v. Memorial Hosp.</u>, 824 P.2d 61, 64-65 (Colo. App. 1991) (emphasis added).

It is clear, however, that as a matter of law, Defendants' alleged conduct does

not fall within this exception because there remains a genuine issue of material fact

whether Defendants' conduct was fraudulent.  "[I]n the context of a claim for tortious

interference with prospective economic advantage, 'wrongful means' refers to conduct

such as 'physical violence, <u>fraud</u>, civil suits, and criminal prosecutions.' <u>R-G Denver,</u>

<u>Ltd. v. First City Holdings</u>, 789 F.2d 1469, 1476 (10th Cir. 1986); <u>Electrolux Corp. v.</u>

<u>Lawson</u>, 654 P.2d 340, 342 (Colo. Ct. App. 1982); <u>Restatement of Torts</u> § 768 cmt e."

<u>Occusafe, Inc. v. EG&G Rocky Flats, Inc.</u>, 54 F.3d 618, 623 (10th Cir. 1995) (emphasis

added) (applying Colorado law).  Accordingly, with these factual issues remaining in

doubt, the competitor's privilege does not provide a proper basis for summary judgment.

### 2. Intentionality

Next, Defendants contend that NetQuote has produced no evidence establishing that Defendants <u>intentionally</u> induced third parties to terminate their relationships with NetQuote, as is required to sustain a claim for tortious interference with contract. NetQuote disagrees, relying on the deposition testimony of Michael Levy, MostChoice's Chairman.

At his deposition, Levy testified that he "hired Brandon Byrd ... to reverse engineer NetQuote's customer list" by submitting bogus leads to the NetQuote website.[7] (Doc. No. 166-4 at 4.)  After Byrd generated this list, and the instant litigation had commenced, Levy testified that he decided to e-mail the agents for whom Byrd had obtained e-mail addresses, and had "three sales guys" call the remaining agents.  (<u>Id.</u> at 97-98.)  Ostensibly Levy engaged in this conduct in an effort to generate business for MostChoice.  All the while this was occurring, MostChoice advertised on its website that its leads were "Better than NetQuote Leads."

NetQuote asserts that the foregoing is sufficient evidence to survive summary judgment on the issue of intentionality.  The court agrees.  A reasonable juror could readily conclude that given Defendants admittedly sought to reverse engineer NetQuote's customer list, Defendants did so with the intention of soliciting NetQuote's customers, and thus interfering with NetQuote's contractual relations.  This notion is buttressed by the fact that Defendants did in fact solicit these customers at some later point in time.  Although Levy testified at his deposition that he was "not interested in

---

[7] Evidently, submitting a bogus lead to the NetQuote website would somehow reveal to Defendants the insurance agent customers to whom NetQuote would provide those leads.

harming NetQuote," other facets of his testimony would allow a reasonable juror to conclude otherwise. Accordingly, Defendants are not entitled to summary judgment on NetQuote's tortious interference claim.

### C. NetQuote's Lanham Act False Advertising Claim

MostChoice asserts that it is entitled to summary judgment on NetQuote's false advertising claim arising under the Lanham Act. NetQuote's Lanham Act claim arises under § 43(a)(1)(B) of the Act, which provides:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which– ...
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B) (emphasis added). NetQuote asserts that MostChoice violated this section of the Lanham Act when it advertised on its website that its leads were "Better Than NetQuote Leads." (Doc. No. 166 at 17.)

MostChoice previously moved to dismiss this cause of action for failure to state a claim, asserting that its alleged conduct was "mere puffing." This court rejected that argument, asserting that "[a]lthough a simple statement that one's products are better than a competitor's likely is 'mere puffing,' ... NetQuote correctly characterizes the bulk of MostChoice's alleged statements as 'factual.'" (Doc. No. 68 at 12.) In its motion for summary judgment, however, MostChoice asserts that NetQuote has produced no evidence of consumer confusion resulting from the alleged falsehood. Although such evidence is required under a theory of implied falsehood, it is not required under a

theory of literal falsehood.  Zoller Labs., LLC. v. NBTY, Inc., 111 Fed. Appx. 978, 982

(10th Cir. 2004) (unpublished).  NetQuote raises arguments under each theory, each of

which will be considered in turn.

