IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 07-cv-00630-DME-MEH

NETQUOTE, INC., a Colorado corporation,

    Plaintiff,

v.

BRANDON BYRD, an internet user making use of the IP Addresses 64.136.27.226 and 64.136.26.227, and

MOSTCHOICE.COM, INC., a Georgia corporation,

    Defendants.

---

**RULING ON MOTION TO STRIKE, PURSUANT TO FEDERAL RULE OF EVIDENCE 702, THE TESTIMONY OF PLAINTIFF'S EXPERT WITNESS STEPHEN DUREE**

---

At the close of trial on Friday, October 10, Defendants MostChoice and Brandon Byrd ("MostChoice") moved to strike, pursuant to Federal Rule of Evidence 702, the expert testimony of Plaintiff NetQuote's witness, Stephen Duree.

MostChoice had previously moved pursuant to Rule 702 to exclude Mr. Duree's testimony. (Doc. No. 151.) This court referred MostChoice's motion to the Magistrate. The Magistrate conducted a <u>Daubert</u> hearing and issued a report and recommendation, which recommended that MostChoice's motion be denied.
--

1

(Doc. No. 224.) MostChoice objected to the Magistrate's report (Doc. No. 228), NetQuote filed a response (Doc. No. 232), and MostChoice filed a reply (Doc. No. 233.) This court accepted and adopted the Magistrate report and recommendation that Defendants' Objection to Mr. Duree's testimony be denied. (Doc. No. 235.)

Generalized pre-trial statements concerning Mr. Duree's expert testimony on causation have now become clarified and fleshed-out after Mr. Duree's trial testimony, and necessitate this court's reconsideration of Mr. Duree's expert testimony. The court's duty to admit testimony only if allowed under Daubert and the Federal Rules of Evidence is not limited to a pre-trial (and necessarily preliminary and incomplete) evaluation of expert testimony, but is a continuing obligation and requires the court to strike expert testimony that does not meet Daubert standards. See Massock v. Keller Industries, Inc., 147 Fed. Appx. 651 (9th Cir. Sept. 1, 2005) (unpublished) (affirming district court's exclusion of expert testimony after hearing trial testimony, where district court previously refused to exclude the testimony after an in limine motion seeking its preclusion); Luce v. United States, 469 U.S. 38, 41-42 (1984) ("even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous in limine ruling"); see also Weaver v. Blake, 454 F.3d 1087, 1092 (10th Cir. 2006) (not reversible error for district court to revisit at trial Daubert ruling that was subject of a previous ruling on a motion in limine);

--

Mems v. City of St. Paul-Dept of Fire and Safety Services, 2002 WL 224411 (D. Minn. Feb. 20, 2002) (unpublished) (explaining it was not error for court to reconsider and reverse its earlier Daubert ruling based on party's misrepresentation during Daubert hearing). Therefore, based on Mr. Duree's trial testimony, I have decided to re-visit my previous determination and conclude that Mr. Duree's expert opinion testimony regarding the causal link between the terminated accounts and MostChoice's wrongful conduct must be excluded.[1] Consequently, any exhibits or portions of exhibits prepared by him that are the results of his causation conclusions or that were designed to validate or test his conclusions of causation.

After hearing Mr. Duree's testimony at trial, this court determines that Mr. Duree's testimony does not satisfy the requirements for admission of expert testimony under Rule 702, because his testimony is not the product of reliable principles and methods, and he has not applied his principles and methods reliably to the facts of the case.

Therefore, the jury will be instructed to disregard Mr. Duree's testimony regarding

---

[1]The court notes that there is no undue prejudice to NetQuote caused by this court's re-visiting its earlier ruling. At the time the final pre-trial order was entered on March 24, 2008 (Doc. No. 217), discovery was complete and Defendant's Motion to Exclude Expert Testimony, filed on December 14, 2007 (Doc. No. 151) was still pending. Therefore, NetQuote was aware that if Mr. Duree's testimony was excluded, the time for discovery was complete and that the time to designate additional experts had passed.
--

the causation of termination of NetQuote's local accounts, and NetQuote is instructed to redact these conclusions from all admitted exhibits[2] or to re-submit copies of those exhibits without Mr. Duree's conclusions. But Mr. Duree's testimony as a summary witness will be allowed. Thus, the portions of his testimony that do not include conclusions attributing the loss of identified accounts to MostChoice's conduct, but merely summarizing NetQuote's records and aggregating other relevant and admissible data will be allowed. Further, his testimony regarding the national accounts is not challenged, and so that portion of his testimony will not be striken.

## DISCUSSION

### The District Court's Role Under Rule 702

Federal Rule of Evidence 702 governs the admissibility at trial of expert testimony. Rule 702 provides that an expert may testify to "assist the trier of fact to understand the evidence or to determine a fact in issue" "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods

---

[2]These exhibits include, but are not limited to, Joint Exhibits 1, 5, 6, 7, 8, 9, 10, and Plaintiff's Exhibit 176. If any party believes that other exhibits need to be redacted or striken from the record, they are ordered to advise the court by 8:00 am on Wednesday, October 15th.

reliably to the facts of the case." Fed. R. Evid. 702.

