# Exhibit 7 — Excerpts from Levy Deposition Designation played at Trial

ID: Levy01
Description:

ID: ML001
Description: Page 6:11-6:13

MICHAEL LEVY,
having been first duly sworn, was examined and testified as follows:

ID: ML002
Description: Page 6:16-6:19

Q. Good afternoon, Mr. Levy. Again, my name is Dan Williams, I represent NetQuote. Can you please state your name for the record?
A. Michael Andrew Levy.

ID: ML003
Description: Page 6:23-7:10

Q. You're employed by MostChoice; is that correct?
A. Correct.
Q. What's your position with MostChoice?
A. My title is chairman and founder.
Q. Are you chairman of a board of directors?
A. Uh-huh. Yes.
Q. Who else is on the board of directors?
A. Marty Fleischmann.
Q. Anyone else?
A. That's it.
Q. What's Mr. Fleischmann's title?
A. President and CEO.

ID: ML004
Description: Page 7:12-7:13

Did you found MostChoice?
A. Yes.

ID: ML005
Description: Page 7:22-7:24

Q. What's the business of MostChoice?
A. We generate sales leads, and then we sell them to people who would buy sales leads.

ID: ML006
Description: Page 9:20-10:3

Q. What did you do prior to being an insurance agent?
A. I was in school. I also very briefly sold cars. That was only for about three months. I worked for my father's company as a director of marketing and head bottle washer, and -- that was a joke. That's what I refer to myself as. It was a chemical engineering firm. And that's pretty much it.

ID: ML009
Description: Page 12:4-12:12

Q. Have you ever been deposed before?
A. Yes.
Q. Frequently?
A. I don't know what you would define as frequently.
Q. Well, how many times?
A. I was thinking about that the other day, because I don't really know. I knew I was going to be questioned. Maybe eight or nine times now.

ID: ML014
Description: Page 20:7-20:14

Q. Does MostChoice keep records of the number of agents it currently has that it sells insurance quotation leads to?
A. No, we have a system where we can generate that information at any time. So there's no reason for us to, say, print off a record or document and keep -- and store it. I mean, you just type in the range, and extract out the data.

ID: ML015
Description: Page 20:18-21:2

Q. Can you do that and give that to us tomorrow?
A. Yes, I can tell you approximately where it stays right now.
Q. Great.
A. It stays right around 956 -- I'm sorry, between 945 and 956 active accounts. I can't tell you how many agents that represents, because some people are buying for multiple agents, and it's not really even a question that we ever ask.

ID: ML016
Description: Page 31:7-33:20

Q. What does MostChoice do to steer traffic to it on the non-pay per clicks side, or the free site, for users who type NetQuote into Yahoo and Google?
A. Nothing. The pages that you refer to in question, there's a story behind those pages that might clear some things up. They go back to 2005 when me and Chris Findlater, one of the former owners got into an argument after one of my salesmen said something that he didn't like. I don't remember what it was exactly, but he called up threatening to sue, because my salesman -- I think it basically just said that we were better than NetQuote.
And he threatened me, and I threatened him. And Marty tried to get in the middle of it, and calm everybody down. And when I say threaten, I mean threaten with lawsuits. And in the end, I told Chris, go ahead, and sue me for it. And then I went and I registered the domain name BetterThanNetQuote.com. And that's where all of that goes back to. There's never been any significant

amount of traffic. We've never even gotten a single lead off of that page. It's -- it just goes back to that little spat.

Q. My question relates to why NetQuote, either through news feeds or otherwise, shows up at least hundreds of times on the MostChoice web site?

A. Because they, through the news feeds, they are on pages that have news about other topics that are on our site, like each of the insurance companies. Aetna is one of the ones that I've seen -- that's actually on an Aetna page. And it just so happens that NetQuote is advertising on another page on the Internet that is being pulled in by the RSS news feeds. I assume you know how RSS news feeds work.

Q. So is it your testimony that MostChoice is not intentionally putting NetQuote references either through news feeds or directly on to its web site to steer traffic to MostChoice if people type NetQuote into Google or Yahoo?

