IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 07-cv-00630-DME-MEH

NETQUOTE, INC., a Colorado Corporation

       Plaintiff,

v.

BRANDON BYRD, an internet user making use of the IP Addresses
64.136.27.226 and 64.136.26.227, and
MOSTCHOICE.COM, INC., a Georgia corporation,

       Defendants.

---

ORDER (1) DENYING MOSTCHOICE'S MOTION FOR JUDGMENT AS A
MATTER OF LAW, (2) DENYING MOSTCHOICE'S MOTION FOR A NEW TRIAL
OR REMITTITUR, (3) GRANTING, IN PART, AND DENYING, IN PART,
NETQUOTE'S MOTION FOR PREJUDGMENT INTEREST AND PUNITIVE
DAMAGES, AND (4) DENYING MOSTCHOICE'S SUPPLEMENTAL MOTION
FOR A NEW TRIAL BASED ON FALSE TESTIMONY

---

      Before this Court is Plaintiff NetQuote's motion requesting an award of

prejudgment interest and for the Court to exercise its discretion to treble punitive

damages under Colorado law (Doc. 305), Defendants Brandon Byrd and

Mostchoice's ("Mostchoice"'s) motion for judgment as a matter of law (Doc. 306),

Mostchoice's motion for a new trial or remittitur (Doc. 312), and Mostchoice's

supplemental motion for new trial based on false testimony (Doc. 333).  These

issues have been fully briefed and are ready for the Court's judgment.

### I. Mostchoice's Motion for Judgment as a Matter of Law

Mostchoice moves, pursuant to Fed. R. Civ. P. 50(b), for judgment as a matter of law, arguing that the evidence that NetQuote presented at trial cannot support the jury's conclusion that Mostchoice's actions caused NetQuote to lose customer accounts.  Further, Mostchoice argues that the evidence on damages was purely speculative.  (See Doc. 306.)

### A.  The Legal Standard for Granting Judgment as a Matter of Law

"A party is entitled to judgment as a matter of law only if there is no legally sufficient evidentiary basis for the claim." Guides, Ltd. v. Yarmouth Group Prop. Mgmt., Inc., 295 F.3d 1065, 1073 (10th Cir. 2002).  When reviewing the sufficiency of the evidence, the court must "review all the evidence in the record, construing it and all inferences drawn therefrom most favorably to the nonmoving party, and refrain from making credibility determinations or weighing the evidence."  Id.  "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.  That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 151 (2000) (citations and quotations omitted).

B.  <u>Evidence that Mostchoice's Conduct Caused NetQuote to Lose Accounts</u>

"Proximate cause is a factual question in Colorado unless the facts are undisputed and reasonable minds can draw only one conclusion from them." Berg v. United States, 806 F.2d 978, 981 (10th Cir. 1986); see also Bartholic v. Scripto-Tokai Corp., 140 F. Supp. 2d 1098, 1113 (D. Colo. 2000) ("The issue of causation is normally one for a jury. . . .  Therefore, only in instances where the facts allow reasonable minds to draw but one inference should causation be decided by the court as a matter of law.").  "An act is the proximate cause of an injury if there would have been no injury but for the act and if the act was a substantial factor in bringing about the injury.  'Substantial factor' was recently defined as conduct of sufficient significance in producing the harm as to lead reasonable persons to regard it as a cause and to attach responsibility." Berg, 806 F.2d at 981 (applying Colorado law; citations and quotations omitted).  "If a defendant's conduct is 'a substantial contributing cause of the injury, it is irrelevant to the causation analysis whether other factors . . . also contributed to the injury.'" F.D.I.C. v. Refco Group, Ltd., 989 F. Supp. 1052, 1068 (D. Colo. 1997) (quoting Rupert v. Clayton Brokerage Co., 737 P.2d 1106, 1112 (Colo. 1987)).  However, a defendant's conduct will not be considered a "substantial factor" in causing plaintiff's harm "[i]f an event other than the defendant's alleged

conduct appears predominant." <u>Ireland v. Jefferson County Sheriff's Dept.</u>, 193

F. Supp. 2d 1201, 1232 (D. Colo. 2002) (applying Colorado law; citations

omitted); <u>see also</u> <u>N. Colo. Med. Ctr., Inc. v. Comm. on Anticompetitive Conduct</u>,

914 P.2d 902, 908 (Colo. 1996) (noting that if a defendant's conduct was caused

by "a combination of reasons, . . . then only the predominant reason is considered

to be a substantial factor satisfying the proximate cause standard").

The Court will consider in turn the parties' arguments regarding the

sufficiency of the evidence that Mostchoice caused the loss of the HSBC account,

the SBLI account, and the local accounts.

Before discussing these accounts individually, the Court notes that

because neither party requested that the jury return a special verdict regarding

the causation and damages relating to each account, this court will uphold the

jury's damages award as long as the total damage award "is within the scope of

the evidence presented." <u>Jackson v. Pool Mortg. Co.</u>, 868 F.2d 1178, 1180 (10th

Cir.1989) (upholding damage award even though one of the bases for damages

argued before the jury may have been inappropriate as a matter of law because

the jury's award could have been based on other, permissible bases) (citation

and quotation omitted).  The jury returned a general verdict on both causation

and damages, and awarded NetQuote $1.6 million of the $2.57 million in

damages that NetQuote requested.  Given the distribution of the damages that

NetQuote sought for the various alleged losses ($128,000 for lost employee time,

$149,000 for the SBLI account, $974,000-$1.361 million for the HSBC account, and $960,000 for the local accounts), the jury may have determined that Mostchoice caused the loss of all the relevant accounts but that NetQuote was not damaged as extensively as it alleged. Alternately, the jury may have concluded that Mostchoice only caused the loss of some of the accounts, but the accounts were not as valuable as NetQuote claimed. The Court will uphold the jury's verdict if the evidence supports either of these conclusions.

     1. The HSBC Account

Mostchoice argues that the jury could not have reasonably concluded that Mostchoice's actions caused HSBC to terminate its relationship with NetQuote. Mostchoice argues that: (1) Paul Goott, HSBC's Director for Business Development and Marketing, testified that Byrd's false submissions played only a "small part" in HSBC's decision to terminate its relationship with NetQuote; (2) NetQuote, not HSBC, actually terminated this relationship; (3) Mr. Byrd's leads were such a small portion of the total number of leads that NetQuote sent to HSBC that they could not have caused the loss of the account; and (4) HSBC's dissatisfaction with NetQuote's service was based upon problems with NetQuote's leads and services other than Mr. Byrd's submissions.

Construing all the evidence in the light most favorable to NetQuote, the Court concludes that there was sufficient evidence to support the jury's

conclusion that Mostchoice's actions caused NetQuote's loss of the HSBC account. Paul Goott, who was personally involved in making the decision to terminate HSBC's relationship with NetQuote, testified that the low conversion rate of NetQuote's leads (i.e., the rate at which leads were converted into sales) was one of the two main reasons that HSBC terminated its account with NetQuote. Mostchoice is correct that Byrd submitted only a small fraction of the leads that NetQuote submitted to HSBC. However, Mary Bro, the director of the call center that HSBC used to sell NetQuote's leads, provided testimony that the jury could have relied on to determine that Mostchoice's actions caused HSBC's low conversion rate. Ms. Bro testified that the call center received a significant number of false leads within the first week of servicing NetQuote's leads. She testified that, after receiving a number of bad leads right in the beginning, the call center employees were motivated to "work [NetQuote's] leads last in the day" (Bro Tr. at 16), because the call center employees had other lead sources and worked partially on a commission. Finally, she affirmed that the call center's initial experience with bad leads had "a pretty significant effect for the whole project." (Id.)

Based on the combination of the testimony from Mr. Goott and Ms. Bro the jury was free to conclude that, even though Mr. Byrd's submissions were only a small percentage of the total leads HSBC received from NetQuote, the timing of those submissions had a significant impact on the conversion rate for all the

leads that NetQuote sent to HSBC.

This evidence also disposes of Mostchoice's argument that other problems with NetQuote's leads caused the termination. Although Mostchoice presented some evidence of other problems with NetQuote's leads, that evidence does not undermine or contradict Mr. Goott's testimony that the low conversion rate was one of the two main reasons that HSBC terminated its account with NetQuote or the evidence that Mr. Byrd's leads were a substantial factor in the low conversion rate. Cf. Refco Group, Ltd., 989 F. Supp. at 1068 ("If a defendant's conduct is 'a substantial contributing cause of the injury, it is irrelevant to the causation analysis whether other factors . . . also contributed to the injury.'" (quoting Rupert, 737 P.2d at 1112)). Nor does that evidence establish that reasons other than Mostchoice's conduct were the predominant cause of NetQuote's loss of the HSBC account. Cf. Ireland,193 F. Supp. 2d at 1232 (noting that, under Colorado law, a defendant's conduct will not be considered a "substantial factor" in causing plaintiff's harm "[i]f an event other than the defendant's alleged conduct appears predominant").