### 1.  Implied Falsehood

Under its theory of implied falsehood, NetQuote asserts that because

MostChoice's conduct was intentionally deceptive, NetQuote is relieved "from the

burden of providing direct evidence of consumer confusion through surveys and the

like."  (Doc. No. 166 at 18.)  In making this argument, NetQuote cites cases from the

First, Second, Eighth, and Ninth Circuits.  Although the Tenth Circuit has not yet

addressed this issue, it does indeed appear that "other circuits have held that, like a

finding of literal falsity, a conclusion that a defendant intended to deceive triggers a

presumption of consumer confusion that relieves a Lanham Act plaintiff of any obligation

to present evidence of likely confusion."  Scotts Co. v. United Indus. Corp., 315 F.3d

264, 281 (4th Cir. 2002) (citing Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.,

284 F.3d 302, 316 (1st Cir. 2002) ("It is well established that if there is proof that a

defendant intentionally set out to deceive or mislead consumers, a presumption arises

that customers in fact have been deceived"); William H. Morris Co. v. Group W, Inc., 66

F.3d 255, 258 (9th Cir.1995) ("If [the defendant] intentionally misled consumers, we

would presume consumers were in fact deceived and [the defendant] would have the

burden of demonstrating otherwise")).  With the weight of this authority in mind, the

court adopts the rule that when a defendant intentionally attempts to mislead

consumers, a reasonable presumption arises that consumer confusion has in fact

occurred.  Of course, such a presumption may be rebutted by the defendant.

In arguing that MostChoice intentionally set out to deceive or mislead consumers, NetQuote asserts that such an intention may be inferred from the efforts MostChoice went to in order to send over 3,500 false leads to the NetQuote website. To this end, NetQuote cites deposition testimony from Byrd that suggests MostChoice specifically hired Byrd to submit false leads to the NetQuote website for 20-30 hours a week, and compensated Byrd $15 per hour for a period of nine months to do so. (Doc. No. 166-3 at 69-71.) The court agrees with NetQuote that, based on MostChoice's conduct in directing Byrd to submit over 3,500 leads to the NetQuote website, a reasonable juror could conclude that MostChoice intended to harm NetQuote's lead quality and thereby deceive consumers when it advertised that its leads were "Better Than NetQuote Leads." Accordingly, MostChoice is not entitled to summary judgment on NetQuote's Lanham Act false advertising claim.

## 2. Literal Falsehood

As an alternative argument in support of its Lanham Act claim, NetQuote asserts that MostChoice advertised a literal falsehood, which would abrogate the need for NetQuote to establish consumer confusion. The alleged literal falsehood to which NetQuote cites is MostChoice's claim that it does not purchase leads from third-party lead aggregators and that it instead obtains all of its "leads ... from people who visit the site." (Doc. No. 166-11.) According to NetQuote, this is demonstrably false, as MostChoice's CEO, Martin Fleischmann, testified in his deposition that MostChoice had purchased leads from LeadCo, an apparent third-party aggregator. (Doc. No. 166-23.) Fleischmann added, however, that MostChoice only engaged in this practice for a "short period." (Id.) Thus, as MostChoice points out, "Netquote has not come forward with

any evidence that Mostchoice was buying leads [from LeadCo] at the time" the allegedly false statement was published. (Doc No. at 177.) In the absence of any such evidence, the court agrees that NetQuote has failed to generate a question of material fact on this issue. However, despite NetQuote's failure to present sufficient evidence of a literal falsehood, NetQuote's alternative theory of implied falsehood is sufficient to survive MostChoice's motion for summary judgment on the Lanham Act claim.

## IV. NETQUOTE'S MOTION FOR SUMMARY JUDGMENT

MostChoice has asserted a counterclaim against NetQuote under Georgia law for "click fraud." (Doc. No. 87.) In relation to this claim, MostChoice has asserted that it uses "pay per click" advertising, whereby "the advertiser pays each time an internet user 'clicks' on the advertiser's ad and is taken to a page on the advertiser's website." (Id. at 2.) According to MostChoice's complaint, click fraud occurs when "a person imitates a legitimate user of a web browser clicking on an ad, for the purpose of generating a charge per click without having actual interest in the target of the ad's link." (Id.) MostChoice asserts that NetQuote engaged in such conduct 25 times from October 22, 2004 through August 3, 2005, and 27 times from January 11, 2007 through September 7, 2007.[8]

---

[8] MostChoice's response to NetQuote's motion for summary judgment asserts that "Mostchoice has performed an analysis of internal click data and has identified over 8,000 clicks ... that are believed to have come from Netquote through an America Online (AOL) proxy." The only evidence that MostChoice offers of this, however, is an unsworn, unauthenticated affidavit that is not properly before the court. (See Doc. No. 170-2.) Evidently, MostChoice subpoenaed AOL for information about the matter, but AOL responded that no information was available. (See Doc. No. 196.) Accordingly, MostChoice lacks any admissible evidence for this assertion.