The district court serves as a "gatekeeper," under Rule 702, to ensure that expert testimony is both relevant and reliable. See United States v. Gabaldon, 389 F.3d 1090, 1098 (10th Cir. 2004). The objective of our gatekeeping role "is to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999).

"This gatekeeper function requires the judge to assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts." Dodge v. Cotter Corp., 328 F.3d 1212, 1221 (10th Cir. 2003). "The touchstone for relevance, in this context, is whether 'the evidence or testimony [will] assist the trier of fact to understand the evidence or to determine a fact in issue." Gabaldon, 389 F.3d at 1098 (quoting Daubert v. Merrell Dow Pharms., Inc. 509 U.S. 579, 589 (1993)). "For expert testimony to be reliable under Daubert, it must be based on scientific knowledge, which implies a grounding in the methods and procedures of science based on actual knowledge, not subjective belief or unsupported speculation." Id. (quotation omitted).

The Daubert Court provided a non-exhaustive list of four factors to guide

5

the district court's decision-making:

> (1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community.

Gabaldon, 389 F.3d at 1098 (citing Dodge, 328 F.3d at 1222). The district court has "considerable leeway in deciding whether particular expert testimony is reliable." Kumho Tire, 526 U.S. at 152; see also id. (court of appeals reviews district court's decision to admit or exclude expert testimony for an "abuse of discretion").

**Admissibility of Mr. Duree's Testimony on Causation**

Mr. Duree cannot testify to the causal link between Byrd's false submissions and the accounts that terminated their relationship with NetQuote for two reasons. First, Mr. Duree has not articulated any reliable principles or methods that guided his analysis of causation. Second, even if this court found that Mr. Duree's determination of causation based primarily on the relationship between the timing of the Byrd leads and the subsequent termination of the account (and the absence of a compelling alternative explanation in the Goldmine

6

records) constituted a reliable principle or method, that method was not reliably applied. His testimony regarding causation must, therefore, be striken from the record.

Mr. Duree has not articulated any reliable principles or methods underlying his determination of causation. Mr. Duree determined causation in two stages: an initial identification phase and a subsequent confirmation phase. (Transcript 10/17/08 at 73.) The initial identification phase was conducted in three steps. Mr. Duree began by identifying the 1,068 accounts that had received Byrd's leads. (Id. at 79.) Then, he removed the 609 accounts that were still active in July 2007. (Id. at 80.) Finally, Mr. Duree excluded another 297 accounts (1) that had only received one bad lead, (2) that had terminated during or immediately after a free trial, or (3) where he determined that he did not "feel that [Byrd's submissions] were sufficiently causally related" to the account's termination based on his "visual scan" of a variety of factors such as the timing of Byrd's leads, the total revenue from the account, and the duration of the account. (Id. at 83-84.) This third step in Mr. Duree's initial identification of the accounts he thought were terminated because of Byrd's leads was not based on any clearly articulated principle or method.

Mr. Duree's "visual scan" was conducted in an indeterminate and untestable

7

manner. In its response to defendant's motion to exclude Mr. Duree's testimony before Magistrate Judge Hegarty (Doc. No. 164), NetQuote claimed that its expert "considered a number of factors, including the duration that the agent had been a NetQuote customer, the timing of the receipt of the malicious applications relative to the termination or inactivity of the account, and the number of malicious leads received by type of insurance product." Id. at 6; see also id. at 10 (claiming that, in addition to the above-mentioned factors, Mr. Duree also considered the "revenue by type of insurance lead."); see also Doc. No. 232 at 3, 9-10.

Despite NetQuote's repeated assertions that Mr. Duree considered these factors, Mr. Duree made no effort to explain how he considered these factors, how much weight he gave each factor, or whether he was able to articulate any testable hypotheses regarding how these factors influenced the local accounts. One of the Daubert factors this court considers in determining the admissibility of an expert's analysis is "whether the opinion at issue is susceptible to testing and has been subjected to such testing." See Gabaldon, 389 F.3d at 1098 (citing Dodge, 328 F.3d at 1222). However, none of these factors are quantified or articulated as a method or principle that could be tested.

Mr. Duree's consideration of these factors also provided no method or principle that would be helpful to the jury. Mr. Duree's testimony at trial made it

8

clear that he did nothing more than generally note the existence of these factors and provide a gut determination of whether these factors suggested to him that Byrd's leads caused the account to terminate. Further, Mr. Duree made no effort to conduct systematic or statistical analysis of the other factors he has identified, to determine the extent to which they may have influenced these accounts. For example, Mr. Duree made no effort even to compare comparable accounts that received Byrd leads to those that did not in order to ascertain if the attrition rate was higher for comparable accounts that received Byrd's leads. Mr. Duree's failure to undertake any credible statistical, econometric, or rigorous analysis undercuts the reliability of his methods. While this court is wary of second-guessing an expert and does not mean to suggest that these analytical tools should be the sine qua non of admissibility, it highlights these tools as examples of the types of expert analysis that a court might consider to be reliable. See Zenith Electronics Corp. v. WH-TV Broadcasting Corp., 395 F.3d 416, 418-20 (7th Cir. 2005) (excluding expert testimony based the witness's "expert intuition," and noting that the plaintiffs had the burden of demonstrating "that some problem blocked the use of multivariate regression and other statistical tools" in his analysis).