A. Correct, because I know that it will never actually get any traffic. The odds --

Q. But you do do that with other companies like Google -- I'm sorry, like Geico.

A. Geico.

Q. Yeah.

A. I didn't really come here prepared to talk about Geico.

Q. But you knew about that, right?

A. Yeah, I mean -- and we're involved in litigation with Geico.

Q. And you do do that with Geico, right?

A. Yes, we do that with Geico.

Q. And you do it with Zander Insurance?

A. We are in litigation with Zander Insurance.

Q. For the same business practice?

A. Yes.

Q. And with Amica?

A. That's over with now.

Q. But you were in litigation this year with Amica for that same business practice?

A. Yes.

ID: ML018
Description: Page 63:11-65:11

Q. You hired Brandon Byrd to submit false leads to NetQuote's web sites, correct?

A. I handle -- I hired Brandon Byrd to gather information, of which part of the reason or one of the techniques that he uses is the submission of lead information.

Q. Did you hire Brandon Byrd to submit false leads to NetQuote's web sites?

A. I hired Brandon Byrd to determine -- to reverse engineer NetQuote's customer list. I am not interested in harming NetQuote. I -- if they gave me a way of getting their customer list without going through so much trouble, I would. That is unfortunately a consequence of it that cost us a lot of time. And in reality, didn't cost NetQuote anything. But anyway, it's led to this litigation. Maybe it's cost them a lot of legal fees.

Q. Is that a yes to my question?

A. The answer is no, because just because we

enter information into their web site doesn't mean that it generates a lead.
Q. But you did hire Mr. Byrd to enter false information to NetQuote's web site, right?
A. To enter information, yes.
Q. Not his real information, right?
A. Correct.
Q. False information?
A. Yeah, I would call it -- depending upon your definition of false, none of that information actually existed, so correct.
Q. So is there some reason you don't want to admit that you hired Mr. Byrd to enter false information into NetQuote's web site --
A. Well, you're getting into a definition --
Q. Hold on. Don't speak when I'm speaking. Is there any reason you don't want to admit that you hired Mr. Byrd to enter false information into NetQuote's web site?
A. It's not the word false that I have the problem with. It's the word "information". You see "information" implies that they would actually do something with it. Until they actually do something with it, it's nothing but bits and bytes going over a -- going over a data line. So I don't object to the false. I object to the information.
Q. What would you call the false information that he submitted? Data?
A. He submitted data.
Q. So did you hire Mr. Byrd to submit false data into NetQuote's web sites?
A. Yes.

ID: ML019
Description: Page 66:20-67:10

Q. You taught Mr. Byrd how to execute his steps under the project, right?
A. I showed him how.
Q. In your home?
A. Yes.
Q. One evening?
A. Yeah, about 20 minutes.
Q. And Mr. Byrd then would produce databases of NetQuote's insurance agents, correct?
A. He would input the information that he revealed into the database.
Q. And what would he do with those databases?
A. Occasionally, I would ask him for it, and then he would bring it to me. A couple times he might have e-mailed it to me, but he had a problem. And mostly he'd just bring it to me.

ID: ML020
Description: Page 68:17-69:11

Q. It's your testimony you really didn't care that much about learning the identity of NetQuote's insurance customers?
A. It would have been something that had been -- it had been something that had been nagging me for a while, you know, but I got a lot of things on my plate. And they got bought for this incredible sum of money. And, you know, I just -- I began -- it's something I always wanted to know, and he needed a

job. And this was one of the few things I could think of, so I kind of created the project. And we just went forward with it.
Q. Why not instruct him to type in as the name test or tester or something like that, so it would be obvious to the insurance agents that the lead was bogus --
A. I just didn't --
Q. Let me finish my question. So it would obvious that the lead was bogus?
A. I just didn't think of it.

ID: ML021
Description: Page 96:16-98:17

Q. I guess my question was, were you basically unconcerned with what the specific agents were that were identified through Mr. Byrd's false submissions to NetQuote's web sites?
A. I was -- I guess define concern. I just wanted to kind of know the answer to the question, you know, how many agents do they really have. Do they really have 20,000 agents? You know, if we identify these agents, can we -- you know, what happens when we, you know, call upon them, do we convert them? I mean, to this day, the majority of the agents have not been contacted at all.
Q. Is that a yes to my question?
A. Was I concerned? Define concerned. Any level of concern at all?
Q. Was it a significant business activity of MostChoice to secure the names of NetQuote's agents through Mr. Byrd's false submissions to their web sites?
A. No.
Q. But Mr. Byrd periodically did provide you with databases of the list of agents, correct?
A. Correct.
Q. And did they provide those databases to anyone other than you at MostChoice?
A. No, just me.
Q. And what did you do with them?
A. The first one I got, I just looked it over and was kind of judging his performance. I didn't do anything with them honestly for about four, five months. And then I eventually put them into our general sales database, I marked them with my name, so that anybody else would call them.
And by then the lawsuit had been filed. And I was kind of hesitant over whether or not we were ever going to call them. And then this lawsuit wouldn't go away. So I said, you know what, I've gone through all this trouble to find out, you know, how many they got, and who they are, and now they've sued me. I'm going to get some value out of this.
And so then I gave -- I took the ones that had e-mails which the majority of them don't have e-mails, and so I inserted them into our e-mail marketing, you know, database. I shot out a few e-mails. And not a whole lot came back.
And, you know, but we worked the ones that came back. And then after a while, I gave -- I decided I gave the all clear to three sales guys to call on these. And I said, you know, go ahead and call on them, and see what you can do with them. I