Mostchoice also argues that Mr. Byrd's leads did not cause the termination of NetQuote's relationship with HSBC because NetQuote, not HSBC, terminated that relationship. (See Doc. 306 at 4-5.) However, as NetQuote points out, many of the witnesses testified that HSBC, not NetQuote, was responsible for ending that relationship. Most importantly, Scott Striegel, a NetQuote executive, testified

that HSBC terminated the relationship "in a way that a lot of corporations do . . . they came back with kind of a ridiculous proposal." (Tr. at 656.) In other words, Mr. Streigel testified that HSBC's offer was so ridiculous that it effectively constituted a termination of its relationship with NetQuote. The jury could have believed this evidence in order to conclude that HSBC, not NetQuote, terminated the relationship.

### 2. The SBLI Account

Mostchoice argues that there was "hardly a whiff of evidence" to support the jury's conclusion that Mr. Byrd's false submissions led to NetQuote's loss of the SBLI account. (Doc. 306 at 8.) In support of its claim that Byrd's leads caused the loss of the SBLI account, NetQuote offered testimony from John Doria, the "director of strategic planning" at SBLI. Mr. Doria was listed as SBLI's contact person in its contract with NetQuote (Joint Ex. 4), and was responsible for submitting reports about the success of that relationship. Although Mr. Doria was not personally involved in deciding the fate of the NetQuote contract, the jury was free to conclude that his involvement with the account was sufficient to qualify him to explain the reasons for the termination of the relationship.

Mr. Doria offered somewhat conflicting testimony regarding the reasons leading to SBLI's termination of its relationship with NetQuote. On the one hand, he testified that the volume of false submissions that SBLI received was "one of

the main factors" that led SBLI to terminate its relationship with NetQuote. (Doria

Tr. at 15-16.) On the other hand, he testified that the decision to terminate the

relationship with NetQuote was primarily based on a "cost-benefit analysis" of the

ratio between leads and sales (id. at 19-20), and admitted that the volume of

Mr. Byrd's false submissions would only have changed those ratios "a little bit"

(id. at 20).

Where a witness gives conflicting testimony, this Court will defer to the

jury's judgment regarding which portions of the testimony to believe. See United

States v. Mendez-Zamora, 296 F.3d 1013, 1018 (10th Cir. 2002) (affirming a

criminal sentence on direct appeal and stating that "[d]espite the criminal

involvement of key government witnesses and the apparent inconsistencies in

their accounts, their testimony can sustain the verdict"); see also United States v.

Glenn, 312 F.3d 58, 64 (2d Cir. 2002) (noting that, when deciding a challenge to

the sufficiency of the evidence in support of a criminal conviction, the court must

defer to the jury's evaluation of witnesses' testimony, even if "their testimony was

pock-marked with inconsistencies"). The inconsistencies in Mr. Doria's testimony

do not, therefore, give this Court the authority to disregard the jury's conclusions.

Further, the jury could have inferred from the evidence regarding the effect of

false leads on other accounts, that Mr. Byrd's leads played a similarly substantial

role in causing the loss of the SBLI account.

### 3. <u>The Local Accounts</u>

Mostchoice also argues that NetQuote failed to prove that Mostchoice's actions caused the loss of any local accounts. (<u>See</u> Doc. 306 at 9-11.) Mostchoice argues that the evidence showed that customers had a number of complaints with NetQuote's leads that were unrelated to Mostchoice's false submissions. Therefore, Mostchoice argues that the jury could not reach a reasonable conclusion on causation merely by reviewing the documentary evidence that included facts like the number and timing of Byrd's false submissions, the time that the account opened and closed, and the number of total leads the account received.

NetQuote identified 157 local accounts that received two or more of Mr. Byrd's false submissions and then, within a short period of time, stopped purchasing NetQuote's leads. Some of those accounts received as many as 15-18 of Mr. Byrd's leads very shortly before terminating and, therefore, appeared to have been seriously effected by those false submissions. However, even the accounts that received a smaller number of bad leads may have terminated because of Mr. Byrd's leads. William Smoltino, a former local account holder, testified that a small decrease in lead quality would give him a "negative sentiment" towards NetQuote. (Smotlino Tr. at 18-19.) His testimony regarding his dissatisfaction with receiving bad leads is corroborated by agents' complaints contained in the Goldmine records. The jury could infer that this "negative

sentiment" would lead an agent to stop buying leads from NetQuote.

Furthermore, as discussed above, the jury heard testimony indicating that

Mr. Byrd's leads caused the termination of two national accounts, and could have

inferred that Mr. Byrd's submissions would have a similar effect on local

accounts. The jury was free to conclude, based on the number of Mr. Byrd's

leads, the timing of the termination, and the other evidence in the record, that at

least some of these accounts terminated because of Mr. Byrd's leads.

The Court acknowledges that this evidence is not compelling, but it is

sufficient for NetQuote to survive a motion for judgment as a matter of law.


C.  Damages

Under Colorado law, Mostchoice is liable for the pecuniary loss of the

benefits of NetQuote's contracts with its national and local accounts and other

consequential losses which were "naturally and proximately" caused by

Mostchoice's submission of false leads.  See Ballow v. PHICO Ins. Co., 878 P.2d

672, 677-78 (Colo. 1994) (recovery in fraud allowed for all damages "naturally

and proximately caused" by fraudulent act); Hein Enters. Ltd. V. San Francisco

Real Estate Investors, 720 P.2d 975 (Colo. App. 1985) ("[D]amages for loss of

business advantage or opportunity can properly be recovered under a theory of

intentional interference with contractual relationship . . .  includ[ing] loss of profits

and changes for gain.").  Damages are only recoverable for losses that "a plaintiff

can establish with reasonable certainty by a preponderance of the evidence."

Loughridge v. Chiles Power Supply Co., Inc., 431 F.3d 1268, 1280 (10th Cir.

2005) (citing Pomeranz v. McDonald's Corp., 843 P.2d 1378, 1381 (Colo. 1993)).

However, "[o]nce the fact of damage has been established with the requisite

degree of certainty, a plaintiff will not be barred from recovery for failing to prove

the amount of loss with mathematical certainty."  Id.  "It is well settled that a

verdict will not be upset on the basis of speculation as to the manner in which the

jurors arrived at it." Midwest Underground Storage v. Porter, 717 F.2d 493, 501

(10th Cir. 1983).  As the Tenth Circuit explained in United Phosphorus, Ltd. v.

Midland Fumigant, Inc., if the verdict is "within the range of the evidence" it will be

upheld.  205 F.3d 1219, 1228 (10th Cir. 2000) (quotation omitted).


### 1. Lost Value v. Lost Profit

Mostchoice argues that NetQuote's request for damages for lost value was

inappropriate in the context of the termination of lost customer accounts, and that

the damage calculation should have been based on lost profits from the

termination of the customers' contractual relationships.  Mostchoice's argument

that NetQuote could not request damages measured by the lost value of the

customer relationships is unconvincing.  Under Colorado law, diminution in value

is ordinarily the rule applied to measure damages to real property.  See

Loughridge, 431 F.3d at 1280.  Although diminution in value is generally used to

measure damages to real property, Mostchoice does not explain why lost value can not also be used to measure damages to an intangible asset. If there is a market for an intangible asset,[1] like there is for real property, there is no reason that a plaintiff should not be able to measure the damages from the loss of that asset by the calculation of the fair value. Mostchoice appears to be correct that there are no Colorado cases that measure damages for a contractual relationship by calculating the fair value of the contractual relationship. Instead, damages flowing from a terminated contract have always been calculated by lost profits. Nonetheless, this does not indicate that Colorado would not recognize fair value as an appropriate measure of damages for the loss of contractual relationship. More likely, the reason there are no other cases where damages for the loss of contractual relationship are measured by fair value is because the fair value of a contractual relationship should usually be less than the present value of lost profits from the contractual relationship: the amount a market participant will purchase an asset for will generally be less than the present value of the expected profit, because the buyer of an asset has to factor taxes, other transaction costs and expenses, and its own need for a profit into the purchase price of the asset. Thus, considering the evidence that was introduced in this

---

[1] Mostchoice has not challenged the premise that there is a market for the customer accounts, although it did, of course, challenge the value that should be assigned such accounts.

case, it would be harmless error, if error, to allow the plaintiff to ask for lost value rather than the present-value of lost profits from the lost accounts.