NetQuote has moved for summary judgment on MostChoice's click fraud claim, asserting that Georgia law does not recognize the tort of click fraud, and even if it did, "there is no evidence to support at least two of the elements of fraud: (1) a false representation or (2) justifiable reliance." (Doc. No. 157 at 6.) The court agrees with NetQuote that there is no indication Georgia has adopted the tort of "click fraud." Furthermore, even if this court were to assume for purposes of this order that Georgia has adopted such a tort, the court agrees with NetQuote that MostChoice has failed to offer any evidence that NetQuote engaged in a misrepresentation.

NetQuote admits that its employees have occasionally clicked on MostChoice's advertisements. (Doc. No. 158-2.) In this regard, Gregg Coccari, NetQuote's CEO declared:

> NetQuote, like other companies in the on-line insurance lead generation industry, periodically looks to see what advertisements its competitors have listed on Google, Yahoo, and other search engines. Specifically, on occasion, NetQuote's employees type various search terms into search engines to see whose advertisements appear in addition to NetQuote's. Its employees sometimes click through on the advertisements. To my knowledge after investigation for purposes of this lawsuit, I have found no instance in which any NetQuote employee has ever clicked on a MostChoice advertisement for the purpose of causing MostChoice to exceed some daily limit on the number of times its advertisements can be displayed each day. I have found no evidence that any employee at NetQuote misused any MostChoice advertisement. The reason NetQuote employees have occasionally clicked on MostChoice's advertisements is to see what the substantive content ... that is on MostChoice's website that is linked to the ... advertisement.

(Id. at 2-3.)

Relying on this declaration, NetQuote asserts that its clicks were legitimate and did not involve any misrepresentations. Deposition testimony of MostChoice's CEO, Martin Fleischmann, supports this notion:

| Q | What are the reasons that someone would click through Yahoo or Google to MostChoice website and would not fill out an application that are not fraudulent reasons? |
| A | ... Some people maybe are just looking for information, and some people are just kind of clicking through to see what was there, you know, and click away. |
| Q | And those are legitimate uses of the MostChoice website in your view? |
| A | Yes. At the end of the day, we're trying to get people to come to our website, and if they are – to either find out information, of if they want to get help, they can fill out a request form. |

(Doc. No. 158-3 at 104-05.) Even more importantly, however, MostChoice has failed to produce any evidence that NetQuote's clicks were prompted by some illicit purpose.

Accordingly, summary judgment in NetQuote's favor is appropriate.[9]

## V. CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that Defendants' Motion for Summary Judgment (Doc. No. 149) is GRANTED with respect to the 46 local accounts identified in Stephen Duree's expert report as "MostChoice Not Substantial" and "Other non-damage sub-classifications." Defendants' Motion for Summary Judgment is DENIED in all other respects. Plaintiff's Motion for Summary Judgment (Doc. No. 157) with respect to Defendant MostChoice's counterclaim is GRANTED.

---

[9] In MostChoice's response to NetQuote's motion for summary judgment, MostChoice also asserts that it "has set forth sufficient allegations" to state a claim "under a theory of intentional tort under Restatement § 870." (Doc. No. 170 at 5.) There is some question whether such a cause of action is recognized under Georgia law, and moreover, whether MostChoice sufficiently pled this cause of action in its complaint. In any case, these issues are moot, as a necessary element of "intentional tort" is that a party engaged in conduct "not justifiable under the circumstances." As previously explained, MostChoice has offered nothing beyond mere allegations to suggest that NetQuote's conduct was somehow unjustifiable.

DATED at Denver, Colorado, this <u>17th</u> day of June, 2008.

BY THE COURT:

*s/ David M. Ebel*

_____
David M. Ebel
United States Circuit Judge