Furthermore, Mr. Duree admitted that his exclusion of accounts that only

9

received one bad lead was "arbitrary." (Id. at 83.) This admitted arbitrariness begs the question why Mr. Duree did not also exclude accounts that had received two, or perhaps three, of Byrd's leads.[3] In fact, during his cross examination, Mr. Duree admitted that, for a larger account, two or three bad leads would not likely have a serious impact on an account's decision to terminate with NetQuote.[4] (Id. at 159.)

After stripping away Mr. Duree's arbitrary exclusion of accounts that only received one Byrd lead, and his unscientific analysis of the other factors he has articulated, his testimony is reduced to a finding that the timing of Mr. Duree's leads in relation to the date of termination should, absent evidence to the contrary, establish that those leads caused the termination.[5] However, based on the evidence in this case, the timing parameters utilized by Mr. Duree do not, by themselves,

---

[3]Mr. Duree's invocation of the colloquialism "once shame on me, twice shame on you," to distinguish between the significance of one bad lead and two bad leads is not a sufficient justification. (See Transcript 10/17/08 at 199.)

[4]Such accounts may have been excluded during his "visual scan" of the information, but there would be no way for this court to review the accuracy and reliability of those determinations, because Mr. Duree gave no indication of what constituted a "large" account and no testable method or principle to guide the jury's consideration of this issue.

[5]Indeed, Mr. Duree admitted in his testimony that his determination of causation was, in at least one case, based on "just the timing fact." (Transcript 10/17/08 at 190.)

adequately support his conclusions about causation.  See, e.g., Goebel v. Denver and Rio Grande Western R. Co., 346 F.3d 987, 999-1000 (10th Cir. 2003). Furthermore, even if timing alone would be sufficient indicia of causation, Mr. Duree's application of this analytical method was unreliable.  He has testified that some accounts were terminated because of Byrd's leads even when the account remained active for as long as three months after receiving those leads.  (See, e.g., Account No. 123116, at Joint Ex. 10, SD0066.[6])  If timing alone is sufficient to establish causation, then several months of active, post-Byrd lead purchases should be sufficient to rule out causation.  Finally, if timing alone is sufficient to establish causation, then Mr. Duree's testimony is of no assistance to the jury, because the jury can, on its own, "visually scan" a spreadsheet to determine the temporal relationship between the receipt of Byrd's leads and an account's subsequent termination, and draw their own conclusions on causation.

This court will also exclude Mr. Duree's testimony regarding the "confirmation phase" of his analysis and exhibits prepared by Mr. Duree, because that testimony and those exhibits are necessarily predicated on Mr. Duree's conclusion that he has identified specific NetQuote accounts that were terminated because of Byrd's leads.  At the confirmation phase of his analysis, Mr. Duree

---

[6]This account joined in October 2006.  It received three Byrd leads that month, but remained active through January 2007.

11

began by excluding 12 accounts that had been reactivated. (Transcript 10/17/08 at 125.) Then, Mr. Duree and his colleagues read through the Goldmine records of the remaining accounts to determine if they indicated that other factors, like a history of collection troubles, starts and stops, or an agent's retirement were the true cause of the account's termination. (Id. at 128-29.) Mr. Duree's expertise does not shed light on these records, and his testimony regarding which accounts left for alternative reasons must be striken.

Further, this court does not consider this "confirmation phase" to constitute a valid test of Mr. Duree's methods, as plaintiff alleges. (See Doc. No. 290 at 4.) Mr. Duree claimed that the inspection of the Goldmine records verified his methods at the initial identification phase. (Transcript 10/17/08 at 131.) However, he only perused the Goldmine records of the accounts he had already identified as substantially affected by Byrd's leads. This analysis does not establish that MostChoice was the cause of the remaining accounts leaving NetQuote. It would only establish that the Goldmine records did not indicate alternative reasons for their departure. The absence of any indication in the Goldmine records of why an agent left is no evidence or confirmation of Duree's conclusion that the accounts terminated because of Byrd's leads, and it does not add anything to Mr. Duree's essential conclusion that causation can be inferred

12

from timing.[7] The "confirmation process" in fact provided no confirmation of Mr. Duree's essential hypothesis.

## CONCLUSION

For the forgoing reasons, the court grants defendants' motion to strike Mr. Duree's testimony regarding which local accounts terminated because of Byrd's leads. The court also strikes that portion of Mr. Duree's testimony and the exhibits or portions of exhibits prepared by him that are the results of his causation conclusions or that were designed to validate or test his conclusions of causation.

DATED this __14th__ day of October, 2008.

BY THE COURT:

*s/ David M. Ebel*

U. S. Circuit Court Judge

---

[7]Tellingly, even when the Goldmine records did suggest an alternative reason for an agent's departure, Mr. Duree often included that "lost" account in his damages calculation if his "visual scan" somehow convinced him that Byrd's leads were a substantive contributing cause for the departure.