brought those call records for you, by the way. You wanted them and I brought those call records.

ID: ML022
Description: Page 99:11-101:9

THE WITNESS: And basically, I told three guys -- I told my best salesman and my two guys in business development that these were part of a special project. And that they were -- I never told them where they came from. I just said, these are customers that we know have -- are either purchasing or have purchased Internet insurance leads before. And so just call them and see what you can do with them.

And so they started calling them. And honestly, as you can see, they're very -- A, they're very hard to get in touch with. And, B, when you do get in touch with them, you get pretty much what you expect from when you're talking to somebody who is already buying leads someplace else, which is that they're not going to do anything until after they're done with who they're currently purchasing from.

So you know, honestly, my top sales guy's paid on straight commission. He's not really -- he doesn't care to go after any of them anymore, because he didn't see the success that he wanted to. He primarily just called on the United American guys because he already had a relationship with United American. He already knew people that were in there.

And my two guys in business development, they called for a few days, and then they just kind of moved on to greener pastures, because they're paid -- even though they have a base, they're paid largely on bonus. And they just won't waste their time with them.

I mean, if there's one thing that I've learned out of this project, from the ones that we contacted, our customer base is very different from NetQuote's customer base. I mean, they are really the auto and home area. We're not in the auto and home area. They primarily, on their life and health side, are just -- they're not selling to a retail base. They're overwhelmingly getting their money from very large customers of which everybody knows who they are.

You don't have to do this project to know who the big customers are. There's only -- there's a small number of them, and everybody knows their names already. And you know, so we -- after that, we just basically moved on and stopped dealing with NetQuote.

ID: ML023
Description: Page 102:19-102:25

Q. Okay. My question was, how soon was it before June 1st, 2007 that you gave this instruction for them to start calling?
A. Couple of weeks.
Q. And that was well after NetQuote filed its lawsuit against you?

A. Yeah, yeah.

ID: ML028
Description: Page 117:1-118:12

Q. And then you said that you then sent out e-mails to certain of the agents on the list --
A. The ones that we have e-mails for.
Q. What did your e-mail say?
A. It's the same e-mail that we've been sending out for months. It's actually our -- a copy of the article that you showed us. And it just basically says, you know, it's actually just talking about MostChoice, never mentions NetQuote. The same article we've been sending out for months beforehand.
Q. When did you send that e-mail?
A. The e-mails are on a loop. And what happens is, is that I insert all the e-mails we get into the database. There is a field that is a random number. It is then sorted based upon that random number, so that the e-mails are evenly disbursed.
And then it just goes on a loop, and I send out, you know, probably 20 or -- 20 or 30,000 or so, you know, per day. And I do it about on average probably two days a week, two to three days a week. So everybody gets an e-mail that's in -- on the list probably once every four weeks, something like that, they get an e-mail from me.
Q. And how many different e-mails are there in this loop?
A. In the last year, last nine months, how many different e-mails? There's only two different variations on the e-mail, so it's all the same e-mail. It's a mass e-mail.
Q. Right. So you're saying there are two different ones?
A. Yeah, there's the first one that has the article and only the article. There's the second one that we're using now that has the article and then it says, "the best leads you can buy, period," and then it just says, "a few reasons why our leads are good," and then it goes into the article.

ID: ML031
Description: Page 120:14-121:3

Q. You say you sent out these mass e-mails and then some of them e-mailed you back; is that right?
A. Yes, there were a total of -- you're talking about lead forms that came in.
Q. Well, you said you sent out -- you said you added the NetQuote agents to your mass database?
A. Right.
Q. You sent it out and then some of them responded by e-mail to MostChoice?
A. Correct. Not by e-mail. They come to our web site, and they fill out a form.
Q. Okay.
A. Same difference. They're getting in touch with us.