## 2. Evidence of Damages

Initially, the Court has significant concerns whether there is sufficient evidence to support the jury's award of damages based on the fair value of lost customer relationships. The parties' experts presented vastly diverging evidence on the "fair value" of a lost customer account. Significantly, Mostchoice's expert, Mark Zyla, concluded that the fair value of the accounts allegedly lost due to Mostchoice's conduct was far lower than NetQuote's expert, Stephen Duree, testified. Even in combination with the $128,000 in losses attributable to the employee time NetQuote spent on addressing Mostchoice's actions, the jury's award far exceeds the damages supported by Mr. Zyla's testimony. Therefore, if the jury's award was based on a lost value calculation, it must have based its conclusion on NetQuote's expert, Mr. Duree's, testimony.[2] This Court, however,

---

[2] The verdict form did not indicate on what basis the jury awarded damages (i.e., lost profits or lost value). The jury instruction the Court gave allowed the jury to award damages based on lost value or lost profits:

28: Plaintiff has the burden of proving the nature and extent of its actual damages by a preponderance of the evidence. . . . In determining these damages you shall consider the following: One, the monetary loss resulting from the loss of plaintiff's customer relationships caused by the actions of defendants, less any savings in costs realized by plaintiff from the loss of such customers; and

was quite unimpressed with Mr. Duree's testimony on this subject.

Mr. Duree testified that the fair value of the terminated accounts is equal to annual account revenue multiplied by a factor of 3.2.[3]  His testimony regarding the fair value of the accounts was based only on the revenue of the account over time (taking into account attrition and discounting to present day dollars).  Mr. Duree did not account for any associated costs or expenses that a buyer would incur with the purchase of the asset and did not consider any taxes that would be factored into the price a market participant might pay for the asset — this was because he assumed that NetQuote experienced no cost savings from the loss of the customer accounts.  Fair value, however, is concerned with the price a market participant would pay for an asset and what costs might be associated with a buyer's purchase of assets; therefore, it is only marginally relevant to a fair value calculation of the customer accounts that NetQuote, itself,

---

[t]wo, costs incurred by plaintiff to respond to defendants' fictitious submissions. . . .

(Tr. at 1390-91.)  As the Court explained when it tendered these instructions to the parties, the instruction is "broad enough that both sides can make the arguments they wish to make [regarding the appropriate calculation fo damages] as it avoids both the term 'profit' and 'damages' and uses, instead, 'loss'."  (Tr. at 1268.)

[3]  This multiplier was determined by the Quist Valuation as an appropriate factor to calculate present day value of the future revenue of NetQuote's accounts, and accounted for the average length of relationship of a customer account (3.5 years), the average annual growth of an account, and a discount factor to calculate the value of the lost revenue from the terminated accounts.

did not have any marginal cost savings associated with their termination.

In contrast, Mostchoice's expert, Mark Zyla, testified that the "fair value" of a lost customer was equal to annual revenue of the account multiplied by 0.285. Mr. Zyla arrived at his multiplier by considering costs and expenses that would be associated with the accounts and taxes that a buyer would have to pay on the accounts, in order to determine the appropriate valuation of the customer accounts. However, the jury could have settled on some multiplier between that suggested by Mr. Zyla and the one suggested by Mr. Duree.

In any event, there was sufficient evidence in the record to support Mr. Duree's calculation of the future revenue from a lost account as equal to the annual account revenue multiplied by 3.2. Therefore, there is sufficient evidence that the value of the lost revenue from the HSBC account was $974,000 and that the value of the lost revenue from the SBLI account was $149,000. Mr. Duree arrived at these figures using the average monthly revenue of the HSBC and SBLI accounts, based on the actual monthly revenue of these accounts before they terminated, to extrapolate the average annual revenue of the accounts. Mr. Duree then multiplied the average annual revenue by 3.2 in order to determine the present value of the future revenue. As stated before, the multiplier of 3.2 took into account the average length of a customer relationship, the average annual growth of an account, and a discount factor to calculate the present day value of the lost future revenue.

Regarding the lost local accounts, NetQuote CEO Greg Coccari testified that the average annual revenue from a local account is between $2,000 and $4,000 depending on whether the agent purchases life, auto or health leads. (Tr. at 868.)  Mr. Duree testified that the value of the lost revenue from the local accounts is equal to the number of local accounts multiplied by the average annual revenue multiplied by 3.2.  (Tr. at 471.)  As discussed, there is sufficient evidence that over a hundred local accounts terminated their relationships with NetQuote because of Mostchoice's fictitious leads and, therefore, that the lost revenue from the local accounts could have been $640,000.[4]

Additionally, Craig Shine testified that NetQuote employees spent considerable time responding to Byrd's false submissions, the equivalent of approximately twenty-two weeks of employee time.  (Ex. D-11.)  Based on communications with employees, Shine calculated that NetQuote employees spent 747 hours identifying and resolving issues related to Byrd's false submissions, which totaled $127,833 in damage.  (Id.)  Therefore, there was sufficient evidence in the record to support at least $1,890,833 of damages, which is greater than the jury's award of $1,600,000 in damages.

Nonetheless, Mostchoice argues that the evidence was insufficient as a

---

[4]  These numbers are conservative as the calculation is based on the low-range of local account revenue, $2000, and the low-range of local account terminations, 100.

matter of law to support the jury's award of damages because NetQuote only presented evidence of lost revenue and not lost profits. Mostchoice argues, therefore, that the jury's award of damages could not have included any savings NetQuote incurred from the loss of the national and local accounts as required by law. Here, however, the jury was properly instructed that they were to subtract "any savings in costs realized by [NetQuote] from the loss of [customer accounts]" in calculating the appropriate damages. (Tr. at 1391.) Additionally, there was evidence presented to the jury indicating that NetQuote would not realize any cost savings as a result of the termination of the lost accounts. (Tr. at 470, 868.) [5] Under Colorado law, where there is no marginal cost savings resulting from lost business, lost profits can equal lost revenue. See Walter v. Hall, 940 P.2d 991, 995 (Colo. App. 1996) ("[W]here operating expenses are fixed gross profits may be awarded because they are equivalent to net profits."). Therefore, there was sufficient evidence for the jury to determine that lost revenue was equal to lost profits, and Mostchoice's argument that there was no evidence of lost profits is not supported by the record.

---

[5] NetQuote's Vice President and Treasurer, Craig Shine, testified that NetQuote would not realize any cost savings as a result of the loss of 111 local accounts; and, NetQuote's CEO Gregg Coccari testified that NetQuote would not realize any cost savings from losing up to three hundred customers. The jury could have extrapolated from Mr. Shine's and Mr. Coccari's statements to conclude that NetQuote did not realize any cost savings from the loss of the two national accounts.

Finally, Mostchoice quarrels with two assumptions Mr. Duree used in his calculations of damages. Mostchoice argues that there is not sufficient evidence to support Mr. Duree's use of a seven-year useful life of an account in his calculation of the multiplier of 3.2 to forecast revenue over the life of a customer account.[6] Mostchoice argues this assumption was speculative because it was not borne out by the actual evidence of the length of NetQuote's past customer relationships. The record, however, supports Mr. Duree's use of a seven-year useful life of an account. Mr. Ford testified that the seven-year useful life of an account was reasonable and consistent with NetQuote's actual past customer experience (Tr. at 133), and Mr. Duree testified that the seven-year useful life of an account was appropriate given his experience with similar business (Tr. at 462). Furthermore, in valuing NetQuote's customer relationship, Quist Valuation projected future revenue streams from NetQuote's accounts using a seven-year useful life for the accounts. Therefore there is sufficient evidence to support Mr. Duree's use of a seven-year useful life in calculating the future revenue over the lifetime of the terminated accounts.

Finally, Mostchoice argues that Mr. Duree's calculation of lost future

---

[6] The useful life of a customer relationship anticipates that no customer will continue its relationship longer than that term. Thus, if NetQuote's customer relationships have a useful life of seven years for account valuation purposes, no customer relationship is assumed to last more than seven years, and the average relationship for an account is assumed to last 3.5 years. (Tr. at 462.)

revenue from the HSBC account was "speculative" because it did not reflect the cap that HSBC requested of 1000 leads per month. Although HSBC eventually did request a cap of 1000 leads, it did so only after having received Mr. Byrd's false leads. (Tr. at 734-35.) Mostchoice's argument that it should get the benefit of capping HSBC's future revenue calculation based on only 1000 leads per month would allow Mostchoice to limit its damages based on its own wrongful conduct. There was sufficient evidence for the jury to conclude that if Byrd had not submitted false leads, HSBC would not have requested the cap of 1000 leads/month; therefore, Mr. Duree did not have to assume a cap of 1000 leads/month in calculating future revenue from the HSBC account.

## II.  Mostchoice's Motion for a New Trial

Mostchoice moved for a new trial pursuant to Fed. R. Civ. P. 59, arguing that the jury's verdict was against the weight of the evidence and its award of damages was excessive. (See Doc. 312.) "A motion for new trial 'is not regarded with favor and should only be granted with great caution.'" Jackson v. Potter, 2008 WL 4969162, 1 (D. Colo. 2008) (quoting United States v. Kelley, 929 F.2d 582, 586 (10th Cir. 1991)).