ID: ML032
Description: Page 121:17-122:3

Q. What happened when MostChoice received these responses, based on its mass solicitation e-mails?
A. They just come up in the queue. And you know, they get assigned off to a salesman -- see, at that point, you can't identify them from any of the other ones that are coming in. So they just get treated like a regular sales lead.
Q. Then the salesman then calls the NetQuote agent?
A. Calls him back, yeah. And they just, you know, try to sell them our service.

ID: ML033
Description: Page 123:3-125:2

Q. You said you tagged all of these entries in the database for you to call?
A. Correct.
Q. Did you put a tag in that referenced NetQuote or Local Insurance or the project?
A. The source was called special. There is nowhere in the database that denotes whether they are from NetQuote, Local or InsureMe, that they can see. In fact, when I went to get that for you this morning, I had to go put a field temporarily on the form, so that I could execute my find, so that I could figure out which ones were relating to NetQuote and which ones were relating to Local. And then which ones were related to InsureMe.
So again, my salesmen don't even know -- did not even know that this project existed. Everything is happening outside of MostChoice.
Q. So when you had Mr. Sullivan and Mr. Cuvo and Mr. Suppa begin telephoning NetQuote's agents, did you do anything to have them contact only NetQuote Local agents and not InsureMe agents?
A. No, they just start from the beginning of the list, or wherever they choose. They basically just do a find on the source, which is special. And then they just pick whatever they want to go after. And the salesmen are pretty good about quickly figuring out where the green pastures are, and where the ones are that they're wasting their time on.
Because again, they're paid on commission. If something is not working out, they're not going to keep doing it. And what happened with these in particular was that they -- these special source is now known as the not special source, it's almost kind of -- kind of ironic, they're not really following up too heavily on them now.
Q. So you launched them on InsureMe's agents as well as NetQuote --
A. Yes, that will make any distinction between NetQuote, Local, InsureMe. I don't care -- I'm just looking, you know, for customers at this point, because I got to assume I'm going to get sued by everybody by the time this is all said and done. So you know, I'm just trying to get some value out of it, although ironically the value that I'm finding is that I probably shouldn't even be calling these guys customers, because they take more time and effort to close than I've ever seen. And they buy virtually nothing. And they complain the whole way. Should be

like a big, red flag, you know, don't waste your time with these guys.

ID: ML034
Description: Page 136:13-137:17

Who at MostChoice was aware of the special project to send false quotation requests to NetQuote and Local Insurance?
A. Actually, none of them were aware that it was NetQuote and -- they've never -- they were never told anything other than these customers have a propensity to buy online leads, because they either are buying them now or have been buying them in the past.
I never told them the source of where they are. It was not until probably in June that, you know, because eventually they kind of figure out who it is that they're buying from, because they're talking to them. They kind of ask, well, you know, is this NetQuote and InsureMe, yeah, that's NetQuote and InsureMe.
Q. Mr. Fleischmann was aware of this project, right?
A. He was aware that the project was going on, but because it happened entirely off-site, he was never aware of any of the details.
Q. But was he aware about it, that you know?
A. Just that we were doing it. We were figuring out how many customers NetQuote really had.
Q. Did he approve of this plan?
A. He was, I guess -- what's the best word -- indifferent.
Q. What do you mean by that? Did he say he thought it was a concern?
A. Marty's concerned about everything.

ID: ML035
Description: Page 138:17-138:20

Q. And Mr. Andrew knew about this project as well, right?
A. No, he only knew that he was gathering up ZIP codes.

ID: ML036
Description: Page 138:23-139:4

What did he understand the purpose of his gathering of ZIP codes to be?
A. That it was for marketing efforts to find agents.
Q. And did you instruct Mr. Andrew as to what to do?
A. Yes.

ID: ML037
Description: Page 139:15-139:20

Q. Who else at MostChoice knew about the false insurance quotation requests to NetQuote and Local Insurance?
A. Just me and Brandon.

Q. Well, and Mr. Fleischmann?
A. And Mr. Fleischmann.

ID: ML039
Description: Page 155:24-156:5

Q. And how many times have you met in person with Mr. Coccari?
A. He came to lunch in January, and I met him at that time. We ate lunch.
Q. Had you met him prior to the January '07 meeting?
A. I had not. I believe Marty had.