> Where a new trial motion asserts that the jury verdict is not supported by the evidence, the verdict must stand unless it is clearly, decidedly, or overwhelmingly against the weight of the evidence. The court considers the evidence in the light most favorable to the prevailing party, bearing in mind that the jury has the exclusive function of appraising credibility,

determining the weight to be given to the testimony, drawing inferences from the facts established, resolving conflicts in the evidence, and reaching ultimate conclusions of fact.

Snyder v. City of Moab, 354 F.3d 1179, 1187-88 (10th Cir. 2003) (citations and quotations omitted).

A.  Sufficiency of the Evidence of Liability

Mostchoice argue that when deciding a motion for a new trial based on the sufficiency of the evidence, a court must weigh the evidence and determine witness credibility for itself, and need not view the evidence in the light most favorable to the prevailing party.  In support of that position, Mostchoice points primarily to the District of Kansas's decision in Rivera v. Rivera, 262 F. Supp. 2d 1217, 1229-31 (D. Kan. 2003).  The court in Rivera acknowledged that the Tenth Circuit has stated that, when deciding on a motion for a new trial, the court should consider the evidence in the light most favorable to the prevailing party.  Rivera, 262 F. Supp. 2d at 1229 (citing Macsenti v. Becker, 237 F.3d 1223, 1235-36 (10th Cir. 2001) (addressing a motion for a new trial and stating that the defendant's "contention that the verdict was against the weight of the evidence is patently without merit when the evidence is viewed in the light most favorable to the plaintiff, which of course is the proper standard of review").  Despite that clear language, the court in Rivera concluded,

[I]n light of the lack of clear, well-reasoned authority on this issue in the

Tenth Circuit and in this district compared to the overwhelming weight of modern authority in other circuits, as well as the fact that it should be more difficult to obtain an order granting a motion for judgment as a matter of law than it is to obtain an order granting a motion for a new trial, the court is persuaded that, in ruling on a motion for a new trial, it may reweigh the evidence and assess the credibility of witnesses.

Rivera, 262 F. Supp. 2d at 1230.

Despite the apparently wide-spread appeal of the standard articulated in Rivera, this Court declines Mostchoice's invitation to ignore the Tenth Circuit's statement that, when determining a motion for a new trial, courts must "consider[] the evidence in the light most favorable to the prevailing party." Snyder, 354 F.3d at 1188. Further, even if this Court independently weighed the evidence and the witnesses' credibility, this Court would only grant a new trial if the verdict was "clearly, decidedly, or overwhelmingly against the weight of the evidence." Id. at 1187 (citation and quotation omitted). Thus, regardless of whether this Court independently weighs the evidence or defers to the jury's conclusions, the moving party carries a great burden in moving for a new trial based on the insufficiency of the evidence, and this Court's decision would be the same regardless of whether this Court could independently weigh the evidence and the witnesses' credibility.

Mostchoice initially incorporates its arguments from its motion for judgment as a matter of law into its motion for a new trial. Given the highly deferential standard for granting a new trial, the Court denies Mostchoice's motion for a new trial based on the arguments presented in its motion for judgment as a matter of

law for all the reasons stated above in the context of Mostchoice's motion for judgment as a matter of law.

Mostchoice also argues, for the first time in its post-trial briefings, that there was insufficient evidence to support the jury's conclusion that Mostchoice intended to harm NetQuote's customer relationships. Mostchoice raised an identical argument in its motion for summary judgment, which the Court rejected, stating that "[a] reasonable juror could readily conclude that given Mostchoice admittedly sought to reverse engineer NetQuote's customer list, Mostchoice did so with the intention of soliciting NetQuote's customers, and thus interfering with NetQuote's contractual relations. This notion is buttressed by the fact that Mostchoice did in fact solicit these customers at some later point in time." (Doc. 237 at 21.) For all the reasons discussed in the Court's order denying Mostchoice's motion for summary judgment, the Court denies Mostchoice's motion for a new trial on this issue.

Finally, Mostchoice argues that Mr. Byrd's misrepresentations were not material because NetQuote never had a person review those submissions. Mostchoice does not specify if this argument relates to the fraud claim, the tortious interference claim, or both. This Court instructed the jury on materiality on two occasions, neither of which were objected to by Mostchoice. First, the Court instructed the jury that Byrd's submissions must have been material in order for NetQuote to prevail on its fraud claim. (See Tr. at 1385.) Second, the

Court instructed the jury that Mostchoice is not entitled to the "privilege of competition defense" if it used "wrongful means . . . such as threats, defamation, fraud, or material misrepresentations of fact." (Id. at 1390.) Since there was no evidence of threats or defamation in this case, the jury could not have found for NetQuote on either claim without also determining that Mr. Byrd's submissions were material. The Court assumes, therefore, that Mostchoice intended its challenge to apply to both claims.

Mostchoice offers no support for its argument that a statement is not material if it is not reviewed by a person, and this Court has found none. Mostchoice raised a similar issue in its motion to dismiss and its motion for summary judgment, where it argued that NetQuote could not have relied on Mr. Byrd's submissions because no person reviewed those submissions before they were forwarded to NetQuote's customers. The Court rejected that argument, holding that Mostchoice made "no cogent argument as to why a corporation is not entitled to rely on information provided to it through the use of computer systems." (Doc. 31 at 11; Doc. 237 at 7.) Similarly in this context, the Court sees no reason to conclude that a statement is not material simply because it has not been reviewed by a natural person. Under Colorado law, "[a] fact is material if a reasonable person under the circumstances would attach importance to it in determining his course of action." Denberg v. Loretto Heights Coll., 694 P.2d 375, 377 (Colo. App. 1984). In this case, NetQuote reasonably relied on the

truth of the information submitted on its website, and acted on that reliance by forwarding that information to its customers. Mostchoice fails to offer any reason to reach a different conclusion.

For the first time in its reply brief, Mostchoice argues that its submissions were not material because the names used in the submissions were "clearly fictitious." (Doc. 332 at 4.) This Court will not generally address arguments raised for the first time in a reply brief. See Stender v. Gerardi, 2008 WL 4452117, *8 (D. Colo. 2008) ("Arguments not raised in an opening brief are deemed abandoned and waived."). Even if the Court determined that this issue had been properly raised, it would reject Mostchoice's argument. At trial, Mr. Byrd testified that the names he used in his submissions "were generally just normal names." (Tr. at 777.) This admission precludes Mostchoice from arguing that Mr. Byrd's submissions were not material because he used names that were obviously fictitious.

### B. Sufficiency of the Evidence of Damages

Mostchoice's arguments that the jury's award was speculative and excessive mostly rehashes the arguments it made in its motion for judgment as a matter of law. As discussed already, there was sufficient evidence to support the jury's calculation of damages. NetQuote presented detailed summaries of the revenue generated by its national and local accounts, testimony regarding the

average length of a customer relationship, and detailed documentation of the time spent by NetQuote employees identifying and responding to Mostchoice's wrongful conduct. The evidence of NetQuote's lost profits and ultimately lost value from the termination of all of the national and customer accounts and the employee time exceeds the jury's actual award of damages.

The jury's award of compensatory damages was approximately $1 million less than the high range requested by NetQuote at trial. Although the evidence on both of these issues was far from overwhelming, the jury's award indicates that it considered the impact of potential issues of causation and damages in rendering its verdict. Far from being excessive, the jury's award of damages indicates careful reflection about causation and damages.

### C. Whether Mr. Duree's Testimony Prejudiced the Jury

Mostchoice argues that it should be granted a new trial because the portions of Mr. Duree's testimony that were ultimately ruled inadmissible prejudiced the jury. (Doc. 312 at 10-11.) As a preliminary matter, the Court notes that Mostchoice's failure to request a mistrial after the Court excluded portions of Mr. Duree's testimony makes it more difficult for Mostchoice to prevail on its current request for a new trial. See Wright, Miller, and Kane, 11 Fed. Prac. & Proc. Civ. 2d § 2805 ("A principle that strikes very deep is that a new trial will not be granted on grounds not called to the court's attention during the trial

unless the error was so fundamental that gross injustice would result.").  Even if this issue had been properly raised, however, this Court would deny Mostchoice's motion.  The jury was instructed on multiple occasions to disregard the portions of Mr. Duree's testimony that related to causation.  There is a strong presumption that a jury will follow a limiting instruction.  <u>See Battenfield v. Gibson</u>, 236 F.3d 1215, 1225 (10th Cir. 2001) (holding that any error was cured by the court's limiting instruction because of "the general presumption that a jury follows a trial court's instructions").  Mostchoice has presented no reason for the Court to disregard that general presumption in this case.