ID: ML040
Description: Page 157:24-158:4

Q. Now, during this meeting, did you reveal that MostChoice was sending thousands of false insurance quotation requests to NetQuote's web sites?
A. No.
Q. Didn't tell him that?
A. No.

ID: ML040A
Description: Page 159:6-159:14

Q. You say you were trying to figure out if he knew that your company was sending these thousands of false submissions?
A. I disagree with the thousands, but -- or the characterization, but that we were sending submissions.
Q. That contained false information, right?
A. Define information. You want to go over it again or do we just --

ID: ML041
Description: Page 160:7-160:23

Yesterday, you testified that you believed that your company had sent over 1,000 false submissions to NetQuote's web sites, correct?
A. He submitted 1,000 pieces of data.
Q. With false information, fake names, correct?
A. Names that do not match people.
Q. I'll call those fake for purposes of this deposition. And you said you were trying to see in this meeting whether Mr. Coccari knew that MostChoice was sending over 1,000 of these fake submissions, right?
A. I was hinting at it. I wanted to see what he -- I wanted to see his response.
Q. But you didn't ask Mr. Coccari directly, correct?
A. No.

ID: ML046
Description: Page 179:20-179:24

Q. Well, let's put it this way. MostChoice

was being sued for paying search engines like Yahoo and Google to return MostChoice when someone typed Zander or Zander Insurance into Google or Yahoo, right?

ID: ML047
Description: Page 180:11-180:16

THE WITNESS: I'm not a lawyer, but I'm going to say yes.
Q. (By Mr. Williams) That's your understanding, right?
A. That's my understanding of what they allege.

ID: ML048
Description: Page 182:15-182:21

Q. What were the keywords that they were objecting to -- what were the keywords that they're objecting to that you purchased?
A. Zander.com, I think, was one of them, and then www.Zander.com was one of them, and then Zander Insurance was one of them. I don't know if any of those would legally represent their name.

ID: ML049
Description: Page 184:19-185:14

Q. (By Mr. Williams) I'm handing you a complaint that was filed against MostChoice in Federal Court in Rhode Island by Amica Mutual Insurance Company, do you see that?
A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. Amica alleges essentially similar conduct as alleged in the Zander complaint; is that right?
A. Yes.
Q. And MostChoice never received permission from Amica to use the Amica name on its web site, correct?
A. Incorrect.
Q. It did receive permission from Amica?
A. As part of the settlement in this case, we are permitted to use the word Amica in a nontrademark capacity.
Q. Is that reflected in a consent permanent injunction that was issued in this case?
A. Yes.

ID: ML050
Description: Page 186:8-187:12

Q. So is MostChoice continuing to use the word Amica on its web site?
A. Yes.
Q. And is MostChoice continuing to use Amica in its paid advertising with Google and Yahoo?
A. No. MostChoice had not been using them in that capacity for long before this consent permanent injunction was entered into.
Q. Is MostChoice willing to enter into a consent permanent injunction to stop using NetQuote

on its web site?
A. Maybe.
Q. Why do you say maybe?
A. I don't give away things for free.
Q. You want NetQuote to pay you to stop using the word NetQuote on your web site?
A. No, I don't need money.
Q. What is --
A. That would be -- you're asking for some form of settlement, and I'll only consider any act of contrition in regards to the settlement of this case in its entirety.
Q. I guess my question wasn't about a settlement. My question was whether MostChoice is willing to go to court now and enter a consent permanent injunction to stop using the term NetQuote on its web site?
A. No.
Q. It's not?
A. No.

ID: ML051
Description: Page 188:10-188:13

Q. You don't think it's wrong to use the word NetQuote repeatedly on your web site to steer traffic to MostChoice's web site?
A. No, I don't think it's wrong.

ID: ML056
Description: Page 196:23-197:14

Q. MostChoice has a page on its web site with BetterThanNetQuote.com as a metatag, correct?
A. Correct.
Q. And that metatag can come up when a user searches on Google or Yahoo, correct?
A. I don't know. I don't even know if it's indexed.
Q. Oh, you know it can, right? Come on.
A. Oh, it can. You're talking about is there a possibility?
Q. That's what I said.
A. Yeah, there's a possibility.
Q. The point of having the metatag is so the information comes up on Google or Yahoo when someone does a search, correct?
A. Yes, especially if it's Chris, or if it was Chris, or if it's you guys looking.