D.  <u>Whether NetQuote's use of Attorneys' Eyes Only Designations Prejudiced Mostchoice</u>

Mostchoice argues that it is entitled to a new trial because of the prejudice resulting from NetQuote's designation of certain materials as "Attorney's Eyes Only" and this Court's refusal to grant Mostchoice a continuance after Mostchoice's attorneys were permitted to share these materials with their client. (Doc. 312 at 11-14.)  The Court addressed a motion premised on these same concerns shortly before the start of trial.  (<u>See</u> Doc. 270.)  For substantially the same reasons identified in that order, the Court finds that the designation of these materials as "Attorney's Eyes Only" did not prejudice Mostchoice's ability to prepare for trial or necessitate a continuance.  Therefore, the Court denies

Mostchoice's request for a new trial on these grounds.

### III.  NetQuote's Motion for Prejudgment Interest

NetQuote requests that the judgment on the jury's verdict include prejudgment interest.  The jury returned a verdict of $1.6 million in actual damages and $3.2 million in punitive damages.  We apply Colorado law regarding prejudgment interest. <u>See</u> <u>Loughridge</u>, 431 F.3d at 1288.  Colo. Rev. Stat. § 5-12-102 governs prejudgment interest in actions that do not involve personal injury, <u>see</u> <u>Goodyear Tire & Rubber Co. v. Holmes</u>, 193 P.3d 821, 824-25 (Colo. 2008), and both parties agree that this statute applies.  Section 5-12-102, as relevant here, provides:

> [W]hen there is no agreement as to the rate thereof, creditors shall receive interest as follows:
>
> (a) When money or property has been wrongfully withheld, interest shall be an amount which fully recognizes the gain or benefit realized by the person withholding such money or property from the date of wrongful withholding to the date of payment or to the date judgment is entered, whichever first occurs; or, at the election of the claimant,
>
> (b) Interest shall be at the rate of eight percent per annum compounded annually for all moneys or the value of all property after they are wrongfully withheld or after they become due to the date of payment or to the date judgment is entered, whichever first occurs.

Colorado has explained that "the purpose of prejudgment interest is to reimburse the plaintiff for inflation and lost return" on money or property to which

a party is otherwise legally entitled.  Goodyear Tire, 193 P.3d at 826; Mesa Sand & Gravel Co. v. Landfill, Inc., 776 P.2d 362, 364 (Colo. 1989).  The award of prejudgment interest recognizes that a plaintiff suffers a loss between the time he is deprived of the use of money or property that would constitute the award and the time of judgment, "frequently termed 'time value of money.'"  Id.  The statute "is to be given a broad liberal construction in order to effectuate the legislative purpose of compensating parties for the loss of money or property to which they are entitled."  Westfield Dev. Co. v. Rifle Inv. Assocs., 786 P.2d 1112, 1122 (Colo. 1990) (emphasis added).  Thus, section 5-12-102 "provides that interest shall be allowed even if the amount is unliquidated at the time of wrongful withholding or at the time when due."  Karg v. Mitchek, 983 P.2d 21, 26 (Colo. App. 1998).  However, under Colorado law "[p]rejudgment interest can only be awarded on past, not future, lost profits."  Western Fire Truck v. Emergency One, 134 P.3d 570, 577 (Colo. App. 2006); see also Curragh Quesland Mining Ltd. v. Dresser Indus, Inc., 55 P.3d 235, 242 (Colo. App. 2002); Bennett v. Greely Gas Co., 969 P.2d 754, 766 (Colo. App. 1998.).

The Colorado Supreme Court recently clarified in Goodyear Tire that, based upon the plain language of the statute, the relevant date for commencing the accrual of prejudgment interest is not the date of the wrong but, instead, the date of "wrongful withholding." 193 P.3d at 830 ("The 'wrong' and the 'wrongful withholding' are separate concepts that may or may not occur at the same

moment in time.").  In so doing, the court disapproved of lower courts'

misinterpretation of its previous decision in Mesa Sand, 776 P.2d at 364, on this

point.  Goodyear Tire, 193 P.3d at 830 ("[T]o the extent the court of appeals has

cited *Mesa* to support a conclusion that prejudgment interest accrues from the

time the prevailing party was 'wronged' *as opposed to* the time when money or

property was 'wrongfully withheld,' we expressly disapprove of those decisions.")

(emphasis in original).  The Court explained that the plain language meaning of

the term "wrongful withholding" is clear although it "may be difficult to apply in

some circumstances."  Id. at 825.  "'Wrongful withholding' indicates that the

aggrieved party lost or was deprived of something to which she was otherwise

entitled." Id.

In the case of a general verdict, as we have here, for the purposes of

prejudgment interest "the court is required to make findings regarding the basis

upon which damages were due."  Peterman v. State Farm Mut. Auto. Ins. Co., 8

P.3d 549, 551 (Colo. App. 2000) (citation omitted).  If it is "clearly ascertainable

from the verdict or from uncontroverted facts [that a prevailing party is entitled to

prejudgment interest], the court may make the computation, and add the interest

to the verdict."  Lowell Staats Min. Co., Inc. v. Pioneer Uravan, Inc., 878 F.2d

1259 (10th Cir. 1989) (quoting Wood v. Hazelet, 237 P. 151, 152 (Colo. 1925));

see also Coleman v. United Fire and Cas. Co., 767 P.2d 761, 764 (Colo. App.

1988) (when a district court makes findings regarding the basis upon which

damages were due "findings should be clearly ascertainable from uncontroverted facts."); Pierson v. United Bank of Durango, 754 P.2d 431, 432 (Colo. App. 1988). NetQuote bears the burden of proof on the amount of damages that was wrongfully withheld or that payment was due before judgment is entered. See Buckley Power Co. v. State, 70 P.3d 547, 563 (Colo. App. 2002) ("A plaintiff bears the burden of proof on both the fact and the amount of damages. [citation omitted.] Interest is a component of a damage award."). If NetQuote meets this burden, this Court is required to award it prejudgment interest. See Colo. Rev. Stat § 5-12-102 (providing that "creditors shall receive interest") (emphasis added).

NetQuote requests prejudgment interest on the entire jury award for compensatory damages, commencing January 1, 2007. (Doc. 305 at 3.) NetQuote contends that the jury awarded damages for the value of the lost customer relationships, therefore "the operative date [for the calculation of prejudgment interests] is the date the accounts were lost, because it was then that Mostchoice had 'wrongfully withheld' the value of these accounts from NetQuote." (Doc. 314 at 5.) NetQuote argues that "it is reasonable and conservative" to use January 1, 2007 as the operative date "because the largest categories of harm occurred in 2006." (Id.) As examples of that harm, NetQuote notes "that one national account, HSBC, terminated in December 2006, the other national account, SBLI, terminated in November 2006, and the employee time for

which [it] sought compensation accrued in the fall of 2006." (Id.)

Because there was a general verdict, it is necessary for the Court to make findings regarding the basis upon which damages were due in order to determine whether and to what extent NetQuote is entitled to prejudgment interest. See Peterman, 8 P.3d at 551. The jury awarded $1.6 million in damages; but it is unclear, because NetQuote rejected the Court's suggestion of a special verdict[7], how the jury awarded these damages across the three categories of harm, and on what basis any damages for terminated accounts was awarded. Also, because the jury instructions provided the jury flexibility in determining "monetary loss," it is unclear whether the jury awarded damages for the lost "value" of the customer accounts or the lost profits from the customer accounts.[8]

Although the amount of damages for the terminated accounts was fiercely contested over the course of the seven-day trial, Mostchoice did not dispute that in the fall of 2006, NetQuote's employees spent employee time identifying and responding to Mostchoice's fictitious submission or NetQuote's quantification of those damages. Therefore, $127,833 in damages for employee time were "uncontroverted" and these damages are entitled to prejudgment interest as of

---

[7] At the jury conference, the Court suggested to both parties a proposed special verdict, but both parties stated they preferred a general verdict. Neither party objected to the general verdict that was used.

[8] See note 2.

January 1, 2007.[9]

On the other hand, the damages for the terminated accounts was not based on "uncontroverted facts." NetQuote argues that the basis of the damages was the "fair value" of the terminated customer accounts, while Mostchoice argues that the award was for lost profits.[10] As explained before, the evidence on the value of the lost customer relationships was controverted — the parties' experts presented evidence vastly diverging on the "fair value" of a lost customer.[11] Although NetQuote could recover prejudgment interest if the jury's verdict was based on lost value, it has not met its burden to prove that the jury awarded damages based on the lost value of the customer relationships. If, instead, the jury awarded damages based on lost profits, then NetQuote could only recover prejudgment interest for the lost profits accruing before the judgment is entered. Even though NetQuote was entitled to prejudgment interest on lost

_____

[9] Although NetQuote argued to the jury that the quantification of damages based on employee time was $128,000, the evidence presented at trial by NetQuote indicated that the amount was $127,833. (See Ex. D-11.)