ID: ML059
Description: Page 201:12-202:24

Who knew that you hired Brandon Byrd to work for MostChoice?
A. That would be Angela Jones. She was the one that gave him the paperwork, Marty Fleischmann knew that Brandon was working with me, and Michael Andrew would have known, because he sent him ZIP codes. Those were the only people that I would know would know, because of any work contact.
It's possible Neidell knew, because they talked. Chris Jetter, I don't think would have known, because I think he was probably in jail, quite

frankly. But I know that Brandon mentioned him. That's about it.

Q. Who at MostChoice knew that Mr. Byrd was submitting these false insurance quotation requests to NetQuote's web sites?

A. The only person that knew that was me, that knew the details of what he was doing.

Q. And you testified yesterday you --

A. Marty knew --

Q. Hang on. I'm sorry. I have to finish my question.

A. Okay.

Q. You testified yesterday that Mr. Fleischmann knew about it?

A. That's what I was saying. Marty also knew about the project, but he didn't really know any details. He just knew that Brandon was the one that I had hired to do it.

Q. What did you tell Mr. Fleischmann about the project?

A. Just that we would be extracting out NetQuote's customer base, and we would find out just how many agents they really had.

Q. Did you tell him that it would be done by submitting insurance quotation requests with false information?

A. Yes.

ID: ML062
Description: Page 217:8-217:13

Q. When did MostChoice stop having Mr. Byrd submit false submissions to NetQuote or Local Insurance?

A. July 20th is the date that I -- I believe it was. It's somewhere between the 17th and the 20th.

ID: ML063
Description: Page 227:14-228:8

Q. Has MostChoice informed InsureMe that it's sending false insurance quotation requests to InsureMe?

A. No.

Q. Why not?

A. Well, I have a feeling somebody else already informed them, but I don't see any reason to.

Q. They might sue you, right?

A. I -- you sued me, so I'm going to assume that they may sue me.

Q. Is that one of the reasons you're not informing them that you're sending false insurance quotation requests to them?

A. Is that the reason why?

Q. Is that one of the reasons why you're not informing them that you're submitting false insurance quotation requests to them?

A. Truthfully, I haven't really thought about it until this very moment. It's not a very high priority.

ID: ML074
Description: Page 243:24-244:12

Q. And do you want to tell us again what the purpose of the Better Than NetQuote leads metatag is that MostChoice has attached to one of its web pages?
A. It just goes back to the argument that I had with Chris Findlater. It got put up. He threatened to sue me if I ever said that we were Better Than NetQuote. And so I went out, and I put up the page that said Better Than NetQuote. I registered a domain name that said Better Than NetQuote. I probably at that time, you know, told him to put in the keyword NetQuote. Then I called up Chris, I said, you don't like apples, how about them apples. Now, go file your suit. That was what the purpose of it was.

ID: ML075
Description: Page 245:7-245:13

Q. You didn't do anything to mark those web page private, so it could only be viewed by NetQuote employees, did you?
A. No.
Q. In fact, it's generally available on the World Wide Web, right?
A. Correct.

ID: ML076
Description: Page 245:16-245:23

Q. (By Mr. Williams) I'm handing you what's been marked Exhibit Number 30. Can you identify this document for the record?
A. This is the page that has the title Better Than NetQuote leads.
Q. That's a the metatag -- or it's one of the metatags in the --
A. That's the title.

ID: ML077
Description: Page 246:6-246:8

Q. And this page is on MostChoice's web site, right?
A. Correct.

ID: ML079
Description: Page 251:19-251:22

The question is, did you put the statement Better Than NetQuote leads on your web page before or after you had the spat with Chris at NetQuote?
A. I don't know.

ID: ML080
Description: Page 252:8-252:15

Q. So when you testified before with certainty that you did this in response to your spat with Chris?
A. Uh-huh.
Q. That was just misleading, right?
A. No, no, I can put a page on there when a

page already exists that's -- it's just going to overwrite the page.

ID: ML082
Description: Page 270:22-271:4

Q. (By Mr. Williams) Okay. You can put that document aside. Yesterday, you said you'd be providing the three false submissions that you personally sent to NetQuote's web site, do you have those?
A. Yes, that's what the -- I think the majority of this big stack of paper here is. I made a copy of every page.

ID: ML083
Description: Page 271:17-272:7

Q. Have you made any false submissions to NetQuote's web sites other than the three that are in your hand?
A. I probably have.
Q. In fact, you made false submissions to NetQuote's web site when you were meeting with Brandon Byrd in September, October of 2006; is that right?
A. Correct.
Q. One of your false submissions uses the e-mail jerrybro@legal-beagle.com?
A. That's it.
Q. What is that e-mail address?
A. I own the domain name legal-beagle.com, and any e-mail that is sent to that domain will be forwarded on to me.