[10] The fair value of an asset is the amount of money that a market participant would pay for that asset. (Tr. 374, 1210.)

[11] If, for instance, the jury had found Mr. Duree's "fair value" calculations not particular credible, and used Mr. Zyla's multiplier instead to calculate "fair value" of the lost national and customer accounts, the jury could have calculated that the "fair value" of the customer accounts was only $185,250. The average annual revenue from two national accounts was $350,000 and from one hundred local accounts was $300,000. Using these figures and Zyla's multiple to calculate fair value, the lost accounts would have only resulted in $185,250 in lost value. ($350K + $300K) x .285 = $185,250.

profits from terminated customer accounts accruing before judgment is entered, NetQuote has failed to prove the amount of damages from those accounts which accrued before judgment was entered.

The Court finds that NetQuote has not shown that it is "clearly ascertainable from the verdict or from uncontroverted facts" that it is entitled to prejudgment interest on any amount other than the $127,833 for lost employee time.

Therefore, the Court grants NetQuote's motion for prejudgment interest in part, and denies it in part. Prejudgment interest at the statutory rate of eight percent per annum, compounded annually, thus will be awarded from January 1, 2007 through the date judgment enters, on the $127,833 in damages for lost employee time. As the judgment will be entered on April 1, 2009, pre-judgment interest is $24,168.00.

**IV. Punitive Damages**

A. Remittitur

In Colorado, punitive damages are available only pursuant to statute. See Ballow, 878 P.2d at 682. Colorado limits a jury's award of punitive damages to "an amount equal to the amount of the actual damages awarded to the injured party." Colo Rev. Stat. § 13-21-102(1)(a). For the purposes of calculating punitive damages, actual damages include prejudgment interest. See James v.

<u>Coors Brewing Co.</u>, 73 F.Supp. 2d 1250, 1255 (D. Colo. 1999).  Colorado then allows the Court to increase, decrease, or entirely disallow an award punitive damages if certain statutory criteria are met. Colo. Rev. Stat. § 13-21-102(2)&(3); <u>see also</u> <u>Hensley v. Tri-QSI Denver Corp.</u>, 98 P.3d 965, 968 (Colo. App. 2004).

Here, the jury awarded $1.6 million in actual damages jointly and severally against Defendants Byrd and Mostchoice, and $3.2 million in punitive damages against Defendant Mostchoice and $10,000 in punitive damages against Defendant Byrd.  The total amount of actual damages for purposes of calculating punitive damages is greater than that awarded by the jury, because it also must factor in prejudgment interest. <u>See</u> <u>James</u>, 73 F.Supp. 2d at 1255.  Therefore, the total actual damages in this case are $1,624,168.00.[12]

Although, at Mostchoice's request, the jury was not informed of their limited authority to award punitive damages, the jury's award of $3.2 million in punitive damages against Mostchoice is not authorized by the law, and the Court reduces it to the maximum allowed under the Colorado law, $1,624,168.00, which is a one-to-one ratio with actual damages.

B. <u>Motion to Decrease Punitive Damages</u>

---

[12] $1,600,000.00 plus $24,168.00 in pre-judgment interest.

Under Colorado law, "the court <u>may</u> reduce or disallow the award of exemplary damages to the extent that: (a) The deterrent effect of the damages has been accomplished; or (b) The conduct which resulted in the award has ceased; or (c) The purpose of such damages has otherwise been served."  Colo. Rev. Stat. § 13-21-102(2) (emphasis added).  Here, Mostchoice requests this Court to decrease the amount of punitive damages. (Doc. 312.)  Mostchoice argues that punitive damages are not warranted because the evidence at trial indicated that Mostchoice's submissions were all part of a project to determine whether NetQuote had 20,000 agents as it claimed in its advertising.  Because this project has been terminated, Mostchoice contends there is no purpose served in awarding a punitive damages.

The jury's award of punitive damages against Mostchoice at the statutory maximum of a one-to-one ratio is entitled to deference, and the Court independently concludes that a one-to-one ratio is appropriate to punish Mostchoice's wrongful conduct and deter future misconduct.

C. <u>Motion to Increase Punitive Damages</u>

While the jury is limited to awarding punitive damages at a one-to-one ratio of actual damages, Colorado law allows the Court to exercise its discretion, in certain circumstances, to increase the amount of punitive damages.  Here, NetQuote requests that this Court increase the amount of punitive damages

awarded against Defendant Mostchoice to three time the actual damages, the

maximum allowable under Colorado law.[13]  (Doc. 305 at 4.)

> Pursuant to section 13-21-102(3),
>
> the court <u>may</u> increase any award of exemplary damages, to a sum
> not to exceed three times the amount of actual damages, if it is
> shown that:
> (a) The defendant has continued the behavior or repeated the action
> which is the subject of the claim in a willful and wanton manner,
> against the plaintiff or another person or persons, during the
> pendency of the case; or
> (b) The defendant has acted in a willful and wanton manner during
> the pendency of the action in a manner which has further aggravated
> the damages of the plaintiff when the defendant knew or should have
> known such action would produce aggravation.

Colo. Rev. Stat. § 13-21-102(3) (emphasis added).  A trial court's ruling under

section 13-21-102(3) will not be disturbed absent an abuse of discretion.  <u>See</u>

<u>Martin v. Union Pacific R. Co.</u>, 186 P.3d 61, 71 (Colo. App. 2007).

NetQuote argues that they have established both criteria for an increase of

punitive damages and that Mostchoice's officers' conduct warrants an increase in

punitive damages.  NetQuote argues that under section 13-21-102(3)(a),

Mostchoice's continued submission of false leads supports treble damages.

Additionally, NetQuote argues that under section 13-21-102(3)(b), Mostchoice's

marketing to agents that it learned about from the false submissions, as well as

---

[13] NetQuote does not request that the amount of punitive damages
awarded against Brandon Byrd be increased.

that Mostchoice's wrongful litigation conduct prolonged and disrupted the litigation, thus supporting treble damages.  If any of this conduct satisfies the requirements of 13-21-102(3) (a) or (b), then the court <u>may</u> exercise its discretion to increase punitive damages.

i.  Section (a)

13-21-102(3)(a) provides the court may increase any award of exemplary damages if it is shown that: "[t]he defendant has continued the behavior or repeated the action which is the subject of the claim in a willful and wanton manner, either against the plaintiff or another person or persons, during the pendency of the case."

The Court finds NetQuote has established that Mostchoice's behavior meets this criteria.  For purposes of determining whether Mostchoice's conduct continued during the "the pendency of the case," the Court is inclined to consider Mostchoice's conduct from the time when Brandon Byrd was served process in the original state case on February 16, 2007.  Brandon Byrd is Mostchoice's agent, Mostchoice knew of Mr. Byrd's conduct and facilitated it, and Mostchoice accepted respondeat superior liability for Mr. Byrd's conduct.  Therefore, for purposes of determining whether Mostchoice's conduct satisfies this criteria, it is relevant to consider whether Mostchoice submitted fictitious leads after February 16, 2007.  The record indicates that Mr. Byrd continued to submit fictitious leads

to NetQuote's website, localinsurance.com, into the summer of 2007 — even after Mostchoice had received a cease and desist letter from NetQuote dated May 30, 2007. (Tr. 793, 800; Exs. P-90, P-99, P-107.)  Thus, the evidence indicates that Mostchoice's submission of fictitious leads continued even after Mostchoice was served as a defendant in this case on April 23, 2007; and, the continued submission of fictitious leads was done in a "willful and wanton" manner.  Such evidence is sufficient to satisfy this criteria, although the bulk of Mostchoice's leads were sent before Mr. Byrd or Mostchoice was sued in this action.

ii. Section (b)

On the other hand, the Court concludes that none of Mostchoice's other alleged conduct meets the requirements under 13-21-102(3)(b).  13-21-102(3)(b) provides the court may increase any award of exemplary damages if it is shown that: "[t]he defendant has acted in a willful and wanton manner during the pendency of the action in a manner which has further aggravated the damages of the plaintiff when the defendant knew or should have known such action would produce aggravation."

First, Mostchoice's marketing to agents it learned of through Mr. Byrd's submissions does not qualify as aggravating conduct under 13-21-102(3)(b), because NetQuote has not established that it suffered any harm as a result of

Mostchoice's conduct. NetQuote did not present any evidence, let alone prove, that any of its accounts terminated their relationships based upon Mostchoice's marketing efforts. Therefore, without evidence of any damage resulting from Mostchoice's conduct, the requirements of 13-21-102(3)(b) are not satisfied.