ID: ML084
Description: Page 272:17-272:23

Q. Do you also use the identity bigdog@legal-beagle.com?
A. That's one of the -- I put that in. I wouldn't say I use the identity, but I put it in.
Q. Have you used that identity for purposes other than your false submission to NetQuote --
A. No.

ID: ML090
Description: Page 286:23-286:25

Q. (By Mr. Williams) You're being handed what's been marked Exhibit Number 38.
A. Uh-huh.

ID: ML091
Description: Page 287:22-288:12

Q. So you're saying that except for the header, the e-mails that you sent to NetQuote's agents are identical to this e-mail; is that right?
A. Yes.
Q. When did you send these e-mails to

NetQuote's agents?

A. I don't know. It just loops throughout the entire list that it goes to. It does it three days a week.

Q. When did your process of sending these e-mails to NetQuote's agents start?

A. April 10th.

Q. And when did it cease, or has it not ceased?

A. It's not ceased. It will just continue to loop on through.

ID: ML092
Description: Page 289:3-289:9

Q. You're not stopping your marketing to the new Local Insurance or NetQuote agents whose identities MostChoice hadn't previously known?

A. Had not previously known?

Q. Correct.

A. Correct. I will not stop that. They'll continue to get an e-mail.

ID: ML095
Description: Page 310:6-311:2

Q. Now, you testified that the special project that you had Mr. Byrd work on was one of the techniques that you used to monitor the competition, right?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. What other techniques did you use to monitor the competition over the last several years?

A. I basically just, you know, I keep educated about their web site. I go to their web site, I visit it. I, you know, keep on top of things like insurance-forums.net. We hear -- a lot of the information comes to us because we're talking to insurance agents so often, and they will volunteer the information.

Q. What else do you do?

A. Marty talks to the presidents of companies he talks to, you know, president of NetQuote. He stays in the loop, you know, I -- it isn't, you know, the number one part of our business. But we're always immersed in it, we're always doing it.

ID: ML098
Description: Page 321:4-321:21

Q. You did tell him what types of products to target in a specific metropolitan area, correct?

A. Yes.

Q. Why not have Mr. Byrd use the same name for each of the false submissions he was sending to NetQuote's customers?

A. I don't remember. I guess he could have.

Q. You don't remember why you told him to use all different names?

A. Not off the top of my head. I told him make up names.

Q. Why didn't you have Mr. Byrd use his true name?

A. Didn't think it was -- didn't really think of it. I guess if he could have used any name for NetQuote, he could have used his own.
Q. But you told him to make up names?
A. Told him to make up names.

ID: ML102
Description: Page 363:5-363:23

Mr. Levy, have you studied NetQuote's code prior to October 2006?
A. I have studied what is publicly available.
Q. So is that a yes?
A. Yes.
Q. Why have you done so?
A. I do it to learn about my competition.
Q. Now, you testified earlier about four pending federal lawsuits against MostChoice, including the current suit, accusing it of inappropriate business practices, do you remember?
A. Four pending.
Q. You're right. You testified previously about four lawsuits within the last year, one of which has now been resolved?
A. Yes.
Q. Concerning MostChoice's inappropriate business practices?
A. Yes.

ID: ML103
Description: Page 364:21-365:1

Q. So you don't think it's MostChoice's business practices that's causing it to be sued?
A. No, because we haven't been sued by that many people.
Q. Four in the last year?
A. Yeah.

ID: ML108
Description: Page 411:9-411:18

Q. Okay. You're aware that in this litigation, I requested an image copy of Mr. Byrd's hard drive, right?
A. Yes.
Q. And you're aware that I requested that the computer be brought to Mr. Isenberg's office, right?
A. Yes.
Q. And then you instructed that it be brought to your office; is that correct?
A. Yes.

ID: ML109
Description: Page 445:25-446:8

Q. And how long were you sending the
Page 446
fictitious submissions to InsureMe?
A. Not long. Probably only three or four weeks. But I could be wrong on that. Brandon did it; not me. But as you can see, in the database there are around 1700 NetQuote agents and only about 400 InsureMe agents. So, you know, I think that

446: 7 shows that InsureMe was done a, you know, much less
446: 8 time than NetQuote was.