Second, NetQuote did not prove that Mostchoice litigated this case in a "willful and wanton manner," as required under 13-21-102(3)(b). Mostchoice's litigation conduct did not constitute over-the-top aggressive conduct.[14] Mostchoice never violated a court order, was never sanctioned for its litigation behavior, and, if anything, the Court notes that Mostchoice's conduct at trial was quite professional. Contrast Coors v. Security Life of Denver Ins. Co., 112 P.3d 59, 67 (Colo. 2005) (punitive damages trebled where defendant "obscured and misrepresented who its decisionmakers were and failed to meet basic discovery and disclosure obligations even after being compelled to produce information"); Tait v. Hartford Underwriters Ins. Co., 49 P.3d 337, 342-43 (Colo. App. 2001) (punitive damages trebled where defendant complained of expedited trial date, committed discovery violation in manner that required the court to hold hearings

---

[14] NetQuote recites conduct by Mostchoice during the pleading, discovery, and other pre-trial stages of this litigation that could be considered as obstructive and harassing. However, NetQuote did not seek sanctions directly for such conduct (for instance under Fed. R. Civ. P. Rule 11 and/or Rule 37), which could have enabled the court to address it in a more timely and focused manner. To the extent that Mostchoice's conduct is these regards was inappropriate, that is adequately addressed by the punitive award that is issued in this case.

to insure compliance, and delegated to counsel many of its continuing obligations to insured despite insurer's ongoing duty to defendant).

### iii. Discretion

The Court will not exercise its discretion to increase punitive damages. The jury's award of punitive damages is capped at $1,624,168.00, and it is the province of the court to decide whether to increase punitive damages. Although the jury attempted to award $3.2 million in punitive damages, it was statutorily limited in its award and properly could not award more than compensatory damages. Thus, the Court cannot give any weight to the jury's award of double punitive damages, because it was more than the jury was authorized to award and was in error.

Therefore, the Court's only concern is whether a one-to-one ratio of punitive damages to actual damages is sufficient. Having considered Mostchoice's conduct, the Court independently concludes that a one-to-one ratio is appropriate for the following reasons. First, Mostchoice's wrongful behavior after the pendency of the case was ineffective and led to minimal, if any, harm to NetQuote. By the time the lawsuit commenced in February 2007, NetQuote had already found a way to filter out Mr. Byrd's fictitious submissions. Second, the evidence indicated that only a small amount of fictitious leads were submitted after the suit commenced; rather, most fictitious leads were submitted before the

lawsuit. Third, Mostchoice's email solicitation of agents (whose information was obtained from Mr. Byrd's fictitious submissions) is simply competitive conduct, and there is no evidence that it led to any agents terminating their relationships with NetQuote. Mostchoice had many of these agents on its email lists already, and previously had had contacts with many of these agents. Also, the sales calls soliciting NetQuote's agents were not terribly egregious conduct. Fourth, NetQuote's litigation conduct was professional. Although Mr. Levy was uncooperative in settling this lawsuit, he was within his rights to seek a trial. Fifth, actual damages, which then provided the base for computing punitive damages in an equal amount, were generous. Although there was sufficient evidence to support compensatory damages and a remittitur is not warranted, the jury was generous with the evidence presented. Thus, a one-to-one award of compensatory to punitive damages is sufficient. Lastly, to the extent Mostchoice has acted inappropriately, a punitive sanction of $1,624,168.00 is a significant award which is adequately sufficient to punish Mostchoice for its actions.

Therefore, the Court will decline to exercise its discretion to increase punitive damages, and punitive damages are awarded at a one-to-one ratio with compensatory damages.


## V. Mostchoice's Supplemental Motion for a New Trial Based on False Testimony

While the other motions addressed in this order were pending, Mostchoice submitted a supplemental motion for a new trial based on its discovery of new evidence allegedly disproving some of the testimony that NetQuote presented at trial. (See Doc. 333.) Mostchoice argues that the following three pieces of testimony are disproved by the newly discovered evidence: (1) NetQuote President Paul Ford's testimony that NetQuote was selling leads to 18,000 State Farm agents in 2006; (2) NetQuote employee Aaron Broome's testimony that NetQuote was selling leads to more than 20,000 individual agents at that time; and (3) NetQuote CEO Greg Coccari's testimony that NetQuote offered only three-and-a-half cent incentives to people submitting leads through the mypoints.com website.

"A motion for a new trial based on newly discovered evidence is generally disfavored and should be granted only with great caution." United States v. Redcorn, 528 F.3d 727, 743-44 (10th Cir. 2008) (quoting United States v. Gwathney, 465 F.3d 1133, 1143 (10th Cir. 2006)). A party moving for a new trial based on the discovery of new testimony carries a very heavy burden.

> In order to obtain a new trial based on newly discovered evidence, the moving party must show that (1) the evidence was newly discovered since the trial; (2) he was diligent in discovering the evidence; (3) the newly discovered evidence is not merely cumulative or impeaching; (4) the newly discovered evidence would have been material; and (5) a new trial with this newly discovered evidence would probably produce a different result.

Wolfgang v. Mid-America Motorsports, Inc., 111 F.3d 1515, 1529-30 (10th Cir.

1997) (citing <u>Joseph v. Terminix Int'l Corp.</u>, 17 F.3d 1282, 1285 (10th Cir. 1994)).


A.  <u>New Evidence Regarding Agents Purchasing NetQuote Leads</u>

In preparation for a different case between these parties, Mostchoice

discovered a document indicating that NetQuote sold leads to 15,807 unique

State Farm agents in 2006.  (Doc. 333, Ex. 2.)  Mostchoice argues that this

evidence contradicts the trial testimony of two NetQuote witnesses, Paul Ford

and Aaron Broome.

At trial, Paul Ford testified that he believed State Farm had about 18,000

agents in the fall of 2006.  (Tr. at 75-76.)  The following colloquy ensued:

> Q. And does NetQuote count those 18,000 agents as a single customer, as
> a single agency?
> A. Well, that would represent one customer. And if they were distributing
> leads to most of those agents, then it would represent up to 18,000
> individual agents.
> Q. And so just one customer accounted for 18,000 agents in the fall of
> 2006?
> A. Yes.

(<u>Id.</u>)  On cross examination, Mr. Ford was asked about a NetQuote document

entitled "Agents Buying Leads."  (<u>See</u> Tr. at 181-82.)  This document indicated

that NetQuote was selling leads to approximately 7,000 agents in the fall of 2006.

(Ex. D-20.)  On its face, this document appeared to contradict Mr. Ford's earlier

testimony that NetQuote was selling leads to as many as 18,000 agents affiliated

with a single account.  Mr. Ford explained that this document was wrongly

labeled, and that "agents" in this document really meant "agencies" — some of which could include many individual agents. (Tr. at 181-82.) Thus, Mr. Ford explained, NetQuote had far more individual agents than the "Agents Buying Leads" document indicated.

Aaron Broome did not testify specifically about the State Farm account; rather, Mr. Broome testified more generally that, in 2006, NetQuote "had over 20,000 agents buying leads from NetQuote." (Tr. at 269.)

Mostchoice argues that the document it discovered contradicts both of these witnesses' testimony. To the contrary, this document actually corroborates Aaron Broome's testimony. Mr. Broome testified that NetQuote sold leads to over 20,000 agents in 2006. According to the document submitted by Mostchoice, NetQuote sold leads to 15,807 State Farm agents in 2006. Even if all the other accounts listed in the "Agents Buying Leads" document represented individual agents, that would still be sufficient to add up to over 20,000 agents by the end of 2006 (15,807 + 7,256 = 23,063). Thus, this newly discovered document does not establish the falsity of Mr. Broome's testimony.[15]

_____

[15] Mr. Broome's testimony may have been somewhat vague and misleading, in that it appears that NetQuote's leads were distributed to no more than 9,000 individual State Farm agents in any given month in 2006. If all the other "agents" in the "Agents Buying Leads" document represented single agent accounts, then it is possible that NetQuote did not in fact sell leads to "over 20,000 agents" in any given month. However, Mr. Broome's testimony that NetQuote distributed its leads to over 20,000 individual in 2006 as a whole appears correct in light of the evidence.

This document may, however, slightly contradict Mr. Ford's testimony that State Farm accounted for 18,000 individual agents. However, the fact that newly discovered evidence might impeach a witness is insufficient to warrant a new trial. See Wolfgang, 111 F.3d at 1529-30 (noting that, to warrant a new trial, newly discovered evidence cannot be "merely cumulative or impeaching"); see also Redcorn, 528 F.3d at 743 (stating that a defendant seeking a new trial based on newly discovered evidence that was not wrongfully withheld must show, inter alia, that "the new evidence is not merely impeaching"); but cf. Baruch v. Beech Aircraft Corp., 172 F.2d 445, 445-46 (10th Cir. 1949) ("It also seems to be the general rule that in the absence of unusual or extraordinary circumstances, the trial court will not grant a new trial on newly discovered evidence, which is intended to or has the effect of discrediting or impeaching the testimony of the movant's witnesses in the original trial."). Thus, Mostchoice's focus on the fact that this evidence may contradict Mr. Ford's testimony is misplaced. The critical inquiry is, instead, whether this new evidence is material and whether it would likely have affected the outcome of the trial. Viewed from this more appropriate perspective, Mostchoice's arguments fail.