ID:           ML110
Description:  Page 448:11-448:13

448:11    Q.   Whose decision was it to stop sending
448:12 leads to the InsureMe web site?
448:13    A.   It was mine.


ID:           ML111
Description:  Page 448:23-449:1

448:23    Q.   You weren't being blocked by the InsureMe
448:24 web site, right?
448:25    A.   No. I don't believe we were being
449: Page 449
449: 1 blocked.


ID:           ML112
Description:  Page 450:15-451:18

450:15    Q.   (By Mr. Williams) I'm going to hand you
450:16 what was previously marked Exhibit No. 232.
450:17    A.   Uh-huh.
450:18    Q.   Do you see that Exhibit 232 is a set of
450:19 two different e-mails; the one on the bottom is from
450:20 Michael Andrew to you dated September 6, 2006, and
450:21 then your response to Mr. Andrew is on the top?
450:22    A.   Uh-huh.
450:23    Q.   I need you to say "yes" or "no."
450:24    A.   Yeah. I see that on the bottom that's one
450:25 from Michael Andrew and then the top is a response
451: Page 451
451: 1 from me.
451: 2    Q.   Okay. And this e-mail relates to
451: 3 assembling data for the fictitious submissions to
451: 4 NetQuote's web site; is that right?
451: 5    A.   Oh. This -- this address is what would
451: 6 become the project.
451: 7    Q.   So is this e-mail asking Mr. Andrew to
451: 8 assemble data for the fictitious submissions to
451: 9 NetQuote's web site?
451:10    A.   Yes.
451:11    Q.   Do you see in the third sentence, you
451:12 write: "I want you to do this but have it put
451:13 together for the remainder of the top ten cities by
451:14 tomorrow at 3:00 p.m."?
451:15    A.   Correct.
451:16    Q.   Why did you need this data assembled by
451:17 3:00 o'clock on September 7th, 2006?
451:18    A.   There is no reason.


ID:           ML113
Description:  Page 457:16-457:22

457:16    Q.   Now, in your deposition in October, you
457:17 testified that you might now inform InsureMe about
457:18 the false submissions that MostChoice had been making
457:19 to that company.
457:20         It's now February of 2008, about four
457:21 months later. Have you done so?
457:22    A.   No.

ID:          ML114
Description:    Page 458:19-459:20

458:19    Q.    And you were the one supervising this
458:20 special project?
458:21    A.    Correct.
458:22    Q.    Now, you said Mr. Byrd was inputting
458:23 information on his computer at home for the
458:24 application forms on NetQuote's web sites, right?
458:25    A.    Correct.
459: Page 459
459: 1    Q.    And what -- well, strike that.
459: 2          You supplied Mr. Byrd with various
459: 3 information that he was inserting into the web site,
459: 4 right?
459: 5    A.    Correct.
459: 6    Q.    You supplied him with ZIP codes, right?
459: 7    A.    Correct.
459: 8    Q.    You supplied him with the names of cities
459: 9 and states, right?
459:10    A.    Correct.
459:11    Q.    You supplied him with street addresses,
459:12 correct?
459:13    A.    I believe so.
459:14    Q.    You supplied him with area codes for
459:15 telephone numbers, correct?
459:16    A.    At one point we did. I don't know if we
459:17 always did, but I believe so.
459:18    Q.    You supplied him with telephone prefixes,
459:19 right?
459:20    A.    Correct.


ID:          ML115
Description:    Page 460:5-460:11

460: 5    Q.    So he was supposed to put an accurate
460: 6 number for ZIP, city, state, address, area code, and
460: 7 prefix, and information he would just make up for
460: 8 first name, last name, and last four digits of the
460: 9 telephone number?
460:10    A.    I don't know if you could phrase it
460:11 exactly that way, but I'd say that's close.


ID:          ML125
Description:    Page 494:7-494:17

494: 7          Are you aware that within the last few
494: 8 weeks your counsel has produced to me about
494: 9 4900 pages of screen shots labeled MCSS 1 through
494:10 4927?
494:11    A.    Correct.
494:12    Q.    What are those documents?
494:13    A.    Those are the screen shots that Brandon
494:14 took and saved after he made his submissions.
494:15    Q.    To the NetQuote or Local Insurance
494:16 web sites?
494:17    A.    Correct.


ID:          ML125A
Description:    Page 494:18-494:21

494:18    Q.    Now, did Mr. Byrd save every single screen
494:19 shot he received or is it possible there are others
494:20 that are not in this set?
494:21    A.    It's possible there are others.