Mostchoice argues that this evidence was material because it would have corroborated Mr. Levy's claim that he was motivated to hire Mr. Byrd to submit false leads in order to disprove NetQuote's claim that it was selling leads to more than 20,000 agents, and that he did not intend to interfere with NetQuote's agent

base.  (See Doc. 333 at 4.)  The question of Mr. Levy's motivations is significant because NetQuote had to prove that Mostchoice intended to interfere with NetQuote's customer relations in order to prevail on its claim of tortious interference.  See Telluride Real Estate Co. v. Penthouse Affiliates, LLC, 996 P.2d 151, 155 (Colo. App. 1999) (stating that the elements of a tortious interference claim under Colorado law require that "the defendant intentionally induced the other party to the contract not to perform the contract with the plaintiff").  However, this document would not have materially assisted Mostchoice in its efforts to establish the innocence of Mr. Levy's motivations.  Cf. Wolfgang, 111 F.3d at 1529-30 (noting that newly discovered evidence will only warrant a new trial if that "evidence would have been material").  At most, this document might support Mostchoice's claim that NetQuote did not actually have the 20,000 agents they claimed to have in their advertisements.   However, the jury's acceptance of Mr. Levy's proffered justification for submitting these false leads did not critically depend on whether NetQuote in fact had 20,000 agents buying leads in 2006.  Thus, even if this document would help Mostchoice show that NetQuote did not have the 20,000 agents they claimed to have, that fact would not have materially advanced Mostchoice's argument that Mr. Levy's motivations in hiring Mr. Byrd were wholly innocent.  The jury was still free to infer from Mr. Levy's efforts in contacting and soliciting the agents he discovered through Mr. Byrd's false submissions that Mr. Levy had intended to solicit those

agents all along.  Further, Mostchoice's counsel admitted at trial that the parties' debate over whether the "Agents Buying Leads" document referred to "agents" or "agencies" and, therefore, whether NetQuote in fact had the 20,000 agents they claimed to have, was "related to the other pending case against NetQuote for the false advertising claims that have been made by Mostchoice."  (Tr. at 165.)  By Mostchoice's own admission, it appears that this entire debate is only material to that other dispute.

Finally, the newly discovered document shows that, in the fall of 2006, NetQuote sold leads to around 13,000 unique State Farm agents.[16]  The "Agents Buying Leads" document indicated that NetQuote was selling leads to over 7,000 agents in the fall of 2006.  Thus, even in light of the reduced figure indicated by this new document, the evidence appears to support NetQuote's claim that it had more than 20,000 agents buying leads in the fall of 2006.  Further, although this issue was not developed at trial (likely because the issue is tangential and did not warrant further development), it appears that NetQuote had other accounts listed

---

[16] According to this document, NetQuote's leads were distributed to fewer than 9,000 State Farm agents in any given month in 2006.  However, State Farm agents apparently came and went rather quickly.  In the months of July, August, and September, NetQuote's leads were distributed to 12,350 unique State Farm agents.  In October, November, and December, NetQuote's leads were distributed to 13,267 unique State Farm agents.  The parties agree that the relevant time-frame here is the fall of 2006, when Mr. Levy hired Mr. Byrd to begin submitting false leads to NetQuote.  For purposes of this analysis, 13,000 is a reasonable estimate of the State Farm agents NetQuote sold leads to in the fall of 2006.

as single "agents" in the "Agents Buying Leads" document that actually represented numerous individual agents. In response to questions asked during his cross examination, Mr. Ford explained that "[w]e sell insurance to companies like American [F]amily and we would call that one account, but they could have 25 hundred agencies, and more than 25 hundred agents receiving the leads." (Tr. at 181.) In other words, Mr. Ford indicated that there were other multi-agent accounts improperly listed as single agents in the "Agents Buying Leads" document. Thus, although the Court expresses no opinion regarding whether NetQuote in fact had more than 20,000 agents in 2006, the Court concludes that Mostchoice has failed to demonstrate that this new document could, on its own, establish that fact.

Finally, Mostchoice has failed to establish that "a new trial with this newly discovered evidence would probably produce a different result." Wolfgang, 111 F.3d at 1529. This document was only tangentially related to an important question in this case—whether Mr. Levy intended to interfere with Mostchoice's customer relationships. The jury had ample opportunity to consider the credibility of Mostchoice's argument that Mr. Levy was motivated to submit all these false leads in order to disprove NetQuote's claim that it had 20,000 agents. The jury chose not to believe that evidence. This document is not compelling enough on that issue for the Court to conclude that a new trial with this evidence "would probably produce a different result." Id. Mostchoice has failed to meet its heavy

burden on this issue.

B.  New Evidence Regarding the MyPoints Offers

Mostchoice submits additional evidence allegedly demonstrating that
NetQuote CEO Greg Coccari testified falsely.  (Doc. 333 at 5-6.)  Mr. Coccari
testified that the leads NetQuote received from MyPoints were high-quality leads
in part because the incentives offered through MyPoints were not sufficient to
induce people who were not actually interested in purchasing insurance to submit
applications.  Mostchoice attempts to counter this testimony with evidence that
was not submitted at trial.  First, Mostchoice points to a MyPoints offer of 5,000
points (the rough equivalent of $35) to anyone who uses NetQuote to change
their auto insurance policy.  (Doc. 333 Ex. 4.)  Second, in its reply brief,
Mostchoice points to a MyPoints offer of 1,000 points to anyone who does not
save money on their car insurance after submitting an application to NetQuote.
(See Doc. 336 Ex. 1.)  Mostchoice argues that these exhibits demonstrate that
Mr. Coccari lied on the stand and that the leads NetQuote received through
MyPoints were not, in fact, high-quality leads.

Mostchoice has failed to establish that either of these pieces of evidence
were "newly discovered since the trial," or that Mostchoice "was diligent in
discovering the evidence."  Wolfgang, 111 F.3d at 1529.  This evidence cannot,
therefore, support a motion for a new trial based on the discovery of new

evidence. By Mostchoice's own admission, the 5,000 point offer was available online as early as October 8, 2008, the third day of trial. (<u>See</u> Doc. 333 at 6.) Mostchoice is not similarly candid about when it discovered the 1,000 point offer, but its failure to assert, let alone provide evidence establishing, that this offer was new is fatal to its claim. Further, as the MyPoints offers are all made online, Mostchoice seems to find itself in a Catch-22. On the one hand, any offer made after the close of trial would be irrelevant, because the trial was not concerned with the post-trial quality of NetQuote leads. On the other hand, it would be very difficult for Mostchoice to establish that it diligently searched in vain for evidence that had been available online before trial.

Even if Mostchoice was able to overcome the hurdles described above, this evidence would not have materially assisted their defense, and was certainly not likely to change the outcome of the trial. Mostchoice has failed to meet its heavy burden on this issue.


**VI. Conclusion**

For the foregoing reasons, Mostchoice's request for judgment as a matter of law is DENIED, Mostchoice's request for a new trial or remittitur is DENIED, NetQuote's request for prejudgment interest is GRANTED in part and DENIED in part, NetQuote's request for the Court to exercise its discretion to increase punitive damages is DENIED, and Mostchoice's supplemental request for a new

trial based on false testimony is DENIED.

Accordingly, the Court ORDERS that:

(1) Defendants Brandon Byrd and Mostchoice shall jointly and severally pay to Plaintiff NetQuote: (a) actual damages in the amount of $1,600,000.00; (b) prejudgment interest in the amount of $24,168.00; (c) post-judgment interest on the sum of $1,624,168.00 at the applicable federal statutory post-judgment interest rate of .59% from the date judgment is entered;

(2) Defendant Mostchoice shall pay to Plaintiff NetQuote: (a) punitive damages in the amount of $1,624,168.00; (b) post-judgment interest on the sum of $1,624,168.00 at the applicable federal statutory post-judgment interest rate of .59% from the date judgment is entered; and,

(3) Defendant Brandon Byrd shall pay to Plaintiff NetQuote: (a) punitive damages in the amount of $10,000.00; (b) post-judgment interest on the sum of $10,000 at the applicable federal statutory post-judgment interest rate of .59% from the date judgment is entered.

It is hereby ORDERED that judgment shall be entered accordingly in favor of Plaintiff NetQuote and against Defendants Brandon Byrd and Mostchoice.

DATED AND SIGNED this  1st  day of April, 2009.

BY THE COURT:

*s/ David M. Ebel*

_____
David M. Ebel
U. S. Circuit Court